UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | | |
|---|---|---|
| PREPARED FOOD PHOTOS, INC., | ) | **Volume 1** |
| | ) | |
| Plaintiff, | ) | Case No. 22-CV-642 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| SHARIF JABER and NOFAL, LLC doing | ) | October 28, 2024 |
| business as FOOD TOWN MART, | ) | 8:33 a.m. |
| | ) | |
| Defendants. | ) | |

---

TRANSCRIPT OF JURY TRIAL (EXCERPT)
BEFORE THE HONORABLE J. P. STADTMUELLER
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:              Copycat Legal, PLLC
                               By:  MR. DANIEL DeSOUZA
                               3111 N. University Dr.
                               Suite 301
                               Coral Springs, FL  33065
                               Ph:  877-437-6228
                               dan@copycatlegal.com


For the Defendants:            Terschan, Steinle, Hodan &
(Present)                      Ganzer, Ltd.
                               By:  MR. W. TIMOTHY STEINLE
                               309 N. Water Street, Ste. 215
                               Milwaukee, WI  53202
                               Ph:  414-258-1010
                               timothy.steinle@tshglaw.com


ALSO PRESENT:                  MS. REBECCA JONES,
                               Intellectual Property Director,
                               Prepared Food Photos, Inc.


U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

```
1                          I N D E X

2    VOIR DIRE/JURY SELECTION:                       PAGE:

3       by the Court                                 11

4    PRELIMINARY JURY INSTRUCTIONS:                  PAGE:

5       by the Court                                 33

6    OPENING STATEMENTS:                             PAGE:

7       by Mr. DeSouza                               48
        by Mr. Steinle                               53
8

9                          WITNESSES

10   ALL WITNESSES:                                  PAGE:

11   For the Plaintiff:

12   REBECCA JONES:
        Direct Examination by Mr. DeSouza            59
13      Cross-Examination by Mr. Steinle             104
        Redirect Examination by Mr. DeSouza          117
14
     AMJAD SHARIF HAMED:
15      Direct Examination by Mr. DeSouza            122

16   SHARIF JABER:
        Direct Examination by Mr. DeSouza            144
17
     For the Defendants:
18
     SHARIF JABER:
19      Direct Examination by Mr. Steinle            187
        Cross-Examination by Mr. DeSouza             197
20      Redirect Examination by Mr. Steinle          203

21   AMJAD SHARIF HAMED:
        Direct Examination by Mr. Steinle            204
22      Cross-Examination by Mr. DeSouza             213
        Redirect Examination by Mr. Steinle          225
23

24

25
```

|   | **I N D E X (Cont'd.)** | |
|---|---|---|
|   | **EXHIBITS** | |
| RECEIVED: | | PAGE: |
| For the Plaintiff: | | |
| 1 | | 71 |
| 2 | | 77 |
| 5 | | 81 |
| 6 | | 84 |
| 10 | | 85 |
| 22 | | 63 |
| 23 | | 65 |
| 24 | | 75 |
| 27 | | 149 |

TRANSCRIPT OF PROCEEDINGS

THE CLERK:  The Court calls Prepared Food Photos,
Incorporated, versus Sharif Jaber and Nofal, LLC, doing
business as Food Town Mart, Case No. 22-CV-642, for a jury
trial.  May I have the appearances beginning with the
plaintiff.

MR. DeSOUZA:  Good morning, your Honor.  Daniel
DeSouza for the plaintiff.  And I have sitting with me at the
table Rebecca Jones, who is my client's intellectual property
director.

MR. STEINLE:  Good morning, your Honor.  I'm Timothy
Steinle from the law firm of Terschan, Steinle, Hodan and
Ganzer.  I represent the defendant Sharif Jaber and Nofal, LLC
doing business as Food Town.  Thank you very much.

THE COURT:  Thank you.  Good morning to counsel.  Good
morning to you, Mr. Jaber and Ms. Jones.

Are there any matters counsel wish to raise before the jury
panel arrives?

MR. DeSOUZA:  None from the plaintiff, your Honor.

THE COURT:  Thank you.

MR. STEINLE:  Nothing for the defendants, your Honor.
Thank you.

THE COURT:  Do counsel have all of their witnesses
here today?

MR. STEINLE:  Your Honor, I do have my witnesses

present in court today.  All -- the plaintiff -- I mean, excuse
me, the defendant and the two identified witnesses Nofal Hamed
and Amjad Hamed are here.  They will be present throughout the
trial so that we can proceed in an orderly fashion.

THE COURT:  All right.

Mr. DeSouza, are your witnesses here?

MR. DeSOUZA:  Yes, your Honor.

THE COURT:  All right.  The two witnesses behind the
rail, if you'd move across the aisle because part of the jury
panel will be seated in those rows behind the rail.  Thank you.

As the Court indicated at the final pretrial conference,
when the jurors come in the courtroom this morning, they will
have already be randomized, meaning they will appear in a
random order.  We will proceed with the voir dire of 14 jurors
seated in the jury box.  If at the conclusion of the voir dire
of those 14 we need to excuse one or more of them for cause, I
will have other jurors seated in the back of the courtroom step
forward and take those seats.

If at the conclusion of the Court's voir dire counsel
believe they have other questions, either of the panel as a
whole or individual jurors, we will undertake that follow-up
voir dire in the jury room so as to not contaminate the panel
as a whole.

As the Court explained at the final pretrial, each side is
allotted three peremptory strikes.  The way those are

1    exercised, our court security officer will circulate the jury

2    list first to plaintiff's counsel, then to defendant's counsel.

3    Each side will exercise their first strike, then the second and

4    then the third.  The plaintiff has the first strike, the

5    defense has the last strike.  We'll be picking a jury of seven.

6    And if all seven are present at the end of the trial, all seven

7    will deliberate.  The jury's verdict in federal court must be

8    unanimous.  There are no dissenting jurors permitted.

08:37    9        Any other matters before the panel arrives?

08:37    10            MR. DeSOUZA:  No, your Honor.

08:38    11       Just for housekeeping purposes, I assume that witnesses who

12   are not parties will be excluded once the --

08:38    13            THE COURT:  Well, if you make an appropriate motion,

14   we'll entertain it.

08:38    15            MR. DeSOUZA:  I -- I do at this point, your Honor.  I

16   think before the jury even gets here, I don't want nonparty

17   witnesses to be hearing the testimony of others until they've

18   testified, so I do move the Court to exclude Mr. Hamed -- I

19   think both -- both Mr. Hameds from the trial until they've

20   testified.

08:38    21            THE COURT:  All right.  Ms. Vraa, you can escort them

22   to the witness waiting room, which is 426 across the hall.

08:38    23       The Court will stand in recess pending the arrival of the

24   panel, which should be in the next five to ten minutes.  The

25   Court stands in recess.

08:39 1           (A short recess was taken.)

08:55 2           COURT SECURITY OFFICER:  All rise for the jury.

08:55 3           (The jury panel entered the courtroom.)

08:56 4           COURT SECURITY OFFICER:  Okay.  Please be seated.

08:56 5           THE COURT:  Good morning, members of the jury panel.

6 My name is JP Stadtmueller.  I am the US district judge before

7 whom the case for which you have been summoned this morning is

8 going to be tried.  I've served as an Article III judge here in

9 the Eastern District of Wisconsin for more than 37 and a half

10 years.  I've tried over 250 cases, and so you're before a very

11 experienced judge.  I was appointed by President Reagan on June

12 1st of 1987.  I want to welcome each of you to our courthouse

13 this morning.

08:57 14    I appreciate that for many of you, this is an entirely new

15 and different experience.  But you should also understand that

16 the jury trial as we know it was first conceived more than 750

17 years ago when the barons of England forced King John to grant

18 them that right.  And shortly after our constitution was

19 adopted, soon to be 250 years ago, amendments were added to

20 ensure the right to a jury trial in both civil and criminal

21 cases.

08:57 22    I also want to take this opportunity to interview --

23 introduce to you the balance of the court staff.  Our court

24 reporter this morning is Ms. Jennifer Stake.  My clerk is Ms.

25 Caitlin Willenbrink.  The Court security officer in charge of

1    the jury is Ms. Lynda Vraa.  And I'm going to ask that each of

2    you now stand so that Ms. Willenbrink can administer the oath

3    to you as prospective jurors.

08:58    4        THE CLERK:  Please raise your right hands.

08:58    5        (The jury panel is sworn.)

08:58    6        THE JURORS:  I do.

08:58    7        THE CLERK:  Thank you.

08:58    8        THE COURT:  Members of the jury panel, the name of the

9    case for which you have been summoned this morning is entitled

10    Prepared Foods Photos, plaintiff, versus Sharif Jaber and

11    Nofal, LLC doing business as Food Town Mart, defendants, Case

12    No. 22-CV-642.

08:59    13        For your general information, the party who initiates a

14    lawsuit is referred to as the plaintiff.  The party or parties

15    against whom a lawsuit is initiated are referred to either as a

16    defendant singular or in this case defendants plural.  This is

17    a copyright infringement case.  Plaintiff Prepared Food Photos

18    operates a subscription service through which users are able to

19    access copyrighted stock photos of food items.  As relevant to

20    this particular case, Prepared Food Photos owns a valid

21    copyright on a stock photograph depicting pork chops.

09:00    22        The defendants in this case are an individual Sharif Jaber

23    and a business known as Nofal, LLC, which Sharif is the owner,

24    sole member, and registered agent of Nofal, LLC.  The limited

25    liability corporation owns and operates a food store doing

1    business under the trade name Food Town Mart.  So when I refer

2    to the business defendant as Nofal, LLC doing business as Food

3    Town Mart, I refer to Mr. Jaber and Nofal, LLC doing business

4    as Food Town Mart together as the defendants.

09:01    5    Prepared Food Photos copyrighted a photograph of pork chops

6    which was posted on a Facebook business page entitled Villard

7    Food Town in September of 2020.  Prepared Food Photos alleges

8    that the photo was posted there without its permission

9    infringing its copyright to the photo.  It further contends

10    that this Facebook page was affiliated with and under the

11    control of Nofal, LLC doing business as Food Town Mart and/or

12    Sharif Jaber and, therefore, that one or both defendants can be

13    held liable for the alleged infringements.

09:02    14    The defendants dispute that they were affiliated with or

15    had control over the Villard Food Town Facebook page where the

16    subject photo was posted.  They also suggest that use of any of

17    the plaintiff's photo was a fair use.

09:02    18    There are disputed issues, therefore, which have been

19    created in this case which the jury selected to hear the

20    evidence in the case must decide; first, whether the defendant

21    Nofal, LLC doing business as Food Town Mart copied protected

22    expressions in the plaintiff Prepared Foods Photo copyrighted

23    work thereby infringing the plaintiff's copyright;

09:03    24    Second, whether the defendant Sharif Jaber is vicariously

25    liable for the infringing acts, if any, of Nofal, LLC doing

business as Food Town Mart, including whether Sharif Jaber had the right and ability to control the alleged infringement of Nofal, LLC doing business Food Town Mart but failed to do so and whether Sharif Jaber profited from the alleged infringement of Nofal, LLC doing business as Food Town Mart;

Next, whether the defendants' alleged copying of Prepared Food Photos protected expression was fair use; and, finally, if the defendants were to be found liable by the jury, what damages, if any, is Prepared Food Photos entitled to receive for the alleged copyright infringement.

To enable the attorneys to select a jury consisting of seven individuals to hear the evidence in this case, it will be necessary for the Court to put a number of questions to the panel, commonly referred to as the voir dire examination. The words "voir dire" are a French derivation and are translated to mean "to speak the truth" as individually each of you respond to the various questions which are put to you. These questions are not designed to embarrass you or to satisfy the curiosity of the Court or the lawyers for the parties, but rather to disclose in a candid, open manner any bias or prejudice any one of you might hold, either toward the parties or the underlying facts in this case.

Stated another way, this procedure will serve to bring out anything in your respective backgrounds or experience that might somehow affect your ability to serve as a fair and

1    impartial juror and at the same time enables the Court to

2    determine whether any potential juror ought be excused for

3    cause.  The procedure also enables the lawyers for the parties

4    to exercise their individual judgment with respect to what is

5    known as peremptory challenges, that is, challenges to

6    individual jurors for which no reason need be given by counsel.

09:06    7    Before proceeding with my questions touching on your

8    qualifications to serve as a juror in this case, I'm going to

9    ask that the first 14 jurors who are seated in the jury box to

10    stand and provide a little background information about

11    themself.  You will note that a cue card with the identified

12    areas of inquiry has been placed on the screen across from the

13    jury box.  You may use this cue card as a frame of reference to

14    provide the information required, which includes your name;

15    your age; your address -- but we do not want street address,

16    just the community, village, or county in which you reside --

17    your marital status; whether you have any children; the extent

18    of your formal education; your occupation and employer now or,

19    if retired, before retirement; and finally, if married, your

20    spouse's occupation or, if retired, before he or she retired.

09:08    21    When providing this information, I would ask that each of

22    you speak slowly since the attorneys for the parties may wish

23    to make some notes concerning your responses.

09:08    24    (Whereupon the voir dire/jury selection was

25    conducted.)

09:08   1          (Whereupon the jury selection/voir dire was

        2          concluded.)

09:58   3          THE COURT:  While counsel exercise their peremptory

        4   challenges, I'm going to provide the jury panel with some

        5   preliminary introductory instructions to guide the jury in its

        6   participation in the trial of this case.  It will be the jury's

        7   duty to decide from the evidence to be presented what the facts

        8   in this case are.  The jury and the jury alone constitute the

        9   judges of the facts.

09:59   10         The jury is to determine the facts from the evidence to be

        11  presented as well as the exhibits that may be introduced during

        12  the trial.  It will be for the jury to determine the inferences

        13  which it feels may be properly drawn from such evidence.

09:59   14         Nothing the Court may say or do during the course of this

        15  trial is intended to indicate nor should be taken by the jury

        16  as indicating what the jury's ultimate verdict should be.  No

        17  statement, ruling, remark, or comment which the Court may make

        18  during the course of this trial is intended to indicate either

        19  the Court's opinion as to how you should decide the case or to

        20  influence the jury in any way in its determination of the

        21  facts.

10:00   22         During the course of the trial, the Court may occasionally

        23  ask questions of a witness in order to bring out facts not

        24  fully covered in the testimony.  Please do not assume that the

        25  Court holds any opinion on the matters to which the Court's

10:00

10:01

10:01

10:02

1   questions may have related.  Remember that the jury and the

2   jury alone are at liberty to disregard all comments of the

3   Court in arriving at its own findings as to the facts.

4       The Court may also find it necessary to admonish the

5   lawyers.  And if the Court should do so, you should not show

6   any prejudice toward a lawyer or his or her client because the

7   Court has found it necessary to issue such an admonishment.

8       From time to time during the trial, it may become necessary

9   for the Court to discuss matters with the attorneys outside the

10  presence of the jury, either by holding a conference at the

11  bench when you are present in the courtroom or by calling a

12  recess.  Please understand that while you are waiting, we are

13  working.  The purpose of these conferences is not to keep

14  relevant information from the jury, but rather to decide how

15  certain evidence is to be treated under the rules of evidence

16  so as to avoid confusion and error.  We will, of course, do

17  what we can to keep the number and length of these conferences

18  to a minimum.

19      The Court may not always grant an attorney's request for a

20  conference.  Do not consider the Court's either granting or

21  denying a request for a conference as any indication of the

22  Court's opinion of the case or what the jury's verdict should

23  be.

24      The evidence from which the jury will find the facts in

25  this case will consist of the testimony of witnesses,

34

1   documents, and other things received into the record as

2   exhibits and any facts the lawyers might agree or stipulate to

3   or that the Court might instruct you to find as a matter of

4   law.

5   Certain things do not constitute evidence in the case and

6   the jury must not consider them.  Such matters include:

7   Statements, arguments, and questions by the lawyers do not

8   constitute evidence in the case.  Similarly, objections to

9   questions do not constitute evidence.

10  A lawyer has an obligation to his or her respective client

11  to make an objection when they believe evidence being offered

12  is improper under the rules of evidence.  The jury should not

13  be influenced by an objection or by the Court's ruling on any

14  objection.  If the objection is sustained, the jury should

15  ignore the question.  On the other hand, if the objection is

16  overruled, the jury should treat the answer as it would any

17  other.  Similarly, if the jury is instructed that some item of

18  evidence is received for a limited purpose, the jury must

19  follow the Court's instruction in that regard.

20  Testimony that the Court has excluded or instructed the

21  jury to disregard does not constitute evidence in the case and

22  must not be considered by the jury.  Anything the jury may have

23  seen or heard outside the courtroom does not constitute

24  evidence in the case and must be disregarded, for the jury is

25  to decide this case solely from the evidence to be presented

here in the courtroom.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence, on the other hand, is proof of facts which you, the jury, may infer or conclude that other facts exist. I will provide the jury with further instructions on these as well as other matters at the end of the case, but I want the jury to have it in mind that it may consider both kinds of evidence.

It will be up to the jury to decide which witnesses to believe, which witnesses not to believe, and just how much of any witnesses' testimony to either accept or reject. In considering the weight and value of the testimony of any witness, the jury may take into account each of the following:

First, the witness' ability to see or hear or know the things about which the witness is testifying;

Second, the appearance, attitude, and behavior of the witness;

Third, the quality of the witness' memory;

Fourth, whether the witness has an interest in the outcome of the case, or any motive, bias, or prejudice;

Fifth, the inclination of the witness to speak truthfully or not, along with the probability or improbability of a witness' statements; and

Sixth, whether the witness' testimony was contradicted by

anything the witness said previously or by the testimony of other witnesses or other evidence received during the trial.

Thus, the jury may give the testimony of any witness such weight and value as the jury believes the testimony is entitled to receive.

As the Court earlier explained, this is a civil case, and the party who wants you to find in its favor has the burden of proof. This burden of proof is to satisfy you by the greater weight of the credible evidence to a reasonable certainty that you should find for that party. When the Court says a particular party must prove something by the greater weight of the credible evidence or when I use the expression "if you find" or "if you decide," this is what the Court means: The evidence in favor of one finding has more convincing power than the evidence opposed to it.

"Credible evidence" means evidence you believe in light of reason and common sense. "Reasonable certainty" means that you are persuaded based upon a rational consideration of the evidence. The rule does not, of course, require proof to an absolute certainty since proof to an absolute certainty is seldom, if ever, possible in any case. However, a guess is not enough to meet the burden of proof.

Those of you who have previously served as a member of a jury in a criminal case recall having heard of the standard proof beyond a reasonable doubt. As the Court earlier

explained, that requirement does not apply to a civil case such as this one. Therefore, you should put that standard out of your mind.

Now I have a few words for the jury regarding its conduct. First, I do not want any member of the jury to discuss this case until the end of the case when you retire to the jury room to begin your deliberation and decide upon your verdict.

Second, I do not want any member of the jury either personally or electronically to communicate with anyone else about this case or anyone who has anything to do with it until the trial has been completed and you have been discharged as a member of the jury. "Anyone else," of course, includes members of your family, friends, and colleagues in the workplace. You may simply tell them that you have been selected as a member of a jury in a civil case in Judge Stadtmueller's court and that Judge Stadtmueller has specifically instructed me that I'm not to discuss the case with anyone until after I have been discharged as a member of the jury.

At the same time, the Court well knows and appreciates the fact that many of you as jurors take advantage of one or more of the wonderful communication technologies available to each of us. However, during this trial, you may not use these devices, including cell phones, Blackberries, iPhones, or iPads to communicate with anyone about this case whether in the form of an e-mail, text, or voice message or by way of an internet

38

blog or chat room or by way of one or more of the social

networking websites such as Facebook, Instagram, LinkedIn,

X/Twitter, Myspace, Snapchat, or YouTube.

Third, I do not want any member of the jury to approach you

to discuss this case or anyone who has anything to do with it.

Should anyone approach you to discuss this case, please report

it to Ms. Vraa immediately; and she, in turn, will report it to

the Court.

Fourth, I do not want any member of the jury to read any

newspaper stories or articles or listen to any radio or

television report or blog that may relate to this case or

anyone who has anything to do with it.  Frankly, I do not

expect or anticipate any media attention to the case; but in

the abundance of caution, I always remind jurors that if you're

one of those who listens to the early morning radio news or

reads the morning paper to have someone else in your household

look at that material to ensure that there isn't anything about

a case in front of Judge Stadtmueller such that even through

inadvertence you may be exposed inappropriately to those sorts

of materials.

Fifth, I do not want any member of the jury to conduct any

independent investigation of the case or the facts associated

with the case for, as a jury, each of you is called upon to

decide this case solely from the evidence presented here in the

courtroom and from no other source.  That means until such time

1    as you are discharged as a member of the jury, you may not

2    conduct any independent research about this case or anyone who

3    has anything to do with it.

10:12    4    In other words, you may not consult with any form of

5    internet reference material, including blogs, dictionaries, an

6    internet search, website or the like to obtain information

7    either about the parties in this case or the facts of this case

8    or anyone who has anything to do with it.

10:13    9    Each of these rules is intended to ensure that jurors

10    remain impartial throughout the trial.  Should any juror have

11    reason to believe that another juror has violated these rules,

12    it should be reported to Ms. Vraa or the Court immediately.

13    Should any juror not comply with these rules, it may well

14    result in the Court having to grant a new trial involving

15    additional time and significant expense to both the parties,

16    their lawyers, as well as the taxpayers.

10:13    17    Finally, the Court does not want any member of the jury to

18    form an opinion in this case until you've had the benefit of

19    all of the evidence together with the Court's instructions on

20    the applicable law.  The Court requires that each of you keep

21    an open mind until you begin your deliberations at the end of

22    the case.  Once the case has been formally submitted to you,

23    you are free to discuss it with your fellow jurors, but only in

24    the jury room.  It is extremely important that each of you keep

25    an open mind, not to decide any matter raised during the trial

1  until the entire case has been submitted to you pursuant to the
2  Court's instructions.

3  Should any member of the jury wish to take notes during the
4  trial, you will be free to do so.  On the other hand, you are
5  not required to take notes if you would prefer not to do so.
6  That is a matter that is left up to each individual juror.

7  Should you do or do not take notes, you should not be
8  influenced by the notes of other jurors, but rather rely upon
9  your own recollection of the evidence.  Should any member of
10  the jury wish to take notes, I would admonish you to be careful
11  not to get so involved in note-taking that you become
12  distracted from what is actually occurring during the witness'
13  testimony or the showing of exhibits.

14  Notes taken by any juror do not constitute evidence in the
15  case and must never take precedence over individual independent
16  recollection of jurors concerning the evidence received during
17  the trial.

18  Should members of the jury elect not to take notes, you
19  should rely on your independent recollection of the trial
20  proceedings and not find yourself unduly influenced by the
21  notes of jurors.  Notes are not entitled to any greater weight
22  than the memory or impression of each juror as to what the
23  evidence and testimony may have been.

24  Any notes taken by the jury during -- juror during this
25  case should not be disclosed to anyone other than your fellow

1    jurors and then only during your deliberations in the jury room

2    at the end of the case.

3    During the trial, your notebooks as well as other materials

4    that may be distributed to you must be left in the courtroom at

5    all times.  When you leave at the end of the day, your notes

6    will be secured and not read by anyone.  At the end of this

7    case, each of you will have to make his or her decisions based

8    upon what you recall the evidence and testimony to be.

9    Members of the jury will not have a transcript of the

10   various witnesses' testimony with which to consult during your

11   deliberations.  Furthermore, it is difficult and time consuming

12   for our court reporter to read back lengthy testimony.

13   Accordingly, it is of extreme importance that each of you give

14   this case, including the testimony and evidence received during

15   the trial, your utmost and undivided attention.

16   That concludes the Court's introductory instructions.  And

17   at this time, I'm going to have Ms. Willenbrink publish the

18   names of those jurors who have been selected.

19   As your name is called, please note where you are now

20   seated and at the conclusion of the publication of the names of

21   those jurors who are selected, I will excuse those jurors who

22   are seated in the back of the courtroom as well as those jurors

23   who have been excused by counsel.

24   Ms. Willenbrink.

25   THE CLERK:  Juror No. 1, ****** ****; Juror No. 5,

1    ***** ******; Juror No. 6, ***** *****; Juror No. 8, *****

2    *****; Juror No. 9, ****** *****; Juror No. 11, *********

3    ******; and Juror No. 14, ***** ***.

10:19    4    THE COURT:  All right.  If your name was called and

5    you're seated in the jury box, you can keep your seat.  If your

6    name was not called, you can take a seat in the back of the

7    courtroom.

10:19    8    (The jurors not selected enter the gallery.)

10:19    9    THE COURT:  All right.  For those jurors who are

10    remaining in the jury box, those of you who are seated in the

11    back row, if you'd take a seat in the front row.  And the --

12    once you've taken those seats, I will have Ms. Willenbrink

13    reread the names of those jurors who have been selected.  As

14    your name is called, please raise your hand.

10:20    15    THE CLERK:  Juror No. 1, ****** ****; Juror No. 5,

16    ***** ******; Juror No. 6, ***** *****; Juror No. 8, *****

17    *****; Juror No. 9, ****** *****; Juror No. 11, *********

18    ******; Juror No. 14, ***** ***.

10:21    19    THE COURT:  Thank you.

10:21    20    Now for those jurors selected, I'm going to ask that you

21    stand and Ms. Willenbrink will administer the oath to you.

10:21    22    THE CLERK:  Please raise your right hands.

10:21    23    (The jury is sworn.)

10:21    24    THE CLERK:  Thank you.

10:21    25    THE COURT:  You may be seated.

10:21

1    Members of the panel, that is, those of you who are seated

2 in the rows behind the rail, I now am going to excuse you

3 because our trial is the only case for which a jury was to be

4 selected today.  In excusing you, I well appreciate that it has

5 no doubt been with a bit of inconvenience that you were hailed

6 into a federal courtroom on a Monday morning.  But I suggest to

7 you that at the end of the day, it is an incredibly, incredibly

8 small price that each of us pay from time to time to fulfill

9 that most important of civic obligations, and that is to serve

10 as a member of a jury.

10:22

11    Even Judge Stadtmueller back in May was over in Milwaukee

12 County for three days on different jury panels.  I wasn't

13 selected, but it underscores a couple of important facts; and,

14 that is, no one is excused from the obligation to serve if you

15 are otherwise qualified and selected.  I didn't happen to be

16 selected.  But like you this morning, without each of you

17 present, we would not have had a sufficient number of potential

18 jurors from which ultimately to select a jury.

10:23

19    So with those thoughts, I'm now going to excuse you.

20 Perhaps on some future occasion, you may be summoned yet once

21 again to serve either in our federal or state courts.  Have a

22 wonderful week, and please do not forget to cast your vote next

23 Tuesday.

10:23

24    Members of the panel, that is, those of you seated in the

25 jury box, I'm going to take our morning recess at this time.

44

1    Ms. Vraa will familiarize you with the jury room.  You will

2    note that there's bottled water available.  There are restrooms

3    available.  There's coffee available, should any of you desire

4    to have coffee.

5        There are only two places that you should be when you're in

6    the building for the next two to three days, and that is either

7    here in the courtroom or in the jury room.  I, again,

8    appreciate for many of you this is perhaps the first time you

9    have ever been in this grand historic structure and there may

10   be an incentive to want to take the proverbial self-guided

11   tour.  I would suggest that you defer doing so until after the

12   case has been completed.

13       And the reason that I make that suggestion is to ensure

14   that even through inadvertence none of you come in contact with

15   either the parties, the lawyers, or the Court or its staff.

16   And should you meet any one of us, whether in the court or

17   elevator, please understand that it is not our intention to

18   avoid you or to shun you, but rather to ensure that there is no

19   verbal contact between one or more of you and anyone associated

20   with this case.

21       As you might appreciate, you or I engaging one another,

22   whether in court or in a stairwell, may be viewed by someone

23   else as an inappropriate contact, and we want to avoid that.

24   And to ensure that such is not the case, I would simply ask

25   that out of respect for our judicial process, you not engage in

1    those activities.

2        Once you are in the jury room, it's locked, so you are free

3    to leave your cell phones or your electronic devices, including

4    computers, in the wardrobe in the juror room.  They will not be

5    accessible by anyone.

6        When we get to deliberations, you are not permitted to have

7    a cell phone in the jury room during deliberations.  Ms. Vraa

8    will collect them.  She will monitor them.  In case any of you

9    receive a phone call that needs attention, she will get it to

10   you.  So if anyone is expecting any sort of contact that may be

11   of an emergency nature, simply let Ms. Vraa know; and she will

12   monitor your communications devices.

13       Finally, there's no smoking permitted in the building,

14   including the jury room.  So if there are any of you who do

15   find it necessary to smoke, I would simply ask that you do so

16   before you come into the courthouse in the morning or during

17   our lunch and recess or at the end of the day.

18       So with those thoughts, I will remind you once again:

19   Please do not discuss this case among yourselves during this

20   recess.  I want each of you to keep the open mind that you have

21   pledged to keep when you took your oath as a juror not to

22   decide any fact concerning this case until you've had the

23   benefit of all of the evidence and testimony to be offered

24   together with the Court's instructions on the applicable law.

25       When we reconvene, we'll move to the next phase of this

1    case in which counsel for the parties are afforded an

2    opportunity to address you in an opening statement.  That is an

3    opportunity to explain to you or provide an outline or a road

4    map, as it is often referred to, of what each side expects the

5    evidence to show.

10:28    6    Obviously opening statements and closing arguments do not

7    constitute evidence in the case, but what they are designed to

8    do is cause you to focus on what they believe the evidence has

9    shown.  And in an opening statement, it's particularly

10    beneficial to you as a jury because the evidence and the facts

11    to which that evidence may relate may not necessarily come

12    before you in the same chronological timeline order that those

13    facts may have been developed.  And so it's in your interest

14    that you have this overall framework within which to relate the

15    various bits and pieces of evidence as they are presented.  But

16    ultimately, it is the evidence which serves as the focal point

17    of your deliberations and fact-finding and return of a verdict.

10:29    18    So with those comments, I'm going to excuse you for 15

19    minutes.  When we resume at 10:45, we'll pick up with the

20    opening statements.

10:29    21    The Court stands in recess until 10:45.

10:29    22    COURT SECURITY OFFICER:  All rise.

10:29    23    (The jury left the courtroom.)

10:30    24    COURT SECURITY OFFICER:  The Court stands in recess.

25    You can be seated.

10:31  1        (A short recess was taken.)

10:46  2        COURT SECURITY OFFICER:  All rise.

10:46  3        (The jury entered the courtroom.)

10:46  4        (The court is called to order.)

10:47  5        THE COURT:  Members of the jury, Ms. Vraa has provided

6  you each with a copy of a notebook.  You'll note on the inside

7  of the top of the first page, just put your juror number.

8  Don't write on the cover or put your name anywhere in the book,

9  just your juror number.

10:47  10       And we're now ready to move to the next phase of the case

11  in which, as the Court explained during its preliminary

12  instructions, have an opportunity to outline for you what each

13  side expects the evidence in the case will show.  So at this

14  time, I'm going to call upon Mr. DeSouza, plaintiff's counsel,

15  to introduce you to the plaintiff's case.

10:47  16       Mr. DeSouza.

10:48  17       MR. DeSOUZA:  Yes, thank you, your Honor.

10:48  18       This is normally where I would say "ladies and gentlemen of

19  the jury," but it appears we're gentlemen heavy today.  As the

20  judge introduced this case at the beginning, this is a

21  copyright case.  It involves a photograph, which my client

22  Prepared Food Photos says was used by the defendants without my

23  client's permission.  Under normal circumstances, this would be

24  a pretty straightforward case.  It's either my client's photo

25  or it's not.  The defendants either used it or they didn't.

10:48  1      But beyond the simple explanation as to what this case is

2      about, I'd like to tell you this case is actually about three

3      things.  The first thing it's about is a photograph.  The

4      second is a Facebook page.  The third, unfortunately, is a

5      person who has not told the truth for the last three years of

6      this case going on.  And that is why each of you is here today.

10:49  7      What about the photograph?  As we said, it was a photograph

8      of pork chops.  Who owns it?  You'll hear testimony that my

9      client owns the photograph.  Prepared Food Photos is a

10     subscription service stock food agency that specializes in food

11     photos that has been around dating back to the mid '90s at this

12     point.  They've built a library of some 18,000 professional

13     photographs all developed in house all by their in-house

14     photographers.  This is one of those 18,000 photographs.

10:49  15     They have a subscription service where people gain access

16     to the entire library of the photographs.  You have to pay them

17     a monthly fee for access to that, and you're free to download

18     and use their photographs.

