UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | | |
|---|---|---|
| PREPARED FOOD PHOTOS, INC., | ) | **Volume 2** |
| | ) | |
| Plaintiff, | ) | Case No. 22-CV-642 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| SHARIF JABER and NOFAL, LLC doing | ) | October 29, 2024 |
| business as FOOD TOWN MART, | ) | 8:59 a.m. |
| | ) | |
| Defendants. | ) | |

---

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE J. P. STADTMUELLER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:
Copycat Legal, PLLC
By:  MR. DANIEL DeSOUZA
3111 N. University Dr.
Suite 301
Coral Springs, FL  33065
Ph:  877-437-6228
dan@copycatlegal.com

For the Defendants:
(Present)
Terschan, Steinle, Hodan &
Ganzer, Ltd.
By:  MR. W. TIMOTHY STEINLE
309 N. Water Street, Ste. 215
Milwaukee, WI  53202
Ph:  414-258-1010
timothy.steinle@tshglaw.com

ALSO PRESENT:
MS. REBECCA JONES,
Intellectual Property Director,
Prepared Food Photos, Inc.

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

```
 1                        I N D E X

 2                         WITNESSES

 3    None


 4                         EXHIBITS

 5    None

 6

 7    JURY INSTRUCTIONS:                        PAGE:
         by the Court                          251
 8       by the Court                          318


 9    CLOSING ARGUMENTS:                        PAGE:
10
         by Mr. DeSouza                        278
11       by Mr. Steinle                        295
         by Mr. DeSouza                        308
12

13    VERDICT RECEIVED:                         PAGE:
         by the Court                          320
14

15

16

17

18

19

20

21

22

23

24

25
```

1            TRANSCRIPT OF PROCEEDINGS

2                    THE CLERK:  The Court calls Prepared Food Photos,

3    Incorporated, versus Sharif Jaber and Nofal, LLC doing business

4    as Food Town Mart for a jury -- Case No. 22-CV-642 for a jury

5    trial.  May I have the appearances beginning with the

6    plaintiff.

7                    MR. DeSOUZA:  Good morning, your Honor.  This is

8    Daniel DeSouza for the plaintiff.

9                    MR. STEINLE:  Good morning, your Honor.  I'm Timothy

10   Steinle.  I appear for the defendant Sharif Jaber and Nofal,

11   LLC.  Mr. Jaber is physically present in court, sir.

12                   THE COURT:  Thank you.  Good morning to counsel, and

13   good morning to your respective clients.  I neglected to

14   mention their presence this morning was not necessary.  So if

15   either wish to leave, they don't have to be here.

16       Our purpose this morning is to address the jury

17   instructions.  As the Court noted yesterday, we provided

18   counsel with draft instructions and verdict form Thursday last

19   week.  And our purpose this morning is to address your

20   concerns, the Court's concerns.  And generally the way the

21   Court proceeds in such matters is we'll go through the

22   instructions Part I and Part II, then Part III, along with the

23   verdict form.

24       So I'm not sure if counsel have any specific requests this

25   morning; or if you do, you want to take them up as we go

| | |
|---|---|
| | through the three parts, we can do it that way, too. |
| 09:01 | MR. DeSOUZA: Your Honor, myself and Mr. Steinle |
| | yesterday after court discussed the jury instructions, and |
| | there were only a handful of items that we had -- |
| 09:01 | THE COURT: Sure. |
| 09:02 | MR. DeSOUZA: -- discussed and had some suggestions to |
| | the Court on, I think, by agreement. I don't know if Mr. |
| | Steinle has come up with additional ones since then, but I can |
| | run those through you just quickly to point them out to you. |
| | There's only four or five of them. |
| 09:02 | THE COURT: Sure. That's fine. Do any of them apply |
| | to Part I? |
| 09:02 | MR. DeSOUZA: These are on the jury instructions, your |
| | Honor, it's on Page 9. I'm just looking at the PDF, but it's |
| | Page 9 of 24 -- |
| 09:02 | THE COURT: All right. |
| 09:02 | MR. DeSOUZA: -- the section that the Court had |
| | highlighted in yellow. |
| 09:02 | THE COURT: Yes. |
| 09:02 | MR. DeSOUZA: There's a sentence there that says, |
| | Sharif Jaber testified in his capacity as the registered agent |
| | for Nofal, LLC. I think Mr. Steinle and I thought that was |
| | more accurate if it was either "member" or "manager." |
| 09:02 | I don't know, Tim, if you had -- what your suggestion was, |
| | but "registered agent" seemed incorrect. I think he is the |

1    registered agent, but he's not here testifying as the

2    registered agent itself.

09:03    3         MR. STEINLE:  It just is a matter of technicality.

4    It's an LLC.  There are members of an LLC.  He's the sole

5    member, so I think the appropriate legal term would be he

6    testified as the sole member of the LLC.  And it's more

7    technical, but that's -- that's what it is, sir.

09:03    8         THE COURT:  All right.  We can accommodate that.

09:03    9         MR. DeSOUZA:  On Page 10 of the PDF, your Honor, there

10    was a couple items you have highlighted in yellow that I just

11    think based on the evidence, they go away, the video.

09:03    12        THE COURT:  Yes.

09:03    13        MR. DeSOUZA:  Yeah, things by video or certain

14    summaries are in evidence.  I think those go away.

09:03    15        THE COURT:  Yes.

09:03    16        MR. DeSOUZA:  On Page 14, there's another item

17    highlighted in yellow, it's the James Bond expression of ideas.

18    I don't think that's applicable here.  I don't think we need

19    that --

09:04    20        THE COURT:  Sure.

09:04    21        MR. DeSOUZA:  -- in the instruction.

09:04    22        THE COURT:  No problem.

09:04    23        MR. DeSOUZA:  And, Tim, I don't know if I missed

24    anything.  That's what I had written down as to what we

25    discussed.

09:04 1      MR. STEINLE:  Well, there -- as we go through the

2  instructions, depending upon how the Court rules on certain

3  things such as fair use and those types of things.

09:04 4      THE COURT:  Sure.

09:04 5      MR. STEINLE:  And the willfulness and those types of

6  things, whether that goes to the jury or not.  But at least in

7  terms of the instructions themselves, sir, I'm stating the

8  obvious, but if willfulness disappears, the -- anything having

9  to do with willfulness disappears.

09:04 10     THE COURT:  You and the judge both missed one in Part

11  III.  The introductory phrase said, "The case will be submitted

12  in the form of ten questions."  There are not ten questions.

09:05 13     MR. STEINLE:  We missed that, your Honor.  I --

09:05 14     THE COURT:  Well, even the judge missed it, so we all

15  make mistakes in life.  So --

09:05 16     MR. DeSOUZA:  What page is that on, your Honor?

09:05 17     MR. STEINLE:  Page 20.

09:05 18     THE COURT:  It is --

09:05 19     MR. STEINLE:  Page 20 of 24, the first sentence.

09:05 20     THE COURT:  Yes, first sentence.  Members of the jury.

09:05 21     MR. DeSOUZA:  Well, the Court -- the Court could still

22  be correct if we come up with another seven questions...

09:05 23     THE COURT:  Well, why don't we go back and go through

24  the instructions beginning in Part I.  After hearing your

25  comments this morning, I don't have any comments or suggested

1  changes in Part I beyond those that both of you mentioned.

09:06  2  MR. DeSOUZA:  I agree, your Honor.  We -- I -- from

3  the plaintiff's perspective, we don't have any other comments

4  to that section.

09:06  5  MR. STEINLE:  Yes, Judge.  Other than what we just

6  stated, obviously --

09:06  7  THE COURT:  Sure.

09:06  8  MR. STEINLE:  -- but there's no other corrections or

9  modifications that I would suggest or recommend.

09:06  10  THE COURT:  All right.  Moving to Part II, there are

11  two issues that are presented on Page 12.  The question of

12  willful, and the question of fair use are both addressed.

13  First, the plaintiff alleges that Nofal doing business as Food

14  Town Mart willfully infringed.  And if that's the plaintiff's

15  contention as it remains, it's certainly entitled to that

16  position.  Willful will remain.

09:07  17  When it comes to fair use, there are concerns that the

18  Court has, and my preference would be to simply inform the jury

19  that the matter of fair use is not a matter that is before them

20  and has been reserved by the Court for determination.

09:08  21  After 37 and a half years, what the Court's real concern

22  here is if we instruct the jury that a particular claim has

23  been dismissed, as opposed to simply telling them that it is a

24  matter that has been reserved for determination by the Court,

25  they more often than not take from a dismissal of certain

239

1    parties or certain claims that somehow the Court is

2    telegraphing to them that there is merit to the other claims

3    and suggesting that they should find in favor of a particular

4    party or a particular claim.

09:09    5    And that's what, through experience, I have endeavored to

6    avoid sending that kind of message, as opposed to simply

7    telling the jury that it is a matter for the Court to

8    determine, without telegraphing what the Court's decision is or

9    was.

09:09    10    So our purpose this morning is to hear both sides out on

11    this.  I wasn't aware until I saw the response to an

12    interrogatory question that the fair use claim had been

13    withdrawn, at least in terms of the pleadings.

09:09    14    MR. STEINLE:  Well, if I may?

09:10    15    THE COURT:  Certainly.

09:10    16    MR. STEINLE:  If -- first of all, if I'm to understand

17    what the Court just stated, what the Court stated in substance

18    is fair use is not necessarily off the table.  And -- and what

19    the Court indicated -- and I believe that to be consistent with

20    the case law.  In other words, I think there's no bright line

21    test for fair use.  And it is a mixed question of fact and law.

22    And the testimony's now come in so facts may or may not support

23    the defense of fair use.  And getting back to where I was, if

24    the Court's just indicated that that issue will be one that the

25    Court may address, if appropriate, at the conclusion of the

1    jury trial and would essentially take the fair use defense off

2    the table for the jury's determination to try to move quickly

3    through this, I don't necessarily have any significant concerns

4    with the jury not deciding that issue, if the Court is

5    indicating that the Court is going -- will -- if necessary,

6    will address that issue in the future.

7              THE COURT:  Sure.

8         Mr. DeSouza?

9              MR. DeSOUZA:  Your Honor, I think fair use is -- as

10   Mr. Steinle said, it's a mixed question of fact or law.  But at

11   the conclusion of the evidence yesterday, we made the 50(a)

12   motion.  I think my position is if the Court grants that

13   motion, I obviously have no issue telling the jury you've

14   reserved on that issue so it doesn't taint them as to believing

15   one way or the other.  But if the Court is not inclined to

16   grant that motion, I think it is proper to submit the question

17   to the jury at that point.  It is a jury question.  The parties

18   have determined this is a jury trial.

19        But I go back to what your Honor just said earlier, which

20   is there's no trial by surprise in federal court, your Honor.

21   We have interrogatory responses that were never amended in this

22   case.  No one ever went back and amended.  We went into trial

23   with interrogatory responses, "We've withdrawn our fair use

24   defense."  And now Mr. Steinle comes to trial yesterday and

25   from his client saying this is not by Facebook page to now say

1    it is our Facebook page and, oh, by the way, fair use is back

2    on the table, I think the Court either determines the 50(a)

3    motion or it gets submitted to the jury because, if anything,

4    my client is looking for some finality at the end of the jury

5    trial, not let's go brief fair use and subsequent motions, and

6    let's have the Court come back and decide the issue.

09:12

7    We're all here. The jury is here.  I think the Court either

8    grants the 50(a) motion fair use is gone, or it gets submitted

9    to the jury and we have an answer today as to -- well,

10   presumably if the jury finishes their deliberations today, we

11   have a final answer at that point would be my preference, your

12   Honor.

09:13

13           THE COURT:  All right.  Mr. Steinle?

09:13

14           MR. STEINLE:  Your Honor, it's crystal clear that the

15   Court can conform the special verdict to the evidence at trial.

16   And throughout the course of pleadings and then throughout the

17   course of discovery and throughout the testimony elicited at

18   trial, things occur.  And what the Court should do, I believe,

19   is to conform the ultimate special verdict to that evidence.

09:13

20       And whether or not this Court believes at least factually

21   that the evidence that was elicited at this trial warrants the

22   submission of a fair use affirmative defense, Mr. DeSouza

23   certainly can argue.  If it's going to be on the special

24   verdict and if that's what the Court ultimately decides, then

25   he can argue that that was a response.  However, as I

1    indicated, evidence changes throughout the course of discovery.

2    Things change throughout the course of discovery.

09:14    3        And so my position is, as I stated, if the Court is of the

4    mindset that fair use will be determined by this Court and not

5    the jury, I'm okay with that.  However, if the Court is of a

6    mindset that fair use is at least a question for the -- to be

7    submitted to the jury, regardless of an answer to an

8    interrogatory during the course of discovery, then -- then fair

9    use, in my opinion, should be on the special verdict.  And he

10    can argue whatever he chooses to argue at that time.

09:15    11        MR. DeSOUZA:  And, your Honor, if I may, I just want

12    to be clear, the 50(a) motion yesterday was not simply you

13    withdrew your fair use defense.  There's no basis for this

14    defense.  The evidence is in.  Your Honor is certainly allowed

15    under Rule 50 to grant judgment as a matter of law on a defense

16    that just cannot survive.

09:15    17        In the history of fair use -- and this is before and after

18    the Supreme Court came down in *Warhol* and give us our guidance

19    on fair use -- there has never been a fair use case where

20    someone says come buy pork chops for 2.29 a pound.  There's

21    nothing transformative.  There's nothing educational.  There's

22    nothing scholastic about it.  It's use of a photo in a

23    commercial advertising for sale of a product.  The question

24    does not need to be submitted to the jury.

09:16    25        Whether they withdrew the defense or not, it is clear as

1    day that none of the factors for fair use are met here, and so

2    it's why we asked yesterday grant the 50(a) motion.  It

3    shouldn't be submitted to the jury, and that's just in addition

4    to the fact that they withdrew the defense in the first place.

5    Certainly we can raise that in closing if it gets that far, but

6    I don't believe there's any basis to submit this question to

7    the jury, your Honor.

09:16    8    THE COURT:  All right.

09:16    9    MR. STEINLE:  Without -- with the Court's permission,

10    I apologize.

09:16    11    THE COURT:  No, no.

09:16    12    MR. STEINLE:  With the Court's permission, the -- the

13    examples that are given in Section 107 under the authority

14    indicates that those are examples of activities that may

15    qualify for fair use.  It's not an exclusive list.  And what

16    the -- what the statute says in substance is there's four

17    things to take into consideration when you're determining

18    whether fair use is applicable.  And the cases are pretty

19    crystal clear that whether or not it's a nonprofit or whether

20    it's a commercial, fair use is used in commercial cases, it's

21    used in nonprofit cases.  And what the Court's saying is -- and

22    that's what I started by -- there's no bright line test.

23    There's no bright line test.

09:17    24    So the mere fact that he asked questions, is this a

25    reporting, is this teaching, is this scholarship, is it

1   research, that doesn't end there.  It doesn't end there because

2   those are only examples of fair use.  So that -- my argument is

3   I think it's still on the table.  That's my opinion.

09:17  4        THE COURT:  All right.  Well, in the interest of

5   avoiding error, the better exercise of the Court's discretion

6   in such matters is we're going to leave it in, and the Court

7   obviously can address it later in motions after verdict if

8   there be a factual basis to revisit the subject.

