# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PREPARED FOOD PHOTOS, INC.,

        Plaintiff,

v.

SHARIF JABER and NOFAL, LLC,
*doing business as* FOOD TOWN
MART,

        Defendants.

Case No. 22-CV-642-JPS

**ORDER**

## 1.  INTRODUCTION

In this case, Plaintiff Prepared Food Photos, Inc. ("Plaintiff") accused Defendants Sharif Jaber ("Jaber") and NOFAL, LLC doing business as Food Town Mart ("NOFAL") (together, "Defendants") of infringing its copyright on a single photo of raw pork chops. *See generally* ECF No. 19. Plaintiff specifically alleged that the infringement occurred when NOFAL posted the subject photo on its business Facebook page, and that Jaber was vicariously liable for that infringement because Jaber, "[a]s the manager and sole member of NOFAL," could control its infringing acts, failed to do so, and ultimately profited from the infringement. *Id.* at 6, 8–9.

The case came before the Court for a jury trial on October 28 and 29, 2024. ECF No. 48. The jury found, in relevant part, that:

- NOFAL infringed upon the copyrighted material of Plaintiff;

- Jaber did not vicariously infringe upon the copyrighted material of Plaintiff;

- The sum of $200.00 fairly and reasonably compensates Plaintiff for its actual damages;

- The sum of $1,000.00 fairly and reasonably compensates Plaintiff for its statutory damages;[1] and

- NOFAL's infringement of Plaintiff's copyrighted material was not willful.

ECF No. 50. Plaintiff elected an award of $200.00 in actual damages, ECF No. 52 at 1, which the Court incorporated into its final judgment, ECF Nos. 53 at 3 and 54. The Court also dismissed with prejudice Plaintiff's claim of vicarious liability against Jaber. ECF No. 54 at 2.

Plaintiff now moves the Court to amend or alter its judgment with respect to both the jury's award of actual damages and the jury's finding that Jaber was not vicariously liable for NOFAL's infringement, or, in the alternative, for a new trial. ECF No. 56. The motion is fully briefed. ECF Nos. 59, 60. For the reasons stated herein, the motion will be denied in all respects.

## 2.    FACTUAL BACKGROUND

The Court has compiled the following recitation of facts primarily from the evidence presented and testimony elicited at trial.[2] Where

---

[1]The jury was instructed to find both actual and statutory damages amounts, subject to Plaintiff's later election. *See* ECF No. 49 at 16–18; 17 U.S.C. § 504(a) ("[A]n infringer . . . is liable for either . . . the copyright owner's actual damages . . . or . . . statutory damages . . . .").

[2]As explained below, the legal standards for the relief that Plaintiff seeks require close examination of *what occurred at trial* and what evidence the jury considered in arriving at its verdict. But the parties, inexplicably, did not bother to cite to the trial transcripts at all in preparing and briefing Plaintiff's post-trial motion. *See, e.g.,* ECF No. 56 at 6 (Plaintiff's brief summarizing the trial in a single paragraph with no citations to the transcripts). This sent the Court on an archaeological dig through the record—thankfully a short one, given the brevity of trial—to pinpoint what the parties presumably believe are the most relevant

additional context is needed and the facts are undisputed, the Court cites to other materials in the record.

### 2.1 Background

Plaintiff owns a valid copyright in a photo of raw pork chops. ECF No. 46 at 1 (stipulation as to ownership). The photo was taken in 1997, but the copyright was not registered until 2017. ECF No. 57 at 51, 56.

On September 28, 2020, the photo was posted to a Facebook page with the name of "Villard Foodtown." ECF No. 57 at 59, 111–12; ECF No. 19 at 5 (screenshot of post); ECF No. 51 (post admitted as exhibit at trial). Plaintiff alleged, and the jury found, that this photo was posted there without Plaintiff's permission and in infringement of its copyright. *See generally* ECF No. 19; ECF No. 50 at 1.

The Facebook page is affiliated with a small, family-owned neighborhood grocery store. At the time that Plaintiff's photo was posted to the Facebook page, Jaber owned NOFAL, the business entity that owned and operated the grocery store. ECF No. 57 at 123; ECF No. 56-2 at 2. As explained immediately below, the evidence presented at trial showed no factual dispute as to Jaber's ownership of NOFAL, nor was there a genuine dispute that the Facebook page was operated on behalf of NOFAL and the grocery store. As detailed *infra* Section 2.2, however, the jury heard differing testimony and evidence as to whether Jaber himself knew about the Facebook page, or knew what NOFAL employees (who are Jaber's sons) were doing with the Facebook page, at the time of the infringement.

---

portions. This is an inefficient use of the Court's time and resources, and a highly questionable choice by counsel.

NOFAL, a limited liability company, owns and operates the store located at 3217 Villard Avenue in Milwaukee, Wisconsin. ECF No. 57 at 123; ECF No. 19 at 4. Jaber has owned NOFAL since 2017, when he bought the business from his brother, Faraj Jaber ("Faraj"). ECF No. 57 at 124, 167–69; ECF No. 36-2 at 12. Jaber testified that he is "the only person that has control over [its] business activities." ECF No. 57 at 123; ECF No. 36-2 at 17 (Jaber stating at deposition that he has "exclusive control over the business activities of NOFAL LLC"). Jaber's sons Nofal and Amjad Hamed ("Nofal" and "Amjad") were employees of NOFAL and worked at the grocery store; both worked there before and at the time of the infringement. ECF No. 57 at 101–03, 138–39. Nofal stopped working there in 2021, *id.* at 136, 138, while Amjad was still working there as of the time of trial, *id.* at 103.

The grocery store was formerly known as Villard Food Town. *Id.* at 169. When Jaber bought NOFAL in 2017, he changed the legal, doing-business-as name of the grocery store to Food Town Mart. *Id.* However, some signage with the former name Villard Food Town remained outside the store even after the legal name change. *Id.*

Nofal ran a Facebook page with the name "Villard Foodtown" beginning in 2010, and Amjad was added as a registered user for this page in 2013. *Id.* at 107–08; *see also* ECF No. 36-5. Amjad took primary control of the Facebook page when Nofal stopped working at the grocery store in 2021. ECF No. 57 at 108, 136. Amjad represented that Nofal still made some posts on the Facebook page after he stopped working at the grocery store, though. *Id.* at 108.