10:49  19     You are not free, if you're not a subscriber, to just go to

20     their website or go online, find a photograph, and decide:  I'd

21     like to use that myself on my website or my social media page

22     or in this case the Facebook page.  What you will hear today is

23     there is a Facebook page, a Facebook page that back in 2021 was

24     named Villard Food Town.  And it has an address on it of 3217

25     West Villard Avenue, Milwaukee, Wisconsin.  It's got the

1    store's phone number.  It's got dozens if not hundreds of

2    photos of ad flyers from the store, products that are for sale

3    at the store, everything else that you would associate with

4    this grocery store.

5         One of those photos and one of those posts had my client's

6    photograph, and it was a post that said pork chops $2.99 a

7    pound, chicken wings something else.  They used three different

8    photos.  One of them is our client's photo.

9         The defendant in this lawsuit, when my client discovered

10   this going back, again, to 2021, hired a law firm, my law firm,

11   to send a letter and say:  You need to take that photo down,

12   and we -- let's try to settle this case so we can stay out of

13   court.

14        The defendant, before this case was ever filed, got that

15   letter.  Magically the photograph disappeared off the Facebook

16   page.  But when contact was made with the defendant, and that's

17   Mr. Jaber himself, he said:  Don't have a Facebook page, never

18   been our Facebook page, don't know what that is.  Yet somehow

19   the photo came down and yet somehow the Facebook page changed

20   from Villard Food Town to Food Town Mart, which is the name of

21   the store as it currently operates.

22        From there and continuing through this day, Mr. Jaber and

23   the defendant Nofal, LLC have had umpteen different

24   opportunities to tell the truth.  They have chosen otherwise.

25             MR. STEINLE:  Well, I'm going to object at this point,

1    Judge.  That's for the jury's determination.  He can state what
2    the facts, but that's conclusionary.

3              THE COURT:  Understood.  The jury has already been
4    instructed by the Court that what counsel say in opening
5    statements does not constitute evidence in the case.  So you're
6    free, Mr. Steinle, to suggest otherwise and put Mr. DeSouza to
7    his proof.  That's what we're here for.

8              MR. DeSOUZA:  At every -- at every opportunity in this
9    case, there's been an allegation, "This is your Facebook page."
10   Defendants have said, "No, it's not."  The allegation has been,
11   "You put this photograph on your Facebook page."  The
12   defendants have said, "No, we didn't."  We have asked them,
13   "Identify all of your social media pages and websites."  They
14   have said, "We have none."  We have said, "Here's a photo from
15   the Facebook page.  It shows the store itself.  Please tell me
16   this is your store."  "No, it's not.  Absolutely not."

17       Now, as the Court just instructed and as Mr. Steinle
18   objected, I'm not providing you evidence.  Each of you has
19   eyes.  Each of you will see this evidence, and you will make a
20   determination is this their store, was this their Facebook
21   page?  But you won't have to decide that yourself, and you
22   won't have to take my word for it because notwithstanding what
23   Mr. Jaber's testimony was throughout this lawsuit, you will
24   also hear from his son Amjad Hamed, who is a floor manager, or
25   at least he was about a year ago when he had his deposition

taken.  And Mr. Hamed will testify, as he's testified already:

"Yes, this is our store's Facebook page.  Yes, I put those photos up there.  Yes, I was responsible for the Facebook page.  Yes, the reason why we would say 2.99 a pound for pork chops is because either my father or the butcher at the store told me that's what the sale was.  And, yes, my father unequivocally knew about this Facebook page that I was running and prior to me, my other brother, Nofal Hamed," -- which is the same as the defendant the Nofal, LLC -- "he was running.  And I have worked at this store going back to 2020.  My brother worked at this store before me.  I'm living at my father's house, living with him," yet, the defendant in this case, defendants, Nofal, LLC and Mr. Jaber, and -- they have testified -- I don't know whether they will continue to do so -- have testified, "Not my store -- or not my Facebook page, no idea what these photos are, they're not my store."

Now, you will hear testimony about things that don't involve this photograph.  Other photos that are on the Facebook page, things like hookahs that are for sale or speakers that are for sale.  And you may wonder, as the Court instructed you earlier, you know, how -- how does all of this tie together?

But it will tie together, and the reason being is the items that are on this Facebook page that show the store, items that are for sale in the store, are all items that Mr. Jaber said, "Absolutely not, we've never sold those things.  That's not my

1    store.  We don't do these things."  And yet his son testified
2    completely contrary of, "Absolutely, we do sell those items.
3    We have sold those items.  Yes, that's our store.  Yes, I took
4    those photographs."

10:55    5    So you -- you will have to make a credibility determination
6    at the end of this case, unless Mr. Jaber wants to turn around
7    and say, "Oops, apparently I was mistaken for three years, I
8    was wrong," if he continues with his story that, "It's not my
9    store," you will have to make the determination:  Is he telling
10    the truth?  And has my client proved its case?

10:56    11    And to prove our case, we will need to tell you it's our
12    photograph, which they don't dispute.  It's subject to a
13    copyright, which they don't dispute.  But that it was on their
14    Facebook page, their social media, without our permission.  I
15    think it's without dispute that it was without permission.  You
16    will have to decide whether it was on their Facebook page or
17    not, has Mr. Jaber been telling the truth for the last three
18    years.

10:56    19    And if you determine that it was on their page and it was
20    without permission, you would have to decide, under the law,
21    what damages you will award against the defendants in this
22    case.  Thank you.

10:56    23    THE COURT:  Thank you, Mr. DeSouza.
10:56    24    Mr. Steinle.
10:56    25    MR. STEINLE:  Thank you, your Honor.

53

10:56

1    May it please this Court, good morning, gentlemen.  I am

2  Timothy Steinle.  I represent the defendants in this particular

3  case.  I would like to take just one second to thank you for

4  taking the time out that the Court indicated in the comments to

5  you how significant and important what you're doing here today

6  is.  And on behalf of my clients, I would like to thank you for

7  your service today.

10:57

8    Factually, this case is not that difficult.  This case is

9  not going to take that long because there are things that are

10  not in dispute.  There is no dispute that it was their

11  photograph.  There is no dispute that it was copyrighted.  But

12  I think you have to -- and you will today and tomorrow -- get

13  the context of what this case is about.

10:57

14    What this case is about is it's about a small inner-city

15  grocery store in the City of Milwaukee.  It's not a chain.

16  It's not Metro Mart.  It's not Sendik's.  It's one stand-alone

17  family-run grocery store in the City of Milwaukee.  And it

18  dates back.  It dates back, Mr. Jaber came to this country, and

19  what he did is he immediately gets a job or shortly thereafter

20  gets a job with Villard Food Town, 27th and Villard, Villard

21  Food Town.  And the store's being run by his brother.  And his

22  brother's name is Faraj.  They call him Frank.  That's --

23  that's his nickname.  He's Frank.

10:58

24    The Jaber family is a very, very large family, and Frank's

25  running this store.  And Sharif begins -- in 2004 begins

54

1    working for Frank.  Things go along.  He's the manager.  Sharif

2    is the manager of this grocery store on behalf of his brother.

3    Because it's a large family-run business, what happens is in

4    2015, everything's going fine, he's the manager, there's no

5    issues.

6        In 20 -- in 2015, his son -- and don't confuse -- his son

7    Nofal comes into the business.  And what Nofal does is Nofal's

8    experienced with the internet, experienced with social media.

9    And what Nofal's going to testify to is that he creates a

10   website.  Excuse me.  It wasn't website.  That's significant.

11   He creates a Facebook page.  And he creates the Facebook page

12   when his uncle is running the store Villard Food Town.  And the

13   URL for this Facebook page is Villard Food Town, when he

14   creates the Facebook page.  Nofal creates a Facebook page.

15       So he and his brother continue to talk.  Sharif wants to

16   buy the business.  And, in fact, Sharif buys the business in

17   2017.  And he names the business -- he renames the business

18   Nofal, LLC and then changes the d/b/a from Villard Food Town to

19   Food Town Mart.  He changes the d/b/a.

20       So what happens is Nofal continues to work there.  There's

21   no issues at all.  There's no problems.  Sharif is running the

22   business.  Nofal's managing the business.  And what happens is

23   Nofal begins to wind down in 2020.  And what happens in 2020 is

24   his other brother -- big family business -- his other brother

25   Amjad comes to the business in 2020, about.  He knows it's

10:59 (line 6)
10:59 (line 11)
10:59 (line 15)
11:00 (line 20)

55

1   COVID.  He comes in 2020.

11:00   2       And what happens is Nofal the son teaches his brother about

3   this Facebook page and teaches him about the fact that there's

4   this Facebook page for Villard Food Town.  That's the URL,

5   Villard Food Town.  Nothing had changed on that -- on that

6   Facebook page.

11:01   7       And what happens is this is Nofal's gone, Amjad takes over

8   the Facebook page.  And what Amjad does is he posts one post on

9   September 28th in 2020, one post.  And he posts a sale of food

10  items.  And on that one Facebook page on September 28th of

11  2020, there is a picture of a pork chop.  Amjad is going to

12  tell you how he set up that Facebook page.  And he's going to

13  describe for you what he did to set up that Facebook page.

11:02   14      The post goes up on the 28th of September of 2020.  Nothing

15  is heard.  Nothing is heard.  They go on with business.  And

16  keep this in mind, too, this one Facebook page with this one

17  photograph is for a one-week sale of pork chops -- not

18  unlimited -- one-week sale of pork chops.  And nothing is

19  heard, nothing is heard.

11:02   20      And Sharif is going to testify you that he did not receive

21  notice at all about any alleged infringement violation.  The

22  first that he hears of it is in February of 2023 when he gets

23  sued for this violation.  Sharif Jaber did not receive notice.

24  And the date of the notice is going to become really

25  significant, too.  The date of the notice is November of 2021.

56

1    But the notice goes to, not Sharif Jaber, the notice goes to

2    Faraj Jaber, Frank Jaber.  It doesn't go to Sharif Jaber.

3    Sharif didn't open his brother's mail.  He's -- he knows

4    nothing about this alleged violation.

11:03    5        So what you are also going to hear is this, the boys are

6    going to testify to, is this:  They did the Facebook page on

7    their own.  Nofal's going to tell you he did it because he

8    thought, well, maybe it can help the business.  I've got a

9    personal Facebook page, maybe it will help the business.  He

10    didn't tell his dad.  And he didn't tell his uncle.  Keep in

11    mind, this Facebook page was set up under Villard Foods.  He

12    didn't tell his Uncle Frank, and he didn't tell his dad.  And

13    Amjad didn't tell his dad.

11:04    14        And the boys are going to testify.  You're going to hear

15    them -- both of them testify.  They're going to say, "We did

16    this on our own.  We didn't talk to our dad.  We didn't talk to

17    our uncle.  They didn't give us any direction.  They didn't

18    give us -- tell us what to put on the Facebook page."

11:04    19        And the other thing that I think is significant with what

20    you're going to hear is this:  Facebook is not a website.  It

21    is an incredibly limited social media site.  Nofal's going to

22    testify to you that at the time of the post in September of

23    2028 (sic), they had 1,000 followers.  That's it.  And what

24    he's going to testify to is this:  When you are on Facebook,

25    the only way that you can get access to the Facebook page is

1    one of two ways, you've got to do a search or you've got to

2    friend them or like them.  And that's the only way that you're

3    going to get contact with the web -- with the Facebook page.

11:05    4    So, ladies and gentlemen, please listen to the testimony

5    carefully, because there are some of very significant disputes

6    about what was known, when was -- what was known, when it was

7    known, what information was provided.  Because you are going to

8    have to decide whether or not Mr. Sharif Jaber knew, whether he

9    controlled the website.  They have to prove he profited from

10    the use of this photograph.  They have to prove that he

11    profited from the use of that photograph.

11:06    12    And at the end of the day, ladies and gentlemen -- at the

13    end of the day, this is what the evidence, the uncontroverted

14    evidence is this:  We are in court today because we have been

15    sued for the use of one photograph on one occasion, one

16    photograph out of a library of 20,000.  This photograph came

17    out of a library of 20 -- one photograph for a limited period

18    of time.  And they have to prove to you that they were damaged

19    by the use of this one photograph on September 28th.  That's

20    what we're doing here.

11:06    21    So again, ladies and gentlemen, I would like to thank you

22    in advance, kind of a unique case, kind of interesting in some

23    respects.  You're going to hear some testimony.  But -- but

24    please, ladies and gentlemen, I thank you in advance for your

25    attention.  It's a very important case to my client.  It's

58

1  important to the plaintiff, too.  It's important.  So I thank

2  you in advance.  And, again, I look forward to it.  Thank you.

11:07  3  THE COURT:  Thank you, Mr. Steinle.

11:07  4  Mr. DeSouza, you may call your first witness.

11:07  5  MR. DeSOUZA:  Your Honor, the plaintiff calls Rebecca

6  Jones.

11:07  7  THE CLERK:  Please stand.  Stand and raise your right

8  hand.

11:07  9  (The witness is sworn.)

11:07  10  THE WITNESS:  I do.

11:07  11  THE CLERK:  Thank you.  Please be seated.  Please

12  state your full name and spell it for the court reporter.

11:08  13  THE WITNESS:  Rebecca, R-E-B-E-C-C-A, Jones,

14  J-O-N-E-S.

11:08  15  REBECCA JONES,

11:08  16  called by the Plaintiff as a witness herein, having been first

17  duly sworn, was examined and testified as follows:

11:08  18  DIRECT EXAMINATION

11:08  19  BY MR. DeSOUZA:

11:08  20  Q.  Good morning, Ms. Jones.

11:08  21  A.  Good morning.

11:08  22  Q.  Ms. Jones, do you have some affiliation with the plaintiff

23  in this case, Prepared Food Photos?

11:08  24  A.  I do.

11:08  25  Q.  And what affiliation is that?

11:08    1    A.   They're my employer.   I'm the intellectual property

         2    director for PFP.

11:08    3    Q.   What does that mean, you're the intellectual property

         4    director?

11:08    5    A.   So I take care of making sure that all of our images and

         6    everything in our library is copyrighted and I oversee a team

         7    who works to make sure that those copyright rights are

         8    protected.

11:08    9    Q.   Okay.   And what is the business of Prepared Food Photos?

11:08   10    A.   We have a library that we license to our subscribers.

11:08   11    Q.   How many images are we talking about?

11:09   12    A.   A little bit more than 18,000.

11:09   13    Q.   Are those 18,000 images that Prepared Food created today,

        14    yesterday, how did it go about getting these photos?

11:09   15    A.   It was over the course of a couple of decades to amass that

        16    library.

11:09   17    Q.   Who created the images?   Are these images that you bought

        18    from someone else?

11:09   19    A.   No, these -- these images were all created in house by

        20    staff chefs in our -- we had a studio with a kitchen.   We had

        21    photograph -- staff photographers.   We have people who work on

        22    color separation, color specialists, to make sure that the

        23    images say the same whether they're used in print or digital.

        24    And then attorneys that we had to hire to copyright the images.

11:09   25    Q.   When you say you created the images in house, is there a

1   physical location from which the images were created?

11:10   2   A.   Yes.   We had a physical kitchen and studio for the

3   photography.   We had food stylists who would plate the images,

4   make sure they looked appealing.

11:10   5   Q.   Does PFP have a website?

11:10   6   A.   We do.

11:10   7   Q.   And describe the website to me.   What can I do on the PFP

8   website?

11:10   9   A.   You can view the library.   There are categories of

10   different, I don't know, like meat or vegetables or desserts.

11   You can view all the images on the library so that you know if

12   you want to become a subscriber what you'll be getting.

11:10   13   Q.   Ms. Jones, I would like to show you what's been marked as

14   Plaintiff's Exhibit 22 today.

11:10   15       MR. DeSOUZA:   And, your Honor, I don't know if you

16   want to control if it's being seen or not, but it's already on

17   the screen.   Is that okay?

11:10   18       THE COURT:   Certainly.

11:10   19       MR. DeSOUZA:   Okay.

11:10   20   A.   No. 22.

11:10   21   BY MR. DeSOUZA:

11:11   22   Q.   Ms. Jones, up on the screen is Plaintiff's Exhibit 22.   Do

23   you see that?

11:11   24   A.   I do.

11:11   25   Q.   And do you recognize what this document is?

11:11    1    A.    Yes.    That's a --

11:11    2    Q.    Can you tell the jury what it is.

11:11    3    A.    That's a -- it appears to be a screenshot of our home page.

11:11    4    Q.    Okay.    And at the -- at the very top of the image, it looks

         5    like there's a URL up here.    Do you see that?

11:11    6    A.    I do.

11:11    7    Q.    Can you tell me what that URL is?

11:11    8    A.    PreparedFoodPhotos.com.

11:11    9    Q.    Okay, perfect.    At the very bottom of the page, it looks

         10   like there's some notation here that says, Captured by FireShot

         11   Pro.    Do you see that?

11:11    12   A.    I do.

11:11    13   Q.    Okay.    Can you tell us what that is, what is FireShot Pro?

11:11    14   A.    FireShot Pro is a Google Chrome extension that we use.

         15   Because we use Mac computers, when you take a screenshot it

         16   doesn't put the date and time on the screenshot.    FireShot Pro

         17   puts the date and time as well as the URL.

11:11    18   Q.    Okay.    And what's the date this screenshot was captured?

11:12    19   A.    It looks like October 1st, 2024.

11:12    20   Q.    And is this a accurate depiction of what the Prepared Food

         21   Photos website looks like in October, 2024?

11:12    22   A.    Absolutely.

11:12    23          MR. DeSOUZA:    Your Honor, I would ask that Plaintiff's

         24   Exhibit 22 be admitted into evidence.

11:12    25          THE COURT:    All right.    Without objection, the Court

1    will receive Exhibit 22.

11:12    2              (Exhibit No. 22 was received in evidence.)

11:12    3    BY MR. DeSOUZA:

11:12    4    Q.   Now, Ms. Jones, I see there's various categories here in

5    the middle of the page.  Can you tell me what -- what am I

6    looking at here in the middle of the page?

11:12    7    A.   It's just a way for anyone who is on the site, if -- you

8    know, if they are looking for a picture of produce, they don't

9    have to scroll through the entire site.  They can -- there's a

10    search bar they can use, or they can just click on the produce

11    section and go through there.

11:12   12    Q.   And are all of your -- I think you said greater than 18,000

13    images hosted on the website?

11:12   14    A.   Yes.

11:13   15    Q.   Other than offering images to your subscribers, as you

16    said, does PFP have any other line of business?

11:13   17    A.   No.

11:13   18    Q.   So if PFP is making money, it is from offering

19    subscriptions to its subscribers?

11:13   20    A.   Yes.

11:13   21    Q.   Okay.  At the very top here, I see language that says,

22    "Exclusive brand building supermarket images."  Do you see

23    that?

11:13   24    A.   I do.

11:13   25    Q.   What does that mean?

11:13

1  A.   That means that we -- one of the draws to our library is

2  that all of these images have been created under the same

3  direction by staff photographers so that that they all have a

4  very similar look, feel, the style, the angles that are used,

5  the color palates that's used, it's all pretty much the same

6  across the board.  So rather -- if you're trying to attract new

7  customers or keep your -- your customers that you already have,

8  you want brand recognition, and so we help with that.

11:14

9  Q.   Okay.  Now, I see just under this orange button it looks

10  like it says, "Unlimited downloads for only $999 a month"?

11:14

11  A.   Correct.

11:14

12  Q.   Is that -- did I read that right?

11:14

13  A.   Yes.

11:14

14  Q.   And is that -- well, I guess, tell me what that means.  Is

15  it a pricing structure that you have adopted?

11:14

16  A.   Yes.  That's the price of our subscription per month with a

17  minimal -- excuse me, an initial -- oh, my gosh -- initial term

18  of one year.  And when -- for as long as you're a subscriber,

19  you are allowed to download.  You can download the entire

20  18,000 if you have the space and capacity.  But -- and unlike

21  other stock photography sites, you don't have to keep track of

22  how many impressions or how many times you've used it and what

23  media.

11:15

24  Q.   All right.  Ms. Jones, I put up on the screen what we've

25  identified as Plaintiff's Exhibit 23.  This appears to be

1    another subpage of the Prepared Food Photos website; is that
2    correct?
3    A.   Yes.
4    Q.   And can you tell me what subpage this is?
5    A.   I believe that's under pricing.
6    Q.   Okay.  And does that appear to be an accurate photo of how
7    PFP's website looks on the pricing page?
8    A.   Yes.
9          MR. DeSOUZA:  Your Honor, I would ask that Plaintiff's
10   Exhibit 23 be admitted into evidence.
11         THE COURT:  All right.  The Court will receive Exhibit
12   23.
13         (Exhibit No. 23 was received in evidence.)
14   BY MR. DeSOUZA:
15   Q.   All right.  Ms. Jones, you were saying it's 999 a month,
16   and I think you said it was a minimum period of time; correct?
17   A.   Yes.
18   Q.   And what is that minimum period of time?
19   A.   It says on there 12-month subscription term.
20   Q.   Okay.  So you have to sign up for at least 12 months is
21   what you're saying?
22   A.   Correct.
23   Q.   Why not just allow someone to sign up today and cancel
24   tomorrow?
25   A.   Because they would download the entire library -- or they

1    could download the entire library and take all 18,000 images.

2    This allows us to make sure that our images are being used with

3    authorization by clients and customers that we have control

4    over so that we can make sure there's not market saturation so

5    that a competitor down the street isn't using the same images

6    that you're trying to use to market and create that brand

7    identity.

11:16   8    Q.   Can I license -- I guess, can anyone go on your website and

9    license a single photograph?

11:16   10   A.   No.

11:16   11   Q.   Why not?

11:16   12   A.   That's not our subscription model.

11:17   13   Q.   So the only thing you offer is the subscribe to your entire

14   library, no individual photos?

11:17   15   A.   Correct.

11:17   16   Q.   Okay.  And how long has that been the case, like going back

17   to till when?

11:17   18   A.   2016.

11:17   19   Q.   Okay.  So at least as of 2016, the only customers that you

20   have had have been subscribers to your entire library?

11:17   21   A.   Yes.

11:17   22   Q.   And who are Prepared Food Photos' customers, like in

23   general, what are their industries that they're in?

11:17   24   A.   We have a lot of grocery store clients.  We have some

25   national food delivery services.  We also have marketing

1    companies and advertising agencies.

11:17    2    Q.   And do you keep track of who those subscribers are?

11:17    3    A.   Yes.

11:17    4    Q.   Why -- well, I guess is it important for you to keep track

5    of who they are?

11:17    6    A.   It's essential.

11:17    7    Q.   Why is that?  Is that for the reason you were just

8    describing about brand identity?

11:17    9    A.   Yes, the brand identity.  We offer semi-exclusivity where

10    because as part of the terms of use when you sign up, you have

11    to provide us with a list of your clients.  And so we monitor

12    that to make sure that, you know, Grocery Store A and Grocery

13    Store B, which might be two blocks down the road, are not using

14    the same picture on their Thanksgiving Day ad and one's paying

15    for it and the other one's not or we just make sure that your

16    store is identified easily by the pictures you use.

11:18    17    Q.   You -- you mentioned categories of people that -- excuse me

18    -- businesses that are your clients.  But can you disclose to

19    the jury who any of your subscribers actually are?

11:18    20    A.   Sure.  We have GrubHub as one of our subscribers, Slice

21    which is similar to GrubHub but they focus only on pizza.  And

22    then we have a couple of different grocery stores across the

23    country that might have a couple of locations.  Some only have

24    one or two.  Some are larger.  I think we have one in Florida,

25    one in Ohio, maybe one in Illinois.  And then a couple of

1      various other advertising and marketing companies.

11:19   2    Q.   And do those advertising and marketing companies themselves

3      have grocery store clients for which they design ads for?

11:19   4    A.   Absolutely.

11:19   5    Q.   Okay.  So are you able to guess or estimate just how many

6      grocery stores are ultimately using your photos with

7      permission?

11:19   8    A.   I wouldn't know off the top of my head, unfortunately.

11:19   9    Q.   Okay.  Now, of the ones that you've identified or of the

10      subscribers that you're aware of, is everyone paying the same

11      $999 a month plan that's up on the screen?

11:19   12    A.   No, that's the minimum.

11:19   13    Q.   Okay.  What do you mean by that?  There are people that pay

14      more than 999 a month?

11:19   15    A.   Yes.  The larger national companies, they pay more.

11:20   16    Q.   Okay.  Is GrubHub one of those companies that pays more

17      than 999 a month?

11:20   18    A.   Yes.

11:20   19    Q.   And is that, as you said, because of the size of their

20      distribution?

11:20   21    A.   Exactly.

11:20   22    Q.   The income that PFP receives from its subscribers, does PFP

23      depend on that income to stay in business?

11:20   24    A.   Yes.

11:20   25    Q.   Okay.  I think you said there's no other line of business.

1    PFP doesn't sell golf clubs.  It doesn't do anything other than

2    offer its photos for subscription; correct?

11:20    3    A.   Correct.

11:20    4    Q.   How many employees does PFP have?

11:20    5    A.   A half a dozen.

11:20    6    Q.   Half a dozen?

11:20    7    A.   Yeah.

11:20    8    Q.   And are all of those employees involved in the area of

9    business that you described earlier?

11:20    10    A.   Yes.

11:20    11    Q.   Ms. Jones, we're obviously in a lawsuit against the

12    defendants in this case.  Tell the jury why you filed this

13    lawsuit.  What's -- what's the reason why we're all here today?

11:20    14    A.   Because the defendant has continually denied responsibility

15    for this and has continually lied and refused to participate in

16    any type of a settlement discussion.

11:21    17        MR. STEINLE:  Well, I object and ask that the answer

18    be stricken.  The purpose of a reason why she filed a lawsuit

19    has nothing to do with the factual determination in this

20    particular case.

11:21    21        THE COURT:  Yeah.  We've been through this, Mr.

22    DeSouza, in your opening statements.  You can ask the witness

23    factual questions.  Whether somebody lied or didn't lie is not

24    a matter for this witness to give fact.  The facts are going to

25    be determined by the jury, not your witness.

11:21    1          MR. DeSOUZA: Understood, your Honor. I'll -- I'll

2    ask a different way to get a different answer from her.

11:21    3    BY MR. DeSOUZA:

11:21    4    Q. Ms. Jones, this lawsuit, does it involve one or more of

5    Prepared Food Photos' photographs?

11:21    6    A. Yes.

11:22    7    Q. Okay. And what is Prepared Food Photos alleging the

8    defendants did here?

11:22    9    A. Used our image without authorization or licensing.

11:22    10    Q. Okay. And what image are we talking about?

11:22    11    A. It's a picture of boneless center cut pork chops, raw

12    boneless pork chops.

11:22    13    Q. Okay. Ms. Jones, I'm going to put on the screen what's

14    been identified as Plaintiff's Exhibit 1. Okay? Do you see

15    that on the screen?

11:22    16    A. I do.

11:22    17    Q. Okay. Is Plaintiff's Exhibit 1 the photograph that

18    Prepared Food Photos is alleging was used by the defendants

19    without permission?

11:22    20    A. Yes.

11:22    21    Q. Okay. And this is a photograph that is owned by Prepared

22    Food Photos?

11:22    23    A. Yes.

11:22    24          MR. DeSOUZA: Your Honor, I would ask that Plaintiff's

25    Exhibit 1 be admitted into evidence.

70

11:22    1          MR. STEINLE:  No objection.

11:22    2          THE COURT:  All right.  The Court will receive Exhibit

         3    1.

11:22    4          (Exhibit No. 1 was received in evidence.)

11:22    5    BY MR. DeSOUZA:

11:23    6    Q.  Okay.  Ms. Jones, how was this photograph created?

11:23    7    A.  It was created in our studio.  We have food stylists.  So

         8    under the direction of either the creative director or

         9    management team, we would decide what needed to be

        10    photographed.  Obviously, this is not cooked, so the chef

        11    didn't cook this.  But the food stylist would arrange it.  The

        12    photographer, staff photographer, would take pictures of it

        13    through various angles and maybe turn the cutting board a

        14    little bit after the food stylist had arranged everything nice

        15    and neat on the cutting board.

11:23   16          And then after the photograph is taken, the color

        17    specialist would go through and make sure that the colors look

        18    right and do any editing or anything if there's shadow

        19    somewhere that they don't want, take those out.  Then there's

        20    another process that they go through to, like I said before,

        21    make sure the color stays the same whether it's used on print

        22    or digital.  And then it would be submitted for copyright

        23    registration.

11:24   24    Q.  Okay.  And this particular photograph, is this one that is

        25    included in the 18,000 or so photographs that if I were a

1    subscriber I would gain access to?

11:24    2    A.   Yes.

11:24    3    Q.   Is this photo on the PFP website -- I'm sorry, by PFP I

4    mean Prepared Food Photos.  Is it okay if I shorten it down?

11:24    5    A.   I do not, I do it all the time.

11:24    6    Q.   Okay.  Is this a photograph that's included on your website

7    that someone can go and find?

11:24    8    A.   Yes.

11:24    9    Q.   Okay.  So what I'm going to do, Ms. Jones, is I'm going to

10    show you what we've marked as Plaintiff's Exhibit 24.

11:24    11    THE COURT:  Mr. DeSouza, before we move, Ms. Jones,

12    can you tell the jury when this photograph was taken?

11:24    13    THE WITNESS:  I would have to look at the deposit

14    material or the copyright certificate to -- I don't know it off

15    the top of my head.

11:25    16    THE COURT:  Well, before you conclude your testimony,

17    we're going to get an answer to that question.

11:25    18    THE WITNESS:  I can tell you, Judge, all of the images

19    in our library were copyrighted by 2017.

11:25    20    THE COURT:  Now, that wasn't my question.

11:25    21    THE WITNESS:  Okay.

11:25    22    THE COURT:  My question is when was this photo

23    taken --

11:25    24    THE WITNESS:  All right.

11:25    25    THE COURT:  -- not when it was copyrighted, when it

1   was taken.

2            THE WITNESS:  I understand.

3            THE COURT:  There's been suggestion that it was

4   actually taken 20 years earlier.

5            MR. DeSOUZA:  And I'll cover that with her, your

6   Honor, when I look at the copyright registration certificate.

7   If it's okay, I'll make sure that I cover it in our next

8   exhibit here.

9            THE COURT:  Very well.

10  BY MR. DeSOUZA:

11  Q.  Ms. Jones, I have put up on the screen what's been

12  identified as Plaintiff's Exhibit 24.  Do you see that there?

13  A.  I do.

14  Q.  And can you tell me, what is Plaintiff's Exhibit 24?

15  A.  It's the same picture but on our website.

16  Q.  Okay.  So if I go to your website, how would I go about

17  finding this photo?

18  A.  You could either go to the category where there's meat or

19  pork, or you could do a search, that box where it says "search

20  images," and you could put in the words, you know, if you were

21  looking for a picture of raw pork chops or boneless center cut

22  pork chops, go through the images, select the one.

23  Q.  Now, if I'm not a subscriber, I can still go to your

24  website and see this photo; correct?

25  A.  Correct.

11:26  1   Q.   Am I allowed to download this photograph off your website

2   if I'm not a subscriber?

11:26  3   A.   Not legally, no.

11:26  4   Q.   Okay.  I see there's something at the top right there that

5   says "download photo"?

11:26  6   A.   Uh-huh.

11:26  7   Q.   Is there any way for me just to download this photo from

8   your website if I'm not a subscriber?

11:26  9   A.   Not that I'm aware of, no.  It says right underneath that,

10   "To download images, subscribe here."

11:27  11   Q.   So I'd have to click over here in order to subscribe and

12   become authorized?

11:27  13   A.   Right.  And once you're subscribed and you're logged into

14   your account, then there would be a download button.

11:27  15   Q.   Okay.  Now, you testified that this image or at least one

16   of the things you do is copyright some of these images with the

17   copyright office; correct?

11:27  18   A.   Correct.

11:27  19   Q.   For those members of the jury that aren't involved in

20   copyright, describe what that process is like.  How does one

11:27  21   copyright an image?

11:27  22   A.   So there's an application, the electronic copyright office

23   website.  You'd fill out the application.  There's multiple

24   steps for that.  You pay a fee, submit your application.  Along

25   with the application, you also have to provide them with a list

1    of images that are on that registration application, provide

2    them with photos of every image that you want included in that

3    registration.  There's a description, also, along with that.

4    And then it's submitted to the copyright office.  There's an

5    examiner who reviews all the materials, makes sure that

6    everything meets their requirements.  And if it does, then you

7    receive in the mail your copyright certificate.

8                MR. DeSOUZA:  Okay.  Before I forget, Ms. Jones, your

9    Honor, I'd ask that Exhibit 24 be moved into evidence.

10               THE COURT:  All right.  The Court will receive Exhibit

11   24.