09:18  9        So the entirety of the balance of Part II, unless there be

10  specific changes, will go forward as the draft suggests.  That

11  leaves only the matter of questions that may pertain to

12  damages.  And the Court has a question mark with respect to the

13  second full paragraph from the bottom on Page 17 with respect

14  to the matter of lost profits.

09:19 15        MR. DeSOUZA:  Your Honor, the plaintiff is not seeking

16  disgorgement of profits in this case, so actual damages would

17  be limited to the other categories of actual damages as

18  described in the instruction.  So I think the parenthetical,

19  the plus any profits --

09:19 20        THE COURT:  All right.

09:19 21        MR. DeSOUZA:  -- can come out.

09:19 22        THE COURT:  Okay.

09:19 23        MR. DeSOUZA:  The same way that on Page 18 what's in

24  the parenthetical there can also come out.

09:19 25        THE COURT:  All right.  So that brings us to Part III

245

1    and the jury verdict form.  We're still with five questions

2    rather than ten.

09:20   3         MR. STEINLE:  May I ask, please, of the Court, actual

4    damages and statutory damages under the unambiguous language of

5    the statute, it's alternative.  You either get actual or you

6    get statutory.

09:20   7         THE COURT:  Well, then ultimately it's the plaintiff's

8    determination once they see the verdict.

09:20   9         MR. STEINLE:  So that's --

09:20  10         THE COURT:  But the jury still determines both

11    amounts, and then it becomes a question for plaintiff to elect.

09:20  12         MR. STEINLE:  And the only reason that I hesitate is I

13    have a problem with -- it's not a problem -- I have a question

14    as to whether the jury -- or whether the plaintiff gets to

15    argue both.  In other words, my expression is he gets two kicks

16    at the cat, so to speak.  He gets to argue to the jury for

17    actual damages and gets to argue to the jury for statutory

18    damages.  And then when the statute says -- doesn't he have to

19    elect before closing as to which item of damages he's claiming?

09:21  20         THE COURT:  I don't believe the answer to that

21    question is yes.  I think it's no, he doesn't have to.

09:21  22         MR. DeSOUZA:  Your Honor, if I may, it's directly in

23    504(c)(1).  It says, "At any time before final judgment is

24    rendered," not before the jury comes back.  There's a Seventh

25    Circuit case, copyright case, the jury awarded both statutory

1    damages and actual damages.  The plaintiff elected.  Seventh

2    Circuit says that's perfectly appropriate per the plain

3    language of the statute.

09:22    4    THE COURT:  Sure.  No, unless you've got some more

5    recent authority, Mr. Steinle, it's a matter for plaintiff to

6    elect.  You have -- if you want to use the two kicks at the cat

7    analogy, you can argue both.  You're not limited to arguing one

8    or the other.  You can argue that he's not entitled to damages

9    under either theory.

09:22    10    MR. STEINLE:  I understand the ruling of the Court.  I

11    understand it.

09:22    12    THE COURT:  All right.  Anything further, Mr. DeSouza,

13    on instructions?

09:22    14    MR. DeSOUZA:  Your Honor, I don't think I have a basis

15    to change the vicarious infringement instructions because they

16    are standard, but I'll make a record that there is language in

17    the standard instructions that says a defendant -- or for

18    vicarious purposes, a defendant must profit from the

19    infringement, whereas I believe that law in the Seventh Circuit

20    rather than using the word "profit" uses the defendant has a

21    "financial interest" in the infringing activities.  But I

22    understand the Seventh Circuit has given us our standard

23    instructions and they have "profit," but I would ask your Honor

24    to change the word "profit" to the word "financial interest."

25    Understanding what your Honor's ruling is likely to be, I'm

1    just making my proffer on that point, your Honor.

09:23    2    THE COURT:  Mr. Steinle, do you have any thought?

09:23    3    MR. STEINLE:  Well, my thought is the standard

4    instruction says the word "profit."  I don't see -- those are

5    the standard instructions, and I don't see any reason to change

6    it, and I would object to changing it.

09:24    7    THE COURT:  All right.  We will abide by the standard

8    instruction.  And for purposes of any appeal, Mr. DeSouza has

9    made his record.

09:24    10    MR. DeSOUZA:  Thank you, your Honor.

09:24    11    Other than that, I have no further suggestions or problems

12    with the instructions, your Honor.

09:24    13    MR. STEINLE:  Nor do I.

09:24    14    THE COURT:  Thank you.  Now, how long do both of you

15    anticipate your arguments going?  I told the jury yesterday

16    it's going to take pretty close to an hour for the Court to

17    read everything, so -- and I would hope since jurors generally

18    appreciate the fact that they have the benefit of the

19    instructions before counsel argue because it allows you to key

20    off from instructions, address the evidence in light of

21    instructions, et cetera, so they don't really appreciate having

22    counsel simply go through the rote exercise of rereading the

23    very instructions that they heard from the Court.

09:25    24    They have them in a binder, so if you wanted to reference

25    them, you're certainly free to do so.  There aren't too many

1    courts that do it the way we do.  But they have the

2    instructions here in the courtroom to follow as I read them.

3    They can take them into the jury room and use them as a frame

4    of reference during their deliberations.

09:26    5        MR. DeSOUZA:  Your Honor, I've yet to meet the lawyer

6    that doesn't like the sound of his own voice, and so I don't

7    want to underestimate the amount of time that closing takes.

8    But having done a few of these cases in similar form, I think

9    it's probably about a half an hour for closing --

09:26   10        THE COURT:  Sure, that's fine.

09:26   11        MR. DeSOUZA:  -- for either side, I think.

09:26   12        THE COURT:  Sure.

09:26   13        MR. STEINLE:  And consistent with my opening, I would

14    anticipate that -- a similar amount of time.  We have a three

15    -- three or four question special verdict.  It's not overly

16    complex, your Honor.

09:26   17        THE COURT:  Sure.  Well, we will get these

18    instructions formatted.  They should be available this morning

19    sometime between 10:30 and 11:00, if you'd like copies before

20    1:00 this afternoon.

09:26   21        MR. STEINLE:  May I please ask a question?

09:26   22        THE COURT:  Certainly.

09:27   23        MR. STEINLE:  Have we discussed the special verdict

24    and specifically Question No. 6 as it relates to the

25    willfulness?  I -- it is -- Question No. 6, willfulness, I made

1    a motion to dismiss that any -- that claim.  And I am inquiring

2    of the Court whether the question of willfulness will be

3    submitted to the jury.

09:27   4    THE COURT:  It will be, and your motion was taken

5    under advisement.  So the motion is still live, just like Mr.

6    DeSouza's motion to dismiss the fair use claim is still alive.

09:27   7    MR. STEINLE:  Very well.  I understand.

09:27   8    MR. DeSOUZA:  Your Honor, just to clarify, are we able

9    to get electronic copies of the jury instructions and verdict

10   forms so that if need be we can --

09:28   11   THE COURT:  Sure.

09:28   12   MR. DeSOUZA:  -- put them on the screen?

09:28   13   THE COURT:  We'll make that happen.  If you give or

14   provide Ms. Willenbrink an address where you'd like them

15   e-mailed to, we can do that.

09:28   16   MR. DeSOUZA:  Thank you, your Honor.

09:28   17   THE COURT:  So we'll see you shortly before 1:00, and

18   the jury will be here, and we'll be ready to proceed.  Thank

19   you for your contributions, and we'll stand in recess until

20   1:00.

09:28   21   COURT SECURITY OFFICER:  All rise.

09:28   22   (A recess was taken.)

13:00   23   COURT SECURITY OFFICER:  All rise.

13:00   24   (The jury entered the courtroom.)

13:00   25   (The court is called to order.)

13:00  1    THE COURT:  Good afternoon, members of the jury, and
2      good afternoon to counsel, and good afternoon to their clients.
13:00  3      Members of the jury, the Court and counsel have completed
4      their work on the jury instructions.  They've been printed and
5      formatted, and Ms. Vraa is going to make copies of the
6      instructions and the binder available to you now, after which
7      the Court will proceed with reading those instructions.
13:01  8      COURT SECURITY OFFICER:  Oh, I'm sorry.  Here, I've
9      got it.  Thank you.
13:01  10     THE COURT:  These instructions are formatted in a
11     three ring binder in three separate parts.
13:01  12     Part I, General Introduction.  Members of the jury:  Now
13     that you have heard all the evidence in the case, it becomes my
14     duty to instruct you on the law which applies to this case.
13:01  15     These instructions will be in three parts:
13:01  16     First:  The instructions on general rules which define and
17     control the jury's duties in a civil case;
13:02  18     Second:  The instructions stating the rules of law which
19     you must apply, that is, what each party must prove in their
20     case; and
13:02  21     Third:  Some rules and guidelines for your deliberations
22     and return of your verdict.
13:02  23     At the conclusion of my instructions the lawyers for the
24     parties will deliver their closing arguments followed by the
25     concluding instructions of the Court.

13:02　1　　　　Copies of these instructions will be available in the jury

2　room for each of you to consult should you find it necessary.

13:02　3　　　　It is your duty to find the facts from all the evidence in

4　the case.  To those facts you must apply the law as I give it

5　to you in these instructions, whether you agree with the law or

6　not.  All of the instructions are equally important and should

7　be considered together as a connected series and regarded as

8　the law applicable to the case.  As jurors, you have no right

9　to disregard, or give special attention to, any one of the

10　instructions, or to question the wisdom of any rule of law.

13:03　11　　　　As jurors, you should consider and view the evidence in

12　light of your own observations and experiences in the affairs

13　of life.

13:03　14　　　　In determining the facts, you should do so from a fair

15　consideration of the evidence.  That means you must not be

16　influenced by prejudice, fear, favor, public opinion, personal

17　likes or dislikes, opinions, or sympathy.

13:04　18　　　　This case should be considered and decided by you as an

19　action between persons of equal standing in the community, of

20　equal worth, and holding the same or similar stations in life.

13:04　21　　　　All parties are equal before the law.  Each of the parties

22　in this case is entitled to the same fair consideration.  In

23　this case, the plaintiff, Prepared Food Photos, Inc. and one of

24　the defendants, Nofal, LLC doing business as Food Town Mart,

25　are corporations; the other defendant, Sharif Jaber, is an

1    individual.  Corporations are entitled to the same fair

2    consideration that you would give any individual person.

13:05    3        In reaching your verdict, you may consider only the

4    testimony of the witnesses and the exhibits received in

5    evidence.  Certain things are not evidence, and you may not

6    consider them in determining what the facts are.

13:05    7        Those matters and things which are not evidence include the

8    following:

13:05    9        First, opening statements and closing arguments by the

10    lawyers for the parties are not evidence.  What they have said

11    in their opening statements served to acquaint you with the

12    facts they expected the evidence to show.  What they say in

13    their closing arguments is intended to help you interpret the

14    evidence.  You should consider the closing arguments carefully;

15    however, if the evidence as you recall it differs from the way

16    Prepared Food Photos, Inc.'s or Sharif Jaber or Nofal, LLC

17    doing business as Food Town Mart's lawyers have characterized

18    it, keep in mind it is your recollection of the evidence that

19    controls during your deliberations.

13:06    20        Second, questions and objections by the lawyers for the

21    parties are not evidence.  Prepared Food Photos, Inc.'s or

22    Sharif Jaber or Nofal, LLC doing business as Food Town Mart's

23    lawyers have a duty to object to what they feel are improper

24    questions asked of the witnesses.  You should not draw any

25    conclusions for either side from the fact that an objection was

1    made to any question and that the witness may not have been

2    permitted to answer it.  If I sustained objections to questions

3    that were asked, you must not speculate on what the answers

4    might have been.

13:07    5    Third, testimony or exhibits which have been excluded or

6    stricken, or that you have been instructed to disregard, are

7    not evidence and must not be considered.  In addition, if

8    testimony or exhibits have been received for a limited purpose,

9    you must follow the limiting instruction given as to such

10   matters.

13:07   11   Fourth, anything you may have heard or seen about this case

12   outside the courtroom must be entirely disregarded by you.  You

13   are to decide this case solely on the basis of the evidence

14   received during the trial.

13:08   15   If during the course of this trial you have gained any

16   impression that I have a feeling one way or another about this

17   case, then you should completely disregard any such impression

18   because you, as jurors, are the sole judges of the evidence and

19   the credibility of the witnesses in this case.  My feelings are

20   wholly immaterial.  Neither by these instructions, nor by any

21   ruling or remark which I have made, do I mean to indicate any

22   opinion as to the facts or as to what your verdict should be.

23   Moreover, I have a duty to caution or warn a party or an

24   attorney who does something that I believe is not in keeping

25   with the rules of evidence or procedure.  You are not to draw

1    any inference against the side whom I may caution or warn

2    during the trial.  You are the sole and exclusive judges of the

3    facts.

4        In determining the facts, you are reminded that before each

5    member of the jury was accepted and sworn to act as a juror,

6    you were asked questions regarding your competency,

7    qualifications, fairness, and freedom from prejudice or

8    sympathy.  On the faith of those answers, each of you was

9    accepted by the parties to serve as a juror.  Therefore, those

10   answers are as binding on each of you now as they were then,

11   and should remain so until the jury is discharged from

12   consideration of this case.

13       In this civil action, certain questions in the special

14   verdict form ask that you answer the questions "yes" or "no."

15   The party who wants you to answer the questions "yes" has the

16   burden of proof as to those questions.  The burden of proof is

17   to satisfy you by the greater weight of the credible evidence,

18   to a reasonable certainty, that "yes" should be your answer to

19   the questions.

20       When I say a particular party must prove something by "the

21   greater weight of the credible evidence," or when I use the

22   expression "if you find," or "if you decide," this is what I

23   mean:  The evidence in favor of a "yes" answer has more

24   convincing power than the evidence opposed to it.  "Credible

25   evidence" means evidence you believe in light of reason and

13:09 (line 4)
13:10 (line 13)
13:10 (line 14)
13:10 (line 20)

common sense.  "Reasonable certainty" means that you are persuaded based upon a rational consideration of the evidence. This rule does not, of course, require proof to an absolute certainty, since proof to an absolute certainty is seldom, if ever, possible in any case.  However, a guess is not enough to meet the burden of proof.

Those jurors who may have sat in a criminal case have heard of proof beyond a reasonable doubt.  As I stated in my preliminary instructions, that standard does not apply in a civil case such as this one and, therefore, you should put it out of your mind.

The evidence from which you are to determine the facts in order to reach a verdict consists of:

First:  The sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness;

Second:  Deposition testimony presented during the trial;

Third:  Exhibits which have been received into evidence, regardless of who may have produced them; and

Fourth:  Any facts to which the parties' lawyers have agreed or stipulated or which I have directed you to find.  A stipulation is an agreement between both sides that certain facts are true.

During the course of the trial, I occasionally may have asked questions of a witness, in order to bring out facts not then fully covered in the testimony.  Please do not assume that

1    I hold any opinion on the matters to which my questions may

2    have related.  Remember that you, as jurors, are at liberty to

3    disregard all comments of the Court in arriving at your own

4    findings on the facts.