As noted above, the subject photo was posted to this Facebook page—with the name "Villard Foodtown"—in September 2020; Amjad

testified that he created the post. *Id.* at 112.[3] Defendants' counsel objected to the introduction of the screenshot of the Facebook page on the basis that that "Villard Food Town is not on trial here," but the Court overruled the objection. *Id.* at 60. Indeed, Jaber appeared to concede that, at the time of the infringement, the Facebook page was functionally Food Town Mart's page, despite still being named "Villard Foodtown." *Id.* at 129 ("Q [by Plaintiff's counsel]: And you heard [Amjad] say that this is the Facebook page that he was running on behalf of Food Town Mart; correct? A [by Jaber]: Yes. Q: And do you agree, as you sit here today, this is the Facebook page that was being run by Food Town Mart? A: Yes."). Therefore, it does not appear that Defendants genuinely disputed that the page was affiliated with NOFAL.

Plaintiff discovered the infringing post in October 2021. ECF No. 57 at 58–59. At some point thereafter, the name of the Facebook page was changed to Food Town Mart. *Id.* at 71, 121. Additionally, the post with Plaintiff's photo was taken off the Facebook page at some point after this lawsuit commenced. *Id.* at 71, 120.

### 2.2 Testimony Related to Jaber's Knowledge of the Facebook Page, the Lawsuit, and Store Activities

Jaber acknowledged before the jury that, as of the time of trial, he knew about the Facebook page and that it was affiliated with Food Town

---

[3]Amjad testified that the post would have reached about 1,000 Facebook followers. ECF No. 57 at 191. Amjad walked the jury through a demonstration of how he found Plaintiff's photo on Google and used it in making the post. *Id.* at 186–89, 192–200. This demonstration showed that there was no "trademark," "copyright identification," or "watermarking" on the photograph as a Google result. *Id.* at 189. The Google result included a notice that "[i]mages may be subject to copyright" and linked to Plaintiff's website, which included pricing and subscription information. *Id.* at 194–98.

Case 2:22-cv-00642-JPS    Filed 04/07/25    Page 5 of 32    Document 61

Mart (and therefore NOFAL). *See id.* at 129. However, he testified that he only became aware of the Facebook page and its affiliation with NOFAL after he and NOFAL were named as Defendants in the operative complaint in February 2023. *Id.* at 132; *id.* at 144–45 (restating Jaber's deposition testimony that "in February, 2023, [his] sons disclosed to [him] for the first time that this Facebook page belonged to [his] store"); *id.* at 171–72 ("Q [by Defendants' counsel]: Were you ever made aware that there was . . . any Facebook page for Villard Food Town? A [Jaber]: No. . . . Q: At any point in time . . . up until the time that you were sued, did you . . . ever physically see the Facebook page? A: No, sir."). Jaber further denied having created or directed anyone else to create the Facebook page, having "done anything as it relates to [NOFAL], LLC . . . on the internet," or having "done anything as it relates to any social media or Facebook pages as it relates to Food Town." *Id.*

Amjad—whom Plaintiff called to testify prior to calling Jaber— similarly stated that Jaber "didn't know" that the page existed or that Amjad and/or Nofal were making posts on the page until February 2023, "after he got a lawsuit for a Facebook page." *Id.* at 115–16 ("I never told him that I was posting on Facebook."). Amjad also stated that Jaber never gave him "any instructions with respect to how to run this Facebook page" or "what to post or what not to post." *Id.* at 114, 116. The infringing post included information about pricing; Amjad testified that he would have gotten price information either from Jaber or the grocery store's butcher, but that he did not recall who gave him the pricing information included in the post. *Id.* at 112–13; *see also id.* at 172 (Jaber testifying that he would be able to tell Amjad product pricing information "on any particular day" but would not ask why Amjad was asking that question).

Plaintiff questioned witnesses about Jaber's responses to discovery requests and prior deposition testimony from August to October 2023. On these occasions, Jaber denied—on his own behalf and as NOFAL's corporate representative—knowing about the Facebook page or the infringing post. *Id.* at 125–27; 145–51. Plaintiff emphasized that these positions during discovery were inconsistent with Jaber's position at trial that he knew about the Facebook page as of February 2023. *See id.* at 163 (Plaintiff's counsel arguing that "[i]t's a factual dispute issue as to whether he knew or not and when he knew it. At one point [Jaber] testified I knew in February, 2023. Yet in October of 2023, in August of 2023, he's saying, no, I didn't.").

Plaintiff's intellectual property director, Rebecca Jones ("Jones") testified that, after discovering the infringing Facebook post, Plaintiff, through counsel, sent an "infringement letter" ostensibly to Defendants, dated November 22, 2021. *Id.* at 62–63. However, the letter was sent to "Villard Food Town, LLC, . . . Attention Faraj Jaber," which are "not the defendants in this case"[4] and which were no longer the owner of the LLC or the doing-business-as designation of the store at that time. *Id.* at 63; *see also id.* at 89–90 (Jones confirming that no notice was sent to Jaber, either personally or as president of NOFAL). Further, the letter was sent to "3127 West Villard Avenue," which is not the correct address for the grocery store, *id.* at 91; Jones stated that she pulled this incorrect address from the Facebook page. *Id.* at 63–64, 70–71, 91. Jones indicated that she believed that the letter was delivered and received based on "the actions of the defendant

_____

[4]Villard Food Town was the original defendant but was removed from subsequent amended complaints. ECF Nos. 1, 9, 19.

after the letter was sent"—taking the photo down and changing the name of the page, *see id.* at 121—but admitted that she did not have proof of delivery. *Id.* at 73–74.

Jaber testified that he did not receive the November 2021 infringement letter or any "letter like that at any point in time prior . . . to being sued." *Id.* at 173–74. He stated that he does not know how the Facebook post was removed and the page name changed, and that he never told Amjad or Nofal to remove the post. *Id.* at 176–78. Amjad denied removing the post or changing the name of the page. *Id.* at 120–21. He further stated that the post with Plaintiff's photo pertained to a time-limited sale but that it was not his typical practice to take a post down after the sale that it advertised had expired. *Id.* at 204.

Plaintiff attempted to impeach Jaber by referencing his deposition testimony and contrasting it with Amjad's deposition and trial testimony, *see id.* at 31–32 (Plaintiff's opening statement discussing intention to impeach Jaber), but the Court sustained objections to these lines of questioning and excluded from evidence the photographs that Plaintiff offered to support its questioning. For example, Plaintiff attempted to elicit testimony from Amjad that hookahs were sold in the grocery store, a fact that Jaber denied earlier in the discovery phase, and that his father was "familiar with the products that are sold at the store." *Id.* at 117–18; ECF No. 36-2 at 30–31. Similarly, Plaintiff unsuccessfully attempted to get Amjad to testify about the layout of the store since Jaber denied in the discovery phase that some photographs of the store on the Facebook page in fact depicted the store. ECF No. 57 at 118–19; ECF No. 36-2 at 34–35.