12               (Exhibit No. 24 was received in evidence.)

13   BY MR. DeSOUZA:

14   Q.  All right.  Ms. Jones, you just described the process to go

15   through to get the images registered with the copyright office;

16   correct?

17   A.  Yes.

18   Q.  Have you done this process previously?

19   A.  Yes.

20   Q.  Is the photograph we're looking at here, the pork chops,

21   subject to a US Copyright Registration?

22   A.  Yes.

23   Q.  Okay.  Ms. Jones, I'm going to show you what we've marked

24   as Plaintiff's Exhibit 2, which is a document that says

25   "Certificate of Registration."  It says United States Copyright

1  Office, and it has a registration number of VA2-027-172.  Do

2  you see that?

11:29   3  A.  I do.

11:29   4  Q.  Okay.  Ms. Jones, what are we looking at here?  Is this the

5  registration for the photo at issue or something else?

11:29   6  A.  No.  This is appears to be a scan of the certificate that

7  we received from the copyright office.

11:29   8  Q.  Okay.  And this is a seven-page document, it appears to be;

9  is that right?

11:29   10  A.  Yes.

11:29   11  Q.  Okay.  Ms. Jones, I'm going to go to Page 4 of this

12  document.  And do you see the photograph that is at issue in

13  this case identified on this certificate?

11:29   14  A.  I do.

11:29   15  Q.  Okay.  Where is it?

11:29   16  A.  It's RawPorkChopCCBNLS005_ADL.

11:30   17  Q.  Okay.  And there's also a date -- well, it appears to be a

18  date next to it.  Do you see that?

11:30   19  A.  I do.

11:30   20  Q.  What does that date mean --

11:30   21  A.  That would --

11:30   22  Q.  -- to your knowledge?

11:30   23  A.  That would be the date of creation of the image.

11:30   24  Q.  Okay.  So when the Court asked you earlier when was this

25  photo created and you didn't know, does this certificate help

1    you figure out when the photo was taken?

11:30    2    A.   Yes.

11:30    3    Q.   Okay.  And it's when, in October of 1997?

11:30    4    A.   Yes.

11:30    5    Q.   Okay.  And it looks like as I scroll up or down, most, if

6    not all, of these photos all appear to have a 1997 date; does

7    that seem correct to you?

11:30    8    A.   Yes, they have to.

11:30    9    Q.   And when we see here -- go ahead and read this line for me

10    as to how this is described here.

11:30    11    A.   "Group registration of photos published 1/4/1997 through

12    12/5/1997; about 250 photos total."

11:30    13    Q.   Okay.  So, Ms. Jones, is this the US Copyright Certificate

14    that pertains to the photograph at issue in this case, among

15    other photos?

11:31    16    A.   Yes.

11:31    17        MR. DeSOUZA:  Okay.  Your Honor, I would ask that

18    Plaintiff's Exhibit 2 be moved into evidence.

11:31    19             MR. STEINLE:  There is --

11:31    20             THE COURT:  All right.  The Court will receive Exhibit

21    2.

11:31    22        (Exhibit No. 2 was received in evidence.)

11:31    23    BY MR. DeSOUZA:

11:31    24    Q.   Ms. Jones, has either of the defendants in this case,

25    whether it's Nofal, LLC doing business as Food Town Mart or Mr.

1  Jaber, ever subscribed to PFP's library of photographs?

11:31  2  A.  No.

11:31  3  Q.  Have either of the defendants ever reached out to PFP to

4  inquire about subscribing to the library of photographs?

11:31  5  A.  No.

11:31  6  Q.  Have you ever received any correspondence or communications

7  from the defendants just asking about your photographs?

11:31  8  A.  No.

11:32  9  Q.  Now, the allegation in this case, as you said earlier, is

10  that the defendants, one or both of them, used the photograph

11  without permission; correct?

11:32  12  A.  Yes.

11:32  13  Q.  When did you first find out about this?

11:32  14  A.  I believe it was October of 2021.

11:32  15  Q.  Okay.  And how do you find out?  Are you in their store,

16  are you walking around, how do you come to the conclusion that

17  one of these defendants is using your photograph without

18  permission?

11:32  19  A.  We do a Google reverse image search.

11:32  20  Q.  What does that mean, for the less technically inclined?

11:32  21  A.  So on Google, you can go up on the right corner, it says

22  images.  You click that, and you're able to drag and drop into

23  the search bar a JPG or whatever of an image, and Google will

24  scour the internet, return results that are either your image

25  or visually similar images where that image was used.

11:33    1    Q.   And then based on those results, you determined that one of

         2    these defendants was using the photograph?

11:33    3    A.   Yes.

11:33    4    Q.   Okay.  Why -- why are you doing these -- well, I guess why

         5    did you do this Google reverse image search presumably of the

         6    photograph at issue in this case; right?

11:33    7    A.   Right.

11:33    8    Q.   So why are you doing this search?

11:33    9    A.   As a way to protect our images, our intellectual property.

        10    And like I had mentioned before about the brand exclusivity

        11    that we offer out clients, we need to make sure that our images

        12    are only being used by our licensed paid subscribers.

11:33   13    Q.   Okay.  And is this a process that you typically follow

        14    searching -- is it just the pork chop photo or is it all your

        15    images that you're searching for?

11:33   16    A.   It is all 18,000 images.

11:33   17    Q.   Okay.  And there's a person that's tied to a computer and

        18    has to do this --

11:33   19    A.   Yes.

11:33   20    Q.   -- looking for these images?

11:34   21    A.   Yes.  Yep.  We have a couple of researchers who do this

        22    research.

11:34   23    Q.   Okay.  But at some point in time -- and I think you said

        24    roughly October, 2021 -- you came to the conclusion or found

        25    what appears to be an unauthorized use of this pork chop photo;

1  correct?

11:34  2  A.  Correct.

11:34  3  Q.  Okay.  What did you do upon that discovery?  What's the

4  next step once you discovered this?

11:34  5  A.  We took one of those FireShot screenshots.

11:34  6  Q.  Okay.  You took a screenshot?

11:34  7  A.  Yes.

11:34  8  Q.  All right.  Ms. Jones, I will show you what we have

9  identified as Plaintiff's Exhibit 5.  I'll blow it up so you

10  can see it.

11:34  11  A.  Uh-huh.

11:34  12  Q.  Is Plaintiff's Exhibit 5 the screenshot that was taken upon

13  your discovery?

11:34  14  A.  Yes.

11:34  15  Q.  Okay.  And who took this screenshot?

11:34  16  A.  Either I did or one of my associate -- my researchers.

11:35  17  Q.  Okay.  Now, much like the other screenshot we're looking

18  at, there is a URL at the top here; correct?

11:35  19  A.  Yes.

11:35  20  Q.  Tell me what the URL is.

11:35  21  A.  Www.facebook.com/villardfoodtown and then slash question

22  mark reference equals page underscore internal.

11:35  23  Q.  Okay.  But we have a -- I suppose a Facebook account that

24  is named name Villard Food Town; correct?

11:35  25  A.  Yes.

11:35    1    Q.  Okay.  And at the bottom of the page, we also have a date

         2    as to the date of this screenshot; correct?

11:35    3    A.  Yes.

11:35    4    Q.  And that says what?  What's the date?

11:35    5    A.  November 22nd, 2021.

11:35    6    Q.  Okay.  So is that roughly when this screenshot was taken?

11:35    7    A.  Yes.

11:35    8    Q.  As I say roughly, but there's a specific time hereof 9:49

         9    a.m. and 59 seconds; correct?

11:35   10    A.  Yes.

11:35   11         MR. DeSOUZA:  Okay.  Your Honor, I would ask that

        12    Plaintiff's Exhibit 5 be moved into evidence.

11:35   13         MR. STEINLE:  Well, I do object to the introduction of

        14    that, improper foundation.  The URL is Villard Food Town.  The

        15    Villard Food Town is not on trial here.

11:36   16         THE COURT:  Well, that's a good point for you to raise

        17    with the jury, Mr. Steinle.  This is plaintiff's case.  If --

        18    there's no reason not to receive it if it benefits your client.

11:36   19         The objection is overruled.  The Court will receive Exhibit

        20    5.

11:36   21         (Exhibit No. 5 was received in evidence.)

11:36   22    BY MR. DeSOUZA:

11:36   23    Q.  All right.  Ms. Jones, you said this was the Facebook page

        24    you discovered that had the -- your photograph on it; correct?

11:36   25    A.  Correct.

11:36    1   Q. And I'm assuming -- well, actually, you tell me. Is it

2   this screenshot that we're looking at here that appears to be

3   September 28th, 2020?

11:36    4   A. Yes. That appears to be the post date.

11:36    5   Q. All right. Well, there's three photographs here. I think

6   I know which photo we're talking about. But which photo are

7   you contending is the PFP photo?

11:37    8   A. The larger photo on top of the raw pork chops.

11:37    9   Q. Okay. As you are familiar with your own photograph and you

10   look at this photograph, is there any doubt in your mind we're

11   looking at two of the same?

11:37    12   A. It's the same photograph.

11:37    13   Q. Okay. Now, the name of this account, as you see, is

14   Villard Food Town; correct?

11:37    15   A. Correct.

11:37    16   Q. And the post, the actual post, has that same name,

17   correct --

11:37    18   A. Yes.

11:37    19   Q. -- Villard Food Town?

11:37    20   A. Yes.

11:37    21   Q. Okay. And with respect to -- well, I guess there's some

22   text together with the photographs; correct?

11:37    23   A. Yes.

11:37    24   Q. Are you able to read that, or do you want me to blow that

25   up a little bit?

11:37  1   A.   No, I can read it.

11:37  2   Q.   Okay.  Let's go ahead and read the text for me.  What does

3   it say?

11:37  4   A.   "Fresh chicken drumsticks $0.99 a pound, fresh pork spare

5   ribs $1.99 a pound, fresh boneless cut pork chops $2.29 a

6   pound."

11:38  7   Q.   Okay.  So someone is using the PFP photo of pork chops to

8   advertise the sale of pork chops at 2.99 a pound -- I'm

9   sorry --

11:38  10  A.   2.29.

11:38  11  Q.   -- 2.29 a pound; correct?

11:38  12  A.   Yes.

11:38  13  Q.   Okay.  And what do you do after you've taken this

14  screenshot?

11:38  15      So you've got your screenshot.  You believe someone's using

16  your photo without permission.  What comes next?

11:38  17  A.   We contact your firm.

11:38  18  Q.   My firm?

11:38  19  A.   Yes.

11:38  20  Q.   Okay.  And what happens then?

11:38  21  A.   You -- an infringement letter is sent -- a letter is sent

22  out informing the alleged infringer of the use.

11:38  23  Q.   Okay.  So, Ms. Jones, I'm going to show you what we've

24  marked as Plaintiff's Exhibit 6.  Do you see that on the

11:38  25  screen?

11:38  1  A.   I do.

11:38  2  Q.   And do you recognize this document?

11:38  3  A.   I do.

11:39  4  Q.   Tell me what it is we're looking at here.

11:39  5  A.   This would be the letter that was prepared and sent.

11:39  6  Q.   Okay.  So when you said a letter was sent to the infringer,

7  it's this letter we're looking at?

11:39  8  A.   Yes.

11:39  9  Q.   And that's from my law firm; is that correct?

11:39  10  A.   Yes.

11:39  11  Q.   Okay.  And what's the date of this letter?

11:39  12  A.   November 22nd, 2021.

11:39  13       MR. DeSOUZA:  Okay.  Your Honor, at this time I would

14  ask that Plaintiff's Exhibit 6 be moved into evidence.

11:39  15       THE COURT:  All right.  The Court will receive Exhibit

16  6.

11:39  17       (Exhibit No. 6 was received in evidence.)

11:39  18  BY MR. DeSOUZA:

11:39  19  Q.   Ms. Jones, I see that this is sent to Villard Food Town,

20  LLC, which is not the defendants in this case, Attention Faraj

21  Jaber; correct?

11:39  22  A.   Yes.

11:39  23  Q.   And there's an address of 3127 West Villard Avenue.  Where

24  is that address coming from, the 3217?

11:39  25  A.   From the Facebook page.

11:39    1    Q.   It's coming from the Facebook page itself?

11:39    2    A.   Yes.

11:40    3    Q.   Okay.  Let me take this down, Ms. Jones, and let me show

         4    you what we'll identify as Plaintiff's Exhibit 10.

11:40    5         All right.  Facebook -- I'm sorry, Plaintiff's Exhibit 10

         6    is another Facebook page; correct?

11:40    7    A.   Yes.

11:40    8    Q.   And is this this -- is this another screenshot that you or

         9    some member of your team captured?

11:40   10    A.   Yes.

11:40   11    Q.   And is it a screenshot of the same Villard Food Town

        12    Facebook account when you see in the URL?

11:40   13    A.   Yes.

11:40   14         MR. DeSOUZA:  Okay.  Your Honor, I would ask that

        15    Plaintiff's Exhibit 10 be moved into evidence.

11:40   16         THE COURT:  All right.  The Court will receive Exhibit

        17    10.

11:40   18         (Exhibit No. 10 was received in evidence.)

11:40   19    BY MR. DeSOUZA:

11:40   20    Q.   Okay.  Tell me what -- tell me what Exhibit 10 is, Ms.

        21    Jones.

11:40   22    A.   It's a screenshot of the initial landing page I guess you

        23    would call it when you go on to this business' Facebook page.

11:41   24    Q.   Okay.  And is there an address that is published with

        25    respect to this store?

11:41 1  A.  Yes.

11:41 2  Q.  And what's the address?

11:41 3  A.  3217 West Villard Avenue, Milwaukee, Wisconsin.

11:41 4  Q.  Is that the address that you received with respect to

5  sending that letter out to the alleged infringer?

11:41 6  A.  Yes.

11:41 7  Q.  Okay.  Now, there is also -- I guess there's a picture of

8  some store that says, "You're Someone Special," here.  Do you

9  see that?

11:41 10  A.  I do.

11:41 11  Q.  And are you familiar with this photo or at least what's

12  being depicted in the photo?

11:41 13  A.  Yes.

11:41 14  Q.  What is that?

11:41 15  A.  That's the front of the Food Town Mart store.

11:41 16  Q.  How do you know that?

11:41 17  A.  Because I was there yesterday.

11:41 18  Q.  Okay.  And that's what it looks like?

11:41 19  A.  Yes.

11:41 20  Q.  Does that "You're Someone Special" appear on the front of

21  the store?

11:41 22  A.  It does.

11:41 23  Q.  And just to be clear, were you at 3217 West Villard,

24  Milwaukee, Wisconsin?

11:42 25  A.  Yes.  That's the address my GPS took me to.

11:42    1    Q.   Okay.  So you send this letter to 3217 West Villard, and

2    that's going back to Plaintiff's Exhibit 6; correct?

11:42    3    A.   Yes.

11:42    4    Q.   Why is this letter being sent?  What's the point?

11:42    5           MR. STEINLE:  Well, I object to that, Judge.  That's

6    improper foundation.  There's no foundation that she drafted

7    the letter.  It was drafted by counsel.  And I don't know how

8    she can testify as to why the letter's being sent.

11:42    9           THE COURT:  Yeah.  Yeah, the objection is well taken,

10   Mr. Steinle, and sustained.

11:42   11    BY MR. DeSOUZA:

11:42   12    Q.   Okay.  Ms. Jones, do you -- as the intellectual property

13   director, do you provide guidance to any of the law firms that

14   you work with with respect to notifying an infringer of an

15   alleged infringement?

11:42   16    A.   Absolutely.

11:42   17    Q.   Okay.  And as the intellectual property director, do you

18   have goals that you seek to accomplish by notifying an

19   infringer?

11:43   20    A.   Yes.

11:43   21    Q.   Okay.  What are your goals in notifying an infringer of an

22   alleged infringement?

11:43   23    A.   We have two goals basically.  No. 1 is to let them know

24   that we know they're using the image and ask them to take it

25   down.  And No. 2 is to ask for some kind of compensation for

1    that unauthorized use.

11:43    2    Q.   Why ask for compensation?

11:43    3    A.   Because it damages our reputation, our relationship with

4    our clients.  And we're telling our clients that we're offering

5    them some exclusivity, and if somebody else is -- and they're

6    paying a good amount of money for that.  And if somebody else

7    is using this image without having paid for it, without

8    authorization, without licensing, without permission, then it's

9    just -- it's just not right.

11:44    10    Q.   Now, you've seen this letter before; correct?

11:44    11    A.   Yes.

11:44    12    Q.   And does this letter identify both your photograph and the

13    alleged infringement?

11:44    14    A.   Yes.

11:44    15    Q.   Okay.  So if I scrolled down, that's your photograph;

16    correct?

11:44    17    A.   Correct.

11:44    18    Q.   And underneath that, it explains that the photograph was

19    registered with the Register of Copyrights, and that's the same

20    number we were just looking at on the certificate; correct?

11:44    21    A.   Yes.

11:44    22    Q.   Okay.  And then what are you doing here?  You're providing

23    -- is this the URL --

11:44    24    A.   Yes.

11:44    25    Q.   -- for the screenshot we just looked at?

11:44  1    A.   Yes.

11:44  2    Q.   And is that the screenshot itself that we were just looking

3    at as well?

11:44  4    A.   Correct.

11:44  5    Q.   Okay.  Now, there's some text, there's some case law.  It

6    looks like you're asking for a certain amount of money here.

7    How much money were you asking for before this lawsuit was

8    filed?

11:45  9    A.   $30,000.

11:45  10   Q.   Okay.  How do we get to $30,000?  What's the -- what's the

11   rationale for you asking for 30,000?

11:45  12   A.   Because of our subscription model where it's basically a

13   thousand dollars a month with a year-to-year contract term.

14   This image was on their site on that Facebook page for over a

15   year, so they would have had to have paid about 24,000 if they

16   licensed it properly.  We don't believe that somebody who

17   steals an image should pay the same as somebody who licenses it

18   properly, so...

11:45  19   Q.   The -- the screenshot of the infringement had a November,

20   2021 date; correct?

11:45  21   A.   Yes.

11:45  22   Q.   Was the image still published on that Facebook page in

23   November of 2021?

11:45  24   A.   Yes.

11:45  25   Q.   And to your knowledge, when did the infringement begin?

| 11:45 | 1 | A. The September date. |
| 11:45 | 2 | Q. In 2020? |
| 11:46 | 3 | A. '20, yes. |
| 11:46 | 4 | Q. Okay. So that's why you say more than a year -- |
| 11:46 | 5 | A. Correct. |
| 11:46 | 6 | Q. -- at that point? |
| 11:46 | 7 | Now, if Food Town Mart or whoever's Facebook page it is had |
| | 8 | properly subscribed to your library of photographs, how much |
| | 9 | would they have paid, at least through November of 2021? |
| 11:46 | 10 | A. I'm sorry? |
| 11:46 | 11 | Q. If the -- if whoever's Facebook page it is -- |
| 11:46 | 12 | A. Uh-huh. |
| 11:46 | 13 | Q. -- had been a true subscriber and paid you for access to |
| | 14 | your photographs -- |
| 11:46 | 15 | A. Yes. |
| 11:46 | 16 | Q. -- how much would they have had to pay from that September, |
| | 17 | 2020 through at least November, 2021 time period? |
| 11:46 | 18 | A. It would have been $1,000 a month. |
| 11:46 | 19 | Q. But you said there was an annual commitment; correct? |
| 11:46 | 20 | A. Correct. So they can pay monthly, but it's still an annual |
| | 21 | one-year term. |
| 11:46 | 22 | Q. Okay. So from September, 2020 through September, 2021 -- |
| 11:46 | 23 | A. Would have been -- |
| 11:46 | 24 | Q. -- would have been the -- |
| 11:46 | 25 | A. 11,988 is what it comes out to. |

11:47  1  Q.  Let's call it 12, because I'm not great at math.  So
       2  roughly 12,000?

11:47  3  A.  Yes.

11:47  4  Q.  And then from the September, 2021 into November, 2021, are
       5  they just paying for two months, or are they paying for another
       6  whole year?

11:47  7  A.  Another year.

11:47  8  Q.  Okay.  So the total -- if the infringement stopped in
       9  November of 2021, the total that someone would have had to pay
      10  is what?

11:47  11  A.  About 24,000.

11:47  12  Q.  Okay.  Now, you asked for more than 24,000, though.  You
      13  asked for 30,000.

11:47  14  A.  Uh-huh.

11:47  15  Q.  Why are you asking for more than what they would have had
      16  to pay legally?

11:47  17  A.  Because it's the same as if you go into a grocery store and
      18  you steal.  You help yourself to some apples or bananas.  If
      19  you get caught, you don't just pay the price for those apples
      20  and bananas.  You're punished by having to pay more.

11:47  21  Q.  This letter, I see it says via Federal Express; correct?

11:48  22  A.  Yes.

11:48  23  Q.  And there's one address that's identified here, the 3127
      24  West Villard; correct?

11:48  25  A.  Yes.

11:48    1   Q.   Is there any other address that got sent to?

11:48    2   A.   No.

11:48    3   Q.   Was it sent by e-mail to anyone else?

11:48    4   A.   No.

11:48    5   Q.   Okay.   So as far as you know, this is the only address that

         6   it actually goes to; correct?

11:48    7   A.   Absolutely.

11:48    8   Q.   What happened in the weeks or months after this letter was

         9   sent?

11:48   10   A.   The September, 2021 -- Sept -- the --

11:48   11   Q.   2020.

11:48   12   A.   Yes, the Sep -- the 2020 post was removed, was the only

      13   thing that was removed from their Facebook page.   And the name

      14   was changed on the Facebook page.

11:48   15   Q.   What do you mean the name was changed on the -- well, I

      16   guess, let's start with the removal.   You hired a law firm.   A

      17   law firm sent a letter to an address.   After it got there, the

      18   photograph came down?

11:48   19   A.   Yes.

11:49   20   Q.   Okay.   Do you know if this was a week later, two weeks, six

      21   months?   Do you know when the photo came down?

11:49   22   A.   I don't know exactly.   I know it was shortly after the

      23   letter was sent.

11:49   24   Q.   Okay.   And to your knowledge, were any other photographs

      25   removed from this Facebook page?

11:49  1   A.  No.

11:49  2   Q.  Did you contact Facebook and say, "Facebook, you remove the

3   photo yourself"?

11:49  4   A.  No.

11:49  5   Q.  Okay.  To your knowledge, anyone other than the owner of

6   this Facebook account could have removed this photograph -- to

7   your knowledge, could anyone have done it?

11:49  8   A.  No.

11:49  9        MR. STEINLE:  I object.  Improper foundation.  How

10   would she know?

11:49  11        THE COURT:  She doesn't, so it's sheer speculation.

11:49  12   BY MR. DeSOUZA:

11:49  13   Q.  Okay.  But you did not reach out to any other party

14   demanding that it remove the photograph from the Facebook page

15   other than who was ever at the receiving end at this West

16   Villard Avenue address; correct?

11:50  17   A.  Correct.

11:50  18   Q.  Okay.  Now, other than the photograph coming down somewhere

19   in the near time frame after having sent it, you said the name

20   of the Facebook account also changed?

11:50  21   A.  Yes.

11:50  22   Q.  Okay.  So I'm going to go back to Plaintiff's Exhibit 10.

23   And this was the screenshot of the -- I guess the main account;

24   correct?

11:50  25   A.  Yes.

11:50    1    Q.  And tell me if I'm wrong, but the URL for this account is

2    still Villard Food Town; correct?

11:50    3    A.  Correct.

11:50    4    Q.  And the name, you're saying, changed after the letter was

5    sent?

11:50    6    A.  Yes.

11:50    7    Q.  What did -- what was the name changed to?

11:50    8    A.  Food Town Mart.

11:50    9    Q.  So now when I look at posts on this site, it shows as Food

10    Town Mart instead of Villard Food Town?

11:50    11    A.  Yes.

11:51    12    Q.  Okay.  Do you, as you sit here, know how it is that the

13    name got changed from Villard Food Town to Food Town Mart?

11:51    14    A.  No.

11:51    15          MR. STEINLE:  I object, speculation.  It's --

11:51    16          THE COURT:  She said she doesn't know.

11:51    17      Ms. Jones, while we're on the subject of the letter, did

18    Mr. DeSouza's office ever provide you with a receipt for

19    delivery of that letter to anyone at that address on Villard

20    Avenue?

11:51    21          THE WITNESS:  No.

11:51    22          THE COURT:  Do you know that the letter was ever

23    delivered?

11:51    24          THE WITNESS:  I have no proof that it was delivered,

25    other than the actions of the defendant after the letter was

1   sent.

11:51   2       THE COURT:  But you don't know who removed it, you

3   don't know who got the letter, none of that; correct?

11:51   4       THE WITNESS:  I don't know how I would know those

5   things.

11:51   6       THE COURT:  And you don't know who, if anyone,

7   received that letter; correct?

11:52   8       THE WITNESS:  I -- Facebook delivered it to that

9   address -- I mean, Fed Ex delivered it to --

11:52   10      THE COURT:  How do you know Facebook delivered it?

11  There's no tracking number on the letter, there's nothing.

12  This is serious business.  If you don't have proof, let's say

13  so.

11:52   14      THE WITNESS:  I don't have proof that the letter was

15  delivered.

11:52   16      THE COURT:  Thank you.

11:52   17  BY MR. DeSOUZA:

11:52   18  Q.   Ms. Jones, eventually this lawsuit was filed; correct?

11:52   19  A.   Yes.

11:52   20  Q.   And we're -- I think this lawsuit was filed sometime in

21  '22, 2022, thereabouts; is that right?

11:52   22  A.   Sounds right, yes.

11:52   23  Q.   Okay.  Since filing this lawsuit, have either of the

24  defendants admitted or acknowledged, yes, this is our Facebook

25  page?

11:52    1    A.   No.

11:52    2    Q.   Have they said anything different than that?

11:52    3    A.   Yes.

11:53    4    Q.   What -- to your knowledge, have the defendants denied that

         5    this is their Facebook page?

11:53    6          MR. STEINLE:   Well, I'm going to object to the form of

         7    the -- improper foundation until he establishes that she talked

         8    to someone personally.

11:53    9          THE COURT:   Right.   Let's get those preliminary

      10    questions out, Mr. DeSouza.

11:53   11    BY MR. DeSOUZA:

11:53   12    Q.   Ms. Jones, are you familiar with the pleadings and other

      13    documents that have been filed in this lawsuit since the

      14    beginning?

11:53   15    A.   Yes.

11:53   16    Q.   Okay.   Am I correct that Prepared Food filed a complaint

      17    where it made its allegations of copyright infringement?

11:53   18    A.   Yes.

11:53   19    Q.   Am I correct that defendants filed an answer to that

      20    complaint?

11:53   21    A.   Yes.

11:53   22    Q.   Okay.   In that answer, to your knowledge, did the

      23    defendants admit or deny that this is their Facebook page?

11:53   24    A.   They deny.

11:53   25    Q.   Okay.   Have there been other documents exchanged in this

1  case where the defendants, to your knowledge, have denied this

2  is their Facebook page?

11:53  3        MR. STEINLE:  Well, I object, but which defendants is

4  he talking about?

11:54  5        THE COURT:  Yeah.

11:54  6  BY MR. DeSOUZA:

11:54  7  Q.  Ms. Jones, to your knowledge, have there been any other

8  documents where Nofal, LLC d/b/a Food Town denies that this is

9  its Facebook page?

11:54  10  A.  Yes.

11:54  11  Q.  Okay.  To your knowledge, are there also documents filed in

12  this case where Mr. Jaber denies that this is Nofal, LLC's

13  Facebook page?

11:54  14        MR. STEINLE:  I object --

11:54  15  A.  Yes.

11:54  16        MR. STEINLE:  -- improper foundation.

11:54  17        THE COURT:  No, the answer will stand.  The objection

18  is overruled.

11:54  19  BY MR. DeSOUZA:

11:54  20  Q.  Okay.  Are you familiar with what interrogatories are, Ms.

21  Jones?

11:54  22  A.  I am.

11:54  23  Q.  In general, what is your understanding of what

24  interrogatories are?

11:54  25  A.  Interrogatories are written questions that are to be

1    answered truthfully.

11:54    2    Q.   Okay.   Did Prepared Foods serve interrogatories on either

3    of the defendants in this case?

11:54    4    A.   Yes.

11:55    5    Q.   Okay.   Have you seen the defendants' responses to those

6    interrogatories?

11:55    7    A.   I have.

11:55    8    Q.   Okay.   Ms. Jones, I'm going to put up on the screen what

9    we've marked as Plaintiff's Exhibit 8, which is identified as

10   Nofal, LLC d/b/a Food Town Mart's answers to interrogatories.

11   Do you see that?

11:55    12   A.   I do.

11:55    13   Q.   Have you ever seen this document prior to today?

11:55    14   A.   Yes.

11:55    15   Q.   Is this a document that was served on the plaintiff in this

16   lawsuit?

11:55    17   A.   Yes.

11:55    18   Q.   Okay.   And if I scroll to the very bottom, Ms. Jones, it

19   appears to be dated; correct?

11:55    20   A.   Yes.

11:55    21   Q.   And what's the date?

11:55    22   A.   17th day of August, 2023.

11:55    23   Q.   And it's signed; correct?

11:55    24   A.   Yes.

11:55    25   Q.   Who signed it?

11:55   1    A.    Sharif Jaber.

11:55   2    Q.    All right. And it looks like there's also a notary

3    signature, and I won't ask you to interpret whose signature

4    that is, okay.

11:55   5    A.    Thank you.

11:56   6         MR. DeSOUZA:    Okay. Your Honor, I would ask that

7    Plaintiff's Exhibit 8 be admitted into evidence.

11:56   8         MR. STEINLE:    Well, I don't think that this is --

9    proper foundation's been laid for a document in discovery to be

10    admissible into evidence. I don't think -- I think that there

11    has to be a proper foundation, in other words, the individual

12    that signed the discovery. They're trying to get in this

13    discovery through a third party, Judge.

11:56   14         THE COURT:    Understood. Mr. DeSouza, since the

15    individual who executed the affidavit will be a witness, you

16    can ask him about the response. But this is not a proper

17    witness to do so.

11:56   18         MR. DeSOUZA:    All right. I'll take --

11:56   19         THE COURT:    The objection is sustained.

11:56   20         MR. DeSOUZA:    I'll take that down, your Honor.

11:56   21    BY MR. DeSOUZA:

11:57   22    Q.    Ms. Jones, you said your understanding is the defendants

23    have denied this being Nofal, LLC's Facebook page; correct?

11:57   24    A.    Correct.

11:57   25    Q.    Do you believe that to be a true statement?

11:57    1         MR. STEINLE:  Well, I object, Judge.  Again, he's

2    asking this opinion to render an opinion about the

3    truthfulness.

11:57    4         THE COURT:  The objection is sustained.  The jury is

5    instructed to ignore the question.

11:57    6    BY MR. DeSOUZA:

11:57    7    Q.  Ms. Jones, other than the Facebook page -- other than the

8    Facebook post with the alleged infringement, did you take

9    photographs or screenshots of any other photographs on that

10    Facebook page?

11:57    11    A.  I did.

11:57    12    Q.  How many are we talking about?

11:57    13    A.  I would have to say maybe hundreds.

11:57    14    Q.  Okay.  Ms. Jones, I would like to show you what we've

15    identified as Plaintiff's Exhibit 19, okay?  Is this another

16    screenshot of the same Villard Food Town account?

11:58    17    A.  Yes.

11:58    18    Q.  Okay.  And I guess this is at a time when the name was Food

19    Town Mart; is that right?

11:58    20    A.  Yes.

11:58    21    Q.  And the date of this screenshot, Ms. Jones, is what?

11:58    22    A.  26 September, 2023.

11:58    23    Q.  Okay.  So the lawsuit was already going at that time;

24    correct?

11:58    25    A.  Yes.

11:58  1    Q.  All right.  So what is this a screenshot of?

11:58  2    A.  All of the photos that appear on this business' Facebook

3    page.

11:58  4    Q.  So you took a screenshot -- it looks like there's a photo

5    tab, if you will, on this Facebook page?

11:58  6    A.  Yes.

11:58  7    Q.  And you took a screenshot of all of the photographs that

8    appeared on the Facebook page as of that date?

11:58  9    A.  Correct.

11:58  10          MR. DeSOUZA:  Okay.  Your Honor, I would ask that

11    Plaintiff's Exhibit 19 be moved into evidence.

11:58  12          MR. STEINLE:  I would object on relevancy grounds.

13    We're talking about one photograph.  I don't know what

14    relevance this has to the proceedings before the Court.

11:59  15          THE COURT:  The objection is sustained.