13:13    5         There are two kinds of evidence:  Direct and

6    circumstantial.  Direct evidence is direct proof of a fact such

7    as the testimony of a person who claims to have personal

8    knowledge, such as an eyewitness.  Circumstantial evidence, on

9    the other hand, is proof of a chain of facts and circumstances

10   from which you could find that another fact exists even though

11   it has not been proved directly.

13:14    12        The law makes no distinction between the weight to be given

13   either direct or circumstantial evidence.  Therefore, all of

14   the evidence in the case, including circumstantial evidence,

15   should be considered by you in arriving at your verdict.  It is

16   for you to decide whether a fact has been proved by

17   circumstantial evidence.  In making that decision, you must

18   consider all the evidence in the light of reason, common sense,

19   and experience.

13:14    20        You are to consider only the evidence in the case.  But in

21   your consideration of the evidence you are not limited to the

22   bald statements of the witnesses.  In other words, you are not

23   limited to what you see and hear as the witnesses testify.  You

24   are permitted to draw, from facts which you find have been

25   proved, such reasonable inferences as seem justified in the

light of your experience.

Inferences are deductions or conclusions which reason and common sense lead the jury to draw from facts which have been established by the evidence in the case. You are allowed to make reasonable inferences, so long as they are based on the evidence.

In determining whether any fact has been proved, you should consider all of the evidence bearing on the question, regardless of who introduced it.

If you have taken notes during the trial, you may use them during your deliberations to help you remember what happened during the trial. You should use your notes only as aids to your memory. The notes are not evidence. All of you should rely on your independent recollection of the evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impressions of each juror.

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of each witness, or by the manner in which each witness testified, or by the character of the testimony given, or by evidence to the contrary of the testimony given. However, you should not be influenced by any person's race, color, religion, national ancestry, or sex.

You should carefully scrutinize all the testimony given,

the circumstances under which each witness has testified, and
every matter in evidence which tends to show whether a witness
is worthy of belief.  Consider each witness' age, intelligence,
motive, state of mind, and demeanor or manner while on the
stand.  Consider each witness' ability to observe the matters
as to which he or she has testified, and whether he or she
impresses you as having an accurate recollection of these
matters.  Consider also any relation each witness may bear to
either side of the case, including any interest, bias,
prejudice held by the witness; the manner in which each witness
may be affected by your verdict; and the extent to which, if at
all, each witness is either supported or contradicted by other
evidence in the case.

Inconsistencies or discrepancies in the testimony of a
witness or between the testimony of different witnesses, may or
may not cause the jury to discredit such testimony.  Two or
more persons witnessing an incident or a transaction may see or
hear it differently; innocent mis-recollection, like failure of
recollection, is a common experience.  In weighing the effect
of a discrepancy, always consider whether it pertains to a
matter of importance or an unimportant detail, and whether the
discrepancy results from innocent error or intentional
falsehood.

A witness may be discredited or impeached by contradictory
evidence, or by evidence that at some other time the witness

1   has said or done something, or has failed to say or do

2   something, which is inconsistent with the witness' present

3   testimony.  If you believe any witness has been impeached and

4   thus discredited, it is your exclusive province to give the

5   testimony of that witness such credibility, if any, as you may

6   think it deserves.

7   After making your own judgment, you will give the testimony

8   of each witness such weight, if any, as you may think it

9   deserves.

10  You may, in short, accept or reject the testimony of any

11  witness in whole or in part.

12  You may consider statements given by a party before trial

13  as evidence of the truth of what he or she said in the earlier

14  statements, as well as in deciding what weight to give any

15  witness' testimony.

16  With respect to other witnesses, the law is different.

17  During the trial, attorneys for the parties questioned certain

18  witnesses regarding prior statements or acts that those

19  witnesses may have made.  You may consider those prior

20  inconsistent statements in reaching your verdict, but your

21  consideration of those statements must differ based upon the

22  situation in which they were offered.  If the prior statement

23  was given by a witness under oath before trial, then you may

24  consider that prior statement for two purposes:  first, as

25  evidence of the truth of what was said in the prior statement;

13:20
13:20
13:20
13:21
13:21

1    and, second, as part of your decision on what weight to give

2    the witness' testimony.

13:22    3    On the other hand, if the witness did not make the prior

4    statement under oath or acted in a manner that is inconsistent

5    with the witness' testimony here in court, then you may

6    consider that evidence only for the purpose of deciding whether

7    the witness' testimony in court was true and what weight it

8    should receive. Whenever considering a witness' prior

9    statement or conduct, you should again consider whether it was

10    simply an innocent error or an intentional falsehood and

11    whether it concerns an important fact or an unimportant detail.

13:23    12    If you find that a witness' testimony conflicts with facts

13    established by other evidence and that the testimony cannot be

14    reconciled with those facts, then disregard the conflicting

15    testimony. But the testimony of the witness is overcome by

16    other evidence only if that evidence establishes a conclusion

17    contradicting such testimony beyond any reasonable ground for

18    doubt.

13:23    19    Prepared Food Photos designated Rebecca Jones as its

20    corporate representative. You should consider Rebecca Jones'

21    testimony as complete, knowledgeable, and binding on Prepared

22    Food Photos, Inc. Similarly, Sharif Jaber testified in his

23    capacity as the sole member of Nofal, LLC doing business as

24    Food Town Mart. You should consider Sharif Jaber's testimony

25    as complete, knowledgeable, and binding on Nofal, LLC doing

business as Food Town Mart.

If you, during your deliberations, wish to have another opportunity to view an exhibit that was presented as evidence, you should send a note written to me through the bailiff, signed by your foreperson or by one or more members of the jury, and I will allow you to return to the courtroom for another opportunity to view that exhibit.  You are not required to view any exhibits a second time.  You may rely, instead, on your recollections of these exhibits as you observed them at trial.

A demonstration of how a witness downloaded Prepared Food Photos, Inc. photograph from the internet has been shown to you.  This demonstration was used for convenience and to help explain the facts of the case.  It is not in itself evidence or proof of any facts.

You are not bound to decide any issue of fact in accordance with the testimony of any number of witnesses which does not produce in your mind's belief in the likelihood of truth, as against the testimony of a lesser number of witnesses or other evidence which does produce such belief in your minds.

The test is not which side brings in the greater number of witnesses, or presents the greater quantity of evidence, but which witness, and which evidence, appeals to your minds as being most accurate and otherwise trustworthy.

You are instructed that it is entirely proper for an

1   attorney to interview any witness in preparation for trial.

13:26   2   The law does not require any party to call as witnesses all

3   persons who may have been present at any time or place involved

4   in the case, or who may appear to have some knowledge of the

5   matters at issue in this trial. Nor does the law require any

6   party to produce as exhibits all papers and things mentioned in

7   the evidence in the case.

13:27   8   Part II, The law applicable to Prepared Food Photos' claims

9   and Sharif Jaber's and Nofal, LLC doing business as Food Town

10   Mart's defense.

13:27   11   The Court will now summarize the issues that you must

12   decide and for which I will provide instructions to guide your

13   deliberations.

13:27   14   The plaintiff, Prepared Food Photos, Inc., has alleged that

15   Nofal, LLC doing business as Food Town Mart willfully infringed

16   its copyright in a photograph of pork chops. It also alleges

17   that Sharif Jaber vicariously infringed its copyright in the

18   same photo by failing to stop Nofal, LLC doing business as Food

19   Town Mart, from engaging in the alleged infringing activity.

13:28   20   You must decide the following four main issues:

13:28   21   One: Whether the defendant Nofal, LLC doing business as

22   Food Town Mart copied protected expression in the plaintiff

23   Prepared Food Photo, Inc.'s copyrighted work thereby infringing

24   the plaintiff's copyright;

13:29   25   Two: Whether the defendant Sharif Jaber is vicariously

liable for the infringing acts, if any, of Nofal, LLC doing business as Food Town Mart;

Three:  Whether the defendants' alleged copying of Prepared Food Photos' protected expression was fair use; and

Fourth:  If the defendants are liable for copyright infringement, what damages Prepared Foods, Inc. is entitled to.

The Court will now instruct you on the law applicable to Prepared Food Photos claims and Sharif Jaber and Nofal, LLC doing business as Food Town Mart's defense.  You must give separate consideration to each of the parties' claims and defenses in this case.

1.  Direct Copyright Infringement.

Prepared Food Photos, Inc. claims that Nofal, LLC doing business as Food Town Mart infringed its copyrighted material, namely, a photo of pork chops, by displaying the photograph on a Facebook page possibly in connection with Nofal, LLC's business activities.

To succeed on this claim, Prepared Foods, Inc. must prove by a preponderance of the evidence each of the three following elements:

One:  The photograph is the subject of a valid copyright;

Second:  Prepared Food Photos, Inc. owns the copyright in the photograph; and

Three:  Nofal, LLC doing business as Food Town Mart copied protected expression in Prepared Food Photos, Inc. copyrighted

1    work.

13:31    2        The parties have stipulated that the photograph is the

3    subject of a valid copyright and that Prepared Food Photos,

4    Inc. owns the copyright in the photograph.  You are therefore

5    only required to decide the third element:  Whether Nofal, LLC

6    doing business as Food Town Mart copied protected expression in

7    Prepared Food Photos, Inc. copyrighted work.  I will explain

8    what the terms "copy" and "protected expression" mean.

13:32    9        You may infer that Nofal, LLC doing business as Food Town

10    Mart copied Prepared Food Photos, Inc. work if the similarities

11    between the two works can be explained only by copying, rather

12    than by coincidence, independent creation, or the existence of

13    a common source for both works.

13:32    14        "Protected expression" means expression in the plaintiff's

15    work that was created independently, involving some creativity.

16    Copyright law protects only original expression in the work.

17    This includes the way the facts or ideas are expressed in the

18    work but does not include the facts or ideas themselves.

13:33    19        Your determination as to the element of copying protected

20    expression in copyrighted material, and therefore as to

21    Prepared Food Photos, Inc. claim of copyrighted infringement

22    against Nofal, LLC doing business as Food Town Mart, should be

23    indicated in response to Question No. 1 on the special verdict

24    form.

13:34    25        If you find that Prepared Food Photos, Inc. has proved by a

265

preponderance of the evidence that Nofal, LLC doing business as Food Town Mart copied protected expression in Prepared Food Photos, Inc. copyrighted work, you must go on to consider Nofal, LLC doing business as Food Town Mart's fair use defense.

On the other hand, if you find that Prepared Food Photos, Inc. has not proved by a preponderance of the evidence that Nofal, LLC doing business as Food Town Mart copied protected expression in Prepared Food Photos, Inc. copyrighted work, then you must find that Nofal did not infringe Prepared Food Photos, Inc. copyrighted material, and you will not consider any other question as to Nofal, LLC doing business as Food Town Mart's fair use defense, Sharif Jaber's vicarious liability, or damages.

2.  Fair Use.

Nofal, LLC doing business as Food Town Mart contends that, even if it copied protected expression in Prepared Food Photos, Inc. copyrighted work of pork chops, its copying is allowed under what the law calls "fair use."

To succeed on this defense, Nofal, LLC doing business as Food Town Mart must prove, by a preponderance of the evidence, that it made fair use of Prepared Food Photos, Inc.'s work for the purpose or purposes of criticism, parody, comment, news reporting, teaching, scholarship, or research.

In deciding this, you should consider the following:

The purpose and character of Nofal, LLC doing business as

1   Food Town Mart's use, including whether Nofal, LLC doing

2   business as Food Town Mart's use is of a commercial nature or

3   whether the use is for nonprofit educational purposes;

4       The degree of creativity in Prepared Food Photos, Inc.'s

5   work;

6       Whether Prepared Food Photos, Inc.'s work was published or

7   unpublished;

8       The amount of Prepared Food Photos that Nofal, LLC doing

9   business as Food Town Mart copied, and the significance of the

10  portion copied in relation to Prepared Food Photos work as a

11  whole; and

12      How Nofal, LLC doing business as Food Town Mart's use

13  affected the potential market for Prepared Food Photos, Inc.

14  work.

15      It is up to you to decide how much weight to give each

16  factor.

17      Your determination as to whether Nofal, LLC doing business

18  as Food Town Mart made fair use of Prepared Food Photos, Inc.

19  work should be indicated in response to Question No. 2 in the

20  special verdict form.

21      If you find that Nofal, LLC doing business as Food Town

22  Mart has not proved by a preponderance of the evidence that it

23  made fair use of Prepared Food Photos, Inc.'s work, then you

24  should go on to consider whether Sharif Jaber was vicariously

25  liable for Nofal, LLC doing business as Food Town Mart's

1  infringement of Prepared Food Photos, Inc. and damages.

2  On the other hand, if you find that Nofal, LLC doing

3  business as Food Town Mart has proved by a preponderance of the

4  evidence that it made fair use of Prepared Food Photos, Inc.'s

5  work, then you need not consider any other question as to

6  Sharif Jaber's vicarious liability or damages.

7  3.  Vicarious Copyright Infringement.

8  Prepared Food Photos claims that Sharif Jaber is liable for

9  Nofal, LLC doing business as Food Town Mart's infringement of

10  Prepared Food Photos, Inc.'s copyright in the subject photo.

11  To succeed on this claim, Prepared Food Photos, Inc., must

12  prove, by a preponderance of the evidence, the following

13  elements:

14  One:  Nofal, LLC doing business as Food Town Mart infringed

15  Prepared Food Photos' copyright, as defined in the instructions

16  I have already given you;

17  Second:  Sharif Jaber profited from the infringement by

18  Nofal, LLC doing business as Food Town Mart; and

19  Three:  Sharif Jaber had the right and ability to stop or

20  limit the infringement by Nofal, LLC doing business as Food

21  Town Mart but failed to do so.

22  Your determination as to whether Sharif Jaber is

23  vicariously liable for Nofal, LLC doing business as Food Town

24  Mart's copyright infringement should be indicated in response

25  to Question No. 3 on the special verdict form.

If you find that Sharif Jaber is vicariously liable for Nofal, LLC doing business as Food Town Mart's copyright infringement, then you must go on to determine the appropriate amount of damages. If you find that Nofal, LLC doing business as Food Town Mart is liable for copyright infringement but that Sharif Jaber is not vicariously liable for Nofal, LLC doing business as Food Town Mart's copyright infringement, then you must still go on to determine an appropriate amount of damages.

4. Damages.

If you find that Prepared Food Photos, Inc. has proved that Nofal, LLC doing business as Food Town Mart has infringed Prepared Food Photos, Inc. copyright and/or that Sharif Jaber has vicariously infringed Prepared Food Photos, Inc. copyright, then you must determine the amount of damages, if any, that Prepared Food Photos is entitled to recover. If you find that Prepared Food Photos has failed to prove infringement, or that Nofal, LLC doing business as Food Town Mart made fair use of Prepared Food Photos, Inc.'s work, then you will not consider the question of damages.

Your determination as to what damages Prepared Food Photos, Inc. is entitled to recover should be indicated in response to Question Nos. 4, 5, and 6 on the special verdict form.

Prepared Food Photos must prove damages by a preponderance of the evidence. Prepared Food Photos may recover for any actual losses it suffered because of the infringement.