Jaber said that he sells pork chops in his store "every week," and confirmed that when "NOFAL . . . makes money, that's profit that goes to

[him]" and that there are "no other partners that get distributed the money." ECF No. 57 at 124, 181.

### 2.3 Testimony Related to Damages

Jones offered testimony relevant to Plaintiff's damages. Plaintiff maintains a library of about 18,000 stock photos of food; it employs food stylists and photographers to create the images and engages attorneys to copyright the images. *Id.* at 39–40. Plaintiff then licenses these photographs to customers—grocery stores and food delivery services as well as marketing and advertising agencies—on a subscription model. *Id.* at 42–46. The cost of a subscription starts at $999 a month for a minimum subscription term of twelve months; a subscriber who pays these fees may access Plaintiff's entire library of 18,000 images. *Id.* at 44–45.

It is not possible to license a single photo from Plaintiff; in order to access one photo, a customer must enter into at least a twelve-month subscription. *Id.* at 45. The purpose of this twelve-month subscription requirement is to prevent a user from "download[ing] the entire library and tak[ing] all 18,000 images" and then "cancel[ing] tomorrow." *Id.* at 44–45. Jones testified that the advantage Plaintiff offers is "brand identity" and "semi-exclusivity[,] . . . because as part of the terms of use . . . , [customers] have to provide [Plaintiff] with a list of clients," which Plaintiff "monitor[s]" to ensure that customers in the same area are not using the same photographs. *Id.* at 45 (also discussing Plaintiff's efforts to prevent "market saturation").

In the November 2021 infringement letter, Plaintiff demanded that Defendants pay Plaintiff $30,000 in compensation for unauthorized use of the photo and immediately cease use of its photo on the Facebook page. *Id.* at 66, 68. Plaintiff's rationale for asking for $30,000 was based on (1) the cost

of its subscription, (2) the length of time that Plaintiff's photo was on the Facebook page, and (3) an additional penalty for unauthorized use. *Id.* at 68. Under Plaintiff's subscription model—$999 a month for a minimum of 12 months—Defendants owed $11,988 for each year in which the infringing photo appeared on its Facebook page. *Id.* at 68–70. The photo appeared on the page from September 2020 through at least November 2021—i.e., over the span of two years—which under Plaintiff's subscription model would have required two twelve-month subscriptions, totaling roughly $24,000. *Id.* Plaintiff asked for $30,000, "more than what [Defendants] would have had to pay legally" if they used Plaintiff's photo with authorization, because Plaintiff "do[esn't] believe that somebody who steals an image should pay the same as somebody who licenses it properly." *Id.* at 68, 70 ("You're punished by having to pay more.").

When asked on cross-examination to explain her statement in a declaration that the unauthorized use of a single one of Plaintiff's photographs "greatly reduce[s] the value of the library," Jones testified that

> an unauthorized use goes against what we are telling our licensed paying subscribers they are receiving, which is the enforcement of ensuring that only our subscribers are using our photos, we have control over who and where those photos are being used.

*Id.* at 94–95. Jones disagreed that "[t]he value of the library is only reduced if someone is aware that . . . that photograph is a copyrighted photo." *Id.* at 95. Jones further disagreed that Defendants' counsel's calculation—that the photo in the post represented about ".0005 percent"[5] of the value of Plaintiff's photo library—reflected the actual value of the photo. *Id.* at 94.

---

[5] Actually, one photo out of 18,000 is about .005 percent of the library.

Case 2:22-cv-00642-JPS    Filed 04/07/25    Page 10 of 32    Document 61

Defendants attempted to impeach Jones by pointing out inaccurate statements in her declaration as to who sent the infringement letter, to whom it was sent, and whether any follow-up emails were sent to Defendants. *Id.* at 89–90.

### 2.4    Jury Instructions and Verdict

The Court instructed the jury that, in order to find that "Jaber is [vicariously] liable for NOFAL['s] . . . infringement of [Plaintiff's] copyright," Plaintiff had to "prove, by a preponderance of the evidence," that

1. NOFAL . . . infringed [Plaintiff's] copyright, . . . ;
2. . . . Jaber profited from [NOFAL's] infringement . . . ; and
3. . . . Jaber had the right and ability to stop or limit the infringement by NOFAL . . . .

ECF No. 49 at 15. With respect to actual damages, the Court instructed the jury that actual damages represent "[a]ctual losses from copyright infringement" and might include, for example:

- A decrease in the market value of [Plaintiff's] copyrighted work caused by the infringement;

- Profits that [Plaintiff] proves that it would have made without the infringement. Profits are the revenue that [Plaintiff] would have made on sales [it] would have made without the infringement, less any additional expenses [it] would have incurred in making the sales;

- What a willing buyer would reasonably have paid [Plaintiff] to obtain a license to display its copyrighted work.

*Id.* at 16–17. The Court instructed the jury as follows with respect to statutory damages:

In determining the appropriate amount [of statutory damages] to award, you may consider the following factors:

Case 2:22-cv-00642-JPS    Filed 04/07/25    Page 11 of 32    Document 61

- The expenses that NOFAL . . . saved and the profits that it earned because of the infringement;

- The revenues that [Plaintiff] lost because of the infringement;

- The difficulty of proving [Plaintiff's] actual damages;

- The circumstances of the infringement;

- Whether NOFAL . . . intentionally infringed [Plaintiff's] copyright; and

- Deterrence of future infringement.

With respect to the factor of intentional infringement: if [Plaintiff] proves that NOFAL . . . willfully infringed [Plaintiff's] copyright, then you may, but are not required to, increase the statutory damage award as high as $150,000.00. Infringement is considered willful if [Plaintiff] proves that NOFAL . . . knew that its actions constituted infringement . . . or acted with reckless disregard of [Plaintiff's] copyright. On the other hand, if NOFAL . . . proves that it innocently infringed [Plaintiff's] copyright, then you may, but are not required to, reduce the statutory damage award to a sum as low as $200.00. Infringement is considered innocent if NOFAL . . . proves that it did not know, and had no reason to know, that its acts constituted infringement.

*Id.* at 17–18.

After hearing all the foregoing evidence, the jury found that NOFAL, the business entity, was responsible for infringing Plaintiff's copyright by posting the photo on the Facebook page, but that Jaber was not vicariously liable for NOFAL's infringement. ECF No. 50 at 1–2. The jury awarded $200 in actual damages and $1,000 in statutory damages. *Id.* at 3. The jury found that NOFAL's infringement was not willful. *Id.*

## 3.    MOTION TO ALTER OR AMEND JUDGMENT

Plaintiff moves under Federal Rule of Civil Procedure 59(e) for the Court to amend its judgment "to conform with the damages evidence

presented at trial"—that is, to replace the jury's $200.00 actual damages award with an award of $23,976.00—and to reverse the jury's determination that Jaber was not vicariously liable for NOFAL's infringement. ECF No. 56 at 6–13. This request fails right out of the gate for legal reasons independent of the trial record, so the Court will address it as a threshold matter.