11:59  16    BY MR. DeSOUZA:

11:59  17    Q.  Ms. Jones, why did you take photographs -- why did you take

18    screenshots of other photographs on the page?

11:59  19    A.  To show --

11:59  20          THE COURT:  Mr. DeSouza, that's irrelevant to the

21    case, unless you're prepared to demonstrate to this jury that

22    the named defendants posted other of your client's photos on

23    their web page or Facebook page, it's totally irrelevant to

24    your client's case.

11:59  25          MR. DeSOUZA:  Your Honor, the relevance, if you will,

1    is that Mr. Jaber in his deposition looked at these same

2    photographs, photographs that depict the store itself, the

3    shelving on the store, the products being sold, and testified

4    under oath, "I don't sell those products.  That's not my store.

5    Those are not signs from my store."  And so the relevance is at

6    least with respect to products being sold and flyers showing

7    that this is, indeed, the store at issue, your Honor, the same

8    signs, the same speakers, the same --

12:00    9         THE COURT:  With all due respect, Mr. DeSouza, your

10    explanation just given totally underscores Mr. Steinle's

11    objection.  Not relevant.

12:00    12    BY MR. DeSOUZA:

12:00    13    Q.  Ms. Jones, was Food Town Mart authorized at any point in

14    time to use PFP's photograph?

12:00    15    A.  No.

12:00    16    Q.  The --

12:00    17         THE COURT:  Ms. Jones, you don't even have evidence

18    that this photograph actually came from your website; correct?

12:00    19         THE WITNESS:  Correct.

12:01    20         THE COURT:  And looking at the photograph as a

21    layperson, how would he or she even know that it was

22    copyrighted without the copyright symbol appearing in the

23    graphic?

12:01    24         THE WITNESS:  There was no requirement for

25    a photograph --

12:01   1          THE COURT:  I'm not saying about a requirement.  I'm

2      talking about if I were to see a photograph on the internet, it

3      didn't have the copyright signal -- symbol, it didn't come from

4      Getty Images where most of these photos have a disclaimer at

5      the foot saying where it was produced, so how would a layperson

6      know that an item is copyrighted in the absence of the

7      copyright symbol?

12:02   8          I appreciate the law says there's no requirement.  But my

9      question is:  How does a layperson acquire an understanding

10     that something is or may be copyrighted?

12:02   11          THE WITNESS:  When you perform a Google search for an

12     image, it says under the results, "This image may be subject to

13     copyright."  You have the option to view the image source and

14     follow that trail.

12:02   15          THE COURT:  Thank you.

12:02   16          THE WITNESS:  You're welcome.

12:02   17     BY MR. DeSOUZA:

12:02   18     Q.  Ms. Jones, whether -- whether it was named Villard Food

19     Town or Food Town Mart, at least the display name of the

20     Facebook account, did that account use the photo that's at

21     issue in this case?

12:02   22     A.  Yes.

12:03   23     Q.  Okay.  And you don't know whether whoever put the photo up

24     got it specifically from your website or from some other

25     website that may have been authorized to use the photograph;

1 | correct?

12:03 2 | A.  Correct.

12:03 3 |          MR. STEINLE:  Well, I object.  That's asked and

4 | answered.  She already answered the question.  She said she

5 | doesn't know where it -- that it came from her website.  It's

6 | asked and answered.

12:03 7 |          THE COURT:  Yes.  That's correct, Mr. Steinle.

12:03 8 |      Do you have any other questions, Mr. DeSouza?

12:03 9 |          MR. DeSOUZA:  No, your Honor, not at this time.

12:03 10 |          THE COURT:  Mr. Steinle, any cross of this witness?

12:03 11 |          MR. STEINLE:  I do, your Honor.

12:03 12 |          THE COURT:  You may proceed.

12:03 13 |          THE WITNESS:  May I just -- may I get a drink of

14 | water?

12:03 15 |          THE COURT:  Certainly.

12:03 16 |          THE WITNESS:  Thank you.

12:03 17 |          THE COURT:  Ms. Vraa, could get the witness a cup of

18 | water.

12:04 19 |          THE WITNESS:  I have my bottle.  Thank you.  Thank you

20 | very much.

12:04 21 |                     CROSS-EXAMINATION

12:04 22 |                     BY MR. STEINLE:

12:04 23 | Q.  Good afternoon, Ms. Jones.  I think it's early afternoon.

12:04 24 | A.  Good afternoon.

12:04 25 | Q.  In this particular case, ma'am, you completed or prepared

1    and finished a document which was entitled The Declaration of

2    Rebecca Jones.  Do you remember doing that, ma'am?

12:04    3    A.  I do.

12:04    4    Q.  And, in fact, that was filed with this Court under Document

5    No. 36, and it was -- this document, the declaration, is

6    entitled 36-1.  Do you remember doing that document, ma'am?

12:04    7    A.  I do.

12:04    8    Q.  In that document -- and by the way, you signed that

9    document under oath, did you not?

12:04    10    A.  Yes.

12:05    11    Q.  Now, in that document, ma'am, you indicated some things.

12    You indicated that --

12:05    13         MR. DeSOUZA:  I'm going to object, your Honor.

14    Whatever document Mr. Steinle is referring to is not on any

15    exhibit list.  He's not using it to refresh a witness'

16    recollection.  He's not impeaching her, as far as I can tell

17    with it, it's -- I think it's an improper exhibit at this

18    point.

12:05    19         MR. STEINLE:  Oh, no, Judge.  This is a document

20    that's filed with the Court.  This is a document in the record

21    already.  It is not an exhibit.  I'm not going to use it as an

22    exhibit.  I'm -- this is a document that she -- this is a prior

23    executed affidavit that she prepared.

12:05    24         THE COURT:  Sure.  No, the objection is overruled.

25    You may question the witness.

12:05    1    BY MR. STEINLE:

12:05    2    Q.  Now, ma'am, in that document, you indicated that there were

         3    -- and I'm going to read it -- "For any image," and then you

         4    put in parentheses, "(including the 16 at issue in this

         5    lawsuit)," comma, "the plaintiff photographer spent hours

         6    specializing lighting, equipment and take dozens if not

         7    hundreds of images."  We're not talking about 16 images.  We're

         8    talking about one photograph of a pork chop; right?

12:06    9    A.  Correct.

12:06   10    Q.  But you indicated in this affidavit that there were 16

        11    different images that are at issue in this lawsuit, did you

        12    not?

12:06   13    A.  There was an inadvertent six.

12:06   14    Q.  Pardon?

12:06   15    A.  There was an inadvertent six that was included.

12:06   16    Q.  But -- but it's written S-I-X-T-E-E-N.  It's not

        17    inadvertent to write S-E-X -- S-I-X-T-E-E-N, is it?

12:06   18    A.  No.  It was an error.  It's never been disputed that

        19    there's only one image involved.

12:06   20    Q.  And then -- and then in this affidavit, what you indicate,

        21    ma'am, is you said when the plaintiff staff discovers an

        22    existing photograph, it says the plaintiff, meaning PFP,

        23    creates an infringement notice and that the date of -- and the

        24    date of the delivery is within one or two days thereafter.

        25    That's what it indicates, the plaintiff.

106

12:07    1       Did you, ma'am, or did PFP create an infringement notice?

12:07    2    A.  We did.

12:07    3    Q.  And do you have a -- did you prepare that infringement

      4    notice?  Did PFP prepare that infringement notice?

12:07    5    A.  We did.

12:07    6    Q.  And do you have a copy of that infringement notice?

12:07    7    A.  I -- I do.

12:07    8    Q.  And when was -- when was the date of the infringement

      9    notice sent by PFP?

12:07   10    A.  The infringement notice was sent to our attorney.

12:07   11    Q.  No, but that's not what it says.  It says the infringement

   12    notice indicates it's sent to the violator.  Did PFP send an

   13    infringement notice to the violator?

12:07   14    A.  Is that -- is that what -- does it say an infringement

   15    notice was sent to the violator?

12:07   16    Q.  I will read this to you.  When the plaintiff's --

   17    plaintiff's staff discovers an existing, and then there's a

   18    parentheses, infringement of one of the photographs, the

   19    plaintiff creates an infringement notice on the date of

   20    discovery within one or two days thereafter.  The infringement

   21    notice identifies the date, displays the subject, and displays

   22    a screenshot of the infringer's alleged use together with the

   23    URL where the infringement is located.  And then you say a true

   24    and correct copy of the infringement notice with respect to the

   25    work at issue in this lawsuit is attached hereto and labeled as

1    Exhibit No. 1, but that wasn't attached, was it?

12:08    2    A.   The screenshot from the infringement notice was.

12:08    3    Q.   But not the notice.

12:08    4    A.   If I can explain the process a little bit?

12:08    5    Q.   No.  I'm just asking whether PFP, your company --

12:08    6    A.   Uh-huh.

12:08    7    Q.   -- sent an infringement notice within one or two days after

8    discovery.

12:08    9    A.   We did.

12:09   10    Q.   And who did you send it to?

12:09   11    A.   Our attorney.

12:09   12    Q.   You never sent it to the violator.

12:09   13    A.   No.

12:09   14    Q.   And the -- as we sit here today, the only notice that you

15    know of is the letter from Mr. DeSouza in November of 2021?

12:09   16    A.   Along with the complaints.

12:09   17    Q.   The only infringement notice.

12:09   18    A.   Correct.

12:09   19    Q.   And you have testified on direct examination what we're

20    talking about today is a photograph that was taken in 1997;

21    correct?

12:09   22    A.   Yes.

12:09   23    Q.   It wasn't copyrighted for 20 years until 2017; right?

12:09   24    A.   Correct.

12:09   25    Q.   And it wasn't used until 2023; right?

12:09   1   A.   Incorrect.

12:09   2   Q.   Excuse me. It is incorrect. 2020 it was used; right?

12:09   3   A.   Correct.

12:10   4   Q.   So from the date of creation until the date of use, that

5   photograph's 23 years old?

12:10   6   A.   Yes.

12:10   7   Q.   Is that photograph on the internet before it's copyrighted?

12:10   8   A.   I don't know.

12:10   9   Q.   In any event, you continue on with your declaration and you

10   indicate this: That the defendant's have -- are not and have

11   never been licensed to display the work. And this is your

12   affidavit under oath: Through its ongoing diligent efforts to

13   identify unauthorized use of the photographs, the plaintiff's

14   first discovery of the defendant's unauthorized use display of

15   the photograph at issue is in approximately April of 2022.

16   That's what you have in your declaration, ma'am. That it

17   wasn't even discovered until six months after the notice goes

18   out.

12:11   19   A.   No. I'm sorry. That must have been an error on my

20   declaration. Because the day that we take the screenshot is

21   the first day we find the use, which is before that date.

12:11   22   Q.   But you continue on in your declaration, and you state in

23   the following paragraph that: Given the volume of the

24   plaintiff's library, the plaintiff was reasonably unable to

25   discover the defendant's improper use of the work prior to

109

1    April of 2022.

12:11    2         So, again, in another paragraph, you're referencing

3    discovery in April of 2022.  Was the work discovered prior to

4    April of 2022?

12:11    5    A.   It was discovered at the date of the screenshot.

12:11    6    Q.   Then why in your declaration are you commenting or

7    mentioning under oath that the discovery is in April of 2022?

12:12    8    A.   It was an error.

12:12    9    Q.   Now, you also indicate in your declaration that:  Following

10   plaintiff's discovery of the infringement, the plaintiff sent

11   at least one infringement notice to the defendant to notify it

12   of the impermissible use.  And then you continue in your

13   declaration under oath by stating:  The defendant's president

14   and founder -- the defendant's president and founder --

15   responded to the plaintiff's infringement notice by seemingly

16   wanting to resolve the matter.  Multiple subsequent e-mails to

17   the defendant to resolve this matter were largely ignored.

12:12    18        Did the plaintiff, you, did you send an infringement notice

19   to Sharif Jaber or Nofal, LLC?

12:13    20   A.   My attorney's office, as our representative, sent an

21   infringement notice.

12:13    22   Q.   But that doesn't -- it says the plaintiff sent it.  But

23   we've already established the letter to Faraj Jaber is the only

24   notice that's been sent in this case; right?

12:13    25   A.   Yes.

12:13  1  Q.  Do you have any notice that was sent to Sharif Jaber

2  personally or as the member president of Nofal, LLC?  Do you

3  have any notice?

12:13  4  A.  No.

12:13  5  Q.  So who did -- who did the PFP talk to who was the president

6  and founder of the defendant that talked about resolution?  Who

7  talked to them?

12:13  8  A.  I know that there was -- there was a discussion and -- with

9  the landlord, who let us know who owned the grocery store.

12:14  10  Q.  But that's not the owner of the business, ma'am.  That's

11  not the infringer.  The landlord's not the infringer, is the

12  landlord?

12:14  13  A.  No.

12:14  14  Q.  Is the landlord authorized, if you know, to enter into

15  settlement discussions about a violation of a copyright?

12:14  16  A.  No.

12:14  17  Q.  You indicate in your -- in your affidavit:  Multiple

18  subsequent e-mails were sent to the defendant.  How many

19  e-mails were sent to the defendant Mr. Sharif Jaber?

12:14  20  A.  I don't know.

12:14  21  Q.  How many e-mails were sent to Nofal, LLC?

12:14  22  A.  I don't know.

12:14  23  Q.  But you indicate that in your declaration that multiple

24  e-mails were sent; correct?

12:14  25  A.  Yes.

12:15     1    Q.  Now...

12:15     2        MR. STEINLE:  I am not very talented.

12:15     3     Can you get that there, Sharif, while I get the document

          4   up?

12:15     5        MR. JABER:  No.

12:15     6        MR. STEINLE:  Huh?

12:15     7        MR. JABER:  No.

12:15     8        MR. STEINLE:  I was here before.  It worked.

12:16     9   BY MR. STEINLE:

12:16    10    Q.  Well, let me -- let me ask the question so as to not delay

       11   these proceedings.

12:16    12     The only notice which we've established is sent to Faraj

       13   Jaber; correct?

12:16    14    A.  Yes.

12:16    15    Q.  And did you see the address on that notice?

12:16    16    A.  Yes.

12:16    17    Q.  The address is 3127.  That's not the address of the store,

       18   is it, ma'am?

12:16    19    A.  Correct.

12:16    20    Q.  The address is 3217 Villard.  So the notice even has the

       21   wrong address on it; correct?

12:16    22    A.  I noticed that today, yes.

12:16    23    Q.  You don't know whether anybody ever received that November,

       24   2021 notice, do you -- that anybody ever received it, do you?

12:17    25    A.  I do.

12:17   1   Q.   You do know that they received it?

12:17   2   A.   Yes.   I know that someone received it, yes.

12:17   3   Q.   How do you know that, ma'am?

12:17   4   A.   Because the person who received it indicated that they were
        5   the landlord, and it was not --

12:17   6   Q.   They didn't indicate that to you, ma'am, did they?

12:17   7   A.   They indicated it to my attorney, who represents --

12:17   8   Q.   That -- that's -- they didn't indicate that to PFP, did
        9   they?

12:17   10  A.   Mr. DeSouza's law firm acts as our representative for us.

12:17   11  Q.   If -- if, indeed, what you just testified to, then my
        12  question to you is:   This is now May 31st of 2022.   You
        13  authorized that law firm, the Copycat law firm, to file an
        14  original summons and complaint naming Faraj Jaber; correct?

12:18   15  A.   I don't know that Faraj Jaber was named individually.

12:18   16  Q.   You filed the original complaint against Mr. Jaber doing
        17  business as Villard Food Town; right?

12:18   18          MR. DeSOUZA:   Objection, your Honor.   This is
        19  misrepresenting the record.   The defendant in this case
        20  originally was Villard Food Town, LLC.   Mr. Steinle is just --

12:18   21          MR. STEINLE:   I will withdraw the question and reask
        22  it.

12:18   23          THE COURT:   All right.

12:18   24  BY MR. STEINLE:

12:18   25  Q.   The original lawsuit, we're talking about the notice going

1  in November, and you're telling me there's some conversations

2  about they've got the wrong person.  But even though they've

3  got the wrong person, you sue Villard Food Town, LLC in May of

4  2022; right?

12:19  5  A.  I don't -- I'm not a hundred percent positive on when the

6  conversations were as to the wrong party, whether it was -- I

7  think it might have been after the complaint was filed, the

8  original complaint.

12:19  9  Q.  And it wasn't until February 6th of 2023 that Nofal, LLC

10  and Sharif Jaber are sued.  It isn't until February 6th of 2023

11  that they're -- that my clients are sued; right?

12:19  12  A.  Correct.

12:19  13  Q.  So between May 31st of 2022 and February 6th of 2023, are

14  you aware of any other notice that my client had of this

15  pending copyright lawsuit?  Are you aware of any?

12:19  16  A.  No.

12:20  17  Q.  Other than this one photograph that was incorporated into a

18  group of three photographs listing a sale, are you aware of any

19  other use of any photograph of PFP other than this one?

12:20  20  A.  No.

12:20  21  Q.  And this is one of approximately 20,000; correct?

12:20  22  A.  18,000.

12:20  23  Q.  Okay.  And whether it's one of 18 or 20, that -- we're only

24  talking about one photograph; right?

12:20  25  A.  Correct.

12:20   **1**   Q.  So is -- is the 18,000 the entire library that you sell for

   **2**   $999 a month?

12:20   **3**   A.  We don't sell the library.  You're subscribed to the

   **4**   library.

12:21   **5**   Q.  I apologize for my misspeaking.  The subscription.

12:21   **6**   A.  Correct.

12:21   **7**   Q.  So I'm not a math major, but one out of approximately

   **8**   20,000 is .0005 percent; correct?

12:21   **9**   A.  That's correct, but it doesn't matter.

12:21   **10**   Q.  I didn't ask that, ma'am.  I asked if that was the correct

   **11**   percentage.

12:21   **12**   A.  For the math calculation, yes.

12:22   **13**   Q.  Have you calculated what you have declared to be that the

   **14**   use of the photograph greatly reduced the value of the

   **15**   plaintiff's library, have you calculated that loss, ma'am?

12:22   **16**   A.  Yes.

12:22   **17**   Q.  And what is your calculation, what you talked about, the

   **18**   failure to pay the subscription fee?

12:22   **19**   A.  Yes.

12:22   **20**   Q.  But that's not the comment.  The -- or not the question.

   **21**   The question is:  How does this photograph greatly reduce the

   **22**   value of the library?

12:22   **23**   A.  As I spoke about earlier, an unauthorized use goes against

   **24**   what we are telling our licensed paying subscribers they are

   **25**   receiving, which is the enforcement of ensuring that only our

1  subscribers are using our photos, we have control over who and

2  where those photos are being used.

3  Q.  But it only reduces the value of the library if somebody

4  knows that this is a copyrighted photograph; right?

5  MR. DeSOUZA:  Objection.  How can she know that?  Lack

6  of foundation.

7  THE COURT:  No, that objection is overruled.

8  A.  I'm sorry.  Could you repeat the question?

9  BY MR. STEINLE:

10  Q.  Yes, I may -- yes, I could.  The value of the library is

11  only reduced if someone is aware that the use of that

12  photograph is a copyrighted photo; right?

13  A.  I disagree with that statement.

14  Q.  And coupled with these -- this one photograph were two

15  other photographs that you didn't own those photographs, did

16  you?

17  A.  We did not.

18  Q.  And you don't know whether they're copyrighted, did you?

19  A.  I have no idea.

20  Q.  You also indicate along the same lines that -- in this

21  declaration that the use of the photograph, quote, "greatly

22  impairs the market value of the photographs since others

23  competing with that business or in a related business will not

24  want to obtain a license from the plaintiff's work."  How does

25  anybody know by looking at the screenshot of the violation that

1    that's a copyrighted photo?

12:24    2    A.   They may not know that it's a copyrighted photo, but that

3    doesn't mean that it doesn't damage our company.

12:25    4              MR. STEINLE:   Thank you, Ms. Jones.   I don't have any

5    further questions.

12:25    6              THE COURT:   Thank you.

12:25    7         Mr. DeSouza, anything further?

12:25    8              MR. DeSOUZA:   Yes, your Honor.

12:25    9                       REDIRECT EXAMINATION

12:25    10                       BY MR. DeSOUZA:

12:25    11   Q.   Ms. Jones, you testified -- well, let's start with this

12   idea of copyrighted photograph, Ms. Jones.   Who owned the

13   photograph at issue in this case from the date of its creation

14   through today, so interest from 1997 through today, who's the

15   owner of that photograph?

12:25    16   A.   Our company.

12:25    17   Q.   And in terms of owning the copyright in the photograph, do

18   you understand whether there's any difference in owning the

19   copyright versus registering the photograph with the copyright

20   office?

12:25    21   A.   Registering the photograph with the copyright office just

22   affords you some further protection.   But as soon as a

23   photographer clicks the shutter, they have the copyright to

24   that photo.

12:26    25   Q.   So who owned the copyright in this photograph from 1997

1    through September 28th, 2020, when the alleged infringement

2    occurred?

12:26    3    A.    Our company.

12:26    4    Q.    Ms. Jones, you testified that you went to the store

5    yesterday, I believe; correct?

12:26    6    A.    Yes.

12:26    7    Q.    What time of day did you go to -- and it's the store on

8    3217 West Villard?

12:26    9    A.    Yes.

12:26    10    Q.    What time of day did you go to the store?

12:26    11    A.    It was in the afternoon, early afternoon.

12:26    12    Q.    Okay.  Did you go into the store?

12:26    13    A.    I did.

12:26    14    Q.    Did you shop?

12:26    15    A.    I did.

12:26    16    Q.    Did you walk around?

12:26    17    A.    I walked, yes, around the entire store.

12:26    18    Q.    Okay.  Ms. Jones, I want to show you another one of these

19    screenshots, which we've identified as Plaintiff's Exhibit 18.

20    There it is on the screen.  Do you see that on the screen, Ms.

21    Jones?

12:26    22    A.    I do.

12:27    23    Q.    Okay.  Is this another one of these Facebook posts from the

24    same Food Town Mart or Villard Food Town account?

12:27    25    A.    Yes.

12:27    1    Q.   Okay.   And the date on this screenshot was when?

12:27    2    A.   September 28th, 2023.

12:27    3    Q.   And it appears to be a Facebook post; correct?   Do you see

       4    the date of the post?

12:27    5    A.   I do.

12:27    6    Q.   What's the date?

12:27    7    A.   September 6, 2022.

12:27    8    Q.   Okay.   And I think we -- does this appear to be the same

       9    like main photograph associated with this account which is the

     10    outside of the store?

12:27    11    A.   Yes.

12:27    12    Q.   Okay.   And is this the same store that you went and visited

     13    yesterday?

12:27    14    A.   It is.

12:27    15    Q.   Okay.   Ms. Jones, when you walked around the store, did you

     16    see anything at the store from any of the Facebook postings

     17    that you had looked at previously?

12:27    18          MR. STEINLE:   I object, relevancy.

12:28    19          THE COURT:   Yeah.   This is in 2024, not 2021, '22, or

     20    '23.   This is not relevant to the case before the jury.

12:28    21          MR. DeSOUZA:   Your Honor --

12:28    22          THE COURT:   Let's move on.

12:28    23          MR. DeSOUZA:   -- I'd like to make a record briefly,

     24    your Honor.   The only reason I asked her is that Mr. Jaber has

     25    denied that this is his store in his testimony.   He has said,

1    "Those are not my signs, those are not my store."  And to the

2    extent that Ms. Jones can say, "Yes, those are the same signs

3    and the same things that I saw," that would be the purpose of

4    the testimony, your Honor.

5           THE COURT:  That's fine.  You've made your record.

6    The Court and Mr. Steinle have made theirs.  Let's move on.

7    BY MR. DeSOUZA:

8    Q.  Okay.  Ms. Jones, the original defendant in this case, as

9    Mr. Steinle pointed out, was a company named Villard Food Town,

10   LLC; correct?

11   A.  Yes.

12   Q.  Okay.  But that is no longer the defendant in this case;

13   right?

14   A.  Correct.

15   Q.  And why is it that PFP changed the defendant in this

16   lawsuit from Villard Food Town to both Mr. Jaber and Nofal,

17   LLC?  What reason?

18          MR. STEINLE:  Object, improper foundation.

19          THE COURT:  Yes.  The objection is sustained.

20   BY MR. DeSOUZA:

21   Q.  Ms. Jones, why do you believe that Nofal, LLC and Mr. Jaber

22   are the proper defendants who owned this Facebook page, rather

23   than some other company?

24          MR. STEINLE:  I object, relevance.

25          THE COURT:  Sustained.

120

12:29 1         MR. DeSOUZA:  Okay.  Ms. Jones, I have no further

2  questions for you at this time.

12:29 3         THE WITNESS:  Okay.

12:29 4         THE COURT:  Mr. Steinle, anything further?

12:29 5         MR. STEINLE:  Nothing in response to his redirect,

6  sir.

12:29 7         THE COURT:  Thank you.

12:29 8       Members of the jury, we're going to recess for lunch.  As I

9  explained, we're going to take 45 minutes.  Again, I remind you

10  as I did earlier:  Please do not discuss the case among

11  yourselves during the recess.  You can talk about the Packer

12  win or anything else that may be on your mind, but please do

13  not discuss this case.  Please leave your notebooks on your

14  chair.  They will be there when you return.  I would ask that

15  you be back in the jury room at 1:15.  We'll see you then.  The

16  Court stands in recess.

12:30 17         COURT SECURITY OFFICER:  All rise.

12:30 18         (The jury left the courtroom.)

12:30 19         (The proceedings recessed for lunch.)

13:16 20         COURT SECURITY OFFICER:  All rise.

13:16 21         (The jury entered the courtroom.)

13:16 22         (The court is called to order.)

13:17 23         THE COURT:  Good afternoon, members of the jury.  Good

24  afternoon, counsel and your clients.

13:17 25       Mr. DeSouza, you may call your next witness.

13:17   1          MR. DeSOUZA:  Your Honor, plaintiff calls Amjad Hamed.

13:17   2          MR. STEINLE:  May I have permission to go get him?

13:18   3          THE COURT:  Sure.

13:18   4          THE CLERK:  Please raise your right hand.

13:18   5          (The witness is sworn.)

13:18   6          THE WITNESS:  Yes.

13:18   7          THE CLERK:  Thank you.  Please be seated.  Please

        8   state your full name and spell it for the court reporter.

13:18   9          THE WITNESS:  Amjad Sharif Hamed, first name

        10  A-M-J-A-D, middle name S-H-A-R-I-F, last name H-A-M-E-D.

13:18   11                      AMJAD SHARIF HAMED,

        12  called by the Plaintiff as a witness herein, having been first

        13  duly sworn, was examined and testified as follows:

13:18   14                      DIRECT EXAMINATION

13:18   15                      BY MR. DeSOUZA:

13:18   16  Q.   Good afternoon, Mr. Hamed.

13:18   17  A.   Good afternoon.

13:18   18  Q.   Mr. Hamed, this is not the first time that you and I are

        19  talking to each other; right?

13:18   20  A.   No, sir.

13:18   21  Q.   I think you had your deposition taken in this case, it was

        22  a little less than a year ago in December of last year; is that

        23  right?

13:19   24  A.   Yes, sir.

13:19   25  Q.   At the time of your deposition, you were living with your

1    parents, which I believe are -- Sharif Jaber is your father;

2    correct?

13:19    3    A.   Yes.

13:19    4    Q.   And Sharif Jaber is the gentleman that's in the courtroom

5    over here; correct?

13:19    6    A.   Yes, sir.

13:19    7    Q.   Okay.  Are you still living at that same address?

13:19    8    A.   No, sir.

13:19    9    Q.   Okay.  You've moved since then; correct?

13:19    10    A.   Yes, sir.

13:19    11    Q.   At the time of your deposition, you had not discussed this

12    lawsuit substantively with your father; correct?

13:19    13    A.   No, sir.

13:19    14    Q.   Have you had a chance to discuss it with him since then?

13:19    15    A.   No, sir.

13:19    16    Q.   Okay.  Now, the other defendant in this case besides Mr.

17    Jaber is an entity named Nofal, LLC.  The name Nofal, that has

18    a meaning to you; correct?

13:19    19    A.   Yes, sir.

13:19    20    Q.   It's your brother's name; correct?

13:19    21    A.   Yes, sir.

13:19    22    Q.   I believe it's an older brother; correct?

13:19    23    A.   Yes, sir.

13:19    24    Q.   How much older is Nofal than you?

13:19    25    A.   About five years.

13:19  1    Q.   About five years?

13:19  2    A.   Yes, sir.

13:20  3    Q.   Okay.  Do you still work at the Food Town Mart on 3217 West

       4    Villard?

13:20  5    A.   Yes, sir.

13:20  6    Q.   Okay.  And you worked there about a year ago when we took

       7    your deposition; correct?

13:20  8    A.   Yes, sir.

13:20  9    Q.   True that you've worked there since it was either late 2019

       10   or early 2020; correct?

13:20  11   A.   Yes, sir.

13:20  12   Q.   Food Town Mart at 3217 West Villard, that is a supermarket/

       13   grocery store; correct?

13:20  14   A.   Yes, sir.

13:20  15   Q.   And if I -- my math is right, you've worked there for about

       16   four years at this point, maybe a little bit more; is that

       17   right?

13:20  18   A.   Just about, yes, sir.

13:20  19   Q.   And when you first started, you were a stocking clerk and

       20   you became a floor manager by the time that I talked to you

       21   last year; correct?

13:20  22   A.   Yes, sir.

13:20  23   Q.   About how long were you a clerk versus the floor manager

       24   for?

13:21  25   A.   I don't remember off the top of my head.

13:21    1    Q.   Okay.  Was it pretty quick that you graduated to floor

2    manager?

13:21    3    A.   Maybe about year and a half, two years.

13:21    4    Q.   Okay.  And for the entire time that you've worked at the

5    store, it's been known as the Food Town Mart; correct?

13:21    6    A.   Yes, sir.

13:21    7    Q.   Is there still a sign today at the store that says Villard

8    Food Town?

13:21    9    A.   Yes, sir.

13:21    10    Q.   Okay.  So when I -- when I drive in to the shopping center

11    to the grocery store, there's a sign outside that says Villard

12    Food Town?

13:21    13    A.   Yes, sir.

13:21    14    Q.   There also a sign that says Food Town Mart on the outside?

13:21    15    A.   Yes, sir.

13:21    16    Q.   Okay.  But to your knowledge, at least internally, you

17    believe the store is called Food Town Mart, notwithstanding the

18    sign that says Villard Food Town; correct?

13:21    19    A.   Yes, sir.

13:22    20    Q.   Okay.  The name Villard Food Town, that to your knowledge

21    was the name prior to it being Food Town Mart; correct?

13:22    22    A.   As far as I know, yes, sir.

13:22    23    Q.   But regardless of the name, whether it's Villard Food Town

24    or Food Town Mart, the store has always operated at that same

25    address on Villard Avenue; correct?

13:22   1   A.  3217 West, yes, sir.

13:22   2   Q.  I keep saying "Villard."  Is it "Villard"?

13:22   3   A.  It's "Villard," yes, sir.

13:22   4   Q.  Okay.  Well, I'll do my best.

13:22   5   A.  No problem.

13:22   6   Q.  As the floor manager -- and are you still the floor manager

7   of the store?

13:22   8   A.  Yes, sir.

13:22   9   Q.  Okay.  Has your position changed at all in the year since I

10   last talked to you?

13:22   11   A.  No, sir.

13:22   12   Q.  Okay.  So then as floor manager, I'm correct, then, that

13   you're generally in charge of things like ordering products,

14   opening the store when you're there, closing the store when

15   you're there; is that right?

13:22   16   A.  Somewhat, yes, sir.

13:22   17   Q.  And generally making sure that things are in order at the

18   store?

13:22   19   A.  Uh-huh.

13:22   20   Q.  Yes?

13:22   21   A.  Yes, sir.

13:22   22   Q.  Okay.  And you -- you have a boss at the store; correct?

13:23   23   A.  Yes, sir.

13:23   24   Q.  Sharif Jaber, the defendant in this case, is your boss;

25   correct?

13:23    1    A.   Yes, sir.

13:23    2    Q.   He's the boss of everyone at the store; correct?

13:23    3    A.   Yes, sir.

13:23    4    Q.   And Mr. Jaber does come to the store; correct?

13:23    5    A.   Yes, sir.

13:23    6    Q.   At least five times a week?

13:23    7    A.   Yes, sir.

13:23    8    Q.   And when he's there, he's there for seven, eight hours a

9    day?

13:23   10    A.   Yes, sir.

13:23   11    Q.   Generally a full-time employee, essentially he's there at

12    the store; correct?