1  Alternatively, Prepared Food Photos, Inc. may recover an amount

2  called "statutory damages."  I will define each of these terms.

13:43  3  4.1  Actual Damages.

13:44  4  Actual losses from copyright infringement might include,

5  for example:

13:44  6  A decrease in the market value of Prepared Food Photos

7  Inc.'s copyrighted work caused by the infringement;

13:44  8  Profits that Prepared Food Photos, Inc. proves that it

9  would have made without the infringement.  Profits are the

10  revenue that Prepared Food Photos would have made on sales he

11  would have made without the infringement, less any additional

12  expenses he would have incurred in making the sales;

13:44  13  What a willing buyer would reasonably have paid Prepared

14  Food Photos, Inc. to obtain a license to display its

15  copyrighted work.

13:45  16  4.2  Statutory Damages.

13:45  17  Alternatively, you may award as statutory damages an amount

18  that you find fair under the circumstances.  The amount must be

19  between $750 and $30,000 as further described below, may be

20  adjusted depending on whether the infringement was intentional.

21  In determining the appropriate amount to award, you may

22  consider the following factors:

13:45  23  The expenses that Nofal, LLC doing business as Food Town

24  Mart saved and the profits it's earned because of the

25  infringement;

13:46    1      The revenues that Prepared Food Photos, Inc. lost because

2  of the infringement;

13:46    3      The difficulty in proving Prepared Food Photos, Inc. actual

4  damages;

13:46    5      The circumstances of the infringement;

13:46    6      Whether Nofal, LLC doing business as Food Town Mart

7  intentionally infringed Prepared Food Photos' copyright; and

13:46    8      Deterrence of future infringement.

13:46    9      With respect to the factor of intentional infringement:  If

10  Prepared Food Photos, Inc. proves that Nofal, LLC doing

11  business as Food Town Mart willfully infringed Prepared Food

12  Photos, Inc. copyright, then you may, but are not required to,

13  increase the statutory damages to award a sum as high as

14  $150,000.  Infringement is considered willful if Prepared Food

15  Photos proves that Nofal, LLC doing business as Food Town Mart

16  knew that its actions constituted infringement of Prepared Food

17  Photos, Inc.'s copyright or acted with reckless disregard of

18  Prepared Food Photos, Inc.'s copyright.

13:47   19      On the other hand, if Nofal, LLC doing business as Food

20  Town Mart proves that it innocently infringed Prepared Food

21  Photos, Inc.'s copyright, then you may, but are not required

22  to, reduce the statutory damage award to a sum as low as $200.

23  Infringement is considered innocent if Nofal, LLC doing

24  business as Food Town Mart proves that it did not know, or had

25  no reason to know, that its acts constituted infringement.

13:48    1    Part III, Deliberations.

13:48    2    Members of the jury:  This case will be submitted to you in

3    the form of a special verdict consisting of six questions.  A

4    form for the special verdict has been prepared for your

5    convenience, and you will find that special verdict form

6    following Part III of the Court's instructions.

13:49    7    It reads:  United States District Court, Eastern District

8    of Wisconsin, Prepared Food Photos, Inc., plaintiff, versus

9    Sharif Jaber and Nofal, LLC doing business as Food Town Mart,

10    defendants, Case No. 22-CV-642-JPS.  Special verdict.

13:49    11    We, the jury, duly impaneled and sworn for our special

12    verdict in the above-entitled action find as follows:

13:49    13    Direct copyright infringement against Nofal, LLC doing

14    business as Food Town Mart.  You must answer this question.

15    Question No. 1:  (See Part II, Section 1 of the jury

16    instructions.)  Did Nofal, LLC doing business as Food Town Mart

17    infringe upon the copyrighted material of Prepared Food Photos,

18    Inc.?  Answer, to the right of which appears a blank line with

19    the words "yes" or "no" beneath it.

13:50    20    Based upon the jury's unanimous determination, your

21    foreperson will insert either the word "yes" or the word "no"

22    as your answer.

13:50    23    If you answered "yes" to Question No. 1, then you must

24    answer Question No. 2.  If you answered "no" to Question No. 1,

25    then you do not answer any other questions on this form;

 1    instead, proceed and sign this form.

13:51    2        Fair use, Question No. 2:  (See Part II, Section 2 of the

 3    jury instructions.)  Did Nofal, LLC doing business as Food Town

 4    Mart make fair use of Prepared Food Photos, Inc. work?  Again,

 5    the word "answer" appears to the right of appears -- or beneath

 6    appears the words "yes" or "no" under a blank line.  Again, if

 7    the jury is required to answer this question, based upon the

 8    jury's unanimous determination, your foreperson will insert

 9    either the word "yes" or the word "no."

13:52   10        If you answered "no" to Question No. 2, then you must

11    answer Question No. 3.  If you answered "yes" to Question No.

12    2, then do not answer any other questions on this form;

13    instead, proceed to sign and date this form, even if you

14    answered "yes" to Question No. 1.

13:52   15        Vicarious copyright infringement against Sharif Jaber.

16    Question No. 3:  (See Part II, Section 3 of the jury

17    instructions.)  Did Sharif Jaber vicariously infringe upon the

18    copyrighted material of Prepared Food Photos?  Beneath which

19    again the word "answer" appears to the right of which appears a

20    blank line with the words "yes" or "no" beneath it.  Again, if

21    the jury's required to answer this question, your foreperson,

22    based upon the jury's unanimous determination, will insert

23    either the word "yes" or the word "no."

13:53   24        If you answered "yes" to Question No. 3, then you must

25    answer Question No. 4.  If you answered "yes" to Question No.

1, but "no" to Question No. 3, then you should still proceed to answer Question No. 4.

Damages. If you answered "yes" to Question No. 1 or "yes" to Question Nos. 1 and 3 and answered "no" to Question No. 2, then and only then answer each of the Questions 4, 5, and 6.

Question No. 4: (See Part II, Section 4.1 of the jury instructions.) What amount of money fairly and reasonably compensates Prepared Food Photos, Inc. for its actual damages? Beneath which appears a dollar sign and a blank line to the right. And once again, if the jury's required to answer this question, your foreperson will insert the dollar amount the jury has unanimously agreed upon.

Question No. 5: (See Part II, Section 4.2 of the jury instructions.) What amount of money fairly and reasonably compensates Prepared Food Photos, Inc. for its statutory damages? Again, beneath the question appears a dollar sign with a blank line to the right. And, again, if the jury's required to answer Questions 4, 5, and 6, based on the jury's unanimous determination, your foreperson will insert the dollar amount that the jury has unanimously agreed upon.

Question No. 6: (See Part II, Section 4.2 of the jury instructions.) Was Nofal, LLC doing business as Food Town Mart's infringement of Prepared Food Photos copyrighted material willful? Again, if the jury's required to answer Questions 4, 5, and 6, you will see the word "Answer" beneath

1    the question.  And based on the jury's unanimous determination,

2    your foreperson will insert either the word "yes" or the word

3    "no."

13:56    4    Dated at Milwaukee, Wisconsin, this blank day of October,

5    2024.  Once the verdict is completed with the insertion of each

6    of the answers that the jury is required to make in order to

7    arrive at a completed verdict, the foreperson will affix his

8    signature on the line provided and on the line below print his

9    name.

13:57    10    Returning to the instructions, you will note that certain

11    questions in the special verdict form are to be answered only

12    if you have answered a previous question in a particular

13    manner.  Therefore, it is important that you read each question

14    very carefully before you answer it.  Do not needlessly answer

15    questions.

13:57    16    The amount to be inserted by you in your answers to the

17    damages questions is for you to determine from the evidence in

18    the case.  What the parties' lawyers ask for in their arguments

19    is no criterion or measure of damages sustained.  The opinion

20    or conclusion of the parties' lawyers as to what damages should

21    be awarded should not influence you unless it is sustained by

22    the evidence.  Examine the evidence carefully and dispassion-

23    ately and determine your answers from the evidence in the case.

13:58    24    Any damages you award must have a reasonable basis in the

25    evidence.  They need not be mathematically exact, but there

must be enough evidence for you to make a reasonable estimate of damages without speculation or guesswork.

Nothing should be added to or subtracted from your answers to the damages questions because of sympathy, resentment, nor should you make any deductions because of a doubt in your mind as to the liability of any party.

The fact that I have instructed you on the matter of damages should not be considered as suggesting any view of the Court as to which party is entitled to your verdict in this case. Instructions on damages have been given solely for your guidance.

Your duty is to answer the questions in the special verdict form which, according to the evidence and my instructions, you are required to answer in order to arrive at a completed verdict. It then becomes my duty to direct judgment according to law and according to the facts as you have found them.

You are to answer the questions in the special verdict form solely upon the evidence received in this trial. You are to be guided by my instructions and your own sound judgment in considering the evidence in the case and in answering each question.

You must not concern yourselves about whether your answers will be favorable to one party or to the other, nor with what the final result of the lawsuit may be.

Your verdict must represent the considered judgment of each

1    juror.  In order to return a verdict, it is necessary that each

2    juror agree.  Your verdict as to each question you are required

3    to answer in order to arrive at a completed verdict must be

4    unanimous.

14:01   5    You should make every reasonable effort to reach a verdict.

6    In doing so, you should consult with one another, express your

7    own views, and listen to the opinions of your fellow jurors.

8    Discuss your differences with an open mind.  Do not hesitate to

9    reexamine your own views and change your opinion if you come to

10   believe it is wrong.  But you should not surrender your honest

11   beliefs about the weight or effect of evidence solely because

12   of the opinions of your fellow jurors or for the purpose of

13   returning a unanimous verdict.

14:01   14   Each of you should give fair and equal consideration to all

15   of the evidence and deliberate with the goal of reaching an

16   agreement which is consistent with the individual judgment of

17   each juror.

14:02   18   You are impartial judges of the facts.  Your sole interest

19   of is to determine whether the parties prove their respective

20   cases by the greater weight of the credible evidence, to a

21   reasonable certainty.

14:02   22   Members of the jury, that concludes the Court's

23   instructions on the law applicable to this case.  We're going

24   to now turn to the next phase of the case in which counsel are

25   afforded a second opportunity to address you.  Following that

1    phase, the Court will have a few concluding instructions which

2    appear in your binder, after which the case will be formally

3    submitted to you for your deliberations.

14:03    4    So with those comments, we will now turn to the next phase

5    in the case, and I will first call upon Mr. DeSouza for his

6    opening argument.  As I explained yesterday, since the

7    plaintiff has the burden of proof, Mr. DeSouza will have an

8    opportunity to address you in both an opening argument and a

9    final rebuttal, that is, rebuttal to any arguments that Mr.

10   Steinle makes on behalf of the defendants.

14:03    11   Mr. DeSouza, you may proceed.

14:03    12   MR. DeSOUZA:  Thank you, your Honor.

14:03    13   We you just heard the Court give you the instructions and

14   read the verdict form as to what you will be deciding in this

15   case.  But to summarize it and make it very brief, you are to

16   decide today whether the defendant Nofal, LLC doing business as

17   Food Town infringed a photograph, meaning did it use the photo

18   without permission.  And if it did, what damages are to be

19   assessed against it?  With the other question of:  Is Mr. Jaber

20   vicariously liable for that?

14:04    21   But before I get into the evidence that you've heard, I'd

22   like to discuss briefly what this case is not about.  And I

23   think it's important to know what's not at issue here before

24   you decide what actually is at issue.  And I think Mr. Steinle

25   did a good job yesterday trying to bring up all the different

1       things that are not at issue in this case.

2           So what is not at issue?  What's not at issue is this idea

3       that we heard a lot of testimony about yesterday as to a

4       pre-suit letter that went to the defendant Food Town Mart.  Did

5       they get it?  Did they not get it?  What was the reason for

6       them getting it?  What was the reason for them not getting it?

7       You have just heard all the instructions for an hour, and

8       you've seen the verdict form.  You have it there in front you

9       -- at least the instructions you have in front of you.  I'm not

10      sure if you have the verdict form or not.

11          Nothing in the instructions, nor in the law, nor in the

12      verdict form says anything about:  Did the plaintiff provide a

13      pre-suit notice to the defendant?  Yea or nay.  You will not be

14      asked that question because it is not part of the law.  It does

15      not change whether the defendant Food Town Mart used the photo

16      without permission or not.

17          Now, that said, although that is not an issue in the case,

18      you heard the instructions that you are to make reasonable

19      inferences based on the evidence that you did hear.  And the

20      evidence that you did hear was Ms. Jones testified this letter

21      was sent; and within two weeks thereof, the photograph -- and

22      only the photograph -- came down off of this website that had

23      some hundred to 150 different photographs on it.

24          You heard the testimony from Amjad Hamed, the son of Mr.

25      Jaber, who was in control of the Facebook page.  And he said,

1    "We don't take anything down.  It's not like when a sale is

2    over, we take it down, and that's it.  We never take anything

3    down and leave all the photographs up.  And only myself, Amjad

4    Hamed, and my brother, Nofal Hamed, are in charge of the

5    Facebook account.  No one else has access to it, no one else is

6    in control of it."

7    Yet two weeks after this letter, which Mr. Jaber says he

8    never received, it came down.  Now, certainly it could be a

9    remarkable coincidence that the photograph and only the

10   photograph disappeared and every other photograph for the last

11   five years has remained on this Facebook page.  But I think the

12   reasonable inference that the jury can make is that they did

13   receive that letter.  They knew about the allegation of

14   infringement, and they took the photo down.  If the photo

15   stayed up, we'd be having a different conversation.  But they

16   did take the photo down.

17   But as I said before, it's not what you're asked to decide

18   today.  Whether they got the letter or not, when the photo came

19   down or not, is not one of the six questions that you will be

20   answering.

21   Now, Mr. Steinle yesterday, also, was very animated when he

22   got into a declaration that Ms. Jones submitted in this case,

23   that none of you have had the benefit of seeing, it was never

24   displayed to you, the purpose of that declaration was never

25   discussed with you.  And Mr. Steinle went through, well, you

1    said there's six photographs, and there's only one.  Or you

2    said you discovered this in 2022, and this was really in 2021.

3    Ms. Jones said, "It was an error, I'm sorry, I made a mistake."

14:08    4    At the end of the day, that is not what you are here to

5    decide.  And I think the reason why so much time was spent on

6    both of these things yesterday is because when you actually

7    look at what you are to decide, there's not a whole lot for the

8    defendants to argue with, so they would rather argue about the

9    nonissues in the case than the actual issues in the case.

14:08    10   Now, what are you deciding?  Well, we saw the instructions.

11   What you are deciding, first and foremost, is did Nofal, LLC

12   doing business as Food Town Mart infringe on Prepared Food

13   Photos' copyrighted work?  There were multiple subparts to

14   that.  Is Prepared Food Photos the owner of a photograph?  Is

15   it subject to a valid copyright?  Both of those have already

16   been decided.  The defendants have stipulated absolutely, yes.

17   So the only question is:  Did the defendant copy protected

18   expression in the work?

14:09    19   We know it didn't have permission.  That was clear.  Ms.