Rule 59(e) is not an appropriate vehicle to displace the jury's factual findings in the manner Plaintiff seeks. "A motion to alter or amend a judgment is only proper when 'the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 252–53 (7th Cir. 2015) (quoting *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996)).

Plaintiff relies on the latter basis for relief, arguing that "the jury's award of $200.00 in actual damages is the result of a manifest error of law or fact" because it was unsupported by evidence adduced at trial, ECF No. 56 at 7–9, and is inconsistent with damages awards that other district courts have issued in other cases in which Plaintiff recovered damages, *id.* at 9–12 (collecting cases). Plaintiff further argues that "[t]he jury's verdict with respect to [its] vicarious infringement claim against Jaber was . . . unsupported" by the evidence elicited at trial. *Id.* at 12–13.

But as Plaintiff's motion acknowledges, Rule 59(e) "enables a district court to correct *its own* errors." *Id.* at 7 (quoting *Russel v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995)) (emphasis added by the Court). The purported errors that Plaintiff identifies are with the jury's verdict, not the Court's judgment, which only memorialized that verdict. Plaintiff has not pointed to any authority, binding or otherwise, that permits the Court under Rule 59(e) to override the jury's findings as to

actual damages and vicarious liability. To the contrary, "a court generally may not increase a jury's determination of damages by additur," *Hibma v. Odegaard*, 769 F.2d 1147, 1154 (7th Cir. 1985) (collecting cases and secondary sources), which is squarely what Plaintiff asks the Court to do. Moreover, overriding the jury's factual findings by way of altering the Court's judgment under Rule 59(e) risks "undermin[ing] the jury's fact-finding role and trampl[ing] on the defendant's [S]eventh [A]mendment right to a jury trial." *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 742 (1st Cir. 1982) (citing *Branson v. Prins Ins., Inc.*, 79 F.R.D. 662, 664 (D.S.D. 1978) and 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2817 at 111 (1973)); *see also* 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (3d ed. 2024) ("The court may not, however, give relief under Rule 59(e) if this would defeat a party's right to jury trial on an issue.").

Some district courts have entertained motions to alter a jury's factual findings as to liability under Rule 59(e). *See, e.g.*, *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2007 WL 108412, at *5 (N.D. Ill. Jan. 12, 2007) (considering but ultimately denying motion to alter judgment under Rule 59(e), which argued "that the jury committed . . . . manifest errors of fact" in deciding patent infringement claims); *Orlowski v. Eriksen*, No. 07 C 4015, 2009 WL 5183226, at *7 (N.D. Ill. Dec. 30, 2009) (considering but declining under Rule 59(e) to amend jury finding that defendant was liable for excessive force where jury also found that plaintiff's damages were $0); *but see Genesys Cloud Servs., Inc. v. Talkdesk, Inc.*, No. 1:19-CV-00695-TWP-MKK, 2024 WL 4289737, at *13 (S.D. Ind. Sept. 25, 2024) (discussing case law and noting that "amendment of the judgment is not a proper remedy for an

inconsistent verdict"). But Plaintiff has not demonstrated that doing so is proper.

It is also true that federal courts may increase or reduce a jury's damages award where the amount of damages is clear as a matter of law. 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §§ 2815 and 2816 (3d ed. 2024). But Plaintiff has not argued or established that its damages are clear as a matter of law. First, as explained further in the balance of this Order, the Court does not agree with Plaintiff's statement that it "proffered unrebutted testimony/evidence of its damages that the jury completely ignored." ECF No. 56 at 12. Jones testified as to the value offered by Plaintiff's subscription model, and then Defendants' counsel cross-examined her about these statements, her assessment of the value of one photo from the library, and her credibility. *See supra* Section 2.3. This gave the jury more to consider than just Jones's direct testimony.

Second, Plaintiff argues that the damages award should be in line with awards in similar cases to which Plaintiff cites, but Plaintiff fails to acknowledge that all of its cited cases were decided on default judgment relying only on Plaintiff's declarations (and well over half of which awarded statutory, not actual, damages). ECF No. 56 at 9–12 (citing *Prepared Foods Photos, Inc. v. Patriot Fine Foods LLC*, No. 21-82129-CV, 2022 U.S. Dist. LEXIS 205649, at *10 (S.D. Fla. Mar. 22, 2022) (awarding $23,976.00 in statutory damages); *Prepared Food Photos, Inc. v. 193 Corp.*, No. 1:22-cv-03832, 2022 U.S. Dist. LEXIS 205690, at *15 (N.D. Ill. Sept. 21, 2022) (awarding $35,964.00 in actual damages); *Prepared Food Photos, Inc. v. Miami Beach 411 Corp.*, No. 22-23197-CIVALTONAGA/Damian, 2022 U.S. Dist. LEXIS 216003, at *10 (S.D. Fla. Nov. 28, 2022) (awarding $35,964.00 in actual damages); *Prepared Food Photos, Inc. v. Fat Daddy Co.*, No. 22-61671-CIV, 2022

Case 2:22-cv-00642-JPS     Filed 04/07/25     Page 15 of 32     Document 61

U.S. Dist. LEXIS 216004, at *24 (S.D. Fla. Nov. 29, 2022) (awarding $23,976.00 in statutory damages); *Prepared Food Photos, Inc. v. Perry Wings Plus, Inc.*, No. 22-CV-61883-RAR, 2022 WL 22885965, at *8 (S.D. Fla. Dec. 19, 2022) (awarding $71,928.00 in statutory damages); *Prepared Food Photos, Inc. v. Silver Star of Brooklyn / Brooklyn's Best Inc.*, No. 1:22-cv-04196-WFK-CLP, 2023 U.S. Dist. LEXIS 22037, at *19 (E.D.N.Y. Jan. 23, 2023) (awarding $71,928.00 in statutory damages); *Prepared Food Photos, Inc. v. Chi.-Mkt.-Distribs., Inc.*, No. 1:22-CV-03299-CNS-MEH, 2023 WL 3568164, at *1 (D. Colo. May 19, 2023) (awarding $35,964.00 in actual damages); *Prepared Food Photos, Inc. v. Exec. Dining Club, Inc.*, No. 22-cv-9446 (ER), 2023 U.S. Dist. LEXIS 99676, at *2 (S.D.N.Y. May 25, 2023) (awarding Plaintiff $71,928.00 in statutory damages); *Prepared Food Photos, Inc. v. Shadowbrook Farm LLC*, No. 1:22-CV-00704 (LEK/ATB), 2023 U.S. Dist. LEXIS 110171, at *15 (N.D.N.Y. June 27, 2023) (awarding Plaintiff $23,976.00 in statutory damages); *Prepared Food Photos, Inc. v. WaDaYaNeed, LLC*, No. 1:22-CV-01270 (LEK/ATB), 2023 U.S. Dist. LEXIS 110993, at *15 (N.D.N.Y. June 28, 2023) (awarding Plaintiff $23,976.00 in statutory damages); *Prepared Food Photos, Inc. v. Mikey's Famous Marinades Corp.*, No. 23-CV-1484 (JMA) (AYS), 2023 U.S. Dist. LEXIS 132222, at *13 (E.D.N.Y. July 31, 2023) (awarding $23,976.00 in statutory damages); and *Prepared Food Photos, Inc. v. New Kianis Pizza & Subs, Inc.*, No. 1:23-CV-926-JRR, 2024 U.S. Dist. LEXIS 52023, at *4–5 (D. Md. Mar. 25, 2024) (awarding $47,952.00 in actual damages)).