13:23   13    A.   I mean, it all really depends on the day and what

14    progresses through; but, yeah, roughly about.

13:23   15    Q.   And some -- and some weeks it's seven days a week; correct?

13:23   16    A.   Yeah.

13:23   17    Q.   Okay.  And when your father is -- I'm sorry, your father is

18    generally familiar with the layout of the store; correct?

13:23   19    A.   Yes, sir.

13:23   20    Q.   Okay.  I mean, you've seen him walking around the store

21    before; correct?

13:24   22    A.   Yes.

13:24   23    Q.   And to your knowledge, your father has owned this store

24    since 2017; is that right?

13:24   25    A.   As far as I know, yes, sir.

13:24  1  Q.  And to your knowledge, your father was working at this

2  store prior to 2017?

13:24  3  A.  Yes, sir.

13:24  4  Q.  Food Town Mart, the store, it sells the types of things you

5  would find in a normal grocery store; correct?

13:24  6  A.  Yes, sir.

13:24  7  Q.  So things like food, meat, toiletries, things like that;

8  correct?

13:24  9  A.  Yes, sir.

13:24  10  Q.  And that has stayed consistent since the time that you

11  started working there, whether it was late 2019 or early 2020;

12  right?

13:24  13  A.  Yes, sir.

13:24  14  Q.  Sir, Food Town Mart has a Facebook page; correct?

13:24  15  A.  Yes, sir.

13:24  16  Q.  And the Facebook page that it has is called Food Town Mart;

17  correct?

13:24  18  A.  Yes, sir.

13:24  19  Q.  Are you aware of that same Facebook page being called

20  anything else during the times you worked there?

13:24  21  A.  During the time I worked there, no.

13:24  22  Q.  Okay.  Now, when you started working there, the Facebook

23  page was already existing; correct?

13:24  24  A.  Yes, sir.

13:25  25  Q.  Okay.  And your older brother Nofal, who you said is about

1    five years older than you, he was one that was in charge of the

2    Facebook page before you started working there; correct?

13:25    3    A.   Yes, sir.

13:25    4    Q.   Is that yes, sir?

13:25    5    A.   Yes, sir.

13:25    6    Q.   Okay.  When your older brother stopped working at the

7    store, you took over control of the Facebook page; correct?

13:25    8    A.   Well, yeah, he showed me how to post on the Facebook page,

9    and there is a Facebook page for Food Town.

13:25    10    Q.   Well, when he stopped working at the store, other than

11    transitioning it over to you, he generally stopped being in

12    control of the Facebook page; correct?

13:25    13    A.   Not completely.

13:25    14    Q.   He still did a couple of posts here and there?

13:25    15    A.   Here and there.  I mean, I would talk to him for advice on

16    how to post and go about things.  Sometimes I didn't think I

17    needed advice, and I would post myself.

13:26    18    Q.   And prior to your brother leaving the employment of Food

19    Town Mart, he occupied a similar position to your job as floor

20    manager; correct?

13:26    21    A.   Yes, sir.

13:26    22    Q.   Generally doing the same thing; opening store, closing

23    store, making sure things are in order; correct?

13:26    24    A.   Yes, sir.

13:26    25    Q.   Mr. Hamed, I want to show you what's already been admitted

1   into evidence as Plaintiff's Exhibit 10 on the screen here.  Do

2   you see that on the screen?

13:26   3   A.  Yes, sir.

13:26   4   Q.  Okay.  Exhibit 10, sir, is a Facebook page.  And the URL,

5   if you see in the very lop left, it's facebook.com/

6   villardfoodtown, do you see that?

13:26   7   A.  Yes, sir.

13:26   8   Q.  Okay.  And -- but the display name of the account, the one

9   that shows to people shows as Food Town Mart.  Do you see that?

13:26   10   A.  Yes, sir.

13:26   11   Q.  The photo we're looking at at the top there of the store,

12   is that the store on 3217 Villard?

13:26   13   A.  Yes, sir.

13:26   14   Q.  Okay.  And that's what it looks look today, perhaps minus

15   that red sign on the -- on the right of the store?

13:27   16   A.  Minus the red sign and it's been painted.

13:27   17   Q.  Okay.  It's been painted since this photo was put up there;

18   correct?

13:27   19   A.  Yes, sir.  And the US Cellular sign is not up there.

13:27   20   Q.  All right.  This Food Town Mart Facebook page that we're

21   looking at here, this is Food Town Mart's Facebook page;

22   correct?

13:27   23   A.  Yes, sir.

13:27   24   Q.  And this is the page that you have been responsible for

25   maintaining since you took over the job from your brother;

1  correct?

13:27  2  A.  Yes, sir.

13:27  3  Q.  And prior to you, this was the Facebook page that your

4  brother was responsible for; correct?

13:27  5  A.  Yes, sir.

13:27  6  Q.  The -- if we scroll down just a little bit -- and I'm going

7  to make this bigger because I can't see it from here, my eyes

8  are bad -- if you see at the very bottom, you see there's a

9  date captured by FireShot 26 September, 2023, sir?

13:28  10  A.  Yes, sir.

13:28  11  Q.  All right.  So I'm going to represent to you that this

12  screenshot was created in September of '23; okay?  Is that okay

13  with you?

13:28  14  A.  Okay.  Yes, sir.

13:28  15  Q.  Okay.  Now, the most recent post that's showing here on

16  this Facebook account appears to be July 3rd, 2022.  Do you see

17  that?

13:28  18  A.  Yes, sir.

13:28  19  Q.  Okay.  Who was -- who was in charge of this Facebook page

20  in July of 2022?

13:28  21  A.  Well, I was.

13:28  22  Q.  You said you were?

13:28  23  A.  Yes, sir.

13:28  24  Q.  Okay.  Now, this says, "Fresh chicken wings on sale $2.49 a

25  pound."  Do you see that?

13:28  1   A.   Yes, sir.

13:28  2   Q.   Okay.  And you were the one that created that post;

3   correct?

13:28  4   A.   Yes, sir.

13:28  5   Q.   And if we look over here, like on the information for the

6   store, it has an address there; correct?

13:28  7   A.   Yes, sir.

13:29  8   Q.   And that's the 3217 West Villard that the store is actually

9   located at; correct?

13:29  10  A.   Yes, sir.

13:29  11  Q.   And there's also a phone number underneath that (414)

12  462-4300.  Do you see that?

13:29  13  A.   Yes, sir.

13:29  14  Q.   That's the phone number for the store; correct?

13:29  15  A.   Yes, sir.

13:29  16  Q.   Okay.  Let me go ahead and take that down for you.

17       Now, I'm going to put up on the screen another document

18  that's already been admitted as Plaintiff's Exhibit 5.  Do you

19  see that on the screen, sir?

13:29  20  A.   Yes, sir.

13:29  21  Q.   Okay.  Now, this is the same facebook.com/villardfoodtown

22  account; correct?

13:29  23  A.   Yes, sir.

13:29  24  Q.   But if you scroll to the bottom, this screenshot says it

25  was created on November 22nd, 2021.  Do you see that?

13:29   1    A.   Yes, sir.

13:29   2    Q.   Okay.  And we have here -- kind of the middle of the

        3    screen, we have a Facebook post of September 28th, 2020.  Do

        4    you see that?

13:29   5    A.   Yes, sir.

13:30   6    Q.   You were in control of the Facebook page in September, 2020

        7    when this post was made; correct?

13:30   8    A.   Me and my brother were, yes, sir.

13:30   9    Q.   Some combination of you and your brother; correct?

13:30  10    A.   Yes, sir.

13:30  11    Q.   But you yourself are the one that created this post;

       12    correct?

13:30  13    A.   Yes, sir.

13:30  14    Q.   And you were a Food Town employee at the time that this

       15    post was created; correct?

13:30  16    A.   Yes, sir.

13:30  17    Q.   This posting, if you look, it looks like there's three

       18    different types of meat that are being discussed in the post;

       19    correct?

13:30  20    A.   Yes, sir.

13:30  21    Q.   And the post has prices for each type of meat, 2.29 a pound

       22    pork chops and so on; correct?

13:30  23    A.   Yes, sir.

13:30  24    Q.   And the information for how much the meat is being sold per

       25    pound, that's not information that you independently knew;

1  correct?

13:31  2  A.  No, sir.

13:31  3  Q.  You had to get that information from someone; correct?

13:31  4  A.  Yes, sir.

13:31  5  Q.  And there's only two people that you can think of that

6  information could have come from; right?

13:31  7  A.  Yes, sir.

13:31  8  Q.  One would have been the butcher that was employed at the

9  store; correct?

13:31  10  A.  Yes, sir.

13:31  11  Q.  And the other would have been your father, who is the

12  manager of everything; correct?

13:31  13  A.  Yes, sir.

13:31  14  Q.  Okay.  But you don't recall whether it was the butcher or

15  your father that told you pork chops 2.29 a pound, spare ribs

16  1.99 a pound, you don't remember who gave you the information;

17  correct?

13:31  18  A.  I don't remember who gave me the prices, no, sir.

13:31  19  Q.  Now, the photo that's at issue in this lawsuit is the pork

20  chops, the boneless pork chops.  It looks like there's four of

21  them in the picture.  Do you see that?

13:31  22  A.  Yes, sir.

13:31  23  Q.  Now, whether it's this photo or the other two photos, you

24  would have gone through the same process to find that photo

25  online and post it onto the Facebook page; correct?

13:31  1   A.   Yes, sir.

13:32  2   Q.   Okay.  And that process -- to the extent it wasn't a photo

3   you took yourself, the process was you went on Google, you did

4   a search for fresh pork chops or boneless pork chops, it was

5   displayed on Google Images, and you chose an image you liked

6   and put it on the Facebook page; correct?

13:32  7   A.   Yes, sir.

13:32  8   Q.   And that's the same for the photo of chicken, the same for

9   the photo of spare ribs; correct?

13:32  10  A.   Yes, sir.

13:32  11  Q.   And just to clarify, you did not take the photograph of the

12  four pork chops at the top there; correct?

13:32  13  A.   No, sir.

13:32  14  Q.   Right.  So that's not something you created with your own

15  camera, you went and you found that on Google by doing a search

16  and then put it on the Facebook page; correct?

13:32  17  A.   Yes, on Google Images.

13:32  18  Q.   Okay.  And you don't know exactly what website that photo

19  was ultimately hosted on, correct, like whether it was my

20  client's website or some other website, you just know that it

21  showed up on Google Images; right?

13:33  22  A.   Yes, sir.

13:33  23  Q.   Your father, who is the manager of the store, never gave

24  you any instructions with respect to how to run this Facebook

25  page; correct?

13:33 1   A.  My father doesn't even know that we have -- well, he didn't

2   know that he -- we had this Facebook page.

13:33 3   Q.  You said your father didn't know that you had the Facebook

4   page?

13:33 5   A.  No, sir.  I didn't -- I never told him that I was posting

6   on Facebook.  I never discussed with him what I'm posting on

7   this Facebook page.

13:33 8   Q.  Okay.  Mr. Hamed, in the deposition that you took last

9   year, do you remember being sworn in the same way you were

10   sworn in today giving an oath to tell the truth, whole truth,

11   nothing but the truth?

13:33 12   A.  Yes, sir.

13:33 13   Q.  And you testified truthfully in that deposition, correct?

13:33 14   A.  Yes, sir.

13:33 15   Q.  You didn't lie about anything; correct?

13:33 16   A.  No, sir.

13:33 17   Q.  Okay.  Mr. Hamed, I want to show you your deposition, okay.

18   So if you see, this is a document that says, "Videoconference

19   Deposition of Amjad Sharif Hamed," and the date is December

20   18th, 2023?

13:34 21   A.  Yes, sir.

13:34 22   Q.  Okay.  I'll represent to you this is your deposition, Mr.

23   Hamed.  And this is just a record of everything that I asked

24   you and everything that you testified to; okay?

13:34 25   A.  Yes, sir.

13:34  1   Q.  I want to show you lines -- for your Honor, it's 45/18 to

       2   45/20.

13:34  3       Mr. Hamed, in your deposition I asked you, "Was your father

       4   aware that you were running the Facebook account for the

       5   store?"

13:34  6   A.  At that time, he did know.

13:34  7   Q.  I'm sorry.  Your answer was, "Yes, sir"; correct?

13:34  8   A.  Yes, sir.  At that time, he did know.  This was after he

       9   got a lawsuit for a Facebook page.

13:34 10   Q.  So after the lawsuit was filed, your father knew that this

      11   was the Facebook page for Food Town Mart; correct?

13:35 12   A.  After the lawsuit came out, he asked me.  I told him I had

      13   posted that picture.  He didn't know what it was or what was

      14   going on because he didn't know that we had a Facebook page.

13:35 15   Q.  Through today, your father has still not given you any

      16   instructions as to how to run the Facebook page or what to post

      17   or what not to post; correct?

13:35 18   A.  No, sir.  My dad barely knows how to get onto his phone.

13:35 19   Q.  He barely knows how to get on a computer?

13:35 20   A.  On a computer, to anything technical, technology.

13:35 21   Q.  Okay.  You're familiar with what a hookah is; correct?

13:35 22   A.  Yes, sir.

13:35 23   Q.  And at least over the course of the last four years, you've

      24   sold hookahs at the Food Town Mart store; correct?

13:35 25   A.  Yes, sir.

13:35   1   Q.  And I apologize, let me just clarify.  You said you're

2   familiar with what they are.  Hasn't really come out as to what

3   they are.  A hookah is a smoking device; correct?

13:36   4        MR. STEINLE:  I object, Judge.  I don't know what

5   relevance hookahs has to this lawsuit before this Court.

13:36   6        MR. DeSOUZA:  Your Honor, if I may, Mr. Jaber

7   testified repeatedly that they've never sold these items in the

8   store.

13:36   9        MR. STEINLE:  No, Judge --

13:36   10       THE COURT:  It presupposes that he knows what they

11  are.  You haven't had that demonstrated.  You know, you're

12  trying to impute knowledge when the witness may not have the

13  knowledge and the details.  It's no different than being

14  unfamiliar with technology, whether it's Facebook or computer

15  or cell phone.

13:36   16  BY MR. DeSOUZA:

13:36   17  Q.  Mr. Hamed, you testified what a hookah is; correct?

13:36   18  A.  Yes, sir.

13:36   19  Q.  Okay.  And your -- is your father familiar with the

20  products that are sold at the store?

13:37   21       MR. STEINLE:  I object.  How does he know what his

22  father thinks or knows?

13:37   23       THE COURT:  Yeah.  You can ask his father when he

24  testifies, Mr. DeSouza.

13:37   25       MR. DeSOUZA:  Okay.

13:37  1    BY MR. DeSOUZA:

13:37  2    Q.  Mr. Hamed, there is an inventory list that is kept at the

       3    store; correct?

13:37  4    A.  Yes, sir.

13:37  5    Q.  All the products that you sell and have sold for the last

       6    four years that you've worked there; correct?

13:37  7    A.  Yes, sir.

13:37  8    Q.  And that inventory list shows what you have in stock, what

       9    you don't have in stock; correct?

13:37  10   A.  Yes, sir.

13:37  11   Q.  You have access to the inventory list; correct?

13:37  12   A.  Yes, sir.

13:37  13   Q.  Your father has access to that inventory list; correct?

13:37  14   A.  Yes, sir.

13:37  15   Q.  And products that you sell at the store are generally, if

       16   they're in stock, they're kept out on the shelves somewhere in

       17   the store; correct?

13:37  18   A.  Yes, sir.

13:37  19   Q.  Okay.  Walk me through the layout of the store.  I walk

       20   into the front door of the store, and I'll -- I'll go ahead and

       21   put Plaintiff's Exhibit 10 up again.  Is -- am I correct that

       22   the front door of the store is right over here where my mouse

       23   pointer is, towards the left?

13:38  24          MR. STEINLE:  Your Honor, I'm going object again.  I

       25   don't know what the layout of the store has to do with posting

of a picture on a Facebook page.

13:38  THE COURT:  Yeah, I agree.  Let's move on to get before the jury relevant evidence, Mr. DeSouza.  Everybody has taken their time, whether it's the judge, my staff, these jurors, and we're only here to deal with that which is relevant.

13:38  MR. DeSOUZA:  I understand, your Honor.  I'm just trying to establish for some of these photos that Mr. Jaber testified about as not being his store for Mr. Hamed to tell us where in the store these items would be located.  It's a brief --

13:38  THE COURT:  Well, again, whether it's hookahs or cell phones or computer software folios, he may not personally be aware of these items.  And they have nothing to do with this photo posted on Facebook, so let's move on.

13:39  BY MR. DeSOUZA:

13:39  Q.  Mr. Hamed, since you started working there and since your brother gave the job to you for dealing with the Facebook account, have you removed any photographs from the Facebook page?

13:39  A.  No, sir.

13:39  Q.  Okay.  Are you aware the photograph that we were looking at before -- and I'll pull it up again, it was Exhibit 5 -- this photograph was -- you agree this photograph was posted by you on September 28th, 2020; correct?

13:39  1  A.  Yes, sir.

13:39  2  Q.  Are you aware that if one goes to the Facebook page today

3  that post is no longer there, the September 28th, 2020 post?

13:39  4  A.  Yes, sir.

13:40  5  Q.  You're aware that it's not there?

13:40  6  A.  Yes, sir.

13:40  7  Q.  Okay.  Do you know who removed that post from the Facebook

8  page?

13:40  9  A.  There's only two people that run that page.  It's me and my

10  brother.

13:40  11  Q.  And if you didn't do it?

13:40  12  A.  Then it would be him.

13:40  13  Q.  Okay.  Did you discuss that with your brother as to the

14  removal of that post?

13:40  15  A.  No, sir.

13:40  16  Q.  Do you know when that post was removed?

13:40  17  A.  No, sir.

13:40  18  Q.  Is it fair to say that one would have to ask your brother

19  when it was removed and why to know the answer to those

20  questions?

13:40  21  A.  He's the one that removed it.  You would have to ask him,

22  yes, sir.

13:40  23  Q.  Okay.  Now, do you see, sir, that in this post which you

24  agree you're the one that put up, the Facebook account at the

25  time -- and, again, if you scroll to the bottom, you'll see

1    this was in November of 2021, okay?

13:40    2    A.  Yes, sir.

13:40    3    Q.  Do you see that the account that posted this was named

4    Villard Food Town at the time?

13:40    5    A.  I do see that, yes, sir.

13:41    6    Q.  Okay.  And it's the same facebook.com/villardfoodtown

7    account up here; correct?

13:41    8    A.  Yes, sir.

13:41    9    Q.  Now, we looked at another screenshot that said Food Town

10    Mart, which you agree is the actual name of the store; correct?

13:41    11    A.  Yes, sir.

13:41    12    Q.  Okay.  Again, do you know why the account changed from

13    Villard Food Town to Food Town Mart at some point after

13:41    14    November, 2021?

13:41    15    A.  No, sir.

13:41    16    Q.  Did you make that change?

13:41    17    A.  No, sir.

13:41    18    Q.  And, again, if that change was made, the only two people

19    that are in charge of the account or have access to it are you

20    and your older brother; correct?

13:41    21    A.  Yes, sir.

13:41    22    Q.  So same question, if you don't know, we'd have to ask your

23    brother; correct?

13:41    24    A.  Yes, sir.

13:41    25         MR. DeSOUZA:  Okay.  I have no further questions for

1    Mr. Hamed, your Honor.

13:41   2              THE COURT:  Thank you.

13:41   3        Mr. Steinle, do you wish to question the witness now or

4    during your case?

13:41   5              MR. STEINLE:  In that this was an adverse examination,

6    your Honor, I -- I intend to call Mr. Hamed at the time of my

7    case in defense.  And if I could reserve the right to -- I

8    don't have any questions in clarification of the --

13:42   9              THE COURT:  Sure.

13:42  10              MR. STEINLE:  -- adverse examination.  But I would

11    reserve the right to call him on direct examination in any

12    case.

13:42  13              THE COURT:  That's certainly agreeable.

13:42  14              MR. STEINLE:  So at this point, I don't have any

15    clarification questions.

13:42  16              THE COURT:  All right.  Amjad Hamed, you may step

17    down.  You may be called whether later today or tomorrow.

13:42  18              THE WITNESS:  Thank you, your Honor.

13:42  19              (The witness is excused.)

13:42  20              THE COURT:  Mr. DeSouza, you may call your next

21    witness.

13:42  22              MR. DeSOUZA:  Yes, your Honor.  Plaintiff calls Sharif

23    Jaber as our next witness.

13:43  24              THE CLERK:  Please raise your right hand.

13:43  25              (The witness is sworn.)

13:43   1           THE WITNESS:  Yes, I do.

13:43   2           THE CLERK:  Thank you.  Please be seated.  Please

3   state your full name for the record and spell it for the court

4   reporter.

13:43   5           THE WITNESS:  Sharif Jaber, S-H-A-R-I-F, J-A-B-E-R.

13:43   6               SHARIF JABER,

13:43   7   called by the Plaintiff as a witness herein, having been first

8   duly sworn, was examined and testified as follows:

13:43   9             DIRECT EXAMINATION

13:43   10            BY MR. DeSOUZA:

13:43   11  Q.  Good afternoon, Mr. Jaber.

13:43   12  A.  Good afternoon.

13:43   13  Q.  Mr. Jaber, Nofal, LLC operates a grocery store in Milwaukee

14  under the name of Food Town Mart; correct?

13:43   15  A.  Yes.

13:44   16  Q.  And the address of that grocery store is 3217 West Villard;

17  correct?

13:44   18  A.  Yes.

13:44   19  Q.  You, sir, are the sole owner of Nofal, LLC; correct?

13:44   20  A.  Yes.

13:44   21  Q.  Okay.  You're the only person that has control over the

22  business activities of Nofal, LLC; correct?

13:44   23  A.  Yes, sir.

13:44   24  Q.  There's no other -- there's no other executive of the

25  company besides yourself; correct?

13:44  1  A.   No, just me and my kids.

13:44  2  Q.   And you have been the owner of Nofal, LLC since sometime in

3  2017; correct?

13:44  4  A.   Yes.

13:44  5  Q.   I think that's when you bought the business from your

6  brother; right?

13:44  7  A.   Yes, sir.

13:44  8  Q.   Now, if Nofal, LLC makes money, that's profit that goes to

9  you; correct?

13:44  10  A.   Yes, sir.

13:44  11  Q.   All right.  There's no other partners that get distributed

12  the money; correct?

13:44  13  A.   No, sir.

13:45  14  Q.   So when Nofal, LLC sells something, assuming it makes a

15  profit selling it, you make money off of that sale; correct?

13:45  16  A.   Yes, sir.

13:45  17  Q.   And the same way that when Nofal, LLC has to pay for

18  ordering products or something else, that's ultimately you have

19  to put up that expense; correct?

13:45  20  A.   Yes, sir.

13:45  21  Q.   Okay.  Now, you gave a deposition in this case in October,

22  2023; do you recall that?

13:45  23  A.   Yes, sir.

13:45  24  Q.   I think that was the -- is that the first time you and I

25  talked, or have we talked before that?

13:45    1    A.  No, we talked before.

13:45    2    Q.  We talked before.

13:45    3    A.  Yeah, when you take my deposition.

13:45    4    Q.  Before the deposition, had we talked prior to that?

13:45    5    A.  No.

13:45    6    Q.  Okay.  Now I want to show you, sir, what we've marked as

         7    Plaintiff's Exhibit 27.  Do you see that on the screen?  I'm

         8    sorry, I'll make it a little smaller so we can see the whole --

         9    all right.  Plaintiff's Exhibit 27 is a document titled Notice

        10    of Taking Deposition of the Corporate Representative of Nofal,

        11    LLC d/b/a Food Town Mart.  Do you see that document, sir?

13:46   12    A.  Yes.

13:46   13    Q.  And you've seen -- you saw this document prior to your

        14    deposition; correct?

13:46   15    A.  Yes.

13:46   16    Q.  Okay.  And I'm going to scroll here.  Do you see the date

        17    was in August of 2023; correct?

13:46   18    A.  Yes.

13:46   19    Q.  And when I scroll a little bit further, there was various

        20    deposition topics that were listed in this document.  Do you

        21    see that?  I'm just going to scroll down to the bottom here.

        22    It was a total of 32 different topics; correct?

13:46   23    A.  Uh-huh.

13:46   24    Q.  Yes?

13:46   25    A.  Yes.

13:46  1  Q.  Okay.  Now, in that deposition that you took in October of

2  2023, you understood that you were testifying on behalf of

3  Nofal, LLC; correct?

13:46  4  A.  Yes.

13:47  5  Q.  It wasn't anybody else that testified on behalf of Nofal,

6  it was just you; correct?

13:47  7  A.  Just me.

13:47  8  Q.  And you understood that you were going to be testifying on

9  each of the topics that were identified in this document;

10  correct?

13:47  11  A.  Yes.

13:47  12  Q.  And you were prepared to testify with respect to all 32 of

13  those topics; correct?

13:47  14  A.  Yes, sir.

13:47  15  Q.  I want you to look at the first -- very first topic in this

16  document, sir.  Very first topic was the identity of the person

17  purportedly responsible for uploading the work to the Facebook

18  page and/or website.  Do you see that?

13:47  19  A.  Yes.

13:47  20  Q.  And you were prepared to give testimony with respect to

21  that topic; correct?

13:47  22  A.  Yes.

13:47  23  Q.  And the second topic was the relationship, if any, between

24  defendants, that's you and Nofal, and the person purportedly

25  responsible for uploading the work to the Facebook page and/or

1   the website.  Do you see that?

13:47  2   A.  Yes.

13:48  3   Q.  And just to clarify, I'm going to scroll up just so we're

4   on the same page here, the definition of Facebook page in this

5   document is that same facebook.com/villardfoodtown that we have

6   been looking at all day.

13:48  7   A.  I really don't know.

13:48  8   Q.  Well, I'm just telling you.  The definition for Facebook

9   page was that page, okay?

13:48  10   A.  It could be.

13:48  11   Q.  Okay.  And the seventh topic was the factual circumstances

12   by which the work came to be published on the Facebook page

13   and/or the website.  Do you see that?

13:48  14   A.  Yeah.

13:48  15   Q.  Okay.  Now, in your deposition, there was a -- I guess it

16   was roughly a year ago in October of 2023.  You testified that

17   Food Town Mart has never had a Facebook page; correct?

13:48  18   A.  Not to my knowledge.

13:48  19   Q.  Well, I'm just asking you what you testified to.  That is

20   what you testified to --

13:48  21   A.  Yes.

13:48  22   Q.  -- correct?

13:48  23   A.  I testified no.

13:49  24   Q.  Okay.  And as you sit here today, a year later, do you

25   still agree with that statement that Food Town Mart has never

1   had a Facebook page?

13:49   2   A.   No.   Right now I know that my kids have a Facebook page to

3   my business.

13:49   4   Q.   Okay.   And let me go ahead and take this down, sir.

13:49   5        MR. DeSOUZA:   Actually, your Honor, I would ask that

6   Exhibit 27 be moved into evidence, which was the depo notice.

13:49   7        MR. STEINLE:   No objection.

13:49   8        THE COURT:   All right.   The Court will receive Exhibit

9   27.

13:49   10        (Exhibit No. 27 was received in evidence.)

13:49   11   BY MR. DeSOUZA:

13:49   12   Q.   All right.   Mr. Jaber, I've put up Exhibit 10, which has

13   already been admitted into evidence.   We've seen it a few times

14   today; correct?

13:49   15   A.   Yes.

13:49   16   Q.   Okay.   And just so we're on the same page, is it your

17   understanding that -- well, I guess is that your store that

18   we're looking at in the picture there at the top?

13:50   19   A.   Yes, it is.

13:50   20   Q.   Okay.   So the "You're Someone Special," that's what's there

21   at the store today; correct?   That sign that says, "You're

22   Someone" --

13:50   23   A.   That's just a saying.

13:50   24   Q.   It's just a sign?

13:50   25   A.   Yeah, it's just a sign.

13:50   1   Q.   Okay.  But I'm just asking it's there on the --

13:50   2   A.   Yes, it is.

13:50   3   Q.   Okay.  And to your knowledge -- and you were here when your

        4   son, Mr. Hamed, testified; correct?

13:50   5   A.   Yes.

13:50   6   Q.   And you heard him say that this is the Facebook page that

        7   he was running on behalf of Food Town Mart; correct?

13:50   8   A.   Yes.

13:50   9   Q.   And do you agree, as you sit here today, this is the

        10  Facebook page that was being run by Food Town Mart?

13:50   11  A.   Yes.

13:50   12  Q.   Okay.  That sign over there, that red sign, I think that's

        13  not there anymore; correct?

13:50   14  A.   No, that's been removed ten years ago.

13:50   15  Q.   But it says Villard Food Town; correct?

13:51   16  A.   Yes, when my brother owns it.

13:51   17  Q.   Okay.  But you still have a sign, I think Mr. Hamed

        18  testified, there's still a sign outside I think it's 50 feet

        19  high or something that --

13:51   20  A.   Yes.

13:51   21  Q    -- says Villard Food Town; correct?

13:51   22  A.   Yes, it is.

13:51   23  Q.   And you haven't changed that because it's just too

        24  expensive to take down a sign from that height; right?

13:51   25  A.   And I was not willing to do.

13:51 1 Q. Now, in your deposition, you testified that you have no
2 idea who owns this Facebook account; correct?

13:51 3 A. Yes.

13:51 4 Q. Sir, the topics for your deposition were who owns the
5 Facebook page, how did the photo end up on the Facebook page.
6 Other than talking to your attorney, you didn't talk to either
7 of your sons about the Facebook page; correct?

13:51 8 A. I never talked to my kids until I find out they had the
9 Facebook page.

13:51 10 Q. I mean, nothing stopped you from asking all of your
11 employees --

13:52 12 A. I just got a lawsuit, and I went to my lawyer.

13:52 13 Q. All right. Sir, let me finish the question, please, okay.

13:52 14 How many employees did you have at the time that this
15 lawsuit was filed?

13:52 16 A. Eight.

13:52 17 Q. So if we go back to the 2022 time frame when the lawsuit
18 was filed against you, there was about eight employees at the
19 store?

13:52 20 A. Uh-huh.

13:52 21 Q. Yes?

13:52 22 A. Yes.

13:52 23 Q. You were one of those employees; correct?

13:52 24 A. Yes.

13:52 25 Q. Okay. Your older son Nofal was no longer employed;

1    correct?

2    A.   Yes.

3    Q.   Your younger son -- or I don't know if you have more than

4    two sons, but Amjad Hamed was an employee at the store at the

5    time; correct?

6    A.   Yes, sir.

7    Q.   Other than yourself and your son, you had a butcher that

8    was employed at the store; correct?

9    A.   Yes.

10   Q.   I think had you some cashiers employed at the store?

11   A.   Yes.

12   Q.   Who else did you have employed?

13   A.   I have stock boys.  I have receiving guys.

14   Q.   Did -- from -- from 2022 when you were sued in federal

15   court until October, 2023, you didn't ask a single one of your

16   employees, "Hey, who runs this Facebook page"; correct?

17          MR. STEINLE:  Well, I object to the form.  That

18   misstates the filing.  He was sued in February of 2023, not

19   2022.

20          MR. DeSOUZA:  I'll restate it, your Honor.

21   BY MR. DeSOUZA:

22   Q.   From the date that you received the complaint in this

23   lawsuit, in 2023 or whenever it was --

24   A.   Yes, it was February, '23, I went --

25   Q.   So February of --

13:53   1   A.   -- and asked my kids and I find out who runs this page.

13:53   2   Q.  Well, you're saying when you received this lawsuit in

3   February of 2023 --

13:53   4   A.   Yes.

13:53   5   Q   -- you asked your children who runs this Facebook page?

13:53   6   A.   Yes.

13:54   7   Q.   And that's both Nofal and Amjad?

13:54   8   A.   Yes.

13:54   9   Q.   Okay.  And they didn't tell you, "It was me, I'm the one

10   running it"?

13:54  11   A.   No, they told me.

13:54  12   Q.   Okay.  So they told you in that time frame in February,

13   2023 --

13:54  14   A.   Yes.

13:54  15   Q.   -- "I'm running the Facebook page"?

13:54  16   A.   Okay.

13:54  17   Q.   Okay.  But, sir, your deposition was in October of 2023.

18   In October, 2023, you testified, "I have no idea who's running

19   the Facebook page"; yes?

13:54  20   A.   Well, that's what you asked me, do you know who running the

21   Facebook page, which is I don't know, and I never did.

13:54  22   Q.   Well, sir, if you -- if you knew from your sons in February

23   of 2023 when you got sued, when you got a copy of the

24   complaint --

13:54  25   A.   Uh-huh.