20   Jones testified to it.  Mr. Jaber testified to it.  There was

21   no permission.  Did they copy protected expression?  Well, they

22   copied the entirety of the photograph.  This is not a question

23   of did they copy some small portion, did they create some type

24   of ad that only used something that didn't use the whole

25   photograph.  They used every single bit of the photograph.  So

1    the answer to that question is going to be resoundingly yes.

2        Now, what I find somewhat distressing is that the answer to

3    that question is an obvious yes; yet Mr. Jaber was sued and

4    Nofal was sued in February of 2023.  They got a complaint that

5    said:  Your Facebook page, you were using this, you're

6    responsible for this.  Right off the bat, they denied it.  It's

7    not our Facebook page, we didn't do it, it's not us.  They had

8    an opportunity later in the case come August of 2023, some six

9    months later, asked them a series of written questions:

10   Identify all of your social media pages.  We don't have any.

11   We don't have any.  Did you use the photograph?  No.  We never

12   used the photograph.

13       Until yesterday, the very first time going back to February

14   of 2023, it took until yesterday for Mr. Jaber to get on the

15   witness stand and under oath look at each and every one of you

16   and say:  You're right, it is our Facebook page.  We did use

17   it.  I don't know that I heard "sorry," but he finally

18   acknowledged:  It is our Facebook page, we did use it.

19       But I think in the instructions you'll see there is

20   instruction about discrepancies and witness testimony.  Mr.

21   Jaber testified yesterday:  I got sued in February, 2023.  I

22   received a copy of the complaint.  And upon my receipt of the

23   complaint, I spoke to my children, Nofal and Amjad, and they

24   told me, yes, dad, it's our Facebook page.  And I realized at

25   that time it's our Facebook page.

14:11

1       Yet for some reason, in August, 2023, deny, deny, deny,

2   responses to written questions, not our Facebook page, not us.

3   Mr. Jaber had a deposition in September, 2023, swore to tell

4   the same truth that he swore to tell yesterday, took the same

5   oath, and said don't have a Facebook page, not our page, we

6   didn't do this, I have no idea who could be behind this.

14:11

7       When I asked him in his deposition, tell me the names of

8   all of your employees so we can figure out where this Facebook

9   page is coming from, he conveniently left off the two employees

10  that were in charge of this Facebook page.  He told me the

11  butcher's name.  He told me the cashier's names.  He told me

12  every person in the store except for Amjad and Nofal.  And so

13  your job is to assess credibility, conduct of the parties.

14:12

14      What do you believe he knew and when he knew it?  But at

15  the end of the day, that still doesn't affect the question:

16  Did they use the photograph without my client's permission?

17  And it's undoubtedly yes, because he admitted it, his son Amjad

18  admitted it yesterday.  Amjad admitted it in his deposition.

14:12

19      Now, it's curious with Amjad -- and you heard this

20  yesterday, especially on this idea of when Mr. Jaber knew about

21  something -- Amjad testified a year ago under oath, you know,

22  in December, a little less than a year ago at this point,

23  testified how did you find out that 2.29 a pound for this, you

24  know, what was the process for that?  And he said, "Well,

25  either my dad or the butcher had to tell me.  I don't know

1 which one, it was one of the two of them."

14:13

2   And I asked him right then and thereafter, "Did the butcher

3 know about the Facebook page?"  He said, "Yes."  I then asked,

4 "Did your father know about the Facebook page?"  And he said,

5 "Yes."  Now, he tried to change that testimony yesterday.  He

6 walked it back.  We showed him his deposition testimony, and he

7 confirmed, yeah, that's what I said a year ago.  Again, you can

8 make the credibility determinations, but what all of those

9 facts, regardless of credibility show you, is that they

10 unequivocally used the photo.  And they unequivocally did not

11 have permission to use it.

14:14

12   Now, the next thing that you will answer on the verdict

13 form once you get past Question 1 is:  Is this fair use?  And I

14 asked Mr. Jaber a series of questions yesterday, which you

15 probably know why I asked him today.  Was this for parody?  Was

16 it for education?  Are you a for-profit business or nonprofit?

17 Was this for teaching, scholastic?  He said for profit; no, not

18 teaching; no, not parody; no, not criticism; no, not education.

19 This is unequivocally -- and everyone in the jury has eyes --

20 you used a photograph that is meant to sell products, grocery

21 products, to sell grocery products.  You used it for the exact

22 purpose that this photograph was intended, the only difference

23 being you didn't pay for it.  You used it to advertise a sale

24 in your store.  And as Mr. Hamed said, to draw customers into

25 the store so that they would buy things.

14:15    1    So when you are looking at fair use and its factors, I

2    think unequivocally there is no dispute or debate whether this

3    was fair use.  But the interesting thing you should ask

4    yourself when you look at the fair use defense is consider the

5    defense itself and what the defendants have -- the positions

6    they have taken in this case.

14:15    7    On the one hand, they have said in their answer to the

8    complaint, "Not our Facebook page, we've never had a Facebook

9    page, we've never used a paragraph."  On this hand, they have a

10    defense that says, "Well, yeah, I mean, we used it, but it was

11    fair."  They are making inconsistent positions in this case

12    throughout the entirety of the case.  It was only yesterday

13    that they finally owned up, "Yeah, we did use it."  But going

14    back to February of 2023, they have said, "Never used it; but

15    if we did, it's fair use."  I think you need to consider that

16    and, again, make credibility determinations.

14:16    17    The third question deals with Mr. Jaber's vicarious

18    liability.  You saw there's a whole list of things.  Did Nofal

19    infringe?  Yes, it did.  Did Mr. Jaber have the right and

20    ability to control, and did he fail to take any action, and did

21    he profit from the infringement?  The answer to all of that is

22    yes.

14:16    23    He testified:  I am the sole person in control of this

24    company.  Every single person reports to me.  There are no

25    other owners.  I am the sole, ultimate manager of this store.

1    I'm Amjad's boss, I'm Nofal's boss, the butcher's boss.

2    Everyone in the store, I am their boss.

14:16

3        Vicarious liability does not depend on knowledge.  Even if

4    you find that he was somehow not knowledgeable or didn't know

5    about the Facebook page, it's right and ability to control.  He

6    certainly had the right and ability to control what Nofal, LLC

7    was doing.

14:17

8        Did he profit from the infringement?  Of course he did.

9    You heard the testimony.  They sell pork chops every week in

10   that store.  They advertise pork chops to bring people into the

11   store to buy things, whether it's spare ribs, pork chops, or

12   chicken wings.  Every dollar this store makes, the profit goes

13   to him.

14:17

14       Not only that, but they profited in the form of, you heard

15   the testimony, we have never paid for a single photograph that

16   we've ever used to advertise anything, whether on our Facebook

17   page or otherwise.  They saved whatever money they saved with

18   respect to using my client's photos and whoever else's photos

19   they decided to use.  So all of the elements from vicarious

20   liability are there as well.

14:18

21       Now, when you look at the verdict form, it goes straight

22   into damages.  And the last question is willfulness, but I

23   think you need to address willfulness before you address

24   anything else.  Willfulness can mean two things.  It can mean

25   intentional.  It can mean someone purposefully went out there

1    looking to infringe, and that's why they did it.

14:18    2    But it also means reckless disregard for a copyright

3    owner's rights in the work. And you have that in the

4    instructions. Was this reckless disregard? Well, you all saw

5    the demonstration yesterday. Mr. Steinle and Mr. Hamed set up

6    on the screen the exact search that he did, and it's the same

7    way that he found all the photographs that he's ever found.

8    And the way he found it was he Googled "fresh pork chops," not

9    "free photos of pork chops," just "fresh pork chops." And it

10   came up with a laundry list of the photographs. He happened to

11   like our client's photograph, and that's the one he used.

14:19    12   But I think every member of the jury saw that every one of

13   those photographs, whether it was our client's photo or some

14   other person's photo, directly underneath the photo had the

15   website that the photo was on. And clear as day, before he

16   ever pushed the button and held it to download, it said,

17   "Prepared Food Photos."

14:19    18   At that point, Mr. Hamed could have clicked on the photo,

19   as he could have done on any of the photographs on Google. And

20   when I had him do that, just click, one mouse click whatsoever,

21   one thumb click whatsoever, clear as day Google tells you for

22   just about every photograph that's on their site, "Image may be

23   protected by copyright. Click here to read more."

14:19    24   Or he could have clicked the blue link that said, "Visit

25   site," which would have taken you directly to Prepared Food

1    Photos website which would have invited them to subscribe and

2    become subscribers of our service or my client's service.  He

3    didn't do that.

14:20   4        But what's more is that he testified -- and I asked him --

5    well, what if you had done that?  What if you had clicked and

6    saw, "Images may be subject to copyright," would you still have

7    downloaded the photograph anyway?  And he said, "Well, you

8    know, maybe.  I don't know.  Possibly, I don't know."

14:20   9        So is it reckless to go online and just assume that I can

10   do a Google search and copy photos from anywhere, any website,

11   regardless of whether they're from Getty, iStock, Shutterstock,

12   any different type of service that's similar to what Prepared

13   Food offers.  I say the answer is yes.  But you have to make

14   that determination.  And the reason it's important that you

15   make that determination before we go to the damages analysis is

16   it matters.

14:20   17       As the Court read to you, there are two types of damages

18   under the Copyright Act.  There are actual damages, and there

19   are statutory damages.  If you start with statutory damages,

20   statutory damages say you must give a number between $750 and

21   $30,000 if it's not willful.  You can increase it -- you don't

22   have to, but you can increase it up to $150,000 if you find it

23   to be willful.  You can decrease it -- again, you don't have to

24   -- down to $200 if you find it to be innocent.  The discretion

25   is yours when it comes to statutory damages.  If you find it to

1    be willful, but you say $20,000 is the number, that's your

2    right.  If you find it to be willful and say 100,000 is the

3    number, that's your right.

14:21

4        But if you don't find it to be willful, you are somewhere

5    between the 750 and $30,000.  Now, the Court also instructed

6    you as to what innocent means.  "Innocent" means didn't know

7    and had absolutely no way of knowing.  The notion that they had

8    no way of discovering that Prepared Food Photos opened this --

9    Prepared Food Photos owned this photo when he downloaded and

10   showed you himself downloading it directly off of my client's

11   website when all he had to do was click a button was not

12   innocent.  The defendants have not presented any evidence that

13   someone told him they could do this, that it's okay to do this,

14   that they followed some website that said click here to

15   download free photos.  There's nothing innocent about what they

16   did.  At best, it was reckless which, as the instructions say,

17   is willful.

14:22

18       Now, you will have to award an amount of damages.  And

19   there's two -- there's two pieces to it.  There's the actual

20   damage, and there's the statutory damages.  And they're

21   separate numbers.  They're not the same thing.  My client

22   doesn't get both of them.  You will have to come up with a

23   number for one and the other, and my client will elect which

24   one it prefers at the end of this case, after you are done

25   doing that.

14:23

1       But let's talk about actual damages.  Actual damages, as
2   you have in your instructions, can mean a variety of things.
3   It can mean, for one, the profits that the plaintiff would have
4   made but for the infringement; or, B, the price that a willing
5   buyer was willing to pay to the plaintiff to license that work
6   and/or others.

14:23

7       Now, it is important that you keep in mind the Court's
8   instruction that evidence is -- you're limited to the evidence
9   that has been presented to you.  That is what you are to
10  consider.  And the only evidence on damages that has been
11  presented to you is Ms. Jones' testimony with respect to the
12  subscription rate that my client charges, the fact that there
13  are no shortage of willing buyers that pay that subscription
14  rate, the fact that Ms. Jones said if you use one photograph or
15  10,000 of our photographs, you pay the same $999 at minimum a
16  month rate for use of the photo, and you must do this in one-
17  year increments.

14:24

18      And she testified who their subscribers are, why it's
19  important that they have that subscription plan, and
20  unequivocally testified based on the length of time that was
21  used here from September 28th, 2020 until at least sometime in
22  November, 2021 the actual damages, meaning the lost
23  subscription fee, is $23,976, which is the equivalent of two
24  years of license at the 999 a month.  That is the only number
25  on damages that the jury has heard.

14:24  1      The jury has not heard evidence:  But this photograph is
2      really worth this or, no, this is what buyers would actually
3      pay.  None of that evidence came out.  The only evidence was
4      Mrs. -- Ms. Jones' testimony.  Now, Mr. Steinle tried yesterday
5      to do a math equation with Ms. Jones.  He said, well, what is
6      11,988 -- that's the 999 times 12 -- what's the annual amount
7      divided by 18,000 photos?  It's really just a couple of
8      pennies; right?

14:25  9      Math is what it is.  Never been very good at it myself.
10     I'm assuming that's the right number.  But it doesn't matter
11     because it wasn't evidence.  I could ask Ms. Jones to divide a
12     hundred by two.  It's meaningless when it comes to what are the
13     actual damages here, because she testified:  We don't license
14     individual photographs.  We only do the entire library, and
15     there's good reasons for that.  And she explained those
16     reasons.

14:25  17     So when you are filling in the box what is the plaintiff's
18     actual damages, we would ask that you put in $23,976, which is
19     999 a month times 24 months.  It's the two years that they
20     should have paid if they had done this the right way and
21     licensed the work in the proper manner.

14:26  22     Now, when you get to statutory damages, as I said, it's
23     going to matter whether you find this to be willful or not.
24     But there are a variety of factors you can consider.  One of
25     those factors is essentially the actual damages.  What is the

1    amount of money the plaintiff actually lost here?  That's

2    23,976.  There are various factors for you to consider.  But to

3    me -- and none of them are more important than the other -- but

4    to me, I want you to focus on deterrence.  Deterrence of not

5    just Food Town Mart but other infringers that are out there in

6    the market looking to do something similar, engage in similar

7    activities.

8        MR. STEINLE:  Well, I'm going to object at this point,

9    your Honor.  Nowhere in the instructions does any reference

10   made to deterrence at all, and I would object to this argument.

11       MR. DeSOUZA:  It's on Page 17, your Honor, deterrence

12   of future infringement, and the law is --

13       THE COURT:  Yeah.  What the jury is sufficiently

14   instructed on are the matters that are germane to the evidence

15   in the case, and it will be up to the jury to draw from the

16   evidence that has been presented what the facts are, and their

17   verdict will hopefully speak accordingly.

18       MR. DeSOUZA:  What I want the jury to --

19       JUROR NO. 5:  Excuse me, your Honor.  I apologize.  I

20   need to take a break --

21       THE COURT:  Sure.

22       JUROR NO. 5:  -- for just a few minutes.

23       THE COURT:  We'll take a recess for 15 minutes.

24       COURT SECURITY OFFICER:  All rise.

25       (The jury left the courtroom.)

14:28  1          (A short recess was taken.)

14:28  2          COURT SECURITY OFFICER:  All rise.

14:28  3          (The jury entered the courtroom.)

14:45  4          (The court is called to order.)

14:45  5          THE COURT:  Mr. DeSouza, you may continue.

14:45  6          MR. DeSOUZA:  Thank you, your Honor.