Even if any of these cases were binding authority, which they are not, Plaintiff does not explain what relevance default judgment decisions have in scrutinizing a jury's award of damages or why they make Plaintiff's actual damages ascertainable as a matter of law. Plaintiff also conveniently omits reference to another case it had before this Court in which the Court

granted default judgment but declined to adopt Plaintiff's proposed damage award because it "ha[d] not explained why its own business model, which is structured to disallow licensing of individual photos and short-term licenses, is the single most accurate measure of its damages." *Prepared Food Photos, Inc. v. Hometown Publ'ns II Inc.*, No. 22-CV-652-JPS, 2023 WL 3439535, at *4 (E.D. Wis. May 12, 2023), *default judgment vacated due to Plaintiff's voluntary dismissal of the case*, No. 22-CV-652-JPS, 2023 WL 11931194 (E.D. Wis. May 31, 2023).

To conclude: Plaintiff has not provided, and the Court is unable to locate, any authority that would allow the Court to amend the judgment and directly displace the jury's findings in the manner Plaintiff suggests. It actually appears that granting Plaintiff's request would offend the Seventh Amendment. In any event, Plaintiff's arguments are, at bottom, challenges to the sufficiency and weight of the evidence and the jury's assessment thereof. The motion admits this by its own terms. ECF No. 56 at 9 ("There is simply no rational basis for the jury's award of $200.00 in actual damages . . . .") and 13 ("[T]hus the jury's verdict [as to vicarious liability] was against the weight of [the] evidence."). These arguments are properly addressed through a motion for a new trial, and the Court construes and addresses them as such *infra* Section 4. *See* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2807 (3d ed. 2024) (noting that a court "may grant a new trial if the size of the verdict is against the weight of the evidence").[6] By invoking Rule 59(e), Plaintiff attempts to

---

[6]If Plaintiff wanted to argue that the jury did not have a legally sufficient evidentiary basis to find that Jaber was not vicariously liable or to find any other amount of damages besides that which Jones testified to—which is essentially what Plaintiff is trying to achieve by asking the Court to amend the jury's verdict in this respect under Rule 59(e)—then Plaintiff could have moved for judgment as

shoehorn its desired result into the Court's judgment, bypassing the jury entirely. This is inappropriate. Plaintiff's request to alter or amend the judgment is not well taken and is therefore denied.

### 4. MOTION FOR A NEW TRIAL

Federal Rule of Civil Procedure 59(a)(1)(A) provides that the Court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." This is generally accepted to mean that the Court "may only order a new trial if the jury's verdict is against the manifest weight of the evidence, . . . or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (quoting *Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011) (internal quotation marks omitted)).

"In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011) (citing *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 540 (1958); *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999); and *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989)). The Court does not view the evidence in the light most favorable to either party; it instead makes "its own assessment of the evidence presented." *Id.* at 634 (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000)). "While a court

---

a matter of law on these issues under Federal Rule of Civil Procedure 50(a) at the close of evidence. He did not do so, despite invoking Rule 50(a) for a different purpose. *See* ECF No. 57 at 209 (Plaintiff's oral Rule 50(a) motion on fair use defense). This fact further persuades the Court that Rule 59(e) is not the proper basis for Plaintiff's motion.

adjudicating a motion for a new trial may gauge the weight of the evidence and assess witness credibility, a jury verdict should only be overturned if 'no rational jury' could have rendered it." *Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023) (quoting *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012)).

Plaintiff explicitly references only the "manifest weight of the evidence" standard in its motion, ECF No. 56 at 13, but appears to argue that a new trial is warranted as a matter of fairness as well. The Court understands Plaintiff to be arguing for a new trial as follows.

Plaintiff says that it was "severely prejudiced by the Court's evidentiary rulings excluding" evidence of Defendants' statements in discovery that were inconsistent with Jaber's testimony at trial, and that this evidence, if admitted, would have impacted the jury's assessment of vicarious liability, willfulness, and statutory damages. *See id.* at 13–14.

Relatedly, Plaintiff argues that the jury's finding that Jaber was not vicariously liable for NOFAL's infringement was against the manifest weight of the evidence, at least in part because the Court excluded evidence that might have persuaded the jury otherwise. *Id.* at 12–13 (arguing that "the jury's verdict with respect to Plaintiff's vicarious infringement claim against Jaber was . . . unsupported").

Plaintiff further challenges the jury's award of $200 in actual damages as "arbitrary" and without "rational basis," i.e., against the weight of the evidence. *Id.* at 9, 12. As noted *supra* Section 3, although Plaintiff raised them under Rule 59(e), the Court construes the arguments that the jury's finding no vicarious liability and awarding $200 in actual damages were against the weight of the evidence under the standard for granting a new trial.

Finally, Plaintiff briefly suggests that the jury's allegedly improper determination of actual damages, combined with the exclusion of Plaintiff's proffered evidence, led the jury to calculate an improper statutory damages award, and that a new trial is warranted as a matter of fairness for this reason. *See id.* at 14.

Because Plaintiff's arguments about fairness and exclusion of evidence are in many ways intertwined with its argument that the verdict went against the weight of the evidence (and because Plaintiff's motion, frankly, is disorganized), the Court addresses these arguments as appropriate with respect to each substantive verdict question.

### 4.1 Vicarious Liability

"[A] defendant is vicariously liable for copyright infringement if it has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1179 (N.D. Ill. 1997) (quoting *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992) (internal quotation marks omitted)); *see also* ECF No. 49 at 15. The second element requires "evidence of a direct financial gain or that the 'availability of infringing material acts as a draw for customers.'" *GC2 Inc. v. Int'l Game Tech. PLC,* 255 F. Supp. 3d 812, 825 (N.D. Ill. 2017) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004)). "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ." *Ellison*, 357 F.3d at 1079.