13:54   1   Q.   -- why would you testify in October, which is eight months

2   later, "I don't know who runs the Facebook page"?

13:54   3   A.   I -- because I really don't know at that -- you know at

4   that time when the Facebook page was run.

13:55   5   Q.   But you know it's your sons; yes?

13:55   6   A.   Yes.

13:55   7   Q.   And your sons told you this after you got sued; yes?

13:55   8   A.   Yes.

13:55   9   Q.   Sir, let me show you Exhibit 5.  You were here when this

10   was admitted earlier today; correct?

13:55   11   A.   Uh-huh.

13:55   12   Q.   Yes?

13:55   13   A.   Yes.

13:55   14   Q.   I'm sorry, it's just for record --

13:55   15   A.   Yes.

13:55   16   Q.   -- we have to have a "yes" or "no."

13:55   17   A.   Uh-huh.

13:55   18   Q.   Sir, the Facebook account we're looking at is the same

19   Villard Food Town account that we've been looking the all day;

20   yes?

13:55   21   A.   Yes.

13:55   22   Q.   Okay.  And we've got the photo, which is the alleged

23   infringement in this case.  And you see that as on the Food

24   Town Mart Facebook page; correct?

13:55   25   A.   Yes.

13:55  1   Q.  You agree this is the Food Town Mart Facebook page on which

2   this photograph was on; correct?

13:56  3   A.  I see now it is.

13:56  4   Q.  Okay.  But you're not saying this is not the Facebook page

5   from Food Town Mart; correct?

13:56  6   A.  No.  I'm not saying -- after I've seen it, I cannot

7   disagree.

13:56  8   Q.  Okay.  Now, in your deposition, sir, you testified under

9   oath that this was not an advertisement for the sale of the

10  items that are listed in here, this is not something that you

11  were selling or advertising at Food Town Mart.  Would you like

12  to change that answer today?

13:56  13  A.  Yes, I would.  You asked me is it for advertising.  I told

14  you we do not do advertising, because I don't know, oh, that's

15  my kids with the Facebook.  This is for information only.  It's

16  not an ad.

13:56  17  Q.  Sir, you told me in your deposition this wasn't your

18  Facebook account at all, whether it's an ad or not, you said --

13:57  19  A.  I know, it's not my -- it's not mine.  Until today, I'll

20  tell you it's not mine.

13:57  21  Q.  Well, I'm not asking you as Sharif Jaber, the individual.

22  You have your own personal Facebook page; correct?

13:57  23  A.  Uh-huh.

13:57  24  Q.  "Yes"?

13:57  25  A.  Yes.

13:57  1   Q.   So you -- you know what a Facebook page is; yes?

13:57  2   A.   Uh-huh.

13:57  3   Q.   "Yes"?

13:57  4   A.   Yes.

13:57  5   Q.   Okay.  I know this is not your personal Facebook page, and
       6   I'm not saying that, okay?

13:57  7   A.   Uh-huh.

13:57  8   Q.   Got it?

13:57  9   A.   Yes.

13:57  10  Q.   Okay.  But this is the Facebook page for Food Town Mart
       11  which is Nofal, LLC; yes?

13:57  12  A.   Yes.

13:57  13  Q.   In your deposition, you said Nofal, LLC does not have a
       14  Facebook page; correct?

13:57  15  A.   Correct.

13:57  16          MR. STEINLE:  I object, asked and answered.

13:57  17          THE COURT:  Yeah.  We're -- both sides have made their
       18  points, so let's move on, Mr. DeSouza.

13:57  19  BY MR. DeSOUZA:

13:58  20  Q.   Mr. Jaber, at the time of your deposition, you could not
       21  think of a single person when I asked you who could have put
       22  this on the Facebook page, you could not think of a single
       23  person; correct?

13:58  24  A.   No.

13:58  25  Q.   Notwithstanding that there were only eight employees at the

1    time, one of them was you and one of them was your son, you

2    couldn't identify anyone who possibly could have done this;

3    correct?

13:58    4    A.   No.

13:58    5    Q.   Sir, are you aware of what -- I'm sorry.

13:58    6         Your son Amjad, he testified that he's an employee at Food

7    Town Mart; correct?

13:58    8    A.   Yes.

13:58    9    Q.   And that's true he is an employee; yes?

13:58    10    A.   Yes.

13:58    11    Q.   He's worked there for about four years?

13:58    12    A.   Yes.

13:58    13    Q.   He testified that he is the floor manager, and that

14    involves opening the store, closing the store, organizing

15    items.  Is that generally correct as to what he does?

13:59    16    A.   Yes.

13:59    17    Q.   And your other son Nofal, he worked at the store, but

18    doesn't work there today; correct?

13:59    19    A.   Yes.

13:59    20    Q.   Do you recall when he stopped working at the store?

13:59    21    A.   Mmm, around 2021.

13:59    22    Q.   Okay.  Was it around the same time that Amjad --

13:59    23    A.   Yes.

13:59    24    Q.   -- took over?

13:59    25    A.   Yes.

13:59  1    Q.  And his position at the store, Nofal, was roughly the same

       2    of what Amjad was; correct?

13:59  3    A.  Yes, sir.

13:59  4    Q.  Now, I asked you in your deposition how many employees did

       5    Food Town Mart have in 2020 when this post was made, do you

       6    recall that?  Do you recall me asking you that question?

13:59  7    A.  Maybe.

13:59  8    Q.  You said maybe?

13:59  9    A.  Yeah.  You could ask me that question.

13:59  10   Q.  Well, if you don't recall specifically, I could show you in

       11   the transcript where I asked you.  Do you want to see that?

14:00  12   A.  That's what I'm saying, maybe you asked me.

14:00  13   Q.  Okay.  Well, let me help refresh you, sir.  I am showing

       14   you on the screen a copy of the transcript from your

       15   deposition.  Do you see it was September 26th, 2023?

14:00  16   A.  Yes.

14:00  17   Q.  Do you see that?

14:00  18   A.  Uh-huh.

14:00  19   Q.  Okay.  So I'm going to go to Page 26.  Just allow me to

       20   scroll down a little bit here.  Okay.  You see we have Page 26

       21   there on the left side of the screen?  Over here, you see Page

       22   26?

14:00  23   A.  Yeah.

14:00  24   Q.  Okay.  So I asked you in your deposition:  "How many

       25   employees do you have or did you have in the September, 2020

1    time frame?"  Do you see that?

14:00    2    A.   Yes.

14:00    3    Q.   And you said, "Six employees."

14:00    4    A.   Six employees.  Me and my son is eight.

14:00    5    Q.   Okay.

14:00    6    A.   It's the same answer.

14:00    7    Q.   Okay.  I'm just trying to make sure you -- you remember

8    that the question was asked, okay?

14:01    9         Now, I asked you who were the employees, and you told

10    me, at least back then, it was Mac McLaughlin, a guy named

11    Jose --

14:01    12    A.   Uh-huh.

14:01    13    Q.   -- a woman named Michelle, a gentleman named Tommy White,

14    and you.

14:01    15    A.   Yes.

14:01    16    Q.   You told me you're an employee, and those were the other

17    employees.  Do you recall that?

14:01    18    A.   Uh-huh.

14:01    19    Q.   "Yes"?

14:01    20    A.   Yes.

14:01    21    Q.   Okay.  Nofal Hamed was still an employee at the time of

22    2020; correct?  You said 2021 is when he stopped?

14:01    23    A.   Yes.

14:01    24    Q.   So was he an employee?

14:01    25    A.   Yeah.

14:01　　1　Q.　Okay.　You didn't tell me about him as an employee at your

　　　　2　deposition, do you?

14:01　　3　A.　I don't know exact date when he was done with me.

14:01　　4　Q.　Okay.　Well, what about Amjad Hamed?　He was an employee in

　　　　5　2020; correct?

14:01　　6　A.　Yes.

14:01　　7　Q.　And you did not identify him as an employee of your store.

14:01　　8　A.　I don't call family members as employees.

14:02　　9　Q.　So you thought when I asked you who's an employee you could

　　　　10　just exclude family members as employees?

14:02　　11　A.　Yes.

14:02　　12　　　　　MR. STEINLE:　Well, I object.　That's argumentative,

　　　　13　Judge.

14:02　　14　　　　　THE COURT:　Yeah.

14:02　　15　　　　　MR. STEINLE:　Plus relevance.

14:02　　16　　　　　THE COURT:　The facts are the facts.　Let's move on,

　　　　17　Mr. DeSouza.

14:02　　18　BY MR. DeSOUZA:

14:02　　19　Q.　Mr. Jaber, Amjad Hamed reports to you, you as the boss of

　　　　20　the store; correct?

14:02　　21　A.　Yes.

14:02　　22　Q.　Prior to Amjad Hamed, the role was occupied by Nofal, and

　　　　23　he reported to you as the boss of the store; correct?

14:02　　24　A.　Yes.

14:02　　25　Q.　In fact, whether it's them or any of the other employees at

1    the store, everybody reports to you --

14:02    2    A.    Yes.

14:02    3    Q.    -- correct?

14:02    4         There's no mid-level manager between you and the

5    employees, it's just you; correct?

14:02    6    A.    Yes.

14:03    7    Q.    And you consider your son Amjad to be an honest person;

8    correct?

14:03    9    A.    Yes.

14:03    10    Q.    He tells the truth?

14:03    11    A.    All the time.

14:03    12    Q.    Okay.  And you were here during his testimony; correct?

14:03    13    A.    Yes.

14:03    14    Q.    And he testified truthfully during his testimony that this

15    was the store, this is the Facebook page, and you guys did use

16    the photo at issue in this lawsuit; correct?

14:03    17    A.    Yes.

14:03    18    Q.    Okay.  To your knowledge, did Nofal, LLC have permission

19    from Prepared Food to use the photo on its Facebook page?

14:03    20    A.    No.

14:03    21    Q.    Did Nofal, LLC ever reach out to Prepared Food and say,

22    "Hey, we'd like to license one or more of your photos?"

14:03    23    A.    No, sir.

14:03    24    Q.    Let me take this down for a moment.

14:04    25         I'd like to show you, sir, the most -- the governing

1  complaint in this lawsuit.  It's a document that's been marked

2  as Plaintiff's Exhibit 25.  Do you see that where it says

3  "Second Amended Complaint?"

14:04  4  A.  Yes.

14:04  5  Q.  Okay.  And you'll see it identifies my client up here,

6  which is Prepared Food.  Then it says the lawsuit is against

7  Nofal, LLC d/b/a Food Town Mart and Sharif Jaber.  Do you see

8  that?

14:04  9  A.  Uh-huh.

14:04  10  Q.  "Yes"?

14:04  11  A.  Yeah.

14:04  12  Q.  Okay.  Now, you read the complaint in this lawsuit after

13  you received it; correct?

14:04  14  A.  Yes.

14:04  15  Q.  And you understand this is the document where my client is

16  making allegations of copyright infringement against Nofal and

17  yourself; correct?

14:04  18  A.  Yes.

14:05  19  Q.  Okay.  Now, if I scroll to Paragraph 18, sir, tell me if I

20  read this correctly, Paragraph 18 of this complaint says, "On

21  September 28th, 2020, after Plaintiff's above-referenced

22  copyright registration of the work, Nofal, LLC published the

23  work on its business Facebook page," at this long URL, "in

24  connection with the marketing of its business."  And it shows

25  that screenshot we've been looking at.  Do you see that?

14:05    1    A.   Yes.

14:05    2    Q.   Okay.  So that was the allegation that my client made,

         3    okay.  I'm going to take that down for a moment.

14:05    4         MR. DeSOUZA:  And, your Honor, just for the sake of

         5    the record, I'd ask that Exhibit 20 -- 25, identified as 25, be

         6    put into evidence.

14:05    7         MR. STEINLE:  Well, I would object because it's

         8    already a part of the record.  It's a filed document with the

         9    Court.  I don't know --

14:05   10         THE COURT:  Yeah.  There's no reason to have it come

        11    in as an exhibit.  The objection is noted and sustained.

14:06   12    BY MR. DeSOUZA:

14:06   13    Q.   Okay.  Mr. Jaber, I'm going to put up on the screen

        14    Plaintiff's Exhibit 26, which is a copy of Defendants Nofal,

        15    LLC d/b/a Food Town Mart and Sharif Jaber answer and

        16    affirmative defenses.  Do you see that?

14:06   17    A.   Uh-huh.

14:06   18    Q.   "Yes"?

14:06   19    A.   Yes.

14:06   20    Q.   Okay.  Do you understand this is your response to the

        21    complaint, you and Nofal, what your response to the allegations

        22    were?

14:06   23    A.   Yes.

14:06   24    Q.   Okay.  And if I scroll all the way to the bottom, there's a

        25    date on this that says February 20th, 2023; do you see that?

14:06    1    A.    Yes.

14:06    2    Q.    Okay.  So if we go back to that Paragraph 18 that we were

         3    looking at, read to me in February, 2023 what your response to

         4    the allegation was.

14:07    5            MR. STEINLE:  I object, Judge.  This is an answer to a

         6    complaint.  The document -- there's no -- lack of foundation.

         7    He didn't draft this document.

14:07    8            MR. DeSOUZA:  Your Honor, this is the statement of the

         9    defendants.  It is their own statement.  It is not hearsay.

        10    It's an admission of a party opponent.  Whether they drafted it

        11    or not, this is their document.

14:07   12            THE COURT:  Mr. Steinle, anything further?

14:07   13            MR. STEINLE:  No, your Honor, the document was signed

        14    by me as the lawyer for -- I answered the complaint on behalf

        15    of the defendant.  The defendant didn't sign the answer.

14:07   16            THE COURT:  Yeah.  I think with that understanding,

        17    Mr. DeSouza, you can ask Mr. Jaber whether he agrees with that

        18    statement in the answer or has a different view, but it's not

        19    his, just like the posting of the photo wasn't done by Mr.

        20    Jaber.

14:08   21    BY MR. DeSOUZA:

14:08   22    Q.    Okay.  Mr. Jaber, you see how there is a denial there in

        23    Paragraph 18; correct?

14:08   24    A.    Yes.

14:08   25    Q.    Do you agree -- do you agree or believe that this statement

1    is inaccurate and needs to be changed in some way?

14:08    2    MR. STEINLE:  Well, I'm going to object.  Is he

3    talking as of today or is he talking as of the time that the

4    answer was drafted to the complaint?

14:08    5    BY MR. DeSOUZA:

14:08    6    Q.  Mr. Jaber, as you sit here today, is that an accurate

7    denial?  Do you believe that is inaccurate?

14:08    8    MR. STEINLE:  No, I object.  At the time that the

9    answer was drafted, he -- I believe, in my opinion, he can be

10    asked what he knew and what he understood.  What he -- what has

11    happened over the last couple of years and the knowledge that

12    he's obtained and you ask him today, do you agree or disagree

13    with that, Judge, I object.  That's -- that doesn't -- the time

14    frame doesn't jibe.

14:09    15    THE COURT:  So unless, Mr. DeSouza, you're wanting to

16    define a particular timeline, including when the answer was

17    filed, the Court is prepared to sustain the objection.

14:09    18    MR. DeSOUZA:  Okay.  I'll ask a different question,

19    your Honor.

14:09    20    BY MR. DeSOUZA:

14:09    21    Q.  You see that this document is dated February 20th, 2023;

22    correct?

14:09    23    A.  Yes.

14:09    24    Q.  You testified that in February, 2023, your sons disclosed

25    to you for the first time that this Facebook page belonged to

| | |
|---|---|
| | 1 |
| 14:09 | 2 |
| | 3 |
| 14:09 | 4 |
| | 5 |
| 14:09 | 6 |
| 14:09 | 7 |
| | 8 |
| | 9 |
| | 10 |
| 14:10 | 11 |
| | 12 |
| 14:10 | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 14:11 | 18 |
| 14:11 | 19 |
| | 20 |
| | 21 |
| 14:11 | 22 |
| 14:11 | 23 |
| | 24 |
| 14:11 | 25 |

your store; correct?  Sometime in February of 2023?

A.  I don't know exactly what time; but, yeah, I know about it after that.

Q.  Okay.  So at the time this answer was filed in February of 2023, did you believe that the Facebook page was not yours?

A.  At that time, yes, I believed it wasn't mine.

Q.  Okay.  So if your -- if you had the conversation with your sons in February of 2023, it must have been in the -- I'm assuming eight days -- I don't think it was a leap year -- between the 20th and the end of the month; correct?

A.  It could be after that.  I don't recall exactly what time. I say it's after February.  I didn't -- what exact date.

Q.  Okay.  Sir, let's go ahead and look at Plaintiff's Exhibit 7.  Plaintiff's Exhibit 7 is a copy of -- I believe it's two documents.  It's Nofal, LLC's responses to request for admissions.  And I believe it's followed up by your individual responses to request for admissions.  Do you see that?

A.  Yes.

Q.  Okay.  And both of these documents are dated in August of 2023.  I'll show you here's the one.  Do you see the date of August, 2023?

A.  Yeah.  Yes.

Q.  And we have another one that's also dated August of 2023. Do you see that?

A.  Yes.

14:11    1    Q.    Okay.  Do you recall at some point in this lawsuit you were

2    asked to admit or deny certain facts --

14:11    3    A.    Yes.

14:11    4    Q.    -- in a document that said admit the sky is blue or admit

5    the grass is green.  Obviously those questions weren't asked --

14:11    6    A.    Yes.

14:11    7    Q.    -- but essentially that.  Okay.

8         Now, if we scroll -- and this is the Nofal one -- to No. 9,

9    in August of 2023, you were asked to:  Admit that as of

10    September 28th, 2020, the work, which is the photograph, was

11    displayed on Nofal, LLC's Facebook page.  And in August of

12    2023, you said "deny" correct?

14:12    13    A.    Yes.

14:12    14    Q.    If we look at No. 12, we asked you:  Admit that Nofal, LLC

15    published and/or displayed the work on the Facebook page.  And

16    you said "deny"; correct?

14:12    17    A.    Correct.

14:12    18    Q.    And, again, this is as of August, 2023; right?

14:12    19    A.    Yes.

14:12    20    Q.    Okay.  In No. 15, we asked you:  Admit that the Facebook

21    page is utilized to market and/or advertise Nofal, LLC's

22    business.  Again, in August of 2023, you said "deny"; correct?

14:12    23    A.    Deny.

14:12    24    Q.    No. 16, we asked you:  Admit that the work was displayed on

25    the Facebook page in connection with Nofal, LLC's efforts to

1  market its business.  You said in August of 2023, "deny";

2  correct?

14:13    3  A.   Correct.

14:13    4  Q.   Now, as you sit here today, all of these admissions that I

5  have just looked at, you agree with me that they should be

6  admit, to your knowledge as of today; correct?

14:13    7       MR. STEINLE:  I object, lack of foundation.  The --

8  the document itself, the request to admit, contains photographs

9  of items other than the pork chop which is the subject matter

10  this lawsuit.  And if he's going to try to question and impeach

11  this individual, he should show him the images on the request

12  to admit which include items that are not even part of this

13  lawsuit.  So I would object that lack of foundation.  That's my

14  objection.

14:13   15       THE COURT:  And equally important, Mr. Steinle, is the

16  fact that the first interrogatory started with an introductory

17  phrase, "As of September 20th, 2020," not 2023, three years

18  later.  The way the question was phrased asked the witness to

19  provide an answer as to what he knew at the time the photo was

20  posted.  That's a lot different than learning subsequent to

21  being hailed into court with a lawsuit.

14:14   22       MR. DeSOUZA:  Your Honor, I will say that none of

23  these requests for admissions that I have showed him thus far

24  concern any photograph other than the photograph at issue.  Mr.

25  Steinle is referring to RFAs that start in the 30s or in the

1    40s.  I have not asked him about that.  I do not intend to ask

2    him about that.  I am simply asking whether he agrees or does

3    not with these denials as we are looking at them.

14:14    4            THE COURT:  Well --

14:14    5            MR. DeSOUZA:  And I can cover them individually.

14:15    6            THE COURT:  -- the problem is the denials were as of a

7    particular date.  And as any reasonable litigant and judge and

8    lawyer understands, the dynamic of litigation is such that

9    answers that may be unknown at one point in the litigation

10    become better understood at some point later.  But that does

11    not serve to impute to a party in a lawsuit knowledge as of a

12    particular date when they learned of it subsequently.

14:15    13    BY MR. DeSOUZA:

14:15    14    Q.  Mr. Jaber, if we just look at No. 15 on the screen, do you

15    see that?  Do you see No. 15 together with the response?

14:15    16    A.  Yes.

14:16    17    Q.  Okay.  The question for No. 15 does not say, "Admit that as

18    of September, 2020," it simply says, "Admit that the Facebook

19    page," which is the Facebook page we've been discussing, "is

20    utilized to market and/or advertise Nofal, LLC's business."  Do

21    you see that?

14:16    22    A.  Yes.

14:16    23    Q.  Okay.  In August of 2023, you denied that; yes?

14:16    24    A.  Yes.

14:16    25    Q.  As you sit here today, do you believe that is a true

1    statement --

14:16    2                MR. STEINLE:   I --

14:16    3    BY MR. DeSOUZA:

14:16    4    Q.  -- that the Facebook page is utilized to market and/or

5    advertise Nofal, LLC's business?

14:16    6                MR. STEINLE:   Once again, I object.  He's using this

7    document to impeach this witness as to something that happened

8    in 2020 as opposed to four years later in 2024 as November of

9    2024, today's date, or October.

14:16    10               MR. DeSOUZA:   Your Honor, I'm not even using the

11    document.  I'm asking him a question.  Does he acknowledge that

12    the Facebook page belongs to him as he sits here today.

14:17    13               THE COURT:   Well, then take the document down and ask

14    him that question.

14:17    15    BY MR. DeSOUZA:

14:17    16    Q.  Mr. Jaber, as you sit here today on October 28th, 2024, you

17    agree with me the Facebook page has been used to advertise or

18    market Nofal, LLC's business; correct?

14:17    19    A.  Right now, yes.

14:17    20    Q.  Okay.  And all of the postings on that Facebook page,

21    whether they -- I think the last one -- the most recent one was

22    July of 2022 going back to the beginning of time --

14:17    23    A.  But, sir, this Facebook was started for the business before

24    me.

14:17    25    Q.  It was started for the business before you, but continued

1  after you bought the business; correct?

14:17  2  A.  I don't know nothing about it.

14:17  3  Q.  Well, sir, you bought the business in 2017; yes?

14:17  4  A.  Yes.

14:18  5  Q.  The most recent Facebook post we saw was July, 2022;

6  correct?

14:18  7  A.  Yes.

14:18  8  Q.  Okay.  So 2022 comes after 2017, so the Facebook page

9  continued being used by your sons and your business after you

10  purchased it; correct?

14:18  11  A.  Yes.

14:18  12  Q.  Mr. Jaber, I would like to show you another one of these

13  documents.  It's been identified as Plaintiff's Exhibit 8, and

14  this is Food Town Mart's answers to interrogatories.  Do you

15  see that?  Do you see the word "interrogatories" there?

14:18  16  A.  Yes.

14:18  17  Q.  Okay.  And if I scroll to the bottom, this is another

18  document that's dated in August of 2023; correct?

14:18  19  A.  Uh-huh.

14:18  20  Q.  Yes?

14:18  21  A.  Yes.

14:19  22  Q.  And there's a signature here.  Is that your signature?

14:19  23  A.  Yes.

14:19  24  Q.  And there's a notary signature here as well; correct?

14:19  25  A.  Yes.

171

14:19　　1　Q.　Okay.　Do you recall signing this document with a notary

　　　　　2　there?

14:19　　3　A.　Yes.

14:19　　4　Q.　Okay.　And you recall answering questions -- written

　　　　　5　questions that were in this case; correct?

14:19　　6　A.　Yes.

14:19　　7　Q.　Okay.　So in Interrogatory No. 2, sir, we asked Nofal:

　　　　　8　Identify each and every commercial use of the work by you and

　　　　　9　if such use involves publishing or displaying the work on the

　　　　10　website, the Facebook page, or any other social media page

　　　　11　controlled by you.　Identify each subpage thereof on which the

　　　　12　work was published and/or displayed.

14:19　　13　　　And Nofal's answer in August of 2023 was that Nofal, LLC

　　　　14　did not use the work commercially on any social media.　Do you

　　　　15　see that?

14:20　　16　A.　Yes.

14:20　　17　Q.　In No. 3, sir, we asked you:　Identify all websites and/or

　　　　18　social media pages controlled by you -- and that's Nofal, LLC

　　　　19　-- including any websites or social media pages you have

　　　　20　disabled, continued to remove from public view.

14:20　　21　　　And the answer was:　Food Town Mart and/or Nofal, LLC has

　　　　22　never had a website and has never had any social media pages.

　　　　23　Do you see that?

14:20　　24　A.　Yes.

14:20　　25　Q.　Okay.　Now, as you sit here today, you know that to be an

1   inaccurate answer today based or your knowledge today; correct?

14:20   2   MR. STEINLE:  Same objection that we talked about with

3   the requests for admissions, Judge.  Are we talking about

4   September 28, 2020, or are we talking about the time that he

5   completed the interrogatory?

14:20   6   MR. DeSOUZA:  I just asked him his knowledge as of

7   today, does he believe --

14:20   8   THE COURT:  Well, the problem is, it's not Nofal, LLC

9   or Sharif Jaber.  It's his sons, so they're independent.

10   That's what this whole case is about.  This is not rocket

11   science.

14:21   12   MR. DeSOUZA:  Your Honor, the sons are employees of

13   the store under Mr. Jaber's -- as the boss of the store, these

14   are employees that work for him.

14:21   15   THE COURT:  That's well and true, but they could be

16   doing this quite independent of any employment relationship.

17   That's the problem.

14:21   18   BY MR. DeSOUZA:

14:21   19   Q.  Mr. Jaber, Food Town Mart is a for-profit business;

20   correct?

14:21   21   A.  Yes.  It's for profits, yes.

14:21   22   Q.  Okay.  You sell meat at the store, yes?

14:21   23   A.  Yes.

14:21   24   Q.  There's a meat department?

14:21   25   A.  Yes.

14:21 1  Q.  And in that meat department, I assume they sell pork chops

2  as one of the meat products that are sold?

14:21 3  A.  Yes.

14:21 4  Q.  Are you aware that in this case -- and I think the Court

5  covered this at the beginning of the case -- you are asserting

6  what is known as a fair use defense?

14:22 7  A.  Yes.

14:22 8  Q.  Okay.  Did Nofal, LLC use my client's photograph?

14:22 9  A.  Right now, they -- no.  Yes, they use.

14:22 10 Q.  Okay.  And it was used in connection with a September 28th,

11 2020 post to advertise or tell the world what the price of pork

12 chops were in your store; correct?

14:22 13 A.  Yes.

14:22 14 Q.  Sir, I want to put back on the screen this Plaintiff's

15 Exhibit 8, okay, that was the interrogatory responses we were

16 just looking at.  I'm going to scroll to No. 17, sir.  We asked

17 Nofal in No. 17:  Describe in detail all factual support for

18 defendant's contention set forth in their third affirmative

19 defense that the claims of the plaintiff may be precluded by

20 the application of the fair use doctrine.  Do you see that?

14:23 21 A.  Yes.

14:23 22 Q.  Okay.  And your response was:  As Nofal, LLC, Sharif Jaber

23 or Food Town Mart never used any copyrighted material on any

24 website or social media page.  The affirmative defense of fair

25 use doctrine will be withdrawn.  Do you see that?

14:23  1   A.  Yes.

14:23  2   Q.  But today you are asking the jury to find that your use of

       3   this photograph was fair use; correct?

14:23  4   A.  I'm not asking the Court to use -- to find the use fair.

14:24  5   Q.  Well, you're either asserting the fair use defense or you

       6   are not.

14:24  7        MR. STEINLE:  Well, I object -- I object.  That's a

       8   legal conclusion for the Court to determine whether or not the

       9   doctrine of fair use is applicable or not.  It's factual --

       10  factually driven, not what his opinion is.

14:24  11       THE COURT:  Yes.  You've made your point.  It's a

       12  legal question, and the Court will address it with counsel at

       13  the appropriate time.

14:24  14  BY MR. DeSOUZA:

14:24  15  Q.  Mr. Jaber, are you aware that in August of 2023, you served

       16  documents in this lawsuit stating that the fair use defense

       17  will be withdrawn?  Whatever it is.

14:24  18       MR. STEINLE:  Same objection.

14:24  19       THE COURT:  Sustained.

14:24  20  BY MR. DeSOUZA:

14:24  21  Q.  Mr. Jaber, when the 2.29 a pound pork chop photo went up on

       22  your Facebook page, do you believe that was for purposes of

       23  criticizing anything?

14:25  24  A.  Not to my knowledge.

14:25  25  Q.  Was it for parody, were you making fun of something or

1    making light of something?

14:25    2    A.   Not to any knowledge.

14:25    3    Q.   Was there commentary on the photograph, "Everybody look at

4    this, photograph, it's" -- were you commenting on something?

14:25    5    A.   No.

14:25    6    Q.   What about news reporting?  Was this to report news about

7    something?

14:25    8    A.   No.

14:25    9    Q.   Teaching, did it have anything to do with teaching?

14:25    10    A.   No.

14:25    11    Q.   Did it have anything to do with scholarship, education, in

12    any way, shape, or form?

14:25    13    A.   No.

14:25    14    Q.   What about research?  Did it have anything to do with

15    research?

14:25    16    A.   No.

14:25    17    Q.   Didn't fit in any of those categories that I just said;

18    correct?

14:25    19    A.   No.

14:25    20    Q.   The point of the post at the time was to tell prospective

21    customers the price of pork chops in your store; correct?

14:26    22    A.   I believe so.

14:26    23    Q.   You believe so?

14:26    24    A.   Well, I don't -- I don't do it.  My kids done it, so I

25    don't know what was in their mind.

14:26    1    Q.  Well, whether it was Nofal or whether it was Amjad, both of
         2    those children -- and they were adults at the time, correct --
14:26    3    A.  Yes.
14:26    4    Q.  -- in 2020?  How old was Amjad in 2020?  It's four years
         5    ago.
14:26    6    A.  21.
14:26    7    Q.  He was 21?
14:26    8    A.  Uh-huh.
14:26    9    Q.  So he was an adult; yes?
14:26   10    A.  Yes.
14:26   11    Q.  And his brother was four years older, 25?
14:26   12    A.  Yes.
14:26   13    Q.  Okay.  And they were the -- essentially the floor manager,
        14    manager who's not you; correct?
14:26   15    A.  Yes.
14:26   16    Q.  Is floor manager essentially they're in charge if Sharif
        17    Jaber is not out on the floor?
14:26   18    A.  Yes.  They are in charge of everything.
14:26   19    Q.  Okay.  And did you ever define their specific roles at the
        20    company, like is there a document that says:  You are
        21    responsible for doing A, B, and C, and nothing else?
14:26   22    A.  No.
14:27   23    Q.  Is it essentially they help out doing whatever you're not
        24    doing at the time?
14:27   25    A.  Exactly.

14:27  1  Q.  And it's a problem with an employee, do they take care of?

14:27  2  A.  Yes.

14:27  3  Q.  If things need to be ordered and you're not around, do they

       4  take care of it?

14:27  5  A.  Yes.

14:27  6  Q.  Store needs to be opened or closed, you're not around, they

       7  take care of it?

14:27  8  A.  Yes.

14:27  9  Q.  And as you sit here today, you now know that one of their

      10  jobs was -- or at least one of the activities they did on

      11  behalf of the store was running the Facebook page; correct?

14:27  12         MR. STEINLE:  I object.  This is asked and answered

      13  multiple times.

14:27  14         THE COURT:  Yes.  Time to move on, Mr. DeSouza.

14:27  15         MR. DeSOUZA:  I have no further questions for him,

      16  your Honor.

14:27  17         THE COURT:  Thank you.

14:27  18     Do you have any preliminary questions, Mr. Steinle?

14:27  19         MR. STEINLE:  Judge, just as with Amjad Hamed, I

      20  intend to call Mr. Sharif -- Mr. Jaber at the time of my direct

      21  examination on the defense.  I would reserve the right to

      22  question him at that time, sir.  I have no questions in

      23  clarification at this point.

14:28  24         THE COURT:  Very well.  Mr. Jaber, you may step down.

14:28  25         THE WITNESS:  Thank you.

14:28    1          THE COURT:  You're subject to being re-called by your

        2    counsel.

14:28    3          THE WITNESS:  Thank you.

14:28    4          (The witness is excused.)

14:28    5          THE COURT:  Mr. DeSouza, you may call your next

        6    witness.

14:28    7          MR. DeSOUZA:  Your Honor, the plaintiff rests at this

        8    time.