14:46  7      I think where I left off was dealing with statutory

8  damages.  And there are a number of factors for you to consider

9  with statutory damages.  One of them is the revenue lost by the

10  plaintiff.  To us, that's the 23,976.  That's their actual

11  damages.  But there's also the circumstances of the

12  infringement and deterrence.  And at least there, what you

13  heard in this case was that the standard process for how this

14  defendant operates is not to pay for images or other

15  intellectual property that it uses in its advertisements on its

16  Facebook page or otherwise.  Standard practice is find a photo

17  I like, scroll to it, download it, never even bother looking at

18  the website, and that's not allowed.  It simply is not.  That's

19  not how the law works.

14:46  20      And in addition, as we've already covered, we have this

21  credibility problem of Mr. Jaber for well over a year, I guess

22  18 months, 20 months at this point, of saying, nope, not my

23  page, didn't do it, not me, deny, deny, deny, only to show up

24  at trial yesterday and say, well, you know what, it is our

25  Facebook page.

14:47

1    The amount of effort that has gone in to get to where we

2    are today, to have Mr. Jaber show up on the day of trial and

3    finally say, yeah, you got me, it's my Facebook page, I think

4    justifies what Ms. Jones was talking about yesterday, which is

5    -- and the example she used, and I think it's a good one -- is

6    23,976.  You know, that's the actual damages.  If you had come

7    to us and you had said, I want to license your library, that's

8    what you would have paid.

14:48

9    Statutory damages exist generally where actual damages are

10   somewhat difficult to calculate but, also, as a means -- I

11   don't want to say to punish the offender, but at the end of the

12   day, as Ms. Jones said, if you go into a grocery store, if you

13   go into Macy's, if you go into any store and you see an item on

14   the shelf that you like and it's a $100 for that item, you say,

15   well, I don't want to pay 100, I think I'll just take it for

16   free, and you get caught walking out the door, your get out of

17   jail free card is not to produce $100 and say, well, you caught

18   me, I guess I'll just pay what I should have paid in the first

19   place, and you're done with it.

14:48

20   An infringer, as Ms. Jones said, at least in her opinion,

21   should pay more than what the licensed value was, whether the

22   license value was $100 or in this case $23,976.  And so you

23   will -- as I said, this is your discretion.  Statutory damages

24   is a very discretionary number.  You, as members of the jury,

25   will have to decide this number.  I can tell you what Ms. Jones

1  wants you to put, but that's just one person's opinion.  I'm

2  sure Mr. Steinle has another opinion as to what number you

3  should put down.

14:49  4      In Ms. Jones' opinion if you believe this is not willful,

5  then the statutory damages maximum is $30,000.  And we believe

6  it's appropriate that you would award the full maximum $30,000

7  versus the 23,976 of the actual damages.  If you do find it to

8  be willful, you have the discretion, not the obligation, to

9  increase that amount above 30,000 all the way up to 150,000.

10  And you will make a determination as to what number you believe

11  to be appropriate.

14:49  12      Obviously from a plaintiff who has filed this lawsuit,

13  Ms. Jones and Prepared Food Photos would love nothing more than

14  for you to make that number as high on the scale as possible to

15  send a strong message to infringers such as Mr. Jaber and Nofal

16  and others out there that you can't just do this, nor can you

17  continue doing this.  But it will be your discretion.  Thank

18  you.

14:50  19          THE COURT:  Thank you, Mr. DeSouza.

14:50  20      Mr. Steinle.

14:50  21          MR. STEINLE:  Thank you, your Honor.  Excuse me.

14:50  22      Good afternoon, gentlemen.  I'd like to begin by again

23  thanking you for your time and your service throughout the last

24  two days.  It's very, very significant, not only to my client

25  but to the system that you spent the time in sitting on this

1    particular very important case for my client.  And as you can

2    see from counsel's argument, it is a very significant case.

14:51    3    I'm going to begin by in addition thanking you, trying to

4    remind you of something.  The plaintiff has the burden of

5    proof.  The plaintiff has to prove to you these things that are

6    on the special verdict.  And they have to prove it to you by a

7    preponderance of the evidence.

14:51    8    Now, what was kind of covered or not covered was the fact

9    that what I'm asking you to do is to consider all of the

10   evidence that you've heard over the course yesterday, because

11   all of the evidence is relevant and it's important.  They

12   somehow have completely blown off the testimony about the

13   declaration of Ms. Jones.  Well, that doesn't mean anything,

14   she was just mistaken, she was just mistaken.  But yet they

15   spend time and time and time again attacking Mr. Jaber because

16   of his inconsistencies.  So in essence, well, we can be

17   inconsistent, even though we're the plaintiff and even though

18   we brought this lawsuit, but Mr. Jaber.

14:52   19   And the other thing, gentlemen, is this, is that Mr. Jaber

20   has a right to defend himself against these claims being made

21   in this lawsuit.  So I think all of this information is

22   relevant and important.  And I do want to cover a few things.

14:52   23   First of all, there is no question.  I'm the one that put

24   Amjad on the stand and showed to you how he downloaded this

25   picture and lady -- years of doing this, too many ladies on the

1    jury -- but, gentlemen, the reason that, in addition to other

2    reasons, is that I wanted Amjad to testify as to how he located

3    this photograph.  And there are insinuations from counsel that

4    there are other photographs on that website that don't belong

5    there, and there is not one drop of testimony that there's

6    another photograph on that website or on that Facebook page

7    that doesn't belong there or that is there improperly.

14:53    8        What we're talking about is we're talking about in this

9    courtroom today we're talking about one photograph of one pork

10    chop that was used on a Facebook page, period, end of story.

14:54    11        And what Mr. Amjad -- or what Mr. Hamed did was Mr. Hamed

12    showed you how he obtained the photograph on the big screen.

13    He didn't go -- he went to Google Images.  He saw an image. He

14    put his thumb on it, and it downloaded into his library.  And

15    when it downloaded into his library, his photo library, you saw

16    the photograph.  There were no restrictions on that photograph

17    that he downloaded.  There were no watermarks on that

18    photograph that he downloaded.

14:54    19        So when you look at the entirety of the case, the entirety

20    of the case is the methodology that he utilized, not -- not --

21    you don't have to decide what he could have done.  What you

22    have to decide is what he did do in this particular case, and

23    was it reasonable?  That's what you're going to have to decide.

14:55    24        Now, when we talk about the case, when I said look at the

25    evidence in its entirety, this case was brought by Prepared

1    Foods.  This is the nature of their business.  And what
2    Prepared Foods does is they send an infringement letter and
3    they send an infringement letter to not Sharif Jaber, but to
4    his brother Frank.  And they send it at the wrong address in
5    November of 2021.

6    There is -- and there's an insinuation that that photograph
7    -- or that that letter, rather, was somehow received by my
8    client Sharif Jaber.  There -- there is -- you have to look at
9    the evidence that's on the record.  And the evidence that's on
10   the record is that the only thing that we have is the letter
11   itself.  That's it.  Addressed to a different party, addressed
12   to a different address, indicating the violation.

13   And then again this professional organization, this
14   professional organization goes and files a lawsuit against Mr.
15   Jaber, Frank Jaber, Villard Foods, Villard Food Town, they --
16   they don't do anything except bring a lawsuit against the wrong
17   people.  And then what happens is a year almost passes before
18   they bring a lawsuit against my client Sharif Jaber and Nofal,
19   LLC.  The reason that that's important, ladies and gentlemen,
20   is, again, these are professionals that deal with this every
21   day.  And this is what happens?

22   Now, after the lawsuit is filed, Ms. Jones does a
23   declaration.  And the reason that I made such a big deal about
24   it is it does directly affect her credibility.  I counted
25   numerous times, and I just want to address a few of them, what

1    this -- and this is -- a declaration is a sworn statement under

2    oath.  This is the woman that testified in this courtroom.

3    This is a woman that was involved in commencing this lawsuit.

4    This was a woman that indicated that she's the one that sent

5    the infringement letter.  And in that declaration, countless

6    times what she says is, "I sent the infringement letter,"

7    that's what the declaration says, "I sent the infringement

8    letter."  She says that "I talked to the principal and talked

9    about negotiations and settlement," "I received numerous

10    e-mails from the principal," and then she continues to state

11    that there was some discussion about resolution of this case.

14:58   12    That's significant because -- and they just say, well, she

13    was mistaken.  We're talking about a lawsuit in federal court,

14    and she's just mistaken, and that's acceptable?  That's not

15    acceptable, ladies and gentlemen.  That's not acceptable at

16    all.  And that does directly affect her credibility.

14:59   17    So in -- in this particular lawsuit, ladies and gentlemen,

18    what has happened is you heard the testimony of Amjad, and what

19    Amjad said -- we're going back to the actual infringement --

20    what Amjad said is:  I did it.  I created this Facebook page.

21    And he said:  My father didn't know.  I never told him.

22    There's no way that my client Sharif Jaber knew.

14:59   23    But the other thing that I want to comment about is this is

24    not some great big food chain with delineation of job titles

25    and job duties and job responsibilities.  This is a family-run

1 business with six employees, and they all do their own jobs.

2 And what -- what Amjad said is:  I thought that it would help.

3 That's what he said.  I thought that it would help, I didn't

4 tell my dad what I was doing, I didn't indicate to him anything

5 about what I was doing.

6  So when you are evaluating this case, evaluate the entirety

7 of the evidence that you heard, because as I go through some

8 other things, the entirety of the evidence, the nature of the

9 violation, the scope of the violation, all of those factors are

10 indeed relevant.  It's just not that simple, that there's a

11 violation, therefore, we want $150,000.  It's not that simple.

12 You have to look at the entirety of the case.

13  So when we go through this special verdict that we have

14 heard about and that counsel has talked to you about, the first

15 question that you're going to have to address is:  Did Nofal

16 infringe upon the copyrighted material?  There is no dispute.

17 There is no dispute that he created the material.  There is no

18 dispute that it was copyrighted.  We stipulated to that.

19  But the question then also asks you to decide whether or

20 not they infringed.  And what I mean by that is:  It is

21 important -- it is important to understand this URL is Villard

22 Food Town.  It's not Nofal, LLC.  It's Villard Food Town.

23 That's the actual URL.  So it's going to be you who have to

24 decide whether or not this of use of this one photograph, this

25 one pork chop photograph was to Nofal, LLC's credit -- or to

15:00

15:01

15:01

1    their benefit, excuse me.

2         You're also going to have to ask or address the question of

3    fair use.  And it -- and it doesn't end, as counsel had

4    suggested, at whether it's this -- this -- there are four

5    factors you're going to see that you have to address.  And

6    those four factors include, they include this, when you're

7    deciding fair use:  How creative was the work?  Did the use of

8    a -- was the use a small use of the copyright?  Does the use of

9    the photograph go to the heart of the work?  And how much harm

10   did the -- how much harm did it cause to the existing market

11   value of the existing work?

12        So it doesn't end.  You have to also address these when

13   you're going to decide the question of whether or not fair use

14   applies to Nofal.  And in this particular case, when you're

15   talking about the creative work, we're talking about a

16   photograph.  We're talking about one photograph that's 23 years

17   old at the time of the use.  That's how creative the photograph

18   is.  It's one 23-year-old photograph.

19        And did the use include a small use of the copyrighted

20   work?  We heard over and over and over again, there's 18 or

21   $20,000 in this -- or 20,000 images, excuse me, in this

22   library.  Did this include a small use of a copyrighted work?

23   I -- the answer is absolutely yes.  It's one pork chop

24   photograph out of 20,000.

25             Does the photograph -- does the use of the photograph

1   go to the heart of the work?  You saw him scroll through those

2   -- this doesn't go to the heart of the work.  These are

3   numerous photographs of various types of meat products and

4   other products.  It doesn't go to the heart.

15:04  5   And, lastly, how does it harm the existing market value of

6   the existing work?  There is no evidence -- none, zero -- there

7   is no evidence that this use harmed the existing market value

8   of that library.  Ms. Jones didn't testify:  We lost customers.

9   Ms. Jones didn't testify:  We -- we lost benefit.  Ms. Jones

10   didn't testify that there was any harm to the existing market

11   value.  All she testified to is subscription, period.  That's

12   all she testified to.

15:05  13   So because there is no evidence of any harm to the existing

14   market value, as it relates to the question of fair use, the

15   only answer to that question is:  Yes, fair use is applicable.

16   One picture of one pork chop photo on a Facebook page one time.

17   Fair use.  Fair use is applicable, and I would ask that you

18   answer that question yes.  And I would argue to you you're done

19   at that point.  You don't have to answer any other questions,

20   that Mr. Jaber and his boys are entitled to the defense of fair

21   use.

15:06  22   However, I have to address the next questions because if

23   indeed you don't find that fair use is applicable, then we have

24   to address the question of whether or not Mr. Jaber personally

25   is vicariously liable for the actions of his son in this

1   particular case.  And one thing that counsel left out when he

2   was talking about vicarious liability is they have to

3   demonstrate.  They've alleged vicariously -- that he's

4   vicariously liable.  But they have to address the issue of

5   financial benefit.

15:07   6   And what counsel says is:  Well, of course, he made a

7   financial benefit.  Well, where is the evidence?  Where is the

8   evidence not -- not that Nofal benefited, because we're talking

9   about vicarious liability.  We're talking about personal

10  liability.  And they have to prove that that gentleman

11  personally profited from the use of one photograph on one

12  Facebook page.  They have to prove that before you can find by

13  a preponderance of the evidence that he's vicariously liable

14  for the actions of his son.  And there is no evidence.  They

15  didn't elicit any evidence.  I didn't hear any dollar amount

16  that he gained at all by use of that.

15:08   17  So as it relates to the issue of vicarious liability,

18  ladies and gentlemen, I would submit to you that there's only

19  one answer, and the only one answer to that is, no, he's not

20  vicariously liable for this.

15:08   21  The answer of the -- and I will also think that it's

22  important to address the question of willfulness.  In this

23  particular case, willfulness, an intentional act, that's what

24  it is.  Willfulness is an intentional act.  There is absolutely

25  no evidence that -- you were able to assess the credibility of

1    Amjad.  There is absolutely no evidence that he intentionally,

2    intentionally, violated the copyright rights of Prepared Food.

3    There is absolutely no evidence at all.

15:09   4    So the next step in the analysis is:  Was this with

5    reckless disregard?  Reckless disregard is a very high

6    standard.  We're not talking about did he negligently do what

7    he did, because that's not reckless disregard.  Reck -- excuse

8    me -- reckless disregard is essentially knowing and not caring.

15:09   9    MR. DeSOUZA:  Objection.  Counsel is informing the

10   jury on the law that is not in the instructions at this point.

15:09   11   THE COURT:  Well, the jury understands the Court's

12   instructions, and I have little doubt that they will follow

13   them.  So you may continue, Mr. Steinle.

15:09   14   MR. STEINLE:  Reckless disregard is a much higher

15   standard than mere negligence or making a mistake.  There is no

16   evidence.  Again, you saw the demonstration.  You heard the

17   testimony.  There is no evidence of reckless disregard.  There

18   is no evidence of willful conduct.  There is no evidence as it

19   relates to that issue.

15:10   20   So when you are addressing that special verdict, the only

21   answer to that question is:  There was no willful disregard in

22   this particular case.  There was no -- to make a mistake or to

23   make -- or to have a fault is not reckless disregard.