The parties' arguments for and against a new trial focus specifically on the second element of vicarious liability: direct financial interest or gain to Jaber from the infringement. ECF No. 56 at 12–14; ECF No. 59 at 5–6.

Case 2:22-cv-00642-JPS     Filed 04/07/25     Page 20 of 32     Document 61

Plaintiff contends that the jury should have found Jaber vicariously liable for NOFAL's infringement because the evidence at trial showed that Jaber had a financial interest in and "profited generally" from NOFAL's infringing use of the photo on the grocery store's Facebook page. ECF No. 56 at 12–13. It blames the failure of its vicarious liability claim on Defendants' counsel "confus[ing] the issue by arguing (in closing) that there was no evidence of a specific dollar amount of profit received by Jaber with respect to the sale of pork chops." *Id.* at 13; *see also* ECF No. 58 at 71 (relevant portion of Defendants' closing argument). Plaintiff additionally argues that, had the jury been able to consider evidence that the Court excluded, such as "photographs on the Facebook [p]age other than [Plaintiff's photo]," it would have decided differently on this issue. ECF No. 56 at 13–14. The Court disagrees on all fronts. The evidence adduced at trial amply supports the jury's conclusion that Jaber was not vicariously liable for NOFAL's infringement, and the admission of the evidence to which Plaintiff refers would not have changed this result.

First of all, if Plaintiff's counsel had concerns about Defendants' counsel confusing the issue or misstating the applicable legal standard, this post-trial motion should not be the first time that the Court is hearing that concern. Plaintiff's counsel could have provided the jury clarity on the legal standard for vicarious liability by requesting additional jury instructions, *see* ECF No. 48 at 7–8; objecting during the relevant portion of Defendants' closing argument, ECF No. 58 at 71; and/or responding to this portion during his own rebuttal, ECF No. 58 at 76–85. He did none of these things. In any event, the jury was also explicitly instructed that "opening statements and closing arguments by the lawyers for the parties are not evidence," ECF No. 58 at 21, so it is questionable how much stock the jury

put into Defendants' counsel's statement. *See Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007) (noting that there is a "strong presumption that juries follow instructions" (citing *3M v. Pribyl*, 259 F.3d 587, 600 (7th Cir. 2001)).

Moreover, the evidence presented to the jury could have supported a finding that Jaber accrued no direct financial gain from the infringement or that the infringement did not draw customers to the grocery store, just as the evidence equally could have supported a finding to the contrary. Jaber testified that the grocery store sells pork chops every week and that he profits from those sales. ECF No. 57 at 181. Hearing this testimony, the jury could have concluded that Jaber profited generally from the sale of pork chops before, during, *and* after the infringing post—i.e., that the infringing use of Plaintiff's photo had no measurable effect on pork chop sales at the grocery store, and that Plaintiff's assertion that the infringing use of the photo did generate profits for NOFAL and Jaber was mere speculation. The jury could have reasonably concluded that Plaintiff failed to establish that the infringing use of its photo had any specific effect on Defendants' sales that would not have materialized otherwise.

Amjad testified that the post would have reached the grocery store's approximately 1,000 Facebook followers, *id.* at 191, but Plaintiff's counsel made no attempt to determine whether Amjad—who admitted he managed the Facebook page—knew if any of those followers were in fact converted to store shoppers because of the post or if followers generally came into the store because of Facebook posts. *See Ellison,* 357 F.3d at 1079 (noting as relevant to the direct financial benefit element that "there is no evidence that indicates that . . . customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer

available"). Similarly, Plaintiff's counsel presented no evidence that Defendants' sales—of pork chops, specifically, or of merchandise, generally—increased following the Facebook post. This further undermines a conclusion that the infringing use of Plaintiff's photo directly financially benefited NOFAL and Jaber. It is immaterial that Defendants' counsel argued that Plaintiff had not shown that Jaber attained a specific dollar amount of profits, because there was ample evidence from which the jury could reject Plaintiff's own argument that Jaber "profited generally" from the infringement. ECF No. 56 at 13.

In light of the equally reasonable inferences that can be drawn from the trial record, the Court cannot conclude that the jury's verdict on vicarious liability went against the manifest weight of the evidence. Indeed, the Court is inclined to agree that simply because Plaintiff showed that Jaber profited from sales at the grocery store as a general matter does not mean that Plaintiff showed that grocery store sales or Jaber's profits, in fact, increased *because of* the infringement. Without a clear evidentiary consensus as to one element of vicarious liability, the jury was obligated not to find such liability. ECF No. 49 at 15 (requiring proof of all elements to sustain a claim).[7]

---

[7]The parties do not dispute that Jaber had the "right and ability to supervise the infringing activity." *Marobie-FL*, 983 F. Supp. at 1179 (citation omitted). Although the parties elicited much evidence about whether and when Jaber knew about the Facebook page and the extent to which he knew about and controlled NOFAL employees' activities, neither party asked for, and the Court did not provide, further instruction to the jury about what it meant for Jaber to have the "right and ability to stop or limit the infringement by NOFAL." ECF No. 49 at 15.

To the extent the jury questioned whether Jaber, by virtue of his asserted lack of knowledge of the Facebook page and post prior to February 2023, had the right and ability to control the infringing activity, it appears that as a legal matter

The Court next addresses Plaintiffs' contention that the Court improperly excluded evidence. ECF No. 56 at 14. Plaintiff has not adequately explained how it was prejudiced by the exclusion of other photographs from the Facebook page and related testimony, or how the admission of this evidence and testimony might have impacted the jury's analysis as to vicarious liability. The Court agrees that Jaber took inconsistent positions throughout this lawsuit with respect to when he knew about the Facebook page and its affiliation with NOFAL. But, importantly, at trial in front of the jury, he admitted that as of February 2023 he knew of the Facebook page and the infringing post. So even if the Court had permitted the jury to consider evidence contradicting Jaber's earlier denial of familiarity with the Facebook page, the post, or the store and its products, the jury would have been entitled to credit his live testimony—which did him no favors—more than that evidence. It appears that crediting Jaber's trial testimony is exactly what the jury did here, and the Court finds no fault in that decision. Accordingly, the Court finds no merit in Plaintiff's argument that the Court's evidentiary rulings require a new trial.