14:28    9          THE COURT:  Thank you.

14:28   10       Mr. Steinle, do you have any additional evidence you wish

       11    to --

14:28   12          MR. STEINLE:  I do, your Honor.  But I have a number

       13    of motions that I would like to make at this point in time.

14:28   14          THE COURT:  All right.  Members of the jury, the Court

       15    has a number of matters to address with counsel.  I'm going to

       16    excuse you, again, with the admonition I've given you

       17    throughout, and that is:  Please do not discuss the case among

       18    yourselves during this recess.  It's a little early for an

       19    afternoon recess.  But continue to keep in mind the obligation

       20    to remain free of any improper influences from your fellow

       21    jurors.  We haven't finished all of the evidence and testimony

       22    much less the Court's instructions on the law or the closing

       23    arguments of counsel.

14:29   24       As soon as the Court is ready to proceed, we'll invite you

       25    back.  In the meantime, please leave your notebooks on your

1    chair.

2    The Court stands in recess insofar as the jury is

3    concerned.

4    COURT SECURITY OFFICER:  All rise.

5    (The jury left the courtroom.)

6    COURT SECURITY OFFICER:  You can be seated.

7    THE COURT:  Mr. Steinle.

8    MR. STEINLE:  My first motion is for a directed

9    verdict at this stage, a dismissal of the plaintiff's claims.

10   I would move to dismiss the claim of copyright violation

11   because the plaintiff has the burden of proof.  And the

12   plaintiff failed to establish, other than the fact that the

13   store was bought, we do -- it is uncontroverted Villard Food

14   Town URL was created before Mr. Sharif Jaber purchased the

15   store.

16   The website was utilized, but there is no evidence -- and

17   the plaintiff has the burden of proof -- to prove that they

18   created the website on behalf of the defendant, Nofal and

19   Sharif Jaber.  There is no evidence that that was -- was it

20   utilized?  Yes.  But that doesn't -- that doesn't establish

21   ownership.  He has to establish ownership of that website to

22   prove that there was a copyright violation on behalf of Nofal.

23   And he has failed to do that.  And for that reason, I'm moving

24   to dismiss the copyright violation.

25   Secondly, the second motion that I'm making is to dismiss

14:29
14:29
14:29
14:30
14:30
14:30
14:30
14:30
14:31

1    the vicarious liability claim.  The elements of vicarious

2    liability clearly state, unequivocally state that he has to

3    prove Sharif -- this is vicarious liability that Sharif Jaber

4    himself profited from the use of this picture of a pork chop.

5    There is -- the record is absolutely replete with any evidence

6    that Sharif Jaber -- generally does the store make money?  Of

7    course.  That's not the issue.  The issue is whether Sharif

8    personally profited from the use of one photograph that was

9    used in 2020.  And there is no, absolutely no evidence that

10   Sharif -- and I think the Court must grant the motion

11   dismissing the vicarious liability claims in this particular --

12   in this particular case.

13   Third motion, there is an allegation of willfulness in the

14   complaint, and I'm moving to dismiss any -- dismiss that count

15   in the complaint because, once again, there is absolutely no

16   evidence of willfulness on the part of Mr. Jaber or on the part

17   of Nofal.  Was the picture of -- the one picture of the pork

18   chop used?  Yes.  That doesn't rise to the level of

19   willfulness.  That doesn't rise to the level -- and, again, the

20   plaintiff has now rested.

21   This is their case.  And what we're left with is we're left

22   with a website that doesn't even -- isn't even owned by Nofal.

23   We're left with a picture of a pork chop that's posted on a

24   website that was utilized by, but the URL was never changed.

25   We are left with a lawsuit against my client that's claiming

14:32 (line 13)
14:32 (line 21)

1       vicarious liability when there's no evidence that he personally

2       profited.  And we're left with a lawsuit asserting a claim of

3       willfulness on the part of my client, and there is no evidence.

4       I'm moving to dismiss the case in the entirety.  And in the

5       alternative, I'm asking the Court to dismiss -- or, I mean, to

6       grant the motion dismissing the claims of vicarious liability

7       and willfulness.

8               THE COURT:  All right.  Thank you.

9       Mr. DeSouza?

10              MR. DeSOUZA:  Your Honor, I'll tackle them in order.

11      Mr. Steinle said it's uncontroverted the Facebook page was

12      created before 2017 and that the law says we have the burden of

13      showing that the Facebook page itself was created on behalf of

14      Nofal, LLC.  That is not the law on this subject, your Honor.

15      Mr. Jaber clearly testified that he took ownership of this

16      store in 2017.  The son testified this photo was published in

17      2017 on behalf of Food Town Mart which is Nofal, LLC and

18      displayed on its Facebook page.

19      The underlying website does not have to be created on

20      behalf -- or Facebook page does not have to be created on

21      behalf of this defendant.  This defendant took ownership of

22      this store in 2017.

23              THE COURT:  But does taking ownership of the store

24      carry with it any ownership of the Facebook page that --

25      whether it's family, friends, or others have used?

14:34

1          MR. DeSOUZA:  Well, whether it does or not, your

2   Honor, the law on copyright infringement is who published or

3   who displayed it.  The uncontroverted testimony is that

4   employees of Nofal, LLC -- not of the Villard Food Town or any

5   prior owner -- employees of the defendant in this lawsuit

6   caused the photograph to be displayed on a site.  It does not

7   have to be on your site.  It could be a third-party site.  It

8   could be Yelp.  It could be any different type of third-party

9   site.

14:35

10          If you cause the work to be displayed and you are an

11   employee -- and obviously in terms of respondeat superior,

12   you're an employee of Nofal.  They did not testify that they

13   are an employee of any other entity.  And he testified very

14   clearly he published this on behalf of Nofal, LLC.  So it's a

15   red herring to say, well, the Facebook page was created in --

16   you know, prior to 2017.  It doesn't matter.  What matters is

17   who's the one that caused it to be displayed, and it cannot be

18   -- it cannot be that an employee of some other company caused

19   it to be displayed when the uncontroverted testimony is it was

20   the employee of this store.

14:36

21          THE COURT:  If the employer is unknowing of the

22   posting, how -- what is the principle of law that makes the

23   employer liable?

14:36

24          MR. DeSOUZA:  The employer is liable for actions of

25   its employees in the scope of their employment, your Honor.

14:36      1    THE COURT:  Oh, now you've hit the operative word,

2    scope of their employment.  Where is there in this case any

3    allegation, much less proof that what was done here was within

4    the scope of their employment?

14:36      5    MR. DeSOUZA:  And your Honor --

14:36      6    THE COURT:  And particularly when it's unbeknownst by

7    the employer?

14:36      8    MR. DeSOUZA:  Well, the employer says unbeknownst,

9    your Honor.  It's a factual dispute issue as to whether he knew

10   or not and when he knew it.  At one point he testified I knew

11   in February, 2023.  Yet in October of 2023, in August of 2023,

12   he's saying, no, I didn't.

14:37     13    THE COURT:  Oh, but that was as of the date of the

14   posting.  That's clearly what the import of both those

15   questions and the answers were.

14:37     16    MR. DeSOUZA:  There is -- there is one question, your

17   Honor, that says, "Admit that as of September 28th, 2020."

18   Everything else very clearly says, "You used the photo, you

19   used on your website," there is denial.  Mr. Jaber has now said

20   I admit we used the photo, which would be on the website.

21   Whether the employer knew about it or not is not the question,

22   your Honor.

14:37     23    The question -- and I would agree, if one of the employees

24   got in a car, went to a bar, and got into a fight and injured

25   someone, it's clearly not within the scope of that person's

1    employment.  It's not in furtherance of the job that they're to

2    do.  It's not like it's a laundry store and they went and they

3    got into a fight and hurt someone.  This is a grocery store,

4    your Honor, that advertises its prices and its products on its

5    social media page.  And its manager, the only manager that is

6    not the ultimate boss of the store, went online, got the

7    information from either his father or butcher for purposes of

8    putting this out.

9    He testified, "My father knew about the Facebook page."  He

10   testified, "My father knew about the Facebook page.  Either my

11   father or the butcher is the one that gave me the information

12   from which to put on the Facebook page," and this is a job that

13   was occupied by him for four years and for his brother for four

14   years before that.  The brother hasn't testified yet.  I

15   understand that.  But he's already testified, "My brother did

16   this for years.  I did this for years in furtherance of our

17   job."

18   Now, whether the employer knew they did this or not, it

19   would be the same question as employer, you know, talks badly

20   to someone in the store, employer -- I'm sorry, the employee

21   takes some action, someone talks back to him and he slaps

22   someone at the cashier business.  The employer doesn't have to

23   know about that.  There's nothing in the law that says the

24   employer knew that this guy was violent or that he was going to

25   do this or he was going to do that.  But if that employee was

1    acting within the scope of the employment --

14:39    2         THE COURT:  Your example is far different than someone

3    posting something on the computer at home, et cetera.

14:39    4         MR. DeSOUZA:  And -- but, your Honor --

14:39    5         THE COURT:  To cut to the chase, what the Court is

6    going to do is since both sides wanted a jury trial, we never

7    got through the dispositive motions because counsel failed to

8    comply with the Court's protocols, the case is going to go to a

9    jury.  Mr. Steinle has made his record.  We're going to let the

10    jury see what it will do with the facts as they find them.

14:40    11         So I'm going to invite the jury back.  Hopefully we'll

12    finish the testimony today.  We'll have a jury instruction

13    conference tomorrow morning and instruct at 1:00 tomorrow and

14    argue.

14:40    15         You may invite the jury in.

14:40    16         MR. STEINLE:  Your Honor, may I have five minutes to

17    run to the men's room, please?

14:40    18         THE COURT:  Certainly.

14:40    19         COURT SECURITY OFFICER:  All rise for the jury.

14:40    20         (The jury entered the courtroom.)

14:41    21         (The court is called to order.)

14:41    22         THE COURT:  Members of the jury, the Court will be

23    ready to proceed with further testimony.  Mr. Steinle is using

24    the men's room.  And as soon as he returns, he will call his

25    first witness.

14:42   1    Members of the jury, and I'm sure you've heard this both in

2    the courtroom and perhaps the jury room as well, there's an

3    audible noise interference.  And I believe it may be coming

4    from the building fire alarm system.  They put in a new system.

5    It was tested last Friday.  On Saturday, all of the power in

6    the building was shut off.  We Energies had to do some

7    interface work.  And the audible sound is not the fire alarm,

8    and it's not anything we need to be concerned with, other than

9    it's a nuisance.

14:42  10    Mr. Steinle, you may call your next witness.

14:42  11        MR. STEINLE:  I will call Sharif Jaber to the stand,

12  please.

14:43  13        THE COURT:  Mr. Jaber, you're under the same oath you

14  took when you began your testimony.

14:43  15        THE WITNESS:  Okay.

14:43  16        THE COURT:  You may proceed --

14:43  17        MR. STEINLE:  Thank you, your Honor.

14:43  18        THE COURT:  -- Mr. Steinle.

14:43  19        MR. STEINLE:  Thank you, your Honor.

14:43  20                    SHARIF JABER,

14:43  21  called by the Defendants as a witness herein, having been

22  previously duly sworn, was examined and testified as follows:

14:43  23                DIRECT EXAMINATION

14:43  24                BY MR. STEINLE:

14:43  25  Q.  Good afternoon, Mr. Jaber.

14:43    1    A.   Good afternoon.

14:43    2    Q.   When did you come to this country?

14:43    3    A.   In 1991.

14:43    4    Q.   And are you currently a citizen of the United States?

14:43    5    A.   Yes, I am.

14:43    6    Q.   And where do you reside?  Where do you live?

14:43    7    A.   In Oak Creek.

14:43    8    Q.   You married?

14:43    9    A.   Yes.

14:43   10    Q.   How many children do you have?

14:43   11    A.   Seven.

14:43   12    Q.   When you first came to the country after getting

13    established, what business did you go in?

14:44   14    A.   Grocery stores.

14:44   15    Q.   And at some point in time, were you hired by a company

16    named Villard Food Town?

14:44   17    A.   Yes.

14:44   18    Q.   And do you know who owned Villard Food Town?

14:44   19    A.   My brother.

14:44   20    Q.   And what's his name?

14:44   21    A.   Faraj Jaber.

14:44   22    Q.   And do they call him Frank?

14:44   23    A.   Frank, yes.

14:44   24    Q.   And do you remember approximately what year you were hired?

14:44   25    A.   2004.

14:44  1   Q.   Just a little bit about Villard Food Town.  Where is

2   Villard Food Town -- we established Villard Food Town is on

3   Villard Avenue; right?

14:44  4   A.   3217 West Villard Avenue.

14:44  5   Q.   And a grocery store?

14:44  6   A.   Yes.

14:44  7   Q.   Principally groceries?

14:44  8   A.   Yeah, groceries, a little bit extras.

14:44  9   Q.   And when you were hired, what were you hired as?  What

10   position?

14:44  11   A.   As a manager.

14:44  12   Q.   And then did you keep that same job until sometime later?

14:44  13   A.   Yes.

14:45  14   Q.   Now, Villard Food Town, is Villard Food Town a stand-alone

15   store or are they part of any big chain?

14:45  16   A.   No, just individual.

14:45  17   Q.   And family run?

14:45  18   A.   Family owned and run.

14:45  19   Q.   Now, during the course of the years that you were with

20   Frank, did you and he talk about you buying the business at

21   some point?

14:45  22   A.   Yes.

14:45  23   Q.   And did you eventually buy the business?

14:45  24   A.   Yes, I did.

14:45  25   Q.   And that occurred in what year?

14:45  1   A.   2017.

14:45  2   Q.   And in addition -- strike the question.

14:45  3        Did you -- when you bought the purchase -- or bought the

4   business, did you create a limited liability company to run the

5   business?

14:45  6   A.   Yes.

14:45  7   Q.   And what was the name of the LLC?

14:45  8   A.   Nofal, LLC.

14:45  9   Q.   And Nofal, LLC was the entity that bought the business?

14:45  10  A.   Yes.

14:45  11  Q.   And Nofal, LLC is the entity that operates that business?

14:46  12  A.   Yes.

14:46  13  Q.   In addition to changing the actual ownership of the

14  business, did you also change the name of the business, the

15  d/b/a?

14:46  16  A.   Yes.

14:46  17  Q.   And what did you change it to?

14:46  18  A.   Food Town Mart.

14:46  19  Q.   Now, we've seen a lot of photographs, and we've heard

20  testimony about signage on the store.  The prior name was

21  Villard Food Town?

14:46  22  A.   Yes.

14:46  23  Q.   And there's still -- today there's still signs with Villard

24  Food Town out there?

14:46  25  A.   Yes, sir.

14:46  1    Q.   And why are those signs still out there, sir?

14:46  2    A.   Because I cannot afford to change it.

14:46  3    Q.   For example, there's a very high sign on posts, that type

       4    of thing?

14:46  5    A.   Yes.

14:46  6    Q.   Did you get an estimate as to what it would cost to remove

       7    those signs?

14:46  8    A.   $40,000.

14:46  9         MR. DeSOUZA:   Objection, relevance.

14:46  10        MR. STEINLE:   I'll move through it.

14:46  11   BY MR. STEINLE:

14:47  12   Q.   Prior to purchasing the store, prior to purchasing the

       13   store, were you aware of what Frank was -- Frank Jaber was

       14   doing in terms of advertising or anything like that?

14:47  15   A.   No.

14:47  16   Q.   Prior to purchasing the store, were you ever aware that

       17   Villard Food Town had a Facebook page?

14:47  18   A.   No.

14:47  19   Q.   Now, in addition to you working at the store, were there

       20   other family members, your family members, working at the

       21   store?

14:47  22   A.   Yes.

14:47  23   Q.   And who?

14:47  24   A.   My son.

14:47  25   Q.   Nofal?

14:47   1   A.   Nofal.

14:47   2   Q.   And I've asked you one way. I'm going to ask it a

3   different way. Did Nofal ever tell you that there was --

14:47   4           MR. DeSOUZA: Objection, hearsay.

14:47   5           THE COURT: Well, he's going to testify, so --

14:47   6           MR. STEINLE: Strike -- I'll rephrase the question.

14:47   7   BY MR. STEINLE:

14:48   8   Q.   Were you ever made aware that there was any -- any Facebook

9   page for Villard Food Town?

14:48   10   A.   No.

14:48   11   Q.   After the purchase of the business, was it your intent to

12   essentially run it as it was run in the past?

14:48   13   A.   Yes.

14:48   14   Q.   Mr. Jaber, are you familiar with the internet?

14:48   15   A.   No.

14:48   16   Q.   And have you yourself done anything as it relates to Nofal,

17   LLC, you yourself, on the internet?

14:48   18   A.   No.

14:49   19   Q.   Have you yourself done anything as it relates to any

20   websites for Food Town?

14:49   21   A.   No, sir.

14:49   22   Q.   Have you yourself, sir, done anything as it relates to any

23   social media or Facebook pages as it relates to Food Town?

14:49   24   A.   No, sir.

14:49   25   Q.   Did you at any point in time, sir, or did anyone at your

1    request, create a separate URL Facebook page for Food Town or

2    Nofal, LLC?

14:49   3    A.   No, sir.

14:49   4    Q.   At any point in time, at any point in time up until the

5    time that you were sued, did you even ever physically see the

6    Facebook page?

14:49   7    A.   No, sir.

14:49   8    Q.   Hypothetically, if No -- excuse me -- if Amjad came up to

9    you and said, "What's the price of pork chops this week," would

10    you answer him?

14:50   11        MR. DeSOUZA:   Objection, speculation.

14:50   12        MR. STEINLE:   It's a hypothetical.

14:50   13        THE COURT:   Mr. Jaber, do you know what the price of

14    pork chops is today?

14:50   15        THE WITNESS:   Yes.

14:50   16        THE COURT:   What is it, per found?

14:50   17        THE WITNESS:   3.99.

14:50   18    BY MR. STEINLE:

14:50   19    Q.   If -- if Amjad were to ask you on any particular day what

20    the price of pork chops is, would you answer your son?

14:50   21    A.   Yes.

14:50   22    Q.   Would you ask him why he's asking that question?

14:50   23    A.   No.

14:50   24    Q.   At some point in time, you became aware that the plaintiff,

25    Prepared Foods, had made a claim that you personally and Nofal

1  copyrighted material, you became aware of that; yes?

14:51  2  A.  Yes.

14:51  3  Q.  And when was that, sir?

14:51  4  A.  In February.

14:51  5  Q.  2023?

14:51  6  A.  Three, yeah.

14:51  7  Q.  When you were sued?

14:51  8  A.  Yes.

14:51  9  Q.  At any point in time, Mr. Jaber, in 20 -- in November of
10  2021, did you ever receive notice of an infringement violation
11  from Prepared Foods?

14:51  12  A.  No.

14:51  13  Q.  Did anybody ever inform you of a infringement violation in
14  November of 2021; sir?

14:51  15  A.  No.

14:51  16  Q.  And between 2021, in November of 2021, and February of
17  2023, were you ever made aware from anybody --

14:51  18  A.  No.

14:51  19  Q.  -- about an alleged infringement violation, sir?

14:51  20  A.  No.

14:51  21  Q.  Did you ever receive a letter -- you saw the letter to
22  Faraj Jaber, did you not, sir?

14:51  23  A.  Yeah.

14:51  24  Q.  During the course of this trial, you saw the letter?

14:52  25  A.  I saw it.

14:52  1   Q.   From Mr. DeSouza, you saw that letter?

14:52  2   A.   Uh-huh.

14:52  3   Q.   Did you ever receive a letter like that at any point in

4   time prior --

14:52  5   A.   No.

14:52  6   Q.   -- to being sued?

14:52  7   A.   No.

14:52  8   Q.   Did you ever receive any e-mails from Prepared Food?

14:52  9   A.   No.

14:52  10  Q.   About an alleged violation?

14:52  11  A.   No.

14:52  12  Q.   Did you receive any phone calls --

14:52  13  A.   No.

14:52  14  Q.   -- from anybody about an alleged violation?

14:52  15  A.   No, sir.

14:52  16  Q.   When you received the second amended summons and complaint

17  in February of 2023, sir, do you remember how you received it?

18  Did somebody come in and serve you with paperwork?

14:52  19  A.   Yes.

14:52  20  Q.   So you were physically served with that paperwork?

14:53  21  A.   Yes, sir.

14:53  22  Q.   And that's the first time you learned anything?

14:53  23  A.   Yes.

14:53  24  Q.   Have you, Mr. Jaber, received -- you, have you personally

25  received any financial benefit that you can quantify any way by

1    the use of a photograph of a pork chop on Food Mart's Facebook

2    page?  Have you received any benefit at all personally,

3    compensation?

14:53    4    A.   No.

14:54    5    Q.   Just a final couple questions.  You've now seen the alleged

6    violation from September 28th of 2020, have you not?  You've

7    seen the --

14:54    8    A.   Yes.

14:54    9    Q.   -- the post?

14:54    10    A.   Yes.

14:54    11    Q.   Or you've seen a screenshot of it; right?

14:54    12    A.   Yes.

14:54    13    Q.   And was that for -- was that for a sale of pork chops at

14    that particular point in time?

14:54    15    A.   I don't believe so.

14:54    16    Q.   So what was -- what was the purpose of, in your mind, now

17    that you see it, what was the purpose?

14:55    18    A.   Just probably informational.

14:55    19    Q.   The store that you run, it's located on 27th and Vliet, is

20    on the inner city of Milwaukee?

14:55    21    A.   3217.

14:55    22    Q.   Excuse me.

14:55    23    A.   Yes, it's in City of Milwaukee, Wisconsin.

14:55    24    Q.   Okay.  And does your store service the local residents?

14:55    25    A.   Yes.

14:55   1    Q.   So when you post something like that, if you're aware, is

2    the post primarily for the local people?

14:55   3    A.   Probably.  I don't -- I don't -- I'm not a Facebook or any

4    computer things.

14:56   5         MR. STEINLE:  Thank you, Mr. Jaber.  Those are all the

6    questions that I have on direct examination.

14:56   7         THE COURT:  Thank you, Mr. Steinle.

14:56   8    Mr. DeSouza?

14:56   9                    CROSS-EXAMINATION

14:56   10                    BY MR. DeSOUZA:

14:56   11   Q.   Mr. Jaber, you were here earlier when we were looking -- or

12   when my client testified that after this letter was sent, the

13   photograph was removed from the Facebook page; correct?

14:56   14   A.   Correct.

14:56   15   Q.   And I believe your son testified he's aware it was removed,

16   but he's not the one that did it; correct?

14:56   17   A.   Correct.

14:56   18   Q.   And he said it's either him or his brother, your other son;

19   correct?

14:56   20   A.   Correct.

14:56   21   Q.   Okay.  Do you have any explanation that you can provide to

22   the jury --

14:56   23   A.   I don't know.

14:56   24   Q.   -- as to -- hold on.  Can you explain to the jury why it is

25   that one photograph and one photograph only was removed from

1    the Facebook page after a letter in November, 2021 was sent

2    out?  Do you have any knowledge as to how it came down?

3    A.   No.

14:57    4         MR. STEINLE:  Well, I'm only going to object --

14:57    5    A.   I cannot answer.

14:57    6         MR. STEINLE:  I'm only objecting because lack of

7    foundation.  When was it removed?  I think there has to be more

8    foundation in order for that question to be asked.  I mean, at

9    some point in time it disappears.

14:57    10        THE COURT:  Yeah.  And the real question is that, I

11   don't think can be answered, is, A, whether the letter was

12   sent; and if it was sent, was it sent via Fed Ex?  There's no

13   tracking number on the face of the letter.  There's no

14   indication from any witness who has testified thus far as to if

15   and when it was received.  Equally important, the address to

16   which ostensibly the letter was sent doesn't match the store.

17   It's an incorrect address.  So --

14:58    18        THE WITNESS:  Exactly.

14:58    19        THE COURT:  -- there are a lot of unknowns here that

20   appear that may never be answered.  And the photo may have come

21   down, but it may be by total unmitigated coincidence, whether

22   it was three days later or three weeks later or two days

23   before.

14:58    24        There's no indication as to how that Fed Ex letter was

25   supposedly sent.  Was it snail mail, four or five days because

| | | |
|---|---|---|
| | 1 | of the pandemic, et cetera?  Was it overnight?  Was it two-day? |
| | 2 | Was it five-day?  None of those questions have been answered. |
| 14:59 | 3 | So to imply in the question that something was done after |
| | 4 | the letter was sent makes an improper inference that the letter |
| | 5 | was actually sent in the first place. |
| 14:59 | 6 | BY MR. DeSOUZA: |
| 14:59 | 7 | Q.  Mr. Jaber, did you ever instruct either of your sons to |
| | 8 | remove this Facebook post, the September 28th, 2020 Facebook |
| | 9 | post from that Facebook page? |
| 14:59 | 10 | A.  No. |
| 14:59 | 11 | Q.  As you sit here today, do you know how it is that that post |
| | 12 | was removed from the Facebook page? |
| 14:59 | 13 | A.  No. |
| 14:59 | 14 | Q.  You testified that you were the manager of Villard Food |
| | 15 | Town prior to you purchasing it in 2017; correct? |
| 14:59 | 16 | A.  Yes. |
| 15:00 | 17 | Q.  How many years had you been the manager of the store? |
| 15:00 | 18 | A.  13. |
| 15:00 | 19 | Q.  13 years? |
| 15:00 | 20 | A.  (Indicating.) |
| 15:00 | 21 | Q.  And was your job during those thirteen years roughly the |
| | 22 | same as it is today? |
| 15:00 | 23 | A.  Yes. |
| 15:00 | 24 | Q.  So you were the boss of the entire store during those 13 |
| | 25 | years? |

15:00 1  A.   Yes.

15:00 2  Q.   Even though your brother owned the store, you were the

3  ultimate manager of the store making decisions for the store;

4  correct?

15:00 5  A.   Correct.

15:00 6  Q.   Okay.  And as the manager for 13 years, you don't know

7  whether Villard Food Town did any advertising or marketing in

8  any way, shape, or form?

15:00 9  A.   No, sir.  I had to report to my brother for all.  When I

10  was manager, he was the boss.

15:00 11  Q.   Okay.  Now, Mr. Steinle asked you whether you made any

12  profit from the use of this photo on the Facebook page;

13  correct?  Do you remember that question?

15:00 14  A.   Yes.

15:00 15  Q.   Okay.  You didn't pay for it; correct?  You didn't pay to

16  put the photo on the Facebook page --

15:00 17  A.   No.

15:00 18  Q.   -- correct?

15:01 19      In fact, Nofal, LLC, going back to 2017, has never paid for

20  a single photograph that has appeared on its Facebook page;

21  correct?

15:01 22          MR. STEINLE:  Well, I object.  How does he know what

23  Nofal did or didn't do?

15:01 24          MR. DeSOUZA:  He's here testifying on behalf of Nofal,

25  LLC.  He's the owner, your Honor.

15:01

15:01

15:01

15:01

15:01

15:01

15:01

15:02

15:02

15:02

15:02

15:02

15:02

15:02

1        MR. STEINLE:  Oh, I'm sorry.  I thought -- I

2   apologize, and I withdraw the objection.  I didn't know he was

3   referring to the LLC.  I apologize.

4        MR. DeSOUZA:  Yeah, sorry, it wasn't -- not the

5   individual.

6   BY MR. DeSOUZA:

7   Q.  Sir, Nofal, LLC, Food Town Mart, has never paid for a

8   single photograph that has been displayed on its Facebook page;

9   correct?

10  A.  No, sir.

11  Q.  Okay.  So I am -- just to make sure the record is clear:  I

12  am correct, yes?

13  A.  Yes.

14  Q.  Okay.  So you didn't pay for the pork chop photo.  You

15  didn't pay for any other photo.  Presumably you saved money by

16  not having to pay for any of those photos; correct?

17  A.  I cannot afford it --

18  Q.  Okay.

19  A   -- the ad, from the beginning.

20  Q.  And you testified you sell pork chops at the store;

21  correct?

22  A.  Yes.

23  Q.  And various meat products.  I mean, the photo was chicken

24  wings and spare ribs as well; correct?

25  A.  Correct.

15:02   1   Q.  You sell all of those items in the store; correct?

15:02   2   A.  Yes.

15:02   3   Q.  You wouldn't sell them if they don't actually sell;

4   correct?

15:02   5   A.  Yes.

15:02   6   Q.  Right.  So is it fair to say that every week that goes by

7   you're selling pork chops in the store?

15:02   8   A.  Yes.

15:02   9   Q.  Is it fair to say every week that goes by you're selling

10   chicken wings in the store?

15:02  11   A.  Yes.

15:02  12   Q.  Every week that goes by you're selling spare ribs in the

13   store?

15:02  14   A.  Yes.

15:02  15   Q.  And as I think we covered earlier, when those items sell,

16   the profit distributions go to you and to nobody else; correct?

15:02  17   A.  No.

15:02  18   Q.  That's not correct?

15:02  19   A.  That's correct, they don't go to nobody.

15:02  20   Q.  I'm sorry.  So any profit made from the store after

21   employees are paid and expenses, that goes to you; correct?

15:02  22   A.  Yes.

15:02  23           MR. DeSOUZA:  Okay.  No further questions.  Thank you.

15:03  24           MR. STEINLE:  Just for clarification purposes.

15:03  25                   REDIRECT EXAMINATION

BY MR. STEINLE:

Q.  Before September 28th of 2020, were you making money when you sold chicken wings, before September 28th, 2020, before the Facebook?

A.  Yes.

Q.  Before the Facebook on September 28th, 2020, were you making money on spare ribs?  Were you selling spare ribs?

A.  Yes.

Q.  Were you selling pork chops before September 28th of 2020?

A.  Yes.

Q.  Did you ever do any analysis or calculations to try to determine whether or not the sale of pork chops only increased to any respect or in any respect since September 28th of 2020?

A.  No, sir.

MR. STEINLE:  That's it.  Nothing.

THE COURT:  All right.  Thank you, Mr. Jaber.  You may step down.

(The witness is excused.)

THE COURT:  You may call your next witness.

Mr. Hamed, you're under the same oath which you took earlier.

THE WITNESS:  Sorry, can you say that again?

THE COURT:  Yes.  You testified earlier today; correct?

THE WITNESS:  Yes, sir.

15:05    1          THE COURT:  Yeah.  You're under the same oath.

15:05    2          THE WITNESS:  Yes, sir.

15:05    3          THE COURT:  You may proceed, Mr. Steinle.

15:05    4              AMJAD SHARIF HAMED,

5  called by the Defendants as a witness herein, having been

6  previously duly sworn, was examined and testified as follows:

15:05    7             DIRECT EXAMINATION

15:05    8            BY MR. STEINLE:

15:05    9  Q.  Mr. Hamed, you testified previously, and I'm not going to

10  rehash that testimony.  But you did testify, sir, that you

11  created the Facebook page on September 28th, 2020; create --

12  correct?

15:05  13  A.  The Facebook post, yes, sir.

15:05  14  Q.  Yeah, I'm sorry, the Facebook post.

15:05  15  A.  Yes, sir.

15:05  16  Q.  And when you created that Facebook post, sir, what was the

17  purpose of that Facebook post, a sale?

15:05  18  A.  It was just the couple of things we had on sale for that

19  week.  It was just honestly to bring in more customers.

15:05  20  Q.  And in the Facebook post that you posted, it was for a sale

21  for a limited period of time?

15:05  22  A.  For only one week, sir.

15:06  23  Q.  Now, first of all, we're going to just kind of walk through

24  it, okay?

15:06  25  A.  Okay.

15:06    1    Q.  When you created this Facebook post, how did you go about

2    doing it?

15:06    3    A.  Well, I opened up on Google and searched up pictures of

4    fresh chicken wings, fresh pork chops, fresh ribs, went to

5    Google Images, seen a couple of pictures, held down, saved the

6    photo into my camera roll, and then posted on Facebook.

15:06    7    Q.  Just as it relates to the pork chop, keep it at the pork

8    chop --

15:06    9    A.  Yes, sir.

15:06    10    Q.  -- just as it relates to the pork chop, do you remember the

11    search that you put in?

15:06    12    A.  I believe it was "fresh pork chops."

15:06    13    Q.  And when that -- and that was in Google?

15:06    14    A.  Yes, sir.

15:06    15    Q.  And Google's a search engine; right?

15:06    16    A.  Yes, sir.

15:06    17    Q.  And when you did that, certain images popped up,

18    photographs popped up?

15:06    19    A.  Yes, sir.

15:07    20    Q.  And when the photographs popped up, what did you do as it

21    relates to the pork chops?

15:07    22    A.  I pressed and held and saved the photo into my camera roll.