15:10   24   So as we get to the next questions as it relates to the

25   damages, in this particular case, ladies and gentlemen, yes,

1    there is actual damages, and there's statutory damages.  You

2    had heard the Court's instructions as it relates to actual

3    damages.  And as it relates to the issue of actual damages, the

4    only testimony, the only testimony that you heard was, indeed,

5    the $23,000 figure.  That's the only evidence that you heard.

15:11

6         However, we're not talking about the use -- the unlimited

7    use of a library, the entire library is $11,900 a year.  We're

8    talking about one photograph.  We're talking about the use of

9    one photograph on a Facebook page.  So I will let you decide

10   what the value of one photograph -- and I -- I didn't mean to

11   be flip about it.  But that's 1/20000 of the entire library

12   that he utilized in this particular case.

15:12

13        And did they own it?  Yes, they did.  But to -- I would

14   submit to you that in this particular case that that figure of

15   $23,000 for the use of one photograph is -- is the reason that

16   we're here today, for you to decide what's reasonable.

15:12

17        I would submit to you that you didn't hear any evidence

18   about any lost profits from Prepared Food.  You didn't hear any

19   evidence about how it affected the library.  You didn't hear

20   any evidence about any of those things.  So I would submit to

21   you, ladies and gentlemen, that -- lady -- I keep saying that;

22   it's habit, 40 years habit -- but I would submit to you that

23   the -- that you are entitled, if you believe it to be

24   reasonable, that you could insert zero in there.  They weren't

25   damaged.  They weren't damaged on any level on any respect by

1    the use of this photograph.  So as it relates to actual

2    damages, I would ask you to insert a smaller amount in

3    answering that question.

15:13    4    Now statutory damages is, again, something that you're

5    going to have to decide.  And, again, when you look at the

6    instruction, the instruction on statutory damages relates to

7    the types of things that we talked about today:  What is the

8    violation?  How -- how extensive was the violation?  How much

9    of the library was used?  We're talking about again -- I'm

10    repeating myself a thousand times -- we're talking about one

11    pork chop photo used on one Facebook page.

15:13    12    And the reason that I brought in the information about the

13    Facebook page is because, again, that's important.  We're talk

14    -- we're not talking about this being on the internet.  We're

15    talking about this being on a social media site, a Facebook

16    page.  And we're talking about a Facebook page that has 1,000

17    followers.  And the only way that you can get access to the

18    Facebook page is one of two ways, you either have to like Food

19    Mart or you have to search.  So what is the exposure of this

20    pork chop?  I would argue to you that the exposure is minimal

21    on the overall scheme of things.

15:14    22    So in this particular case, Mr. Jaber is entitled to defend

23    himself against the claims being made.  Mr. Jaber is entitled

24    to defend himself against the claims being made in this case.

25    Mr. Jaber is entitled to assert defenses, including fair use.

1    Mr. Jaber is entitled to dispute $150,000 in damages for a

2    one-use photograph of a pork chop.  And for counsel to

3    insinuate otherwise, that he's not entitled to assert those

4    defenses, is somewhat offensive to me.  He's entitled to assert

5    those defenses.  And to claim, to claim essentially that Mr.

6    Jaber should have just rolled over and paid, should have just

7    done anything.  He is entitled to present a defense, and that's

8    what we've done.

15:15   9        Now, the final comment that I'm going to make is this, is

10   we did discuss this, but I feel that it's significantly

11   important.  Because Mr. Jaber was -- said he didn't say this,

12   he didn't say that, he didn't say this, he didn't say that.

13   Ms. Jones also took an oath and swore under oath in a

14   declaration certain things that happened.  And I'll let you use

15   your own recollection.  And certain things that didn't happen.

16   And when she was confronted with it, all she said was, well,

17   I'm mistaken.  Excuse me, I'm mistaken.

15:16  18       Well, when we're talking about a federal lawsuit that's

19   brought against my client, I'm mistaken doesn't cut it for me.

20   So in this particular case, ladies and gentlemen, I want you to

21   seriously consider that testimony, too.

15:16  22       I would like to finish by saying this.  I thanked you

23   already for your time.  If throughout the course of this trial,

24   gentlemen, I have conducted myself in a fashion that you deem

25   to be unacceptable or inappropriate, I would apologize in

1    advance.  I take my job very, very seriously.  And if I've done

2    anything, please examine the facts of the case, look at the

3    facts of the case in their entirety, and make your decision in

4    this case based upon that.  And I thank you very much for your

5    time.

6              THE COURT:  Thank you, Mr. Steinle.

7         Mr. DeSouza, any final rebuttal?

8              MR. DeSOUZA:  Yes, your Honor.

9         Is there any way to have the screen on during this, your

10   Honor?

11             Mr. Steinle just wrapped up by saying Mr. Jaber is

12   entitled to defend himself and not just roll over and pay

13   anything.  I agree.  Every defendant in every lawsuit is

14   entitled to defend themselves.  What they are not entitled to

15   do is lie through the entire lawsuit and wait until trial and

16   say, yeah, you know what, you're right, I was wrong all those

17   other times that I said it's not my Facebook page.  It was

18   actually us.

19             Mr. Jaber had every right to come into this courtroom and

20   say -- back in the beginning of February of 2023 and say, we

21   did it.  Here's our defenses.  We think it's fair use.  Today

22   he tried both.  He tried saying we didn't to it and it's fair

23   use.  He had every right to say we did it, we don't like the

24   damages, let's focus on the damages, here's how we explain our

25   conduct.

15:19

1      But instead of doing that, he decided to lie.  And whether

2  it's a lie or just a simple failure to prepare, he testified

3  over and over and over a year ago:  Not my Facebook page, we

4  didn't do it, had nothing to do with it.

15:19

5      And Mr. Steinle comes in here at closing arguments and

6  says, well, hold on.  Let's talk about whether this is

7  infringement or not because it said Villard Food Town.  I mean,

8  look, the URL says Villard Food Town.  It doesn't say Food Town

9  Mart.  So, therefore, it's not infringement at all.

15:19

10      I think Mr. Steinle was perhaps not listening to the

11  testimony of his own witnesses, Mr. Hamed who testified, yeah,

12  that's Food Town Mart's Facebook page.  Immediately after

13  November, 2021, they changed the name to Food Town Mart.  They

14  kept the same URL, but it's Food Town Mart.  Mr. Jaber says

15  that's my Food Town Mart Facebook page.  Mr. Hamed says that's

16  our Food Town Mart Facebook page.  And for Mr. Steinle to stand

17  up at this point and say, gotcha, the URL says Villard Food

18  Town, how do you know that's Food Town Mart, when his own

19  witness said, It's our Facebook page, when their fair use

20  defense assumes we used it and it's our Facebook page, when his

21  own son, his manager, testifies, yeah, it's our Facebook page,

22  I find it to be absurd for him to stand up here and say that.

15:20

23      Now, in my initial opening, I remarked that when you don't

24  have a defense, try to deflect and go other places that you

25  want.  So here's what Mr. Steinle did in his closing.  He says

1    Mr. Hamed downloaded the photograph.  There were no

2    restrictions.  There were no watermarks.  I agree.  Does that

3    change whether he had permission to use the photograph or not?

4    He either did have permission or he didn't.  He did not

5    download it -- or at least there's no evidence that he

6    downloaded it from a site that said click here to download free

7    photographs.  He went online.  He found a photograph.  He

8    downloaded it.

15:21    9    The question is whether he had permission to do so or

10    whether he had a license from the plaintiff to do so.  Whether

11    he downloaded the photograph, the specific one or the next one

12    or the next one or the next one, it would be the same question.

13    Did he have permission?  Not the distraction, well, did it have

14    a watermark?  Who cares.  The law does not say it has to have a

15    watermark.  Did it block him from downloading?  Did Mr. Steinle

16    present an ounce of evidence that says there's ways to block

17    people from downloading photographs off of Google Images?  Did

18    he march someone in here to say here's how Google Images works

19    and here's how it stops you from downloading?  He didn't.  Your

20    job is to consider the evidence that's before you.  And the

21    evidence that's before you is they didn't have permission.

15:22    22    Mr. Steinle then went on to say, well, you know, the

23    letter, and did they get the letter, did they not get the

24    letter?  Consider this, ask yourself this question:  Let's

25    assume there was no letter whatsoever.  You never saw a demand

1   letter, it was never presented to you, it was nothing sent

2   before this lawsuit was filed.  What's the significance?  Ask

3   yourself, does that mean they had permission to use the

4   photograph?  It doesn't.

5       The question is:  Did they have permission at the time they

6   downloaded the photograph, not whether a letter was sent, not

7   whether they received it.  Did they have permission?  The

8   answer is still no.

9       Mr. Steinle then went off and said, well, they sued the

10  wrong party when this thing first started.  Okay.  My client

11  did sue the wrong party.  My client sued Villard Food Town,

12  which is what the Facebook page initially at the time that they

13  downloaded the photograph.  They later found out that's not the

14  correct party.  The correct party who owns the store is

15  actually Mr. Jaber and Nofal, LLC d/b/a Food Town Mart.

16      What is the significance of the fact that my client sued

17  Villard Food Town?  Does that somehow change whether they had

18  permission to use the photograph or not?  I say to you that all

19  of these things that Mr. Steinle brought up are for purposes of

20  distracting you from the actual issue, because the actual issue

21  is very simple.  You either had permission to use this

22  photograph, or you didn't have permission to use this

23  photograph.

24      Now, Mr. Steinle then went on to say, and Mr. Hamed's

25  testimony was Sharif Jaber didn't know.  He didn't know about

1    the Facebook page.  I asked Mr. Hamed yesterday when he

2    testified my father didn't know, did you testify in your

3    deposition, did your father or the butcher tell you to put it

4    up on Facebook?  No.  They told me there's a sale.  I found the

5    pictures, and I put it up.

15:24    6    Keep in mind, the last post on this Facebook page was July,

7    2022.  So if dad or butcher were given instructions about what

8    the price of sales are, it came before July, 2022, not in 2023

9    when he was sued, not when he had his deposition taken, and

10    certainly not yesterday.

15:24    11    Was the butcher aware that you were running the Facebook

12    page?  Yes.  Why was your dad aware that you were running the

13    Facebook page?  Yes.  That is how he testified under oath in a

14    deposition a year ago.  The fact that he showed up here

15    yesterday after he's had time and opportunity to think about

16    his answers and how they might affect his father's business,

17    decided to say:  Oh, no, dad didn't know about the Facebook

18    page.

15:25    19    But, again, I ask you:  Think of the significance of all of

20    these pieces of evidence.  Whether dad knew about the Facebook

21    page or not is a credibility determination for you to make, but

22    it doesn't affect whether Sharif Jaber had the right and

23    ability to control the infringing activities of his own

24    company.  He was the man.  All business runs through him.  He

25    makes all decisions, all business activity decisions on behalf

1  of this company.  Did he have the right and ability to control?

2  Of course, he did.

15:26

3      Now, Mr. Steinle says, well, let's not forget about Ms.

4  Jones.  She's got this declaration that, again, none of you

5  have seen that he's chosen to summarize and for whatever reason

6  not put in front of you.  And based on his own interpretation

7  today of what it says, well, Ms. Jones made errors, so the fact

8  that Mr. Jaber lied about this being a Facebook page, you know,

9  one hand washes the other.

15:26

10     The errors in Ms. Jones' declaration that Mr. Steinle keeps

11  coming back to are, oh, you know, it says six photographs

12  instead of one.  I'm sorry.  I discovered it on this date

13  instead of that date.  I'm sorry.

15:26

14     Does it affect whether this is their Facebook page?  No.

15  Does it affect whether they used it without permission?  No.

16  The level of discrepancies in the testimony here for Mr.

17  Steinle to say, well, one person was wrong, so my client's lies

18  are excusable doesn't make any sense.  His client decided from

19  Day 1 to deny anything having to do with this, to cover up the

20  fact that his sons did this but not disclosing them in a

21  deposition and waiting 20 months until he got to trial to

22  finally say:  Yeah, you know, you're right, it was me.  You got

23  me.

15:27

24     So, yes, you can make your credibility determinations.

25  It's what you must do.  But think of the caliber and scope of

1   what it is that Mr. Steinle is pointing out versus what it is

2   that we're pointing out in not only his answer, his responses

3   to interrogatories, his responses to requests for admissions,

4   his deposition testimony, that went on and on and on repeating

5   the same lie.  And as Mr. Steinle said, he's got a right to

6   defend himself.  But nobody has a right to show up in court and

7   lie and lie and lie.  That is not putting on a defense.  That

8   is misleading.  That is mischaracterization.  It is anything

9   but a defense.

10      Mr. Steinle then went on to talk about fair use.  And I

11  don't want to belabor the point.  You have the instructions as

12  to what fair use is.  Mr. Steinle, unfortunately, is mistaken

13  on the law.  But you have your instructions, and you can read

14  them.  He says, well, this is just one photo out of 20,000,

15  18,000, it's -- it's a small portion of the copyrighted work.

16  He's wrong.  The copyrighted work is the photo.  As Mr. Steinle

17  keeps coming back and saying, it's one photo, it's one photo,

18  it's one photo.  The question that you are to ask yourselves

19  is:  What portion of the work at issue in this lawsuit did the

20  defendant use?  Didn't use a small portion of that.  The

21  defendant used 100 percent of that photo, copied it directly,

22  just downloaded it straight off the website and used it.

23      Talked about it not being the heart of the work if its one

24  out of 20,000 photos.  The work is the photograph.  It's not

25  20,000 photographs.  It's the photograph.

15:29   1    Mr. Steinle says, well, there's no -- no evidence of

2    harming the market value; right?  I mean, I guess he wasn't

3    here when Ms. Jones testified the whole reason they have this

4    subscription model and how they control who their subscribers

5    are is so they can ensure that a grocery store in this market

6    or that market doesn't have a competitor down the street using

7    the same set of photographs.  That is the harm, potential harm,

8    to the market.

15:29   9    We then got into damages.  And, again, same thing, actual

10    damages, it's 20,000 or it's 12,000 divided by 20,000 images.

11    It ignores the evidence.  Mr. Steinle wants that to be

12    evidence.  It's his argument.  But that's not evidence that you

13    actually received and heard.  The only evidence you heard was

14    that our subscribers are free to use one photograph, ten

15    photographs, a hundred photographs, or all 18,000 in the

16    library.

15:30  17    But it doesn't matter how many photographs you use.  If

18    you're using any of our photographs, the license price is the

19    $11,988.  The defendants had every opportunity to come before

20    you and say, here's my witness that's going to testify about

21    the value of a single photograph that if you go to this site

22    you could download this photograph of pork chops and it would

23    cost you this amount of money, and have people come in and

24    testify about that.  They chose not to.

15:30  25    They didn't bring any evidence with respect to valuation to

1  you in any way, shape, or form.  And, thus, the only testimony

2  you have is Ms. Jones' testimony, the Prepared Food website

3  which goes over its pricing structure, and the fact that

4  Ms. Jones testified there is no shortage of willing customers

5  that pay this subscription amount regardless of the amount of

6  photographs they use.  There are some subscribers that pay

7  more, but the minimum is the 999 a month, which she says is

8  what this defendant would have had to pay.  And if there's any

9  contrary evidence or testimony on that point, I must have

10  missed it, because it was not presented to you.