### 4.2    Damages

Plaintiff's challenge to the jury's award of $200 in actual damages as against the weight of the evidence also fails. "The court is required to give

---

he did. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931 n.9 (2005) (explaining that the theory of "vicarious liability . . . allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement" (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) and *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354, 355 (7th Cir. 1929))).

significant deference to the jury's verdict and to limit its inquiry to whether the award is 'monstrously excessive,' whether there is any rational connection between the award and the evidence, and whether the award is roughly comparable to those made in similar cases." *Golden v. City of Chicago*, No. 07 C 6928, 2009 WL 3152359, at *4 (N.D. Ill. Sept. 28, 2009) (quoting *Farfaras v. Citizens Bank and Tr. of Chi.*, 433 F.3d 558, 566 (7th. Cir. 2006)); *see also Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (noting that a court may grant a new trial on the basis of a jury's inappropriate damages award when it finds that "there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas" (quoting G.*G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011))).[8]

"In the context of a plaintiff's contention that a jury verdict is too low, the issue is essentially whether 'the record is capable of supporting the jury's verdict, even if some would interpret that evidence differently.'" *Golden*, 2009 WL 3152359, at *4 (quoting *Blumenfeld v. Stuppi,* 921 F.2d 116, 118 (7th Cir. 1990)). "Typically, a reviewing court will not order a new trial

---

[8]Plaintiff cites the *Adams* standard for the first time in its reply brief. ECF No. 60 at 3 (citing 798 F.3d at 543). Because the Court is construing Plaintiff's Rule 59(e) motion as one for a new trial under Rule 59(a), it will look past the error.

Additionally, Plaintiff cites *Entertainment USA, Inc. v. Moorehead Communications, Inc.* for the proposition that "'[a]n award of damages must be within the scope of the evidence that was presented at trial' and cannot stray beyond that scope." *Id.* (quoting 897 F.3d 786, 793 (7th Cir. 2018)). Plaintiff fails to indicate that *Entertainment USA* was analyzing damages in a breach of contract action under Indiana law and quoting Indiana case law. *Ent. USA*, 897 F.3d at 793 (quoting *Indianapolis City Market Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1026 (Ind. Ct. App. 2009)). Assuming that Plaintiff's counsel actually read the case he cites, he offers no explanation for why Indiana contract law—or an Indiana state court's pronouncement of how a jury may determine damages—should govern the jury's determination of damages in this copyright case under federal law.

on damages 'merely because [it believes] the jury's award was too low. The assessment of damages is particularly within the province of the jury as the trier of fact.'" *Id.* (quoting *Blumenfeld*, 921 F.2d at 118 and *Fenolio v. Smith*, 802 F.2d 256, 259 (7th Cir. 1986)).

Plaintiff emphasizes that "[t]he jury was not free to disregard the only testimony/evidence" it heard with respect to damages: Jones's statement that NOFAL's use of the photo over a period spanning two years would have been subject to Plaintiff's usual licensing fee and structure, totaling $23,976 in subscription fees, and that Plaintiff's other customers pay such fees to use its services. ECF No. 56 at 7–8. Plaintiff insists that this means that it established as an undisputed fact that $23,976 is "[w]hat a willing buyer would reasonably have paid [it] to obtain a license to display its copyrighted work." *Id.* at 8 (citing ECF No. 49 at 17).

In response, Defendant notes that the jury was "entitled to reject [Jones's] testimony" after considering that the copyright for the photo was not registered until 20 years after it was taken, inconsistencies between her declaration and testimony at trial, and Jones's testimony on cross-examination about the relative value of a single photo in Plaintiff's photo library. ECF No. 59 at 4 (noting that Jones "admitted" that the photo represented .005 percent of Plaintiff's total library). Plaintiff contends that "[e]ven if Defendants' counsel's division question amounted to evidence (it did not), that would have resulted in a $.60 verdict for Plaintiff," so the jury's $200 damages award could not have been calculated to reflect the value of a single photo. ECF No. 56 at 9. Plaintiff also argues that any issues on which Jones was "discredited" by her testimony are irrelevant to the issue of damages. ECF No. 60 at 4.

The Court takes strong exception to counsel's suggestion that Plaintiff established as an undisputed fact that a willing buyer would have paid $23,976 to use the single photo at issue in this case. A case that Plaintiff cites, ECF No. 56 at 8, *Epic Systems Corp. v. Attachmate Corp.*, provides helpful guidance on the issue of damages in a copyright case:

> Calculating damages based on 'fair market value' is the preferred approach taken in cases involving the unauthorized use of copyrights . . . . *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003) . . . ; *Deltak, Inc. v. Advanced System, Inc.*, 767 F.2d 357, 364 (7th Cir. 1985). . . . In calculating the fair market value of an unauthorized use, courts will attempt to determine the price to which a willing buyer and a willing seller would have agreed had they engaged in an ex-ante "hypothetical negotiation" for the specific type of unlicensed use at issue. *McRoberts Software, Inc.*, 329 F.3d at 566. . . . Some of the factors commonly considered [in this analysis] include "past arms-length licensing practices by the copyright owner or the infringer for similar uses and 'benchmark' licenses by others in the industry may be useful." *Gaylord* [*v. United States*], 777 F.3d [1363,] 1368 [(Fed. Cir. 2015)]. Moreover, "the court is not constrained to accept particular practices of the parties on either side—either to allow owners to charge what they would like to have charged if unconstrained by reality or to shield infringers from paying fair market value for what they took." *Id.* (internal citations and quotations omitted).

No. 15-CV-179-BBC, 2016 WL 3703084, at *2 (W.D. Wis. July 8, 2016). The Court instructed the jury in this case that it could use this fair market value approach in determining actual damages. ECF No. 49 at 16–17.[9]

_____

[9]The jury was also permitted to consider "[a] decrease in the market value" of the photo because of the infringement and profits that Plaintiff would have made without the infringement as measures of actual damages. ECF No. 49 at 17.

So the focus is not just whether Jones's testimony about licensing fees is or is not dispositive, but more broadly whether $200 reflects the fair market value of Plaintiff's photo (or some other measure of Plaintiff's damages) based on all the evidence adduced at trial and all reasonable inferences that can be drawn from it.

First, the Court finds that Jones's testimony was *not* entirely dispositive on the matter of actual damages, because accepting it would require the jury to assume facts not in evidence. As one of the cases Plaintiff relies on states, Plaintiff's annual licensing fees are only a "useful proxy" of its actual damages. ECF No. 56 at 9 (quoting *Patriot Fine Foods LLC*, 2022 U.S. Dist. LEXIS 205649, at *10). That district court specifically noted that Plaintiff had not established "whether any licensor ha[d] paid that amount to utilize a single photograph in the library." *Id.* Similarly, here, Plaintiff established that its current customers have agreed to pay its annual licensing fees, but it did not establish that any customer/licensor had paid or would pay that amount to utilize a single photo. Adopting Plaintiff's position would require the jury and the Court to assume a fact that was not established and that, frankly, goes against all reason: that a would-be licensor (in this case, a single family-owned neighborhood grocery store) would pay about $12,000 a year to utilize a single photo.