15:07    23    Q.  So if you -- if the photo comes up, all you have to do is

24    press your thumb on it, and that photograph will automatically

25    drop into your photo log?

15:07　1　A.　Well, yeah, once you --

15:07　2　　　　　　MR. DeSOUZA:　Objection, leading.

15:07　3　　　　　　MR. STEINLE:　I was just clarifying.

15:07　4　A.　(Continuing.)　So once you press and hold on the photo, it

5　gives you a task bar underneath.　There's multiple options you

6　could do.　And copy is one of those or save image is one of

7　those options.

15:07　8　BY MR. DeSOUZA:

15:07　9　Q.　And that -- and that's what you did in this particular

10　case?

15:07　11　A.　Yes, sir.

15:07　12　Q.　And then after the photograph is in your photo log, what do

13　you do?

15:07　14　A.　I go to Facebook and post it under where I wrote the price.

15:07　15　Q.　Now, when you saw the photo in the Google Images, did you,

16　sir, see any restrictions on that photograph?

15:08　17　A.　No, sir.

15:08　18　Q.　And then when you did what you did by downloading it into

19　your photo log, did you see any restrictions on that photo?

15:08　20　A.　No, sir.

15:08　21　Q.　Do you know what a watermark is?

15:08　22　A.　Yes, sir.

15:08　23　Q.　Did you see any watermarks across the photograph?

15:08　24　A.　No, sir.

15:08　25　Q.　Did you edit, modify, or change that photograph in any

1    respect?

15:08    2    A.   No, sir.

15:08    3    Q.   Did you reduce it so that you would cut off anything from

4    that image?

15:08    5    A.   No, sir.

15:08    6    Q.   You used a photo from Google Images, downloaded it, and

7    added it to the website, that's what you did?

15:08    8    A.   Add it to the Facebook page, yes, sir.

15:08    9    Q.   Excuse me, to the Facebook page.

15:08    10        Did you, sir, have any concerns or reservations about

11    utilizing that photograph on September 28th, 2020?

15:08    12    A.   No, sir.

15:09    13    Q.   When you downloaded the picture, did anything pop up and

14    say, "Don't use it, don't use it," any warnings at all?

15:09    15    A.   No, sir.

15:09    16    Q.   Do you know whether that photograph is presently on Google

17    Images presently?

15:09    18    A.   If I am not mistaken, it is still on there, sir.

15:09    19    Q.   Now, with the Court's permission for demonstrative

20    purposes, for demonstrative purposes, I'm going to ask him to

21    recreate what he did on that particular date, with the Court's

22    permission.

15:09    23        THE COURT:   Certainly.

15:09    24        MR. DeSOUZA:   And, your Honor, I'll object on the

25    basis that Mr. Steinle had every opportunity to put a exhibit

207

1    in if he wanted to show a witness anything.  He has done no

2    exhibits whatsoever.  So if he is asking a witness live to

3    create a search online, I do find that objectionable.

15:09    4         MR. STEINLE:  This is -- this is demonstrative.

15:10    5         THE COURT:  Yes.  No, the objection is overruled --

15:10    6         MR. STEINLE:  Now --

15:10    7         THE COURT:  -- noting that the --

15:10    8    BY MR. STEINLE:

15:10    9    Q.  Mr. Hamed, can you pair your phone with the screen?

15:10    10   A.  I can try to the best of my ability.  And is it 425

11   AirPlay?  Waiting for a code to pop up.

15:11    12        MR. DeSOUZA:  Your Honor, it might be quicker if Mr.

13   Steinle just plugs in his computer and Mr. Hamed tells him what

14   search to put in, if it's -- if that's what we're waiting for.

15:11    15        THE COURT:  Have you gone through this exercise with

16   our IT staff --

15:11    17        MR. STEINLE:  I -- I did.

15:11    18        THE COURT:  -- Mr. Steinle?

15:11    19        MR. STEINLE:  I did exactly that on Friday.  I was

20   here on Friday.

15:11    21        THE COURT:  Okay.

15:11    22        MR. STEINLE:  The IT staff went through this exact

23   procedure with me on Friday.

15:11    24        THE COURT:  All right.  We'll get IT up here.

15:11    25        Members of the jury, as soon as we're ready to proceed,

1    I'll invite you back into the courtroom so Mr. Hamed can

2    complete his demonstration.

15:11    3         Caitlin, call Eric Riedijk and get him here ASAP.

15:12    4              COURT SECURITY OFFICER:  All rise.

15:12    5         (The jury left the courtroom.)

15:12    6              COURT SECURITY OFFICER:  The Court stands in recess.

15:12    7         (A short recess was taken.)

15:21    8              COURT SECURITY OFFICER:  All rise for the jury.

15:21    9         (The jury entered the courtroom.)

15:21    10         (The court is called to order.)

15:21    11              THE COURT:  Mr. Steinle, you may continue.

15:21    12    BY MR. STEINLE:

15:21    13    Q.  Amjad, have you now been able to link your telephone with

14    the television screen, the monitor?

15:21    15    A.  Yes, sir.

15:21    16    Q.  And now that you've linked it with the -- what -- what

17    we're seeing on the monitor is exactly what's on your phone,

18    sir?

15:21    19    A.  This is -- yes.  This is my home screen.

15:22    20    Q.  And was your phone -- telephone used to copy the image

21    that's the subject of this lawsuit, sir?

15:22    22    A.  Yes, sir.

15:22    23    Q.  Now, can you please demonstrate for the jury the procedures

24    that you undertook to obtain the photograph -- and by the way,

25    starting with the search, using the search that you used, can

1    you begin -- begin the process by first of all doing the

2    search.  And then once you find the results from the search,

3    then we'll take the next step.

4    A.  Yes, sir.  So I would go here.

5    Q.  What search did you put in there, for the record?

6    A.  "Fresh pork chops."  And then I would press on images,

7    scroll.  And if I am not mistaken, this is the exact picture

8    right here.  I would press save to photos, swipe up, pick up my

9    camera roll.  It's going to be this picture right here.

10   Q.  And that's the picture that you just downloaded?

11   A.  Yes, sir, so this is in my camera roll.

12   Q.  Okay.  And on that -- on that photograph, there's no

13   trademark, there's no copyright identification, is there?

14   A.  As everybody in here can see, I don't see anything on

15   there.

16   Q.  And is there any watermarking or any other indication, sir,

17   on that photograph?

18   A.  No, sir.

19   Q.  And that's the procedure that you used.  And then once it's

20   in your photo log, you downloaded that -- or you uploaded, I

21   should say, that photograph into the Facebook page?

22   A.  Yes, sir.

23   Q.  Okay.  Now, as the -- strike the question.

24        Are you still the principle user or person that takes care

25   of the Facebook page?

15:23   1   A.   Yes, sir.

15:24   2   Q.   Now, this event is alleged to have occurred on September

        3   28th, 2020; correct?

15:24   4   A.   Yes, sir.

15:24   5   Q.   And were there other posts to the Facebook page on behalf

        6   of Food Town Mart on September 28th of 2020, sir?

15:24   7   A.   I believe there was.

15:24   8   Q.   Are you -- is your Facebook page still a viable Facebook

        9   page or the Food Town Mart page still a viable Facebook page?

15:24  10   A.   Yes, sir.

15:24  11   Q.   And by going to that Facebook page, sir, can you find

       12   whether or not there was any additional posts that were done on

       13   September 28th, 2020?

15:24  14   A.   I sure can.

15:24  15   Q.   Can you do that, sir.

15:24  16   A.   Yes, sir.   This is here on the Food Town Mart Facebook

       17   page.

15:25  18        We're looking for September 28th, 2020?

15:25  19   Q.   That's September 28th, 2020?

15:25  20   A.   Yes, we do.   I did put this up as well.

15:25  21   Q.   And, again, just for the record, that post was made the

       22   exact same date that the pork chop post was made?

15:25  23   A.   Yes, sir.

15:25  24   Q.   Now, Facebook -- I -- Tim Steinle has a Facebook page.

       25   Your posts don't automatically come to me, do they?

15:25    1    A.   The only way they would come to you is if you go on to --

         2    if you search up Food Town Mart or if you are already following

         3    or like our page.

15:25    4    Q.   So that's the limited extent that this Facebook post has to

         5    the internet, in other words, you have to like it or follow it

         6    or I have to physically do a search?

15:26    7    A.   Yes.  You would have to physically go to your search bar

         8    and search up Food Town Mart.  If you are not already following

         9    or liking this page, you would actually have to scroll through

        10    the page to get to one of these posts as well.

15:26   11    Q.   And are you able to determine, sir, the number of followers

        12    for the Food Town Facebook page?

15:26   13    A.   Yes.  We have 1,000 followers.

15:26   14    Q.   You have 1,000 followers?

15:26   15    A.   Yes.

15:26   16    Q.   And other than -- other than the search that I -- that

        17    anybody could do, but you'd have to do a Food Town search;

        18    correct?

15:26   19    A.   Yes, sir.

15:26   20    Q.   Other than the search, the only people that would see that

        21    post would be one of the 1,000 followers?

15:26   22             MR. DeSOUZA:  Objection, speculation.

15:26   23             THE COURT:  No, it's qualified.  The objection is

        24    overruled.

15:26   25    BY MR. STEINLE:

15:26  1   Q.  That would be the only people that can see it?

15:26  2   A.  Yes, sir.

15:27  3   Q.  And this photograph, sir, was posted nowhere else on the

       4   internet, nor was it used by Food Town Mart except for this one

       5   time on September 28th, 2020?

15:27  6   A.  Yes, sir, that was the only time.

15:27  7   Q.  And that was the only time this photograph was used by --

       8   by this Facebook page, sir?

15:27  9   A.  Yes, sir.

15:27  10          MR. STEINLE:  That's all the questions that I have,

       11  sir.

15:27  12          THE COURT:  Mr. Hamed, can you tell us from your

       13  finding that photo when that photo appeared on Google for the

       14  first time?  Was it 1997 or 2017 or some other time?

15:28  15          THE WITNESS:  I -- I do not know, your Honor.

15:28  16          THE COURT:  Thank you.

15:28  17          THE WITNESS:  You're welcome.

15:28  18                    CROSS-EXAMINATION

15:28  19                    BY MR. DeSOUZA:

15:28  20  Q.  Mr. Hamed, can you go ahead and reconnect your phone to --

15:28  21  A.  Yes, sir.

15:28  22  Q.  All right.  Go ahead and run that same search again for

       23  fresh pork chops that you -- that Mr. -- you showed Mr.

       24  Steinle.

15:28  25  A.  (Witness complies.)

15:28  1  Q.  Okay.  Now, my understanding is you clicked on the images

2  tab to see the list of images that Google displays for you;

3  correct?

15:28  4  A.  Yes, sir.

15:28  5  Q.  And if you scroll -- let's go the first row there.  So the

6  very first result, it says "Pkg. Pork Chops."  I think it's J

7  and -- I don't know if it's J&J Packing Company, do you see

8  that?

15:29  9  A.  Yes, sir.

15:29  10  Q.  Okay.  And -- but that's obviously not the pork chop photo

11  that you chose; correct?

15:29  12  A.  No, sir.

15:29  13  Q.  So scroll down to the one that you did choose.  Do we see

14  it anywhere?  Oh, there it is.  Okay.  So assuming -- well, let

15  me ask you, do you know if this is the same order of

16  photographs when you ran your search back in 2020?  Is it

17  different today?

15:29  18  A.  I don't know.

15:29  19  Q.  Do you know if the -- the photo at issue was the very first

20  result that popped up or if you had to scroll down further to

21  get there?

15:29  22  A.  I do not know.

15:29  23  Q.  Okay.  But -- but you saw this photo, and you liked it, and

24  chose to use it; correct?

15:29  25  A.  Yes, sir.

15:29   1   Q.   Okay.  What does it say -- so it says, "Fresh Raw Boneless

   2   Center Cut," I'm going to assume it goes on to say "Pork

   3   Chops," but I see three little dots there.  But that's what it

   4   says there; correct?

15:30   5   A.   Yes, sir.

15:30   6   Q.   What does it say directly underneath that?

15:30   7   A.   "Prepared Food Photos."

15:30   8   Q.   Okay.  Rather than take a screenshot of it or save it to

   9   your computer as you did, go ahead and just click on the photo

   10   itself.  Okay.  So if you had clicked on this photo itself, now

   11   we see the full name, correct, where it says, "Fresh Raw

   12   Boneless Center Cut Pork Chops Prepared Food Photos Inc.";

   13   correct?

15:30   14   A.   Yes, sir.

15:30   15   Q.   What does it say directly underneath that?

15:30   16   A.   "Images may be subject to copyright."

15:30   17   Q.   Okay.

15:30   18   A.   "Learn more."

15:30   19   Q.   Go ahead and click on "Learn more."

15:30   20   A.   (Witness complies.)

15:30   21   Q.   Now, this takes you to a page that says, "What is

   22   copyright?  What types of work are also subject to copyright?"

   23   Correct?

15:30   24   A.   Yes, sir.

15:31   25   Q.   You never clicked on that link when you did this search for

1    this pork chop photo; correct?

15:31    2    A.   I never clicked on the photo to open up that photo in of

3    itself.

15:31    4    Q.   Okay.  But nothing -- nothing stopped you from clicking on

5    that photo or any other photo that you found and posted on the

6    Facebook page; correct?

15:31    7    A.   No, sir.

15:31    8    Q.   You can -- you -- any time you could have just clicked on

9    the photos; correct?

15:31    10   A.   Yeah, I could have.  It was just --

15:31    11   Q.   But looking at this, you agree this is a page that goes on

12   to say, "Copyright ownership gives the owner the exclusive

13   right to use the work, with some exceptions.  When a person

14   creates an original work fixed in a tangible medium, he or she

15   automatically owns copyright to the work."  And it goes on to

16   describe things about copyright, do you see that?

15:31    17   A.   Yes, sir.

15:31    18   Q.   All right.  Why don't you go back.  So we're still on -- if

19   we had clicked on the photo, this is what we'd be looking at;

20   correct?

15:31    21   A.   Yes, sir.

15:31    22   Q.   And you see the way it's -- there's a blue button that says

23   "visit"?

15:31    24   A.   Yes, sir.

15:31    25   Q.   Go ahead and click that for us.

15:31  1   A.   (Witness complies.)

15:32  2   Q.   Does it say what website, I guess the URL that you -- that

       3   you're on right now on your phone?  What is it?

15:32  4   A.   PreparedFoodPhotos.com.

15:32  5   Q.   Okay.  And at the top, that is the photo at issue; correct?

15:32  6   A.   Yep.

15:32  7   Q.   Scroll down a little bit.

15:32  8   A.   (Witness complies.)

15:32  9   Q.   Right there.  Do you see how it says, "Download photo, to

      10   download images, subscribe here"?

15:32 11   A.   Yes, sir.

15:32 12   Q.   Is it correct that when doing your search and finding

      13   whatever results you found, you never actually visited the

      14   website on which any of these photos was actually stored or

      15   hosted, you just looked at the Google search result and

      16   downloaded from there?

15:32 17   A.   Yes, sir.

15:32 18   Q.   Okay.  But you certainly could have gone, clicked through

      19   to the website, and see where the photo was; correct?

15:33 20   A.   I mean anybody could do that, but if it's -- you're -- if

      21   I'm doing something right off the bat --

15:33 22   Q.   Well, let me ask you this, Mr. Hamed.

15:33 23   A.   Yes, sir.

15:33 24   Q.   If you had gone to the website --

15:33 25   A.   Yes, sir.

217

15:33  1    Q.  -- and actually gone here and said "To download images

       2    subscribe here," would you have investigated that further at

       3    that point?

15:33  4    A.  If it says "subscribe here," I probably would have.

15:33  5    Q.  Okay.

15:33  6    A.  And then Google is a public platform.  Pretty sure if -- I

       7    don't know, if you post a photo of yourself on internet, I

       8    don't know how that works, but I'm pretty sure if it's on

       9    Google -- I mean, to my knowledge, I don't know about how that

      10    work -- but if I had posted a picture of myself on Google and

      11    somebody were to take it, I wouldn't know that -- I didn't know

      12    that you owned pictures -- or unless it had a disclaimer or a

      13    warning, attention to it.

15:33 14    Q.  I mean, I guess to summarize, you didn't know any better

      15    based on the knowledge that you had when you did this search;

      16    correct?  Is that right?

15:34 17    A.  I mean, I didn't know any better.  There was no warnings.

      18    There was into copyright on my --

15:34 19    Q.  Well --

15:34 20    A.  -- I mean --

15:34 21    Q  -- sir --

15:34 22    A.  Yes.

15:34 23    Q  -- to be fair, the moment you clicked on that photograph --

15:34 24    A.  Yes, sir.

15:34 25    Q.  -- it gave you a warning that images may be subject to

1     copyright; correct?

15:34   2     A.   Yes, sir.

15:34   3     Q.   And that's directly from Google, that's not from my client,

4     it's not from me; correct?

15:34   5     A.   I don't know that.

15:34   6     Q.   Well, go ahead, go back.

15:34   7     A.   I don't know how Google --

15:34   8     Q.   Let's go back to the search results.

15:34   9     A.   Yeah.

15:34   10    Q.   You know, indulge me.  Click on the first search result

11    there.  It looks like four pork chops.  It says, "Five Pound

12    Best Pork Chops."

15:34   13    A.   Uh-huh.

15:34   14    Q.   All right.  Underneath there it says, "Check website for

15    latest pricing and availability.  Images may be subject to

16    copyright."  It has that same "learn more" message; correct?

15:34   17    A.   Yes, sir.

15:34   18    Q.   Also has a blue link where you can visit the website where

19    this photo is; correct?

15:34   20    A.   Yes, sir.

15:35   21    Q.   All right.  Go back.  Click on the second one.  Same,

22    "Images may be subject to copyright, learn more"?

15:35   23    A.   Yes, sir.

15:35   24    Q.   Blue link "visit"?

15:35   25    A.   Yes, sir.

15:35   1    Q.   Okay.  Go back again.  I mean, let me just ask you this,

2    Mr. Hamed, because it's getting late in the day.  Do you want

3    to keep clicking on images or do you think that if you had

4    clicked on the next one, it's also going to say, "Images may be

5    subject to copyright"?

15:35   6    A.   Probably says same thing.  I don't know, though.

15:35   7    Q.   Okay.  So if you had endeavored to do more than just get a

8    search result and take a screenshot right from your phone, you

9    would have seen, "Images may be subject to copyright," at least

10   with respect to the photograph at issue here; correct?

15:35   11   A.   Yes, sir.

15:35   12   Q.   Okay.  And if you had seen that, would you have done

13   something more than just download the photo right away and go

14   on about your business?  Would you have looked into it further?

15:35   15   A.   Yes, sir.

15:35   16   Q.   Okay.  And if you had looked into it further and found out

17   you had to pay for this image or subscribe to a library of

18   images, would you have chosen a different image, one you didn't

19   have to pay for?

15:36   20   A.   Probably.

15:36   21   Q.   You don't know?

15:36   22   A.   I don't know.

15:36   23   Q.   You might have still downloaded it even if it said, "Images

24   may be subject to copyright"?

15:36   25   A.   Maybe, maybe not, I don't know.  That's --

15:36    1    Q.   Okay.  But for any photo --

15:36    2    A.   Yes.

15:36    3    Q.   -- that was posted on the Facebook page, and you were

         4    scrolling through it with Mr. Steinle before, the Facebook

         5    page, all those different photos, some of those photographs you

         6    took yourself; correct?

15:36    7    A.   Yes, sir.

15:36    8    Q.   You have a camera or at least your phone?

15:36    9    A.   My phone, yes, sir.

15:36   10    Q.   Some of the things, I think there was a -- I don't know, it

        11    was a speaker or a hookah or something.  That was a picture you

        12    took; correct?

15:36   13    A.   Yes, sir.

15:36   14    Q.   Okay.  So you're not searching the internet for photos that

        15    you took; correct?

15:36   16    A.   No, sir.

15:36   17    Q.   Other than photographs you took, was every other photo on

        18    that Facebook page the same process of Google search, download

        19    photo, onto Facebook?

15:36   20    A.   No, sir.

15:37   21    Q.   Okay.  Well, what other photos were different than that

        22    process?

15:37   23    A.   The photos that I took myself.

15:37   24    Q.   Well, that's what I said.  Other than those.

15:37   25    A.   Oh, well --

15:37   1   Q.   Other than the photos you took or your brother took before

2   you, is every other photo on there the same process of Google

3   search, download, don't visit website, go to Facebook?

15:37   4   A.   No.

15:37   5   Q.   No?

15:37   6   A.   No, sir.

15:37   7   Q.   Well, what --

15:37   8   A.   I don't know what you're -- I don't understand what you're

9   asking.

15:37   10   Q.   Okay.  Well, some photos you took yourself --

15:37   11   A.   Yeah.

15:37   12   Q.   -- and put them on the Facebook page; correct?

15:37   13   A.   Yes, sir.

15:37   14   Q.   You certainly did not Google to find those photos --

15:37   15   A.   No, sir.

15:37   16   Q.   -- you already -- your already owned them?

15:37   17   A.   Yes.

15:37   18   Q.   Exclude those photos.  They're out right now.  The other

19   photos that are on the Facebook page, are all of those photos

20   the same process of Google search --

15:37   21   A.   Are we talking about this pork chop photo?

15:37   22   Q.   This pork chop photo or --

15:37   23   A.   Yes, sir.  Then, yes, sir.

15:37   24   Q.   -- or any other photo that you did not take yourself?

15:37   25   A.   Yes, sir.

15:37   1   Q.   Okay.  So whether it's chicken wings or spare ribs or

2   anything else, if you didn't take it, this process by Google;

3   correct?

15:38   4   A.   Yes, sir.

15:38   5   Q.   Okay.  Now, the post that -- the September 28th, 2020 post

6   that had this --

15:38   7   A.   Yes, sir.

15:38   8   Q.   -- I think Mr. Steinle asked you what was the point of it,

9   and you said kind of as a customer draw to bring customers into

10   the store to buy these items; is that right?

15:38   11   A.   Yes, sir.

15:38   12   Q.   Okay.  I mean, these were items that you had in stock;

13   right?

15:38   14   A.   Yes, sir.

15:38   15   Q.   You wouldn't be posting a sale if you weren't actually

16   selling these items; correct?

15:38   17   A.   No, sir.

15:38   18   Q.   And you were trying to get customers from the local area to

19   come to your store and shop; correct?

15:38   20   A.   Well, not from the local area.  It was customers who follow

21   us on Facebook, it was for them to know that we have pork chops

22   at this price --

15:38   23   Q.   Well, any --

15:38   24   A    -- for the week, yes, sir.

15:38   25   Q.   I guess any of your thousand followers could see this

1    message and say, oh, pork chops, 2.29 a pound, let me go shop;

2    right?

15:39    3    A.   Yes, sir.

15:39    4    Q.   And that was the idea, to get people who were following you

5    to come in and shop your store; correct?

15:39    6    A.   Yes, sir.

15:39    7    Q.   Or if someone just did a search for, you know, pork chops

8    Milwaukee, Wisconsin, maybe this would pop up as well and that

9    would act as a --

15:39    10    A.   It wouldn't pop up unless we had boosted it, but I never

11    boosted --

15:39    12    Q.   Okay.

15:39    13    A.   -- so...

15:39    14    Q.   That -- now, you said this was most likely a sale for a

15    week or so; correct?

15:39    16    A.   Yes.   Only a week.

15:39    17    Q.   But the photo itself, whether it was a sale for a week or

18    not, the photo stayed on that website on that Facebook page

19    from September 28th, 2020 through at least November, 2021;

20    correct?

15:39    21    A.   So has my Valentine's Day sale and my Christmas message and

22    most of our sales do stay on our page, but it's just for

23    customers to interact with us, you know, they have questions,

24    they can ask, hey, is this on sale.

15:40    25    Q.   And all I'm asking, Mr. Hamed, is after the sale is over,

1    you don't go into the Facebook page and take the photos down;

2    correct?

15:40   3    A.   No, sir.

15:40   4    Q.   So if they're -- they might relate to 2019, 2020, 2021, but

5    once the sale has come and gone, the photo just stays on the

6    Facebook page unless someone physically goes in and takes it

7    down; right?

15:40   8    A.   Yes, sir.

15:40   9    Q.   And it -- but it's not been your practice to take the

10   photos down after the sale has expired; correct?

15:40  11   A.   No, sir.

15:40  12          MR. DeSOUZA:   Okay.   I have no further questions for

13   you, Mr. Hamed.

15:40  14          THE WITNESS:   Thank you.

15:40  15                      REDIRECT EXAMINATION

15:40  16                      BY MR. STEINLE:

15:40  17   Q.   Regardless of what you could have done, what you

18   demonstrated today going to the thumb -- is it called a

19   thumb --

15:40  20   A.   When you hold down your thumb.

15:40  21   Q.   That's -- that's what you did in this particular case as

22   you saw it after your Google search, you held your thumb on it,

23   it downloaded.   There was no restrictions on the downloaded

24   photo at all, and then you utilized it, that's what you did?

15:40  25   A.   Yes, sir.

15:40    1          MR. STEINLE:  Thank you.  That's it.

15:41    2          THE COURT:  All right.  Thank you, Mr. Hamed.  You may

       3   step down.

15:41    4          THE WITNESS:  Thank you, your Honor.

15:41    5          (The witness is excused.)

15:41    6          THE COURT:  Anything further, Mr. Steinle?

15:41    7          MR. STEINLE:  The defense would rest.

15:41    8          THE COURT:  All right.  Any rebuttal, Mr. DeSouza?

15:41    9          MR. DeSOUZA:  No rebuttal, your Honor.

15:41   10          THE COURT:  Thank you.

15:41   11     Members of the jury, subject to the Court staff reviewing

     12   with counsel the receipt of the exhibits which have come before

     13   you today, the Court does herewith declare the receipt of

     14   evidence in this case closed.  That now brings the Court and

     15   counsel to the next phase of the case in which the Court must

     16   address with counsel the instructions on the law that will

     17   guide you during your deliberations.

15:42   18     Quite a bit of work has already been completed on the

     19   instructions, as well as the verdict form.  Given the hour

     20   today, I'm going to invite you to be back in the jury room

     21   tomorrow at 1:00.  At that time, the Court will instruct you on

     22   the law which applies to this case.

15:42   23     It will take the Court about 45 minutes to an hour to

     24   deliver its instructions.  As the Court reads these

     25   instructions aloud, each of you will have a copy of the Court's

1    instructions to follow as I read them.  Following the Court's

2    instructions on the law, counsel will be afforded an

3    opportunity to once again address you in closing arguments.

4    That is an opportunity for each side to discuss with you what

5    they believe the evidence in this case has shown or perhaps not

6    shown.

15:43    7    Since the plaintiff has the burden of proof, Mr. DeSouza

8    will have an opportunity to address you in both an opening

9    argument as well as a final rebuttal.  In this branch of the

10   Court, rebuttal is limited to just that, rebuttal.  No new

11   argument not raised in plaintiff's opening argument can be

12   raised in rebuttal, just rebuttal.

15:44    13   Thereafter, the Court will have a few concluding

14   instructions for you to guide you in your deliberations.  Once

15   the Court has completed those final instructions, the case will

16   be in your hands to deliberate, to reach a completed, fair,

17   just verdict.

15:44    18   Whatever your verdict is as to each question you may be

19   required to answer in order to arrive at a completed verdict

20   must be unanimous.  As you review the verdict form, you will

21   note that certain questions in the verdict only need be

22   answered if you answered a previous question in a particular

23   way.  So it's important as you follow the Court's instructions

24   and as you deliberate to keep in mind the Court's admonition

25   about not needing to needlessly answer questions that are not

1      to be answered unless you answered a previous question in a

2      particular way.

15:45    3      Once the case is in your hands, it will be left entirely up

4      to you as to when and how long you will deliberate.  For

5      example, tomorrow if you happen to get the case at 3:15, you

6      may wish to deliberate into the evening.  If not, at 5:00 or

7      5:30, we'll suspend for the day, and you'll be invited to

8      return to the jury room at 8:30 the following morning, which

9      would be Wednesday.

15:46   10      So that is a matter that will be entirely left up to you as

11      to how long you may wish to deliberate in order to arrive at a

12      complete unanimous verdict.  So you may want to think about

13      tonight any plans for tomorrow and how long you may wish to

14      deliberate.

15:46   15      Once the case is in your hands, we will make suitable

16      arrangements for building security and an evening meal.  So at

17      some point tomorrow, Ms. Vraa will inquire of you as to how

18      long you may wish to deliberate tomorrow.  And if you wish to

19      stay into the evening, we'll make these other arrangements.  So

20      keep that in mind.

15:47   21      With those comments, I'm now going to excuse you for the

22      balance of today, and we'll see you tomorrow at 1:00.  Have a

23      great evening.  Leave your notebooks on your chair.

15:47   24              COURT SECURITY OFFICER:  All rise.

15:47   25              (The jury left the courtroom.)

15:47    1          COURT SECURITY OFFICER:  You can be seated.

15:47    2          THE COURT:  On Thursday, the Court staff provided

3   counsel with a draft set of instructions and a verdict form.

4   We're going to hold a formal jury instruction tomorrow morning

5   beginning at 9:00 o'clock.  In the meantime, whether here in

6   the courtroom this afternoon or at a suitable location, I would

7   encourage both sides to meet and review the instructions that

8   the Court has put together.  And if you have suggested changes

9   or modifications, whether in the jury instructions or the

10   verdict form, we'll be prepared to address your requests

11   tomorrow morning starting at 9:00.

15:48   12      Obviously, whatever changes be made, whether they be small

13   or significant, we will need to get them formatted, printed.

14   And it takes some time for all of that to be accomplished,

15   because like the jurors, each of you will have a copy of the

16   Court's instructions to follow as the Court reads them.

15:49   17      I do not expect that counsel will be rehashing the jury

18   instructions, other than mentioning them by reference during

19   your closing arguments since the jury will already have had the

20   benefit of those instructions before you close.

15:49   21      Anything else you want to address this afternoon?

15:49   22          MR. STEINLE:  Your Honor --

15:49   23          MR. DeSOUZA:  I'm sorry.

15:49   24          MR. STEINLE:  -- may it please the Court, so it's not

25   deemed to be waived, I'm renewing my motion to dismiss the case

1    and to dismiss the various counts, but I don't want it to be

2    deemed waived, so I'm moving the Court --

15:49

3         THE COURT:  Certainly.  Your place holder is well

4    taken and is protected.

15:50

5         MR. STEINLE:  Thank you.

15:50

6         MR. DeSOUZA:  Your Honor, I'd like to make my own Rule

7    50 motion for judgment as matter of law with respect to the

8    defendants' defense of fair use.  It's their last remaining

9    affirmative defense.  I think in the Court's draft jury

10   instructions and as the Court is well informed on the law, fair

11   use is a defense that is the defendant's burden to prove.  It

12   generally involves -- it doesn't have to be a nonprofit use,

13   but it generally involves a nonprofit use for purposes of

14   criticism, parody, education, scholarship, all the various

15   reasons that I went through with Mr. Jaber.  The use here, your

16   Honor, was posting on a Facebook page to advertise the sale of

17   pork chops at 2.29 a pound.  And as Mr. Hamed testified, the

18   goal there was to engage customers and bring them into the

19   store.

15:50

20        I think under any reading of any fair use case law -- and

21   the Court certainly doesn't have to go all the way to the

22   Supreme Court's recent case in *Warhol vs. Prince*, this is not

23   fair use, your Honor.  This is a commercial use, an

24   advertisement to sell a product.

15:51

25        THE COURT:  All right.  Happy to address it further,

1  particularly when we get to jury instructions tomorrow.  So

2  you've made your record.  Mr. Steinle has made his.  We'll see

3  you both tomorrow at 9:00 o'clock.  The Court stands in recess.

4           COURT SECURITY OFFICER:  All rise.

5           (At 3:51 p.m. the hearing ended.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3                    I, JENNIFER L. STAKE, RDR, CRR, an Official

 4   Court Reporter for the United States District Court for the

 5   Eastern District of Wisconsin, do hereby certify that the

 6   foregoing is a true and correct transcript of all the

 7   proceedings had and testimony taken in the above-titled matter

 8   as the same are contained in my original machine shorthand

 9   notes on the said trial or proceeding.

10

11

12   Dated this 3rd day of December, 2024.

13   Milwaukee, Wisconsin.

14

15

16                    Jennifer L. Stake, RDR, CRR
                      United States Official Court Reporter
17                    517 East Wisconsin Avenue, Room 324
                      Milwaukee, WI   53202
18

19                    Jennifer_Stake@wied.uscourts.gov

20

21

22   ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
     Official Court Reporter, RDR, CRR
23   _____

24

25
```