11      I think the closing remark from Mr. Steinle in his

12  opposition was that this wasn't even on the internet, it was

13  just on Facebook.  I don't even understand the comment.

14  Facebook is the internet.  I think everyone here can draw upon

15  their own experiences to understand that Facebook.com is the

16  internet.  This photograph went up on the internet.  It was

17  used by the defendant to market and sell their meat product.

18      Mr. Steinle says, well, you know, it was no evidence that

19  there's any other photographs out there that they used without

20  people's permission.  Again, Mr. Hamed testified:  I do the

21  same thing every single time I need a photograph.  If I didn't

22  take the photo myself, I just search the internet, willy nilly,

23  if you will, and if I find a photograph I like, I use it.  I

24  don't contact anyone.  I don't try to pay for it.  I don't try

25  to do anything.

316

15:32    1       At the end of the day, you make the determination as to

2    what dollar amounts or yeses and nos you put on here.  But you

3    are limited to the evidence that is before you.  And Mr.

4    Steinle saying let's do a math equation, however right he is on

5    how the math turns out, is not evidence.  He didn't testify.

6    He didn't give you anything about value.  And, therefore, the

7    only thing you have heard is that my client suffered $23,976 of

8    actual damages which is the number you should put in response

9    to the Question 4, I believe.  And then the discretion turns

10   over to you with Question 5 on statutory damages.  Thank you.

15:33   11       THE COURT:  Thank you, Mr. DeSouza.

15:33   12   Members of the jury, I'm going to give you the Court's

13   concluding instructions found on Page 21 of your binder.

15:33   14   Members of the jury, this case is ready to be formally

15   submitted to you for your serious deliberation.  You will

16   consider the case fairly, honestly, impartially, and in light

17   of reason and common sense.  Give each question in the verdict

18   your careful and conscientious consideration.  In answering

19   each question, free your minds of all feelings of sympathy,

20   bias, or prejudice.

15:34   21   This case has taken a great deal of time and effort to

22   prepare and try.  There is no reason to think that it could be

23   better tried or that another jury is better qualified to decide

24   it.  It is important, therefore, that you reach a verdict if

25   you can do so conscientiously.

15:34    1    Nothing said in these instructions and nothing in the

2    verdict form, prepared for your convenience, is meant to

3    suggest or convey in any way or manner any suggestion as to

4    what verdict the Court thinks you should find. What the

5    verdict shall be is your sole and exclusive duty and

6    responsibility. Let your verdicts speak the truth, whatever

7    the truth may be.

15:35    8    If it becomes necessary during your deliberations to

9    communicate with the Court, you may send a note through the

10    bailiff, signed by your foreperson or by one or more members of

11    the jury. No member of the jury should ever attempt to

12    communicate with the Court by any means other than a signed

13    writing, and the Court will never communicate with any member

14    of the jury on any subject touching the merits of the case

15    other than in writing or orally here in open court. If you do

16    communicate with me, you should not indicate in your note what

17    your numerical division is, if any. I will respond either in

18    writing or having you return to the courtroom so that I can

19    respond orally.

15:36    20    You will note from the oath about to be taken by the

21    bailiff that she, too, as well as all other persons, are

22    forbidden to communicate in any way or manner with any member

23    of the jury on any subject touching the merits of the case.

15:36    24    Bear in mind, also, that you are never to reveal to any

25    person -- not even to the Court -- how the jury stands,

1   numerically or otherwise, on the question before you, until

2   after you have reached a unanimous verdict.

15:37   3       Upon retiring to your jury room, your first duty will be to

4   select one of your number as foreperson who will preside over

5   your deliberations, complete the verdict form with the answers

6   you have agreed upon, and serve as your spokesperson here in

7   court.  His or her vote, however, is entitled to no greater

8   weight than the vote of any other juror.

15:37   9       During the course of your deliberations, you should assume

10  the attitude of judges of the facts rather than that of

11  partisans or advocates.  Your highest contribution to the

12  administration of justice is to ascertain the true facts in

13  this case and return a verdict accordingly.  When your

14  deliberations are concluded, and your answers inserted into the

15  verdict form, the foreperson will sign and date the verdict and

16  all of you will return with your verdict here in open court.

15:38   17      Members of jury, that concludes the entirety of the Court's

18  instructions.  I would now ask Ms. Vraa to step forward, and

19  Ms. Willenbrink will administer the oath as the bailiff.

15:38   20          (The Court Security Officer is sworn.)

15:38   21          COURT SECURITY OFFICER:  I swear.

15:38   22          THE COURT:  Thank you.

15:38   23      Members of the jury, you may take your notes and your

24  instruction binder and retire to the jury room.  You are now

25  free to deliberate this evening as long as you deem

1     appropriate.  If you would prefer to come back tomorrow, the

2     Court is prepared for that event as well.

15:39    3       So we wish you the best.  And at the outset, I want to add

4     counsel's comments to reflect those of the Court and that is as

5     a group, you certainly gave this case your undivided attention.

6     It's been a relatively short trial, but I fully expect the

7     verdict that you will reach will reflect the seriousness of

8     your obligation as a juror and your attentiveness, not only to

9     the evidence but the arguments of counsel and the instructions

10    of the Court.

15:39    11      You are now excused to begin your deliberations.

15:40    12         COURT SECURITY OFFICER:  All rise for the jury.

15:40    13         (The jury left the courtroom.)

15:40    14         THE COURT:  I would ask that counsel provide Ms.

15    Willenbrink a number that you could be reached at beginning at

16    5:00 in the event the jury has a question or we will know

17    certainly by 5:00 as to whether they're prepared to deliberate

18    into the evening or return tomorrow.

15:40    19      The Court stands in recess.

15:40    20         (A recess was taken.)

17:10    21         COURT SECURITY OFFICER:  All rise.

17:10    22         (The jury entered the courtroom.)

17:10    23         (The court is called to order.)

17:10    24         THE COURT:  Good evening, members of the jury.  Mr.

25    ****, Ms. Vraa has informed the Court that the jury has reached

1    a verdict in the case; is that correct?

2    17:10    JUROR NO. 1:  That is correct, your Honor.

3    17:10    THE COURT:  Thank you.  That being the case, I would

4    invite you to tender the envelope with your verdict to Ms.

5    Vraa, and she in turn will pass it up to the Court.

6    17:11    Members of the jury, I am now going to invite Ms.

7    Willenbrink to publish your verdict.  As your verdict is read,

8    as to the questions you were required to answer in order to

9    arrive at a completed verdict, I will ask you at the conclusion

10   of the publication of your verdict was this and is this your

11   verdict, so say you one so say you all.  So listen attentively

12   as your verdict is read, because at the conclusion of the

13   publication, I will make that inquiry.

14   17:11    Ms. Willenbrink, would you be so kind as to publish the

15   jury's verdict.

16   17:12    THE CLERK:  In the United States District Court,

17   Eastern District of Wisconsin, Prepared Food Photos, Inc.,

18   plaintiff, versus Sharif Jaber and Nofal, LLC doing business as

19   Food Town Mart, defendants, Case No. 22-CV-642-JPS, special

20   verdict.

21   17:12    We, the jury, duly impaneled and sworn for our special

22   verdict in the above-entitled action find as follows:

23   17:12    Direct copyright infringement against Nofal, LLC doing

24   business as Food Town Mart.  You must answer this question.

25   Question No. 1:  (See Part II, Section 1 of the jury

1   instructions.)  Did Nofal, LLC doing business as Food Town Mart

2   infringe upon the copyrighted material of Prepared Food Photos?

3   Answer:  Yes.

4   If you answered "yes" to Question No. 1, then you must

5   answer Question No. 2.  If you answered "no" to Question No. 1,

6   then do not answer any other questions on this form; instead,

7   proceed to sign and date this form.

8   Fair use.  Question No. 2:  (See Part II, Section 2 of the

9   jury instructions.)  Did Nofal, LLC doing business as Food Town

10  Mart make fair use of Prepared Food Photos, Inc.'s work?

11  Answer:  No.

12  If you answered "no" to Question No. 2, then you must

13  answer Question No. 3.  If you answered "yes" to Question No.

14  2, then do not answer any other questions on this form;

15  instead, proceed to sign and date this form, even if you

16  answered yes to Question No. 1.

17  Vicarious copyright infringement against Sharif Jaber.

18  Question No. 3:  (See Part II, Section 3 of the jury

19  instructions.)  Did Sharif Jaber vicariously infringe upon the

20  copyrighted material of Prepared Food Photos?  Answer:  No.

21  If you answered "yes" to Question No. 3, then you must

22  answer Question No. 4.  If you answered "yes" to Question No. 1

23  but "no" to Question No. 3, then you should still proceed to

24  answer Question No. 4.

25  Damages.  If you answered "yes" to Question No. 1 or "yes"

1    to Question Numbers No. 1 and 3 and you answered "no" to

2    Question No. 2, then and only then answer each of questions

3    numbered four, five, and six.

4         Question No. 4:  (See Part II, Section 4.1 of the jury

5    instructions.)  What amount of money fairly and reasonably

6    compensates Prepared Food Photos, Inc. for its actual damages?

7    $200.

8         Question No. 5:  (See Part II, Section 4.2 of the jury

9    instructions.)  What amount of money fairly and reasonably

10   compensates Prepared Food Photos, Inc. for its statutory

11   damages?  $1,000.

12        Question No. 6:  (See Part II, Section 4.2 of the jury

13   instructions.)  Was Nofal, LLC doing business as Food Town

14   Mart's infringement of Prepared Food Photos, Inc.'s copyrighted

15   material willful?  Answer:  No.

16        Dated at Milwaukee, Wisconsin, this 29th day of October,

17   2024.  Foreperson, ****** ****.

18             THE COURT:  Thank you.

19        Members of the jury, having heard your verdict published,

20   as to each of the questions that you were required to answer in

21   order to arrive at a completed verdict, was this and is your --

22   is this your verdict as to each question, so say you one, so

23   say you all?

24             JUROR NO. 1:  Yes.

25             (Jurors indicating.)

17:15　1　　　　　　THE JURORS:  Yes.

17:15　2　　　　　　THE COURT:  Thank you.

17:15　3　　Mr. DeSouza, do you wish to have the jurors polled?

17:15　4　　　　　　MR. DeSOUZA:  I do not, your Honor.

17:15　5　　　　　　THE COURT:  Thank you.

17:15　6　　Mr. Steinle, do you wish to have the jurors polled?

17:15　7　　　　　　MR. STEINLE:  No, sir.

17:15　8　　　　　　THE COURT:  Thank you.

17:15　9　　Members of the jury, with the return of your verdict in

10　this case, your work has now come to a close, again with the

11　appreciation of the Court, its staff, counsel, and their

12　respective clients.

17:16　13　　As a matter of policy, I generally do not comment on jury

14　verdicts.  And when I tell you that, I don't want any of you to

15　take from that thought that somehow or some way the Court

16　disagrees with the verdict that you reached in the case.  As I

17　explained at the conclusion of the trial this afternoon, each

18　of you gave this case your undivided attention, and no one can

19　ask for more than undivided attention.

17:17　20　　It's a distraction from your everyday life; but as I

21　explained to the panel on Monday, it is indeed at the end of

22　the day a very, very small price that each of us pay in

23　fulfillment of that most important of civic duties.  Obviously,

24　our third branch of government is getting an awful lot of

25　attention these days for a whole lot of reasons.  But it is the

1      bedrock of the foundation of precisely how wonderful the

2      democracy that we live under has flourished for soon to be 250

3      years.  But it takes the shoulder to the wheel by the average

4      citizen to participate in the work of our third branch of

5      government to ensure that this democracy as we know it will

6      continue to flourish.

7      Momentarily, the Court will have a certificate for each of

8      you that I will present in the jury room.  But before we do

9      that, I want to also remind you that we have a rule of the

10     Court that precludes any lawyer or agent on behalf of a lawyer

11     or his or her client from having any contact with you.  Now,

12     that rule, of course, does not preclude any juror initiating

13     any contact, including with the Court.

14     You know, as I explained yesterday, I've been on the bench

15     for 37 and a half years.  I've tried over 250 cases.  But that

16     said, even Judge Stadtmueller is looking for new and better

17     ways to accommodate our citizens.  And if you have some

18     thoughts on the experience that you have come to participate in

19     yesterday and today, I'll be happy to hear from you.  I'm not

20     going anywhere.  I'll be here tomorrow, next week, next year,

21     and God willing, the year after that.  And obviously for

22     someone who is still 82 years old coming to work every day as I

23     did today at 5:30 this morning, it's very telling about how

24     well someone can enjoy his or her work.

25     So with those thoughts, I'll excuse you momentarily.  I

1    know each of you would like to get home and either catch up on

2    what's going on in sports or visiting grandkids.  We all have

3    those social outlets to attend to, too.

17:20    4    So thank you one and thank you all for your service.

5    You're excused.

17:20    6    COURT SECURITY OFFICER:  All rise.

17:20    7    (The jury left the courtroom.)

17:20    8    THE COURT:  You may be seated.

17:20    9    Mr. Steinle and Mr. DeSouza, the jury having heard the

10    evidence in the case, I'm now going to direct the clerk to file

11    the verdict and make it part of the public record in the case.

17:21    12    And I will direct Mr. DeSouza to inform the Court not later

13    than Friday of this week of his client's election with respect

14    to accepting either the actual damages awarded or the statutory

15    damages awarded together with any costs that may be available

16    pursuant to the federal rules and our local rules.

17:21    17    Are there any other matters that we need address this

18    evening?

17:21    19    MR. DeSOUZA:  Your Honor, to clarify, you're saying

20    file the bill of costs by this Friday as well?

17:21    21    THE COURT:  No, elect -- the bill of costs is handled

22    strictly by the clerk of the court.  So there are rules that

23    guide both timing and what is and is not taxable.

17:22    24    MR. DeSOUZA:  Understood.  I just -- I thought you

25    said costs by this Friday, as well.

17:22    1          THE COURT:  No, just an election.

17:22    2          MR. DeSOUZA:  Got it.

17:22    3          THE COURT:  Anything you'd like to add, Mr. Steinle?

17:22    4          MR. STEINLE:  No, sir.  Thank you.

17:22    5          THE COURT:  Very well.  The Court stands adjourned for

         6  the day.

17:22    7          COURT SECURITY OFFICER:  All rise.

17:22    8          (At 5:22 p.m. the hearing ended.)

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

```
 1                    C E R T I F I C A T E

 2

 3                    I, JENNIFER L. STAKE, RDR, CRR, an Official

 4   Court Reporter for the United States District Court for the

 5   Eastern District of Wisconsin, do hereby certify that the

 6   foregoing is a true and correct transcript of all the

 7   proceedings had in the above-titled matter as the same are

 8   contained in my original machine shorthand notes on the said

 9   trial or proceeding.

10

11

12   Dated this 3rd day of December, 2024.

13   Milwaukee, Wisconsin.

14

15

16                    Jennifer L. Stake, RDR, CRR
                   United States Official Court Reporter
17                 517 East Wisconsin Avenue, Room 324
                           Milwaukee, WI   53202
18

19                    Jennifer_Stake@wied.uscourts.gov

20

21

22   ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
     Official Court Reporter, RDR, CRR
23   _____

24

25
```