Second, and more importantly, the jury also could reasonably infer from the evidence that $200 reflects the fair market value of Plaintiff's photo or otherwise is an accurate measure of Plaintiff's damages. As the authorities above suggest, determining the price to which a buyer and seller would have agreed for a one-time use of a single photo is not driven solely by the price that the seller (here, Plaintiff) names, and the jury was not required to make the unreasonable assumption that a licensor in NOFAL's

position would have agreed to Plaintiff's licensing fee. *Epic Sys.*, 2016 WL 3703084, at *2 (noting that the analysis focuses on "the specific type of unlicensed use at issue" (citing *McRoberts Software, Inc.*, 329 F.3d at 566 and *Gaylord*, 777 F.3d at 1368)). Further, just because Plaintiff's licensing model does not permit licensing of single photos does not mean that the cost of a single photo should be discounted as a measure of actual damages. *Id.* ("[T]he court is not constrained to . . . allow owners to charge what they would like to have charged if unconstrained by reality . . . ." (quoting *Gaylord*, 777 F.3d at 1368)).

Plaintiff raises the fair point that the jury did not award the cost of a single photo as its actual damages and instead settled on an amount somewhere between the cost of a single photo and the cost of two twelve-month subscriptions to Plaintiff's library. But the Court finds no basis to suggest that this requires reversal of the jury's damages award and a new trial. It seems likely that the jury was attempting to award Plaintiff more than the cost of a single photo while also penalizing Defendants and recognizing that no willing buyer would have agreed to pay Plaintiff's twelve-month subscription fees for a one-time use of a single photo. This is, after all, essentially what Plaintiff asked for in its November 2021 demand letter: that Defendants pay some amount in excess of what a lawful licensor would have paid, to reflect the unlawful infringement. *See* ECF No. 57 at 70 (Jones testimony regarding the demand letter) ("You're punished by having to pay more."). Or perhaps the jury was attempting to award the value of a single photo, accounting not only for the raw mathematical value of a single photo out of a library of 18,000, but also the time and effort that went into creating, copyrighting, and maintaining the single photo—facts to which Jones testified. These are both appropriate ways of protecting the

interests of the copyright owner while not "shield[ing] infringers from paying fair market value for what they took." *Epic Sys.*, 2016 WL 3703084, at *2 (quoting *Gaylord*, 777 F.3d at 1368).

Alternatively, perhaps the jury found that $200 fairly accounted for the decrease in the market value of Plaintiff's copyrighted work. Jones testified that the use of a single one of Plaintiff's photographs "greatly reduce[s] the value of the library." ECF No. 57 at 94. Perhaps the jury credited this and—although Jones refused to speculate on the degree of reduction in the value of the library—concluded that, despite a single photo having only nominal value when viewed as part of a library of 18,000, the infringing use lowered the value of Plaintiff's library by $200. All of the above-stated conclusions were reasonable ones to draw in light of the evidence and were "within the province of the jury[,] as the trier of fact," to draw. *Blumenfeld*, 921 F.2d at 118 (citation omitted).

It is true, as Plaintiff points out, that "Defendants did not offer any expert testimony concerning the value of a single photograph or the entirety of Plaintiff's library." ECF No. 56 at 7. But Plaintiff does not suggest, let alone demonstrate, that the introduction of such evidence would have changed the jury's assessment of actual damages.[10]

_____

[10]To the contrary, it appears that such evidence would, in all likelihood, have supported the jury's damages award rather than undermine it. *See, e.g.*, *Pricing & Subscriptions*, GALLERY STOCK, https://www.gallerystock.com/pricing [https://perma.cc/K6KY-96LH] (last visited Apr. 7, 2025) (providing a one-time use of stock photo in social media starting at $65 "based on factors such as . . . exclusivity[] and geographic distribution"); *Pricing*, SHUTTERSTOCK, https://www.shutterstock.com/pricing (last visited Apr. 7, 2025) (providing a two-pack of stock photos with "enhanced" licensing at $159, an annual subscription starting at $29 per month, or a month-to-month subscription starting at $49 per month); *Plans and Pricing*, GETTY IMAGES, https://www.gettyimages.com/plans-

For all these reasons, the Court finds that the jury's actual damages award was supported by the record and all reasonable inferences to be drawn therefrom. Accordingly, the size of the actual damages award is not a basis to order a new trial.

### 4.3    Statutory Damages and Willfulness

Having concluded that the jury's conclusion that Jaber was not vicariously liable and its award of actual damages were not against the weight of the evidence, the Court can make quick work of Plaintiff's remaining arguments. As a threshold matter, these arguments are brief and therefore likely waived as completely underdeveloped. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006))). But they also have no merit.

Plaintiff says that the Court's decision to exclude evidence of Defendants' statements in discovery that were inconsistent with Jaber's testimony at trial resulted in an unfair trial because it prevented the jury from accurately assessing whether Defendants' conduct was willful and accordingly impacted its $1,000 statutory damages award. ECF No. 56 at 14. The Court disagrees, for reasons already explained: while it is true that Jaber made incorrect statements in discovery, he corrected the mistakes and testified truthfully to the jury even though doing so was not to his benefit, and the jury was entitled to credit that trial testimony. This would be true even if the Court had admitted the evidence to which Plaintiff refers.

---

and-pricing [https://perma.cc/8MWD-N6LF] (last visited Apr. 7, 2025) (providing for download of a single image starting at $199).

Plaintiff's argument that the trial was unfair because the jury's allegedly improper determination of actual damages infected its determination of statutory damages, *id.*, also fails. As already explained, the jury's actual damages award was not improper. Plaintiff says that the actual damages award affected consideration of "the revenues that Plaintiff lost because of the infringement," *id.*, one of several factors guiding the jury's discretion in determining statutory damages. ECF No. 49 at 17. For the same reasons explained above, it is not reasonable to conclude that Plaintiff lost over $24,000 in revenue (licensing fees) from the infringing use of a single photo, because Plaintiff did not establish that $24,000 was the fair market value of this use.

The Court therefore cannot conclude that the trial was unfair to Plaintiff for either of these reasons.

5.     **CONCLUSION**

For all the reasons stated above, Plaintiff's motion for a new trial or to alter or amend the judgment will be denied.

Accordingly,

**IT IS ORDERED** that Plaintiff Prepared Food Photos, Inc.'s motion for a new trial and/or to amend judgment, ECF No. 56, be and the same is hereby **DENIED.**

Dated at Milwaukee, Wisconsin, this 7th day of April, 2025.